# Exhibit G
### *(Dkt. # 224 - Defendant's Motion for a New Trial)*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
BEAUFORT DIVISION

| | |
|---|---|
| United States of America, | Case No. 9:22-cr-00658-RMG |
| v. | |
| Russell Lucius Laffitte, | |
| Defendant. | |

**Defendant's Motion for a New Trial and for Judgment of Acquittal**

Following nearly ten hours of deliberations, two jurors were improperly dismissed and replaced with alternates, only to have a newly constituted jury return a guilty verdict 40 minutes later. One of those jurors requested removal based on her dissenting status, and the error in her removal constitutes a miscarriage of justice. The Court should grant Mr. Laffitte a new trial because it is in the interests of justice under Fed. R. Crim. P. 33(a).

A new trial is also warranted on other grounds—grounds that both independently and cumulatively undermined the validity of the newly constituted jury's verdict. The Court erred in allowing the Government to intentionally distort the factual distinction between Arthur Badger and the Estate of Donna Badger; in refusing to admit evidence involving dissent and disagreement within Palmetto State Bank motivating board members' testimony; in refusing to admit evidence of Alex Murdaugh's illegal negotiation of checks with Bank of America; and in failing to instruct the jury on Mr. Laffitte's advice-of-counsel defense given the evidence presented. As a result, Mr. Laffitte also moves for a new trial on these grounds under Fed. R. Crim. P. 33(a).

Finally, Mr. Laffitte renews his motion for a judgment of acquittal under Fed. R. Crim. P. 29(c) for the grounds raised at trial and based on the insufficiency of the Government's evidence as outlined below.

## Table of Contents

Standard of Review ...................................................................................................3

Argument ..................................................................................................................4

I.  The Court erred in dismissing jurors following nearly ten hours of deliberations only to have a newly constituted jury return a guilty verdict 40 minutes later .................. 4

  A.  The Court improperly excused the jurors. ............................................ 7

  B.  Viable alternatives short of replacing the jurors existed ...................... 14

  C.  The Court failed to properly instruct the jury to begin deliberations "anew." ................................................................................................. 16

  D.  Mr. Laffitte was prejudiced by excusing the jurors. ............................. 16

II.  The Court erred by allowing the Government to distort the factual distinction between Arthur Badger and the Estate of Donna Badger and by prohibiting Mr. Laffitte from arguing against the Government's mistake of law and fact. ...................... 18

III.  The Court erred in refusing to admit evidence involving dissent and disagreement within the Bank motivating board members' testimony and evidence of Murdaugh's illegal negotiation of checks with Bank of America. ................................... 24

IV.  The Court erred by failing to instruct the jury on Mr. Laffitte's advice-of-counsel defense given the evidence presented by the Government and the defense. .................... 29

V.  The evidence presented on the six counts is legally insufficient. ..................................... 32

Conclusion ..............................................................................................................34

## Standard of Review

Mr. Laffitte moves for a new trial under Fed. R. Crim. P. 33, and/or a judgment of acquittal under Fed. R. Crim. P. 29. Those provisions require that this Court apply different standards in reviewing the motion. Courts "may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). A new trial is warranted "in a variety of situations in which the substantial rights of the defendant have been jeopardized by errors or omissions during trial." *United States v. Ring*, 768 F. Supp. 2d 302, 310 (D.D.C. 2011) (internal citation omitted). The "interests of justice standard" is met where substantial legal error has occurred during trial. *United States v. Wiggins*, 784 F. App'x 919, 921 (6th Cir. 2019). New trials should be granted to avoid a miscarriage of justice. *United States v. Martinez*, 763 F.2d 1297, 1313 (11th Cir. 1985).

Unlike a Rule 29 motion, this Court need not view the evidence in the light most favorable to the Government and can make its own credibility determinations. *United States v. Arrington*, 757 F.2d 1484, 1485 (4th Cir. 1985). "When considering a Rule 33 motion, a district court is owed great deference because it sits, in effect, as a thirteenth juror. A trial judge's superior vantage point is nowhere more certain than in assessing the overall dynamics of a trial, including . . . the overall weight of the evidence." *United States v. Kang*, No. 2:05-CR-928-DCN, 2011 WL 165403, at *2 (D.S.C. Jan. 19, 2011) (quotation omitted).

Mr. Laffitte also moves for judgment of acquittal under Rule 29. "A defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later." Fed. R. Crim. P. 29(c)(1). Under Rule 29, the Court should view the evidence in the light most favorable to the prosecution and then decide whether any rational jury could find the essential elements of the crimes beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

## Argument[1]

### I.    The Court erred in dismissing jurors following nearly ten hours of deliberations only to have a newly constituted jury return a guilty verdict 40 minutes later.

Faced with several notes from jurors expressing disagreement with one or more jurors, and beyond that, the prospect that at least one felt they were being pressured by others, the Court dismissed two jurors.  Mr. Laffitte respectfully submits that this decision constituted error, and deprived him of one of his most cherished rights:  the right to be judged by a fair, unanimous, and impartial jury.  While Mr. Laffitte consented to the removal of one juror based on the information he had at the time and after the Court made clear that a recess for the evening was not acceptable, counsel was neither asked to consent to the removal of the second, and indeed, was not even present when that decision was made.  As shown below, that alone constitutes error.  The ultimate result was to materially alter the composition of the jury after ten hours of deliberations, which manifested itself when the new constituted jury returned a verdict 40 minutes later.  (Tr. 2171:9.)

It is beyond question that any actions impacting the fairness or impartiality of a jury impact "substantial rights" of the defendant within the meaning of decisions construing Rule 33. "In all criminal prosecutions," the Constitution guarantees the right to trial "by an impartial jury."  U.S.

---

[1] After the Government rested its case, Mr. Laffitte moved for a judgment of acquittal under Fed. R. Crim. P. 29.  (Rough Trial Tr. 246:20–259:19, Nov. 15, 2022.)  The defense argued there was insufficient evidence to sustain a conviction for any of the crimes charged, including lack of evidence of the elements necessary to establish a crime.  (*Id.*)  The Court denied the motion, concluding that the government presented a prima facie case.  (*Id.* at 253:2–7 (Count 1); 254:16–21, 258:15–259:19 (Count 2); 249:2–11 (Count 3); 250:2–25 (Count 4); 256:2–6 (Count 5); 258:1–14 (Count 6).)  After he rested his defense, Mr. Laffitte renewed his motion on the same grounds, (Tr. at 1959:15–19, November 21, 2022), and on additional grounds set forth in a supplemental written filing also argued orally to the Court, (*id.* 1955:6–1957:8; Supp. Def.'s Renewed Rule 29 Mot., ECF No. 201), but the Court denied the motion, (*id.* at 1958:20–1959:7.)  Mr. Laffitte maintains the Court's rulings were incorrect.  He incorporates by reference his arguments made during those motions, as well as his oral motion for a mistrial made during the jury's deliberations. (Tr. 2169:25–2170:4; 2171:12–2172:9.)

Const. amend. VI.  "Wherever we might look to determine what the term 'trial by an impartial jury trial' meant at the time of the Sixth Amendment's adoption . . . the answer is unmistakable.  A jury must reach a unanimous verdict in order to convict."  *Ramos v. Louisiana*, 140 S. Ct. 1390, 1395 (2020); *see also* Fed. R. Crim. P. 31(a) ("The verdict must be unanimous.").

Because those crucial Sixth Amendment rights are adversely impacted when jurors are improperly removed, a court must take special care to ensure that jurors are not removed for their disagreement with fellow jurors, and that the decision is made to remove any jurors only in the presence of the defendant.  Accordingly, "[b]ecause a jury must be in universal agreement to convict, it does not take much to see that removing a juror merely because she disagrees with her fellow jurors on the proper outcome of the case would provide an obvious endrun around the unanimous jury verdict guarantee."  *United States v. Litwin*, 972 F.3d 1155, 1169 (9th Cir. 2020).

As a result, the Federal Rules of Criminal Procedure place strict limitations on the substitution of jurors, especially after deliberations have begun.  Rule 24(c)—allowing a court to empanel "alternate jurors to replace any jurors who are unable to perform or who are disqualified from performing their duties"—must be read along with cases warning against taking action that would impact a defendant's Sixth Amendment rights.  Until 1999, alternate jurors had to be discharged once the jury retired to deliberate.  Wright & Miller, 2 Fed. Prac. & Proc. Crim. § 388 (4th ed.).  Under the current rule, courts have discretion to substitute an alternate juror mid-deliberation so long as the Court ensures "that a retained alternate does not discuss the case with anyone until that alternate replaces a juror or is discharged," and the Court instructs "the jury to begin its deliberations anew" after the replacement by an alternate juror.  Fed. R. Crim. P. 24(c)(3).

There are two important limitations on Rule 24.  First, courts must make the decision to replace jurors in the presence of the parties and counsel after appropriate notice.  *United States v.*

*Runyon*, 707 F.3d 475, 517 (4th Cir. 2013) ("We thus hold that [the defendant] should have been present when the district court decided to excuse and replace [the juror].").

Second, even if the defendant is present, the authority to substitute is not unfettered. "Rule 23(b) of the Federal Rules of Criminal Procedure permits a trial court to excuse a deliberating juror for good cause." *United States v. Fattah*, 914 F.3d 112, 149 (3d Cir. 2019). "Good cause does not exist when there is reasonable but sustained disagreement about how a juror views the evidence." *Id.*; *United States v. Hernandez*, 862 F.2d 17, 23 (2d Cir. 1988) (finding dismissal of juror improper when unclear whether juror's "disagreement with his colleagues was not the cause of his removal"). And courts "may not dismiss a juror during deliberations if the request for discharge stems from doubts the juror harbors about the sufficiency of the evidence.'" *Litwin*, 972 F.3d at 1168–69 (quoting *United States v. Symington*, 195 F.3d 1080, 1085 (9th Cir. 1999)).

Because the line between good cause and doubts about the Government's case may not always be clear cut, courts have taken a cautious approach to dismissing jurors, especially holdout jurors: "[I]f the record evidence discloses *any possibility* that the request to discharge stems from the juror's view of the sufficiency of the government's evidence, the court must deny the request. Any other holding would fail to protect adequately a defendant's right to be convicted only by a unanimous jury." *United States v. Brown*, 823 F.2d 591, 596 (D.C. Cir. 1987) (citations omitted) (emphasis added); *Wofford v. Woods*, 969 F.3d 685, 707–08 (6th Cir. 2020) (applying *Brown* and outlining similar tests applied in the Second, Third, Ninth, and Eleventh Circuits). "The animating principle expressed throughout *Brown* is that a defendant's Sixth Amendment right is infringed when there is some causal link between a juror's holdout status and the juror's dismissal." *United States v. Ginyard*, 444 F.3d 648, 652 (D.C. Cir. 2006).

Here, issues surrounding removal of two jurors must be viewed in the context existing when the Court made those rulings. The jury was brought into the courtroom at 9:13 a.m. that morning. (Tr. 2111:6–7.) Close to 8:00 p.m., a series of notes reflected that some jurors were complaining about others, one was feeling pressured to change her vote, and the environment was creating serious anxiety on the part of at least one juror who was removed, Number 88. The Court did not replace the two jurors until around 8:30 p.m. (Tr. 2170:15–16.) Because the jury pool included jurors from as far as two hours away, by the time the court was considering interviewing the affected jurors, many had been serving for more than thirteen hours. They were tired and frustrated to the point that jurors were feeling immense pressure from their colleagues. Despite Mr. Laffitte's request that they just return in the morning, the Court wanted deliberations to continue that night. (Tr. 2158:13—2159:21.) Yet there was no reason why deliberations in the face of the issues raised had to continue that evening, and it was legal error to not provide an alternative option apart from replacing two members of the jury under the circumstances.

A.    **The Court improperly excused the jurors.**

In order to protect Mr. Laffitte's right to a unanimous verdict, the Court should have tried to preserve the empaneled jury and declare a mistrial when it realized a juror's request for dismissal stemmed from animosity and pressure being brought to bear on her views on the case. *See Litwin*, 972 F.3d at 1171 ("Courts . . . have thus reversed convictions where the record indicated an unacceptable risk that a juror was dismissed for reasons stemming from her views on the case"). Instead, the record reflects that the Court dismissed the jurors at first opportunity, without finding out whether the first juror wanted to continue deliberating and in the face of testimony that the second juror was resolute in her position as a holdout juror and wanted to stay. It is in the interest of justice that Mr. Laffitte seeks a new trial.

The Court first made counsel aware of an issue among jurors around 7:45 p.m. the night of November 22, 2022, when it read in open court two notes from a juror who informed the Court she needed to take an antibiotic around 7:21 p.m. (but noted she could delay up to two hours) and who was also "feeling pressured to change [her] vote. (Tr. 2157:24–2158:6.) The notes did not indicate the juror wished to be released from the panel. In response, the Court's first "instinct is that we have alternates and we should get to a verdict, and that it is not practical to get her medicine and drive back." (Tr. 2158: 8–11.) The Court's statement that it was not practical to get the juror her medicine that night appears unfounded, both by the lack of a record on the matter and the fact that the juror lived in Charleston, according to the questionnaire she submitted to the Court. (ECF No. 127 at 249 (Juror No. 93).) At the time, counsel did not know which juror wrote the note and thus had no way of knowing the practicality of obtaining the antibiotic (either by the juror driving to get it, having someone bring it to her, or recessing until the morning). Given the unknown practicality and pressure the juror was feeling over her vote, Mr. Laffitte asked if the jury could break for the evening and return in the morning. (Tr. 2158:16–18.) The Government objected to breaking for the night given there was no indication the jury was "having issues deliberating" and the "impending holiday," and the Court agreed, asserting that "forcing [jurors] to come back tomorrow" was not in "anybody's interest" and would push jurors to a verdict. (Tr. 2159:9–21.)

The third note to the Court from a group of jurors (potentially all the other jurors), received within minutes of the first two notes, made it more evident deliberations had become contentious, and there were issues among the jury panel that needed to be addressed—including one juror being pressured to change her vote (Note 2) and potentially another juror who a group believed disagreed with the Court's final charge, had been previously bullied on a jury, and was "hostile to hearing

any debate from certain other jurors" (Note 3). (*See* Tr. 2158:3–4; 2160:6–18.)[2] The Court then received a fourth note from a juror who was experiencing anxiety and asked for an alternate to be called in. (Tr. 2160:21–24.) From the note alone, it was unclear what triggered the anxiety or whether it could be alleviated.

Neither the Court nor the parties were adequately informed, based only off the content of notes, as to the viability of the jurors. Nor was it apparent which juror was the allegedly hostile juror, and the Court confirmed it wanted to speak first-hand with them. (Tr. 2166:1–7.) As a result, the Court proposed, "with the consent of the parties . . . to set up a place where I will take a court reporter, and without anyone present but the court reporter, I will ask the juror if there's a problem" and asked for "the consent of the parties *for me creating a record to question the juror.*" (Tr. 2166:3–7; 2166:14–15 (emphasis added).) The Government then asked the Court to create a record with the anxious juror and Mr. Laffitte consented to the Court "creating a record to question the juror." (Tr. 2166:14–15.) Mr. Laffitte's expectation, therefore, was that the court would look into the issues of hostility and anxiety, make a record, and report back.

The Court then took a recess to make its record. Although Mr. Laffitte consented to the removal of the juror needing her antibiotic, (Tr. 2169:25–2170:4), the Court dismissed that juror *and* Juror Number 88 during the recess. And there is only a record of the court speaking *in-camera* with one juror—Juror Number 88—who was then dismissed with no prior notification to counsel or Mr. Laffitte. Again, before the recess Mr. Laffitte consented to the judge creating a record to question the jurors—he did not consent to the automatic, off-record removal of the juror who needed her antibiotic and he never consented to the removal of the juror who reported feeling

---

[2] As it turns out, this third note was prepared while the juror needing her antibiotic had left the deliberation room.

anxious. Nor was there any warning before the *in-camera* interview that such an inquiry would result in immediate removal from the panel. Based on the court's desire to identify and interview the alleged hostile juror, plus the evidence one juror was feeling pressured to change her vote and another experiencing anxiety, Mr. Laffitte reasonably expected a record would be made of *both* jurors to provide the necessary detail to enable his counsel to (1) understand whether either juror was the "hostile" juror who the group alleged would not deliberate and (2) take an informed position on removal of the anxious juror and request alternatives to removal (including a renewed request for a break or mistrial, if necessary).

The Court, therefore, erred when it made the decision to dismiss and replace both jurors *in-camera*, outside the presence of Mr. Laffitte or counsel and without providing counsel adequate notice as to the removal of Juror Number 88. *United States v. Runyon*, 707 F.3d 475, 517 (4th Cir. 2013) ("We thus hold that [the defendant] should have been present when the district court decided to excuse and replace [the juror]."); *United States v. Camacho*, 955 F.2d 950, 952–53 (4th Cir. 1992) (holding that a defendant's constitutional and Rule 43 right to be present at jury impanelment extends to removal of jurors); *People v. Patterson*, 832 P.2d 1083, 1085 (Colo. App. 1992) (finding a defendant's right to a fair trial impaired when "the defendant [was] not present when the actual substitution was made, [and] neither he, nor his counsel, were aware of the manner in which it was accomplished until after the deliberations had been concluded.").

Upon returning from recess the Court "report[ed] back to counsel" that during the break it replaced the "juror regarding the medicine." (Tr. 2168:17–19.) No other details were provided about the dismissal nor information about whether the Court asked the juror *in-camera* whether there was bullying occurring in the jury room. Even if the Court's plan were always to replace her to take her medicine, it would be pertinent for all parties to know whether an alternate was being

sent into a potentially toxic, bullying environment (and whether a curative instruction or some other reminder could be warranted before beginning deliberations anew). The Court's removal of the juror without Mr. Laffitte or counsel's presence, and without creating any record of the *in-camera* dismissal proceeding, unfairly prejudiced Mr. Laffitte. *See United States v. Hanno*, 21 F.3d 42, 48 (4th Cir. 1994) ("[T]he district court erred in not recording the proceedings in which jurors were removed.").

Next, the Court explained that it released the juror experiencing anxiety because she could not fulfill her duties and deliberate. (Tr. 2168:20–25.) Defense counsel objected to the removal and requested a mistrial after the Court explained that the juror was not "physically capable or emotionally capable of going forward." (Tr. 2170:2–9.) Absent any adequate colloquy with the juror, it was impossible to reach an informed decision on whether removal was even required. It is apparent, however, that a mistrial was appropriate in either event, irrespective of Juror 88's ability to continue. If, on the one hand, Juror 88 could have continued, especially if curative measures were taken, then her removal was clearly improper since she could have performed her role. It is just as clear that if she could not continue, it was still improper to dismiss her given the decision to do so was made without Mr. Laffitte present, and because her request for dismissal stemmed from her dissenting position—other jurors had essentially bullied her off the jury in order to reach unanimity. *See United States v. Samet*, 207 F. Supp. 2d 269 (S.D.N.Y. 2002).

To be sure, the Court commented that "I didn't think I had any choice. We never got into what's going on in the jury room or anything like that." (Tr. 2170:9-11.) The Court did not disclose more detail about the conversation with the juror, and indeed virtually no details were available to the Court based on its interview of Juror No. 88 and having conducted no interview with Juror No. 93. Since then, however, a review of the short conversation between the Judge and

Juror No. 88, reveals that the Juror was having anxiety *due to the other jurors' reactions to her decisions* and did *not* want to be replaced:

> THE COURT: I received a note that you told me: Can you please call an alternate as I am experiencing anxiety and unable to clearly make my decision. I can provide more information as needed, if necessary." You want to share anything with me? But don't tell me anything about the deliberations themselves. Okay?
>
> JUROR NO. 88: Give me a minute.
>
> THE COURT: Take your time.
>
> JUROR NO. 88: I was very proud to do this. At one point, I thought I wouldn't be able to. But I am prescribed medication and **I've been taking notes clearly. I have my decisions that I made. But I started to feel very anxious due to some of the reactions to my decision.**
>
> THE COURT: Do you feel like you can perform, or do you want me to replace you with an alternate?
>
> JUROR NO. 88: **Your Honor, I don't want to be replaced**, but -- and I'm usually very strong when someone is butting up, but I don't want to be trialed (sic) for my decision.
>
> THE COURT: Well, whatever decision you make is your call.
>
> JUROR NO. 88: Yes, sir.
>
> THE COURT: The issue is, are you able to perform your duties as a juror?
>
> JUROR NO. 88: At this point, no.
>
> THE COURT: Okay. I'm going to honor your request to replace you then.

(*In-Camera* Tr. 2:8–3:3, Nov. 22, 2022.) This was the exact situation the Court had told the parties it wanted to avoid: "I don't want anybody else ganging up on somebody and trying to bump them off a jury. . . . . I can't let a juror be bumped out one way or the other who says, that's not accurate,

I'm fully participating, they just don't agree with me. That -- you know, that's not a juror I remove. I mean, that's a -- you know, I tell them in my charge hold your convictions whatever that is."  (Tr. 2164:25–2165:2; 2165:12–17.)

It was inappropriate to make the decision to remove the juror without Mr. Laffitte or his counsel present.  *See Camacho*, 955 F.2d at 952–53.  The record also offered an inadequate basis for making that decision.  The Court had an obligation to develop an adequate record to support that the juror was not being removed for improper reasons. *See Hanno*, 21 F.3d at 48.  Although Mr. Laffitte respects the Court's decision to refrain from intruding on the jury's deliberations, the cursory interview made it impossible to (l) disregard evidence that the juror was being pressured to change her vote, and (2) address her contradictory statements about her desire to continue.

In fact, the only information available to the Court shows that the juror was being removed based on her disagreement with the others.  Consistent with the Court's original instincts, the record reveals that the juror's request for dismissal stemmed from her dissenting status.  Not only did the Court hear from the dismissed juror that she was being pressured by others, but it had even received a note from the other jurors criticizing the dismissed juror.[3]  (*See* Tr. 2160:6–18.)  At a minimum the juror's and that comment should have been carefully scrutinized to avoid other jurors bumping her from the original jury just so they could go home.  By her admission, Juror 88 was a holdout and felt like she was being placed on trial by the other jurors, who were "butting up" to her position.  (*In-Camera* Tr. 2:19–22 ("Your Honor, I don't want to be replaced, but -- and I'm usually very strong when someone is butting up, but I don't want to be trialed (sic) for my

---

[3] It is unclear from the record which dismissed juror was the allegedly "hostile" juror referenced in the group note to the Court.  After removing the two jurors, the court stated:  "And the decisions I've made resolved the other issue, so I didn't have to address it.  That was the longer one.  I never had to address it.  I understood that it took care from those other decisions."  (Tr. 2169:2–5.)

decision.").) Because there is a causal link between her views on the evidence and her request for dismissal, the Court's replacement of her on the jury infringed on Mr. Laffitte's Sixth Amendment right to a unanimous jury. *See United States v. Brown*, 823 F.2d 591, 597 (D.C. Cir. 1987) (finding district court erred by dismissing juror where there was a possibility "that [the juror's] desire to quit deliberations stemmed from his belief that the evidence was inadequate to support a conviction"); *United States v. Ginyard*, 444 F.3d 648, 652 (D.C. Cir. 2006) ("The animating principle expressed throughout *Brown* is that a defendant's Sixth Amendment right is infringed when there is some causal link between a juror's holdout status and the juror's dismissal."). To correct the Court's error in overruling Mr. Laffitte's objection and refusing his request for a mistrial, the Court should enter a judgment of acquittal and/or grant him a new trial.

### B. Viable alternatives short of replacing the jurors existed.

The Court stated to counsel it did not have "any choice" but to remove Juror No. 88. But when faced with a juror who shares she wants to continue but has anxiety stemming from her dissenting opinion there certainly *are* choices. Especially because the issue arose late at night (at around 9:00 p.m.), after deliberating for about ten hours, the Court erred in rejecting the prospect of adjourning for the night. The sole justification for insisting on moving forward with alternate jurors and asking the jury to begin deliberating anew at 9:00 p.m. was the concern for the impending holidays. That is hardly a justification for a decision which ultimately violated one of Mr. Laffitte's most cherished rights.

The Court also offered no sufficient reason for dismissing this obvious approach, or others. The Court made no effort to encourage the juror to stay. It did not ask her if she felt like she could perform her duties after a break or the next morning, or if the court instructing the jury that disagreement is okay and to conduct deliberations in a proper fashion free of hostility or

intimidation would have alleviated her anxiety and allowed her to continue. The Court instead dismissed her the minute she explained that she could not continue deliberating *in that moment*, without notice to the parties or consideration of other options. Doing so without trying to preserve the original jury was legal error that deprived Mr. Laffitte of a fair trial, court presence, and due process, and violated his right to a unanimous jury. *Compare Perez v. Marshall*, 119 F.3d 1422, 1428 (9th Cir. 1997) (finding good cause to remove a juror where "[t]he record reflects that the trial judge took great pains to preserve the originally empaneled jury. He interviewed [the juror] at length and offered alternatives to ease the stress of deliberations. He also encouraged her to continue deliberating and steadfastly to maintain her position if she believed she was correct.").

As Mr. Laffitte suggested, the jury could have been excused for the night. If the Court had taken this approach, it would have not only allowed Juror No. 88 to continue, but the other juror could have secured her medicine *and* the temperature of the deliberation room could have cooled. (Tr. 2158:16–17.) Allowing for a cooling-off period was the court's approach in *United States v. Samet*, 207 F. Supp. 2d 269 (S.D.N.Y. 2002). There, a juror who had been deliberating for three days requested an alternate to replace her because she was experiencing verbal abuse and could not deliberate or be fair anymore. *Id.* at 271. After three colloquies with the juror and consulting the parties, the court dismissed the jury to return after the weekend for a "cooling off period" and instructed the jurors "to think, also, over the weekend about what I said about the juror's duty being to deliberate, to listen, to talk, to reason, to change your mind if you're persuaded, and to hold your own view even if you're in the minority, if you're only one person, to hold your own views if they're really and truly your views." *Id.* at 272–75; *see also Perez v. Marshall*, 119 F.3d 1422, 1425 (9th Cir.1997) (excusing jury for the evening after issues about an emotional juror arose and waiting until the next morning to determine whether the juror was fit to continue.).

### C.    The Court failed to properly instruct the jury to begin deliberations "anew."

"If an alternate replaces a juror after deliberations have begun, the court must instruct the jury to begin its deliberations anew."  Fed. R. Crim. P. 24(c)(3).  The Court brought the reconstituted jury back into the courtroom and instructed them to "begin your deliberations again," but then expressly told them that they only needed to bring the alternates up to date as to the discussions, which is hardly the same thing as starting over.  (Tr. 2170:17–25.)  Accordingly, when the Court told the jury that it needed to "bring your other two, the two jurors who have not been included, into those discussions," it failed to instruct the jury it had to begin deliberations with a clean slate.  (Tr. 2170:21–23.)  That is far from  instructing the jury to begin deliberations with a clean slate.  It was not enough to instruct the jury that the ten original jurors were "more advanced than the other two" and that the reconstituted jury "need[ed] to walk through those [deliberations] again."  (*Id.*)  If anything, that suggested to the jury that they could simply review their prior actions, not start over.  The Court's instruction falls short of the requirement of Rule 24 and fails to avoid the prejudice of bringing two new jurors into a heated debate with ten others longing to go home after being at the courthouse for nearly twelve hours that day.

### D.    Mr. Laffitte was prejudiced by excusing the jurors.

Here, even apart from the process to remove two jurors, the evidence shows that Mr. Laffitte was prejudiced in that the jury did not begin their deliberations anew or on a clean slate.  The original jury deliberated for about ten hours, reviewed over 300 documents, including tapes, sent two notes with questions about exhibits, and they still had not arrived at a verdict.  After two jurors were replaced, the jury came back with a verdict in just under forty minutes.

"Juror coercion can indeed arise not only from trial court instructions but also from other jurors who are forced to start deliberations anew with an alternate."  *United States v. Scarfo*, 41

F.4th 136, 208 (3d Cir. 2022). "When an alternate is empaneled after jury deliberations have commenced, it is not unnatural to worry 'that the 11 original regular jurors may have already made up their minds to convict and, together, may coerce the alternate juror into joining in their position.'" *Id*. (quoting *United States v. Kopituk*, 690 F.2d 1289, 1310 (11th Cir. 1982)). "The inherent coercive effect upon an alternate juror who joins a jury that has . . . already agreed that the accused is guilty is substantial." *United States v. Lamb*, 529 F.2d 1153, 1156 (9th Cir. 1975) (en banc); *see also* Fed. R. Crim. P. 23(b) advisory committee's notes (1983 amendment) (recognizing, even after receiving an instruction to begin deliberations anew, jurors may be "influenced by the earlier deliberations," and the alternate may be "somewhat intimidated by the others by virtue of being a newcomer to the deliberations").

How long the original jury has deliberated bears great weight when determining whether a defendant has been prejudiced by substituting alternates. Relevant considerations include "the length and complexity of the trial; the amount of time the jury had deliberated before a juror was removed; the steps that the district court took to ensure that the alternate had not been exposed to extrinsic information about the case; and whether the remaining jurors began their deliberations anew after the alternate was substituted." *United States v. Ozomaro*, 44 F.4th 538, 546 (6th Cir. 2022) (quoting *United States v. Oscar*, 877 F.3d 1270, 1289 (11th Cir. 2017)); *United States v. Virgen-Moreno*, 265 F.3d 276, 289 (5th Cir. 2001) (considering, among other factors, "the length of the jury's deliberations . . . and the district court's instructions to the jury upon the substitution to begin its deliberations anew.").

There is just no practical way that the reconstituted jury began its deliberations from a fresh slate. Over three weeks, the Government and defense introduced a combined 312 exhibits covering six counts and played an eight-minute audio clip for the jury during trial and again during

deliberations.  While the Court may have instructed the reconstituted jury to "bring your other two, the two jurors who have not been included, into those discussions," and that the jury "need[ed] to walk through those [deliberations] again," (Tr. 2170:20–25), there is no practical way the jury could have actually done so.  *See United States v. Lamb*, 529 F.2d 1153, 1156 (9th Cir. 1975) ("That impermissible coercion upon the alternate juror in this case was manifestly inherent, and that there was not the conscientious, careful reconsideration by the twelve of the newly constituted jury would seem apparent from the fact that, despite the district judge's instruction to the jury to 'begin at the beginning,' a jury that had required almost four hours to reach its initial verdict needed, after being reconstituted, only twenty-nine minutes to find the appellant guilty a second time.").[4]  For the reasons set forth above and the large discrepancy in the time the original jury deliberated in contrast with the reconstituted jury, the Court should enter judgment of acquittal and/or grant a new trial.

\* \* \*

Undoubtably the Court was in an unenviable position.  (Tr. 2164:12–15.)  But its decision under the circumstances was legal error and deprived Mr. Laffitte to a fair trial, to be present, and due process, and also deprived him of his right to an impartial and unanimous jury.  The Court should enter judgment of acquittal and/or grant a new trial to correct this manifest injustice.

## II.  The Court erred by allowing the Government to distort the factual distinction between Arthur Badger and the Estate of Donna Badger and by prohibiting Mr. Laffitte from arguing against the Government's mistake of law and fact.

Both legally and factually, the Estate of Donna Badger and Arthur Badger are not the same. Yet the Court not only permitted the Government to intentionally confuse the jury by lumping

---

[4] Indeed, the alternates did not have the benefit of listening to the audio when the original jury requested to hear it during their deliberations.  (Tr. 2157:2–13.)

them together consistent with its approach to the Second Superseding Indictment, (*see* 2d Superseding Indictment at 3 n.1, ECF No. 61), but the Court's instructions added to that problem. This error warrants a judgment of acquittal and/or a new trial. Indeed, the Court instructed the jury: "Under the circumstance -- under the charges pending, Arthur Badger and the estate of Donna Badger are referred to collectively as the estate of Donna Badger." (Tr. 2125:4–6.) That instruction is factually and legally incorrect, as explained below. This resulted in a fatal variance between the evidence and the charges, and resulted in there being insufficient evidence to convict on those counts.

Mr. Laffitte served as personal representative ("PR") for the Estate of Donna Badger. As Mr. Laffitte's probate expert, Tiffany Provence, explained: as PR for Donna Badger's estate, Mr. Laffitte's responsibility was "to disburse the assets to whomever is the beneficiary of the estate or the beneficiaries of the estate." (Rough Tr. 29:5–30:2, Nov. 18, 2022). As Donna Badger's husband, Arthur Badger would have been a statutory beneficiary of her estate. *See* S.C. Code Ann. § 62-2-102 (establishing spouse as intestate heir); S.C. Code Ann. § 15-51-20 (establishing spouse as beneficiary of wrongful death action). In any event, the Government's own admitted exhibit confirms in two separate paragraphs that Arthur Badger renounced any interest in the estate and waived his right to be a beneficiary:

> Decedent died intestate. The statutory beneficiaries of the wrongful death claim are Arthur Badger, [and Donna Badger's children], who will take these proceeds according to South Carolina law (with the exception of Arthur Badger who has specifically renounced his right as a statutory beneficiary) after deduction of attorneys' fees and costs.
>
> * * *
>
> The beneficiaries of the survival action are Arthur Badger, [and Donna Badger's children], who will take these proceeds according to South Carolina law, with the exception of Arthur Badger who has specifically renounced his right as a statutory beneficiary.

(*See* Donna Badger Probate File, Gov't Ex. 218 at 46–47; Tr. 114:19–115:6 (admitting exhibit).

Although the reason Mr. Badger waived his right to be the PR for his wife's estate—a separate factual and legal issue—was hotly contested, (*see* Rough Trial Tr. 51:10–21, Nov. 18, 2022; *id.* 71:5–17), there is no evidence in the record to dispute that Mr. Badger was not a beneficiary of his late wife's estate. This tracks the testimony at trial. (Rough Trial Tr. 134:7–15 (discussing "the money the children were receiving as the beneficiaries of [Donna Badger's] estate").)

Given these distinctions, the Law Firm filed *two separate* lawsuits: (1) one lawsuit filed by Mr. Laffitte as the PR for the Estate of Donna Badger that resulted in a settlement allocating $4.6 million to wrongful death recovery and $500 as survival proceeds, (Gov't Ex. 112);[5] and (2) one lawsuit filed by Mr. Badger on his own behalf that resulted in a $3.125 million settlement, (Gov't Ex. 23.) Mr. Badger's disbursement sheet allocated $35,000 to Mr. Laffitte, for serving as PR for Donna Badger, and $1.325 million to Palmetto State Bank ("Bank") to fund a structured settlement for Mr. Badger. (*Id.*) Only Mr. Badger and Alex Murdaugh signed his disbursement sheet—Mr. Laffitte did not. (*Id.*)[6]

This distinction makes a legal significance for Count 2 (Bank Fraud) and Count 3 (Wire Fraud):

- Count 2, Bank Fraud alleges Mr. Laffitte "by means of false and fraudulent pretenses, representations and promises, aided and abetted the Bank Customer, by negotiating and distributing a check totaling $101,369.49 to [Hannah Plyler], *knowing the funds*

---

[5] Plaintiff's expert explained the difference between the two causes of action at trial. (Rough Trial Tr. 66:25–67:18, Nov. 18, 2022.) She also explained the allocation and appointment of a neutral PR was done by the Law Firm for strategic reasons. (Rough Tr.71:5–72:24.)

[6] Both the allocation of the damages across the Estate and Mr. Badger's settlements, and the allocation of damages across the claims were strategic decisions made by Mr. Laffitte's counsel at the Law Firm assigned to this case (Alex Murdaugh and Ronnie Crosby), as was the decision to have Mr. Badger withdraw as the PR and renounce his interest in the estate.

*belonged to the Estate of D.B. and/or the Estate's beneficiaries.*"  (2d Superseding Indictment ¶ 14 (emphasis added).)

- Count 3, Wire Fraud alleges Mr. Laffitte "by means of false and fraudulent pretenses . . . obtained funds, as personal representative [of Donna Badger], *belonging to the Estate of D.B. and/or the Estate's beneficiaries*, and distributed $33,789.83 to the Bank Customer's personal account, affecting a financial institution." (*Id.* ¶ 16 (emphasis added).)

To prove bank fraud (Count Two) under 18 U.S.C. § 1344(2), the Government must prove Mr. Laffitte: (1) knowingly executed or attempted to execute a scheme or artifice to obtain money, funds, or property held by a financial institution by means of false or fraudulent pretenses, representations, or promises; (2) the institution was a federally insured or chartered bank; and (3) he did so with the intent to defraud.  *See* 18 U.S.C. § 1344(2); *United States v. Adepoju*, 756 F.3d 250, 255 (4th Cir. 2014) (citations omitted).  For this charge, it is not enough that a defendant obtain property from a bank and simply make a false statement.  There must be "a relational component: The [defendant] must acquire (or attempt to acquire) bank property 'by means of' the misrepresentation.'" *Loughrin v. United States*, 573 U.S. 351, 362–63 (2014).  Section 1344(2)'s "by means of" language is satisfied when . . . the defendant's false statement is the mechanism naturally inducing a bank (or custodian of bank property) to part with money in its control." *Id*. at 363.  Therefore, the misrepresentation must be the method by which the Bank came to part with funds under its control.

At issue in this second count is "a check totaling $101,369.49" that was distributed to Hannah Plyler "knowing the funds belonged to the Estate of [Donna Badger] and/or the Estate's beneficiaries."  (2d Superseding Indictment ¶ 14).  The Government must have proven that a misrepresentation enabled Mr. Laffitte to obtain the funds.  The Government's theory is that Mr. Laffitte managed to obtain the money, which came from Arthur Badger's independent settlement with USPS, because he was PR of Donna Badger's estate.  As the Government claimed in closing:

> Now, Count 2 relates specifically to a $101,369.49 check that was
> deposited into Hannah Plyler's conservatorship account. This check,
> as we've already seen, was taken from 2015 Arthur Badger's funds.
> And the defendant got this check because of his role as the PR for
> Donna Badger's estate. And under those false pretenses, they were
> able to defraud Arthur Badger of these funds.

(Tr. 2015:23–2015:4; *id.* 2015:19–21 ("He was appointed to be the PR for the estate of Donna
Badger. And under those false pretenses, he was given these funds.").)

This theory pushed by the Government fails to establish the necessary "relational
component" required by *Loughrin*. Mr. Laffitte's role as Donna Badger's PR had nothing to do
with his receipt of the $101,369,49 check from Arthur Badger's settlement, which was made to
the Bank. The funds came from Arthur Badger's independent settlement he negotiated with Alex
Murdaugh. Even if Mr. Laffite had seen Arthur Badger's disbursement sheet and known to
anticipate $1.325 million coming into the Bank to fund a structured settlement for Arthur—even
though the Bank was not legally authorized to do structured settlements—this still would have
nothing to do with Mr. Laffitte's role as Donna Badger's PR. He still would have obtained the
funds as a Bank employee, not due to his PR appointment for Donna Badger's estate or her
beneficiaries. After all, those individuals—beneficiaries of Donna Badger's Estate—were not
entitled to any funds from Arthur Badger's settlement negotiated by Murdaugh and Arthur Badger
without involvement by Mr. Laffitte. There were no false pretenses that allowed Mr. Lafitte to
obtain the $101,469,49. For those same reasons, Mr. Laffitte could not have obtained by false
pretenses the $33,789.83 check from Arthur Badger's settlement funds at issue in Count 3.

That the memo line of the check was "Estate of Donna Badger" is irrelevant. The check
was not written to the Estate of Donna Badger or Russell Laffitte as PR of the Estate of Donna
Badger. Mr. Laffitte did not write the memo line. The check was written by the Law Firm to the
Bank as the payee. It was Mr. Laffitte's status as a bank employee that allowed him to negotiate

a check made to the Bank the way the customer, Alex Murdaugh, directed it.  There was no "false mechanism" or "false pretense" inducing the Bank to part with the funds.  Just as there was no fiduciary duty owed by Mr. Laffitte on those funds—money that came from Arthur Badger's settlement and belonged to him alone—despite the Government's attempt to confuse the jury and make it appear as if the funds "belonged to the Estate of [Donna Badger] and/or the Estate's beneficiaries."  (2d Superseding Indictment ¶ 14).

To the Court, "[t]his is one of those examples where y'all are so embedded in this case that things like the footnote seems immensely important to y'all. And believe me, to me, it's simply a footnote." (Tr. 1964:6–9.)  Yet confusing the issue and making it seem as if the two settlements are the same is of great consequence and had a prejudicial effect on the jury.  The addition of "and/or the Estate's beneficiaries" is legally and factually incorrect because it is undisputed that Arthur Badger renounced his right as a beneficiary to these funds.  (*See* Gov't Ex. 218 at 46, 47.) It is this manufactured confusion that Mr. Laffitte contends should not have been allowed to be presented to the jury.

The Court then compounded this error when it sustained the Government's objection during closing arguments.  Mr. Laffitte was not allowed to explain in closing why the combination of Badger settlements was misleading (legally and factually) or why the statement contained on the face of Counts 2 or 3—that the funds belonged to the Estate of Donna Badger or her beneficiaries—could not be true.  (*See* Tr. 2020:2–17; *id*. 2017:14–16 (Government incorrectly arguing in closing that "these Badger funds, all these checks that were negotiated from Donna Badger, from Arthur Badger").)  As a result, there is a substantial risk the jurors were left with the false and prejudicial idea that Mr. Laffitte violated a fiduciary duty when he negotiated the funds in Counts two and three, which goes directly to alleged false pretenses and origin of the fraud.

(*See* Tr. 2089:14–16 (Government arguing in closing that "you know, you have to understand the probate, because it's kind of the beginning of things.").)

The Court, therefore, erred in allowing the Government to intentionally distort the factual distinction between Arthur Badger and the Estate of Donna Badger and by prohibiting Mr. Laffitte from arguing against the Government's mistake of law and fact.

**III.   The Court erred in refusing to admit evidence involving dissent and disagreement within the Bank motivating board members' testimony and evidence of Murdaugh's illegal negotiation of checks with Bank of America.**

Two other indispensable rights afforded a Defendant are the right to cross-examine and confront his accusers, as well as the right to present evidence in defense of the charges.  As demonstrated below those critical rights were violated here.  During the cross-examination of the Government's witnesses, the Court prohibited Mr. Laffitte from obtaining testimony about (1) the internal factions existing within the Bank's Board of Directors, and (2) Alex Murdaugh's illegal negotiation of checks at Bank of America involving a fake structured settlement company.  (Tr. 634:24–636:25; Tr. 734:20–735:13; Rough Trial Tr. 141:1–142:16, November 14, 2022; Rough Trial Tr. 183:2–186:16, November 14, 2022.)  Both lines of questioning were proper on cross-examination because they would have exposed the biases and motives of several witnesses affiliated with the Bank and were relevant to the crimes charged.

Under the Confrontation Clause of the Sixth Amendment, a defendant possesses the "right to cross-examine cooperating witnesses about sources of potential bias."  *United States v. Cropp*, 127 F.3d 354, 358 (4th Cir. 1997); *see also United States v. McMillon*, 14 F.3d 948, 956 (4th Cir. 1994) ("In a criminal context, cross-examination is an important element of the right of confrontation." (citation omitted)).  "[T]he clearest violation of the Sixth Amendment's guarantee of the right of confrontation is where the defense is not allowed to examine the prosecution

witnesses at all." *United States v. Jordan*, 466 F.2d 99, 101 (4th Cir. 1972). "The Supreme Court has recognized, however, that a defendant's Sixth Amendment rights *may also* be violated by less than a complete denial of all cross-examination." *Id.* (emphasis added) (citing *Alford v. United States*, 282 U.S. 687 (1931); *Smith v. Illinois*, 390 U.S. 129 (1968)).

As the Fourth Circuit has put it: "[I]t is clear from Supreme Court precedent that the Sixth Amendment guarantees the right of a criminal defendant to reasonable cross-examination, when otherwise appropriate, for the purpose of impeaching the credibility of key witnesses." *Quinn v. Haynes*, 234 F.3d 837, 847 (4th Cir. 2000) (citations omitted). Thus, even when some amount of cross-examination is afforded, "prohibiting a criminal defendant from cross-examining a witness on relevant evidence of bias and motive may violate the Confrontation Clause, if the jury is precluded from hearing evidence from which it could appropriately draw adverse inferences on the witness's credibility." *United States v. Turner*, 198 F.3d 425, 429 (4th Cir. 1999) (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986)). "[T]o prove that the exclusion of the evidence was unconstitutional, the defendant must show that his evidence went directly to the issue of bias of the witness, or motive of the witness to fabricate." *United States v. Hill*, 322 F.3d 301, 304 (4th Cir. 2003). The Fourth Circuit distinguishes between evidence involving, on the one hand, a witness's bias or motive and, on the other hand, the witness's general credibility:

> The distinction between impeachment evidence proving bias and impeachment of general credibility is important because generally applicable evidentiary rules limit inquiry into specific instances of conduct through the use of extrinsic evidence and through cross-examination with respect to general credibility attacks, but no such limit applies to credibility attacks based upon motive or bias.

*Quinn*, 234 F.3d at 845 (citations omitted).

"The [Confrontation C]lause does not, however, confer the right to cross-examine 'in whatever way, and to whatever extent, the defense might wish.'" *United States v. Ayala*, 601 F.3d

256, 273 (4th Cir. 2010) (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985)). Accordingly, "[d]istrict courts thus 'retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety or interrogation that is repetitive or only marginally relevant.'" *Id.* (quoting *Van Arsdall*, 475 U.S. at 679).

First, Mr. Laffitte sought to elicit testimony about the factions existing on the Bank's Board of Directors and how some on the Board wanted to sell the Bank while others did not. The Court first permitted Mr. Laffitte to touch on that fact through Mr. Lucius Laffitte, a member of the Bank's Board, (Rough Trial Tr. 183:2–186:16, November 14, 2022), but then shut down that entire line of questioning with others. More specifically, the Court denied Mr. Laffitte the opportunity to pose similar questions to other members of the Bank's Board, including Becky Laffitte. (*See* Rough Trial Tr. 297:17–186:16, November 14, 2022.) The Government was permitted to ask those individual Board members why they voted to remove Russell Laffitte, but Mr. Laffitte could not introduce evidence going to the bias and underlying motive in their answers. By itself the Court's inconsistent approach evidences a problematic evidentiary ruling. *See United States v. Penniegraft*, 641 F.3d 566, 574 (4th Cir. 2011).

In any event, contrary to the Court's conclusion, cross-examination about the factions within the Board of Directors was admissible evidence because it spoke to many of the biases and motives of the Government's witnesses who hold roles on the Board. "A district court by definition abuses its discretion when it makes an error of law." *United States v. Figueroa*, 548 F.3d 222, 230 (2d Cir. 2008) (quoting *Koon v. United States*, 518 U.S. 81, 100 (1996)). At trial, the Court only reviewed the topic for relevancy and failed to view the evidence as going to a witness's bias or motive. (*See* Rough Trial Tr. 183:2–186:16, November 14, 2022; Rough Trial

Tr. 297:17–186:16, November 14, 2022.)  But, as a matter of law, evidentiary limitations are less forceful when evidence bears on a witness's bias or motive.  *See Quinn*, 234 F.3d at 845 (citations omitted); *see also Figueroa*, 548 F.3d at 229–30.  Indeed, as the Supreme Court has stated:  "Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony."  *United States v. Abel*, 469 U.S. 45, 52 (1984).  Accordingly, the Court's restrictive focus on the overall relevancy of the Bank's internal divisions, rather than viewing how the evidence went to bias or motive, was a legal error.

Viewing the evidence under the correct legal framework, if a witness possessed a desire to sell the Bank, unlike the position of Mr. Laffitte and others sitting on the Board of Directors, that offered a solid motive to have Mr. Laffitte completely removed from the Board or Bank, and demonstrated bias.  Without Mr. Laffitte in the way, individuals on the Bank's Board of Directors could pursue the sale of the Bank and possibly generate profits for themselves as shareholders. Discovering witness's biases and motives through these questions were proper and relevant under well-established law.  *United States v. Masino*, 275 F.2d 129, 132 (2d Cir. 1960) ("Cross-examination is proper when its purpose is to reveal bias or interest on the part of the witness being examined."  (citation omitted)); *see also Figueroa*, 548 F.3d at 229 ("The Supreme Court has held that impeachment for bias is admissible under Rule 402"); *Boggs v. Collins*, 226 F.3d 728, 737 (6th Cir. 2000) ("cross-examination as to bias, motive or prejudice is constitutionally protected, but cross-examination as to general credibility is not" (citations omitted)). Thus, the Court erred by not determining how the internal divisions at the Bank spoke to the biases and motives of Bank witnesses.  *See Van Arsdall*, 475 U.S. at 680.

9:22-cr-00658-RMG    Date Filed 12/06/22    Entry Number 224    Page 28 of 35

Second, Mr. Laffitte also tried to provide documentary evidence involving Murdaugh's crimes against Forge Consulting. Murdaugh made accounts with Bank of America named "Forge," and they helped serve as a vehicle for his fraud. The Court completely precluded Mr. Laffitte from asking questions about Forge during cross-examination. (*See* Tr. 734:20–735:13.) If Bank of America was tricked by Murdaugh, the jury had a right to hear about the depths of Murdaugh's deception and whether Murdaugh or the Law Firm had any responsibility for the crimes Mr. Laffitte was charged with. *See Van Arsdall*, 475 U.S. at 680 (finding a violation under the Confrontation Clause when "[a] reasonable jury might have received a significantly different impression of [a witness's] credibility had respondent's counsel been permitted to pursue his proposed line of cross-examination"). It is natural that those affiliated with the Forge transactions possessed a bias and motive to protect themselves from criminal prosecution and not Mr. Laffitte. *United States v. Turner*, 198 F.3d 425, 429–31 (4th Cir. 1999) (concluding that cross-examination about a witness's potential penalties is "highly relevant to testing the witness's credibility," a district court abused its discretion by misunderstanding the "relevant impeachment value" of such evidence); *United States v. Cropp*, 127 F.3d 354, 358–59 (4th Cir. 1997) (agreeing that questions about cooperating witnesses' possible sentences were "potential sources of their possible bias"). For the same reasons the Court erred in forbidding questions about the Bank's internal factions, the Court should have permitted Mr. Laffitte to present the Forge evidence during trial and erred in its contrary decision.

Moreover, the Court's refusal to permit this evidence harmed Mr. Laffitte's ability to prepare a defense and unduly constrained his confrontation of the Government's witnesses. Without examining whether the Government's witnesses possessed specific biases or motives to testify, the Court's evidentiary limitations severely limited Mr. Laffitte's ability to defend his case

because they jury was unable to fully assess the credibility of the Government's witnesses.  *See United States v. Woodward*, 699 F.3d 1188, 1194 (10th Cir. 2012) ("A violation of this constitutional right occurs when the defendant is prohibited from engaging in otherwise appropriate cross-examination that, as a result, precludes him from eliciting information from which jurors could draw vital inferences in his favor."  (quotation omitted)).

Because the Court unduly limited Mr. Laffitte's cross-examination questions and curtailed Mr. Laffitte's Sixth Amendment rights in the process, the Court should enter a judgment of acquittal and/or grant a new trial.

## IV.    The Court erred by failing to instruct the jury on Mr. Laffitte's advice-of-counsel defense given the evidence presented by the Government and the defense.

Another error requiring a new trial is the failure to instruct the jury on Defendant's reliance on counsel.  If the jury concurred in Defendant's contention that he relied on counsel in making decisions which were the subject of the charges, that would have justified the jury returning a verdict of not guilty on all charges.  *See United States v. Dallmann*, 433 F. Supp. 3d 804, 810–11 (E.D. Va. 2020); *United States v. Powell*, 680 F.3d 350, 356 (4th Cir. 2012).

As it relates to jury instructions, "a defendant is entitled to an instruction submitting to the jury any theory of defense for which there is a foundation in the evidence."  *United States v. Hicks*, 748 F.2d 854, 857 (4th Cir. 1984) (emphasis added) (citations omitted); *see also United States v. Dornhofer*, 859 F.2d 1195, 1199 (4th Cir. 1988) ("As long as instructions have an evidentiary foundation and are accurate statements of the law, the district court should include instructions to instruct the jury in the defendant's theory of defense." (quotation omitted)).  Typically, "[a] district court is required to give [an advice-of-counsel instruction] 'if there is "any foundation in the evidence" sufficient to bring the issue into the case, even if that evidence is "weak, insufficient, or

of doubtful credibility.'"" *United States v. DeFries*, 129 F.3d 1293, 1308 (D.C. Cir. 1997) (quoting *United States v. Duncan*, 850 F.2d 1104, 1117 (6th Cir. 1988)).

The advice-of-counsel defense is not an affirmative defense, so defendants only have the burden of production. *United States v. Dallmann*, 433 F. Supp. 3d 804, 810 (E.D. Va. 2020) (citing *United States v. Gonzales*, 58 F.3d 506, 512 (10th Cir. 1995)). "Put simply, 'the government must *prove* the element of willfulness, [but] the court may require the defendant to *produce* evidence supporting the advice-of-counsel defense.'" *Id.* (quoting *United States v. Westbrooks*, 780 F.3d 593, 596 (4th Cir. 2015)). The defendant must "produce some evidence—more than a scintilla—showing": (i) the "full disclosure of all pertinent facts to an attorney," and (ii) a "good faith reliance on the attorney's advice." *Id.* (citing *United States v. Powell*, 680 F.3d 350, 356 (4th Cir. 2012)). Although a "scintilla" has no precise definition, *Sedar v. Reston Town Ctr. Prop., LLC*, 988 F.3d 756, 761 n.3 (4th Cir. 2021), "more than a scintilla . . . means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Craig v. Kijakzi*, No. 5:22-CV-00008-KDB, 2022 WL 3591063, at *2 (W.D.N.C. Aug. 22, 2022).

Documentary and testimonial evidence presented by both parties supported an instruction on the advice-of-counsel defense, including among others:

- A 2009 Email from attorney Ronnie Crosby to a third-party introducing Mr. Laffitte as "a client of our firm." (Gov't Ex. 71); *see also In re Broome*, 356 S.C. 302, 316, 589 S.E.2d 188, 195–96 (2003) (relying on attorney's representations to third-parties about attorney-client status as sufficient to establish an attorney-client relationship).

- Court filings executed by Crosby and Murdaugh referring to Mr. Laffitte as the real party in interest and court dockets referring to those attorneys as Mr. Laffitte's counsel, (Def. Ex. 82).

- Testimony of expert Tiffany Provence: "Q. What does that mean for the relationship then between the plaintiff's attorney and the person serving as PR? Is there an attorney-client relationship? [A]. Oh, absolutely, uh-huh." (Rough Trial Tr. 73:3–6, Nov. 18, 2022)

30

- Testimony from Mr. Laffitte: "And when you became conservator, or PR here, did you believe that they [Murdaugh and Crosby] were your attorneys?  A. I did." (Rough Trial Tr. 138:3–5, Nov. 18, 2022.)

- Testimony from Mr. Laffitte about signing court filings presented by his attorneys, "you would sign what he did because he's your attorney or the attorney in the case and he's representing these people and you are trying to help him . . ."  (Rough Trial Tr. 111:12–14, Nov. 18, 2022.)

The Court, however, refused to instruct the jury on this point, concluding that Mr. Laffitte did not meet the test by applying a count-by-count analysis.  (Tr. 1976–1989.)  The problem with requiring Mr. Laffitte to specify exactly how counsel's advice impacted the specific transaction listed under each count is that it ignored the Government's constant argument that Mr. Laffitte's representations in court filings and reports were a part of the "scheme or artifice" underlying all of the counts.  In its opening, the Government attempted to refute any reliance on counsel defense, broadly suggesting that the defense failed as to all counts, without limiting their argument to any particular count.  As the Government argued to the jury, "Laffitte cannot reasonably claim that he did any of this because he relied on Murdaugh as his lawyer. (Tr. 85:13–17.)  And then in its closing, the Government even brought up the filings, although not tying them to any particular count.  (Tr. 2002:8–12 (discussing Mr. Laffitte signing the age verification on N.T.'s petition attesting that she was a minor); Tr. 2003 (discussing Mr. Laffitte signing forms as conservator for Natasha Thomas and Hakeem Pinckney)).  The Court's analysis of whether the defense should be charged and its conclusion in this regard was too narrow.  As a result, the Court erred.

Given this ruling, Mr. Laffite was then left with no ability to argue to the jury that he relied on the law firm's advice when filling out the forms or deciding how best to fulfil his obligations as conservator or PR.  Failing to give the instruction "seriously impaired the defendant's ability to conduct his defense.'"  *United States v. Smith*, 701 F.3d 1002, 1011 (4th Cir. 2012) (quoting *United States v. Passaro*, 577 F.3d 207, 221 (4th Cir. 2009)).  By not giving the instruction, the jury did

not have the "full scope" of the case, including its ability to conclude that the Government failed to prove the requisite intent given Mr. Laffitte's reliance on the advice from the Law Firm during his service as conservator and PR. *Hicks*, 748 F.2d at 857. By not charging on the defense, the Court "dilute[d] the defendant's jury trial by removing the issue from the jury's consideration. In effect, the trial judge directs a verdict on that issue against the defendant. This is impermissible." *Id*. at 857–58 (quoting *United States v. Strauss*, 376 F.2d 416, 419 (5th Cir. 1967)). Given that Mr. Laffitte's main defense was the lack of a culpable mental state given his reliance, the jury "may have been led to believe that the . . . main defense was actually inconsistent with the law." *DeFries*, 129 F.3d at 1308–10 (reversing conviction for failure to charge on the advice-of-counsel defense). To correct this error, the Court should enter a judgment of acquittal and/or grant Mr. Laffitte a new trial.

## V.       The evidence presented on the six counts is legally insufficient.

Starting with Count One, the charge that Mr. Laffitte conspired with Alex Murdaugh to commit bank or wire fraud must fail because there is no evidence that Mr. Laffitte knew of the unlawful purpose of the conspiracy—to steal from Alex Murdaugh's clients—let alone joined the conspiracy to *further* Alex Murdaugh's aim of stealing from his clients. Alex Murdaugh received millions in illegitimate, stolen client funds. Russell received zero. The only payments Russell received were conservator fees, which were approved by the state courts and memorialized in filings. And when he negotiated transactions for Alex Murdaugh, he did it at his own bank where he knew they would be memorialized by systems he implemented. His total transparency betrays the idea that he knew he was participating in an unlawful scheme. The evidence does not show, beyond a reasonable doubt, that Mr. Laffitte knew Alex Murdaugh's unlawful scheme to steal from his clients, let alone acted to further it.

As for Counts Two and Three (bank and wire fraud), the evidence does not show that Mr. Laffitte used means of false or fraudulent pretenses to obtain money belonging to Arthur Badger. Contrary to the Government's notion that Mr. Laffite's role as a fiduciary and intentional distortion of the Badger settlements was improper, he was never in a fiduciary role for Arthur Badger and would have had no entitlement to the $1.325 million as a fiduciary for Donna Badger. The evidence does not allow a factfinder to conclude, beyond a reasonable doubt, that Mr. Laffitte used "false and fraudulent pretenses, representations, and promises" to obtain these funds.

Furthermore, Count Three cannot be sustained on statute-of-limitations grounds, because the Government only receives the benefit of a ten-year statute of limitations for wire fraud if the scheme to defraud affected a financial institution.  18 U.S.C. § 3293 (proscribing a limitations period of ten years when an offense "affects a financial institution" under § 1343).  To be "affected" by the scheme to defraud means that the Bank itself was victimized by the fraud, rather than the scheme's mere use of the financial institution in the transfer of funds.  *United States v. Ubakanma*, 215 F.3d 421, 426 (4th Cir. 2000).  Here, there is no evidence allowing a jury to find that the Bank confronted a new or increased risk of loss when Laffitte distributed $33,789.83 in funds into Mr. Murdaugh, a Bank customer's account.

Finally, Counts Four, Five, and Six all have a statutory component of "willfulness" that was not met in this case.  As for the $680,000 (Count 4), *at most* the Government's evidence establishes only partial compliance with Bank bylaws by issuing a $680,000 check in attempt to settle wrongdoing.  The Government argued Mr. Laffitte lacked the proper bylaw authority of the when he issued the check.  Even under their theory of the case, there is zero evidence Mr. Laffitte acted with the knowledge that issuing that issuing that check was unlawful.  Once Mr. Laffitte realized the error he made in negotiating Arthur Badger's money to other recipients, he knew the

Bank could be held liable and knew that settling, hand in hand, with the firm would make the wronged client whole and also minimize liability. As Mr. Laffitte testified, the Board had just settled another case for substantially more money based on another Bank employee's role in another case in which money belonging to the Law Firm's client was mishandled. (Rough Trial Tr. 189–19, Nov. 18, 2022). This other settlement frames Mr. Laffitte's mental state in issuing the check. There is zero evidence that Mr. Laffitte acted with the knowledge that his conduct was unlawful when he walked over the $680,000 check to the Firm.

Moreover, the bigger issue about Counts Four through Six is that the jury had to find, beyond a reasonable doubt, that Mr. Laffitte entered into those transactions with the intent to injure or defraud his own Bank. As the Court charged the jury, "Intent to injure or defraud' can be established by proving that the defendant acted in reckless disregard of the Bank's interest. To act with intent to injure or defraud means to act with intent to deceive or cheat for the purpose of causing a financial loss to the bank." (Tr. 2140:5–11). There is no evidence that Mr. Laffitte would seek to injure the bank that had been in his family for four generations, where he was both the CEO and a shareholder.

The Court should grant Mr. Laffitte's renewed motion for acquittal because there is insufficient evidence to allow a jury to find him guilty beyond a reasonable doubt on these counts.

## Conclusion

Each of these grounds independently warrant judgment of acquittal or the granting of a new trial. But together, these errors call into question the validity of the jury's guilty verdict on all counts. Because the cumulative weight of these errors undermine the verdict, the Court should enter a judgment of acquittal and/or grant Mr. Laffitte a new trial.

NELSON MULLINS RILEY & SCARBOROUGH LLP

By: */s/ E. Bart Daniel*
   E. Bart Daniel, Federal Bar No. 403
   E-Mail: bart.daniel@nelsonmullins.com
   Matt Austin, Federal Bar No. 11435
   E-Mail: matt.austin@nelsonmullins.com
   151 Meeting Street / Sixth Floor
   Post Office Box 1806 (29402-1806)
   Charleston, SC  29401-2239
   (843) 853-5200

   Christian J. Myers, Federal Bar No. 13096
   E-mail:  josh.myers@nelsonmullins.com
   Phone: (202) 689-2800
   101 Constitution Avenue NW, Suite 9000
   Washington, DC 20001

*Attorneys for Russell Lucius Laffitte*

Charleston, South Carolina
December 6, 2022