# Exhibit K
## *(Dkt. # 267 - Order and Opinion)*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
### BEAUFORT DIVISION

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | Criminal Action No.: 9:22-00658-RMG |
| | ) | |
| v. | ) | |
| | ) | **ORDER AND OPINION** |
| Russell Lucius Laffitte, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This matter is before the Court on Defendant's motion for a new trial and for a judgment of acquittal pursuant to Rules 29(c) and 33(a) of the Federal Rules of Criminal Procedure and supplemental filings. (Dkt. Nos. 224, 242, 254). Defendant also moves for an evidentiary hearing on the issues raised in his motion for a new trial. (Dkt. No. 231). The Government has filed responses in opposition. (Dkt. Nos. 238, 260). For reasons set forth below, Defendant's motions are denied.

## Legal Standard

Rule 33 of the Federal Rules of Criminal Procedure provides that a trial court "may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. A motion for a new trial under Rule 33 must be filed within 14 days of the verdict, except for a claim of newly discovered evidence. In addressing a Rule 33 motion, "the district court is not constrained by the requirement that it view the evidence in a light most favorable to the government" and "may evaluate the credibility of witnesses." *United States v. Arrington*, 757 F.2d 1484, 1485 (4th Cir. 1985). A trial court, however, "should exercise its discretion to award a new trial sparingly," and should grant a new trial "only when the evidence weighs heavily against the verdict." *United States v. Perry*, 335 F.3d 316, 320 (4th Cir. 2003). Furthermore, it is well settled that Rule 33 allows for

9:22-cr-00658-RMG    Date Filed 03/06/23    Entry Number 267    Page 2 of 42

the grant of a new trial where "substantial legal error has occurred." *United States v. Munoz*, 605 F.3d 359, 373 (6th Cir. 2010).

Rule 29(c) of the Federal Rules of Criminal Procedure provides that a defendant may move for a judgment of acquittal within 14 days following a jury verdict. In addressing a Rule 29(c) motion, the trial court is required to sustain a guilty verdict if, "viewing the evidence in the light most favorable to the prosecution, the verdict is supported by substantial evidence." *United States v. Smith*, 451 F.3d 209, 216 (4th Cir. 2006). Substantial evidence is defined as "evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *Id.*

## Procedural History

Defendant was indicted by the Federal Grand Jury on July 20, 2022 on charges of conspiracy to commit wire and bank fraud, bank fraud, wire fraud, and three counts of misapplication of bank funds. (Dkt. No. 1). The Federal Grand Jury subsequently issued a Superseding and a Second Superseding indictment. (Dkt. Nos. 25, 61). Defendant asserted his right to a speedy trial and, after conferring with counsel, the Court set the trial to commence on November 8, 2022. (Dkt. Nos. 54, 55). The trial was conducted over nine days and resulted in a verdict of guilty on all counts. (Dkt. No. 208). Defendant thereafter filed his motions under Rules 29(c) and 33, and the Government filed responses in opposition. The parties also made supplemental filings at the direction of the Court. The motions are now ripe for disposition.

## Rule 33 Motions for a New Trial

Defendant filed a motion for a new trial on five separate grounds: (1) the replacement of two jurors with alternates after the commencement of deliberations; (2) an "error" in the Indictment, which allegedly distorted the distinction between the personal injury claims of Arthur

Badger and the claims of the Estate of Donna Badger, and the Court's denial of Defendant's right to argue this alleged error; (3) Court rulings which allegedly denied Defendant the right to question bank board members about their interest in selling the bank as a motive for their adverse testimony against Defendant; (4) Court rulings which denied Defendant the right to offer testimony about the negotiation of checks by the Bank of America related to Alex Murdaugh's theft of client funds; and (5) the refusal of the Court to charge an advice of counsel defense.  The Court addresses each of these issues below.

A.    The Replacement of Two Jurors with Alternates after Commencement of Jury Deliberations:

1.    Factual Background

It is important at the outset to detail the circumstances leading to the replacement of two jurors, including the substance of their written communications to the Court, consultations with counsel, the responses of counsel prior to action being taken by the Court, and the basis of the Court's action stated at the time.  Prior to jury selection, the parties were advised that the Court would select four alternate jurors in addition to the required twelve jurors in a criminal trial.  The Court charged the jury after the close of the evidence that "[i]f it becomes necessary during your deliberations to communicate with me, you may send a note through the marshal," but the jurors were advised in any communications "you are not to tell anyone, including me, how the jury stands." (Dkt. No. 223 at 43).  After the Court completed its charge, the Court directed the alternates to be placed in a secure location in the event it became necessary to replace any jurors during deliberations if jurors were "unable to perform . . . their duties." (*Id.* at 44); Federal R. Crim. P. 24(c).  No party objected to the selection of alternate jurors, the Court's charge regarding communications with the Court, or the retaining of the alternates in the event jurors needed to be replaced.

Following the completion of the Court's charge at 10:22 a.m. on November 22, 2022, the jurors were dismissed to begin their deliberations. (Dkt. No. 223 at 45). The Court summoned the parties and counsel to the courtroom at 7:43 p.m. to disclose the receipt of two notes from Juror No. 93. (*Id*. at 49-50). The first note read "need antibiotic @ 19:20. I can delay 1-2 hours." (Dkt. No. 205 at 2). The second note read "feeling pressured to change my vote." (*Id*. at 3). (emphasis in the original).

> The Court advised the parties as follows:
>
> [M]y instinct is that we have alternates and we should get to a verdict, and that it is not practical to get her medicine and drive back. I don't like this because I'm going to bring the jury back and tell them they've got to begin their deliberations again. But I don't know of any other choice I have. I welcome any thoughts anyone may have.

(Dkt. No. 223 at 50).

The Government responded that it agreed with replacing the juror. Defense counsel inquired whether the jury could stop its deliberations that evening and return in the morning. The Government expressed concern with breaking off deliberations that evening "since there's been no indication from the jury that they are having issues deliberating." (*Id*. at 51).

At this point, the Court received another note written by multiple members of the jury. They wrote of a "shared concern" that an unidentified member of the jury was being influenced by the juror's prior jury experience and that the juror disagreed with the Court's charge, "specifically the definitions you provided." (Dkt. No. 205 at 4). The note concluded: "We respectfully ask that you consider speaking to this issue, so that we are able to proceed with deliberations." (*Id*.).

A moment later another note arrived from Juror No. 88: "Can you please call a alternative [sic] as I am experiencing anxiety and unable to clearly make my decision. I can provide more information as needed if necessary." (*Id*. at 5).

The receipt of these various notes from the jurors in quick succession was highly unusual. The Court invited suggestions from the parties, noting that it was unclear if the issues raised in the notes involved two or three jurors. (Dkt. No. 223 at 53, 55). The Court and the parties addressed separately each of the situations raised by the juror notes. Regarding Juror No. 93, the juror needing her medication, the Court again stated that it proposed to replace that juror and to send her home. (*Id*. at 55-56). The Government concurred, observing that the juror "should be allowed to go home" because it would not be proper to "risk someone's health." (*Id*. at 56). Lead defense counsel, Bart Daniel, voiced no objection and subsequently acknowledged on the record that he had agreed to Juror No. 93's replacement. (*Id*. at 62).

The Court and counsel discussed how the Court should address the note from a number of jurors indicating issues with an unidentified juror who allegedly was unwilling to follow the Court's charge and was referencing information from prior jury service. The Government referred to this unidentified juror as a potential "toxic juror" and indicated the juror should be replaced. (*Id*. at 57).

Regarding Juror No. 88, the anxious juror who had asked to be replaced by an alternate, the Court expressed concern with bringing the juror into the courtroom because it might exacerbate the stress she was already experiencing. (*Id.* at 55). The Court proposed, with the consent of the parties, that it would question Juror No. 88 *in camera* with only the court reporter and the courtroom deputy present to determine if the juror was capable of performing her duties. (*Id*. at 58). The Court explained that the Defendant was entitled to 12 functioning jurors and there was a

5

problem with a juror who says "I can't do it anymore." (*Id* at 56). The Government agreed with the Court's proposed procedure, indicating that bringing the anxious juror into the courtroom could contribute to her anxiety. (*Id*. at 58). Defense counsel also consented to the procedure proposed by the Court. (*Id*.). The Court stated that it intended to question Juror No. 88 and "take action. Fair enough? Everybody happy with that?" (*Id*. at 60). No party objected or asked for any clarification, and the Court thereafter left the courtroom to address the request of Juror No. 88 that she be replaced with an alternate. (*Id*.).

The Court then went to another courtroom to interview Juror No. 88. The Court read Juror's No. 88's note to her indicating she wished to be replaced and which ended with a willingness to provide more information as needed. The Court asked the juror whether she wished to share anything with the Court. In compliance with the well-established rule that any inquiry regarding jury deliberations with a deliberating juror was strictly off limits, the Court told Juror No. 88 "don't tell me anything about your deliberations." (Dkt. No. 212 at 2). Juror No. 88 was visibly anxious and asked the Court to "give me a minute." The Court responded, "take your time." After a few moments, Juror No. 88 stated that she was on anxiety medication, was proud to be a juror, and at one point was concerned about whether she could continue her service. She stated she "started to feel very anxious due to some of the reactions to my decision." (*Id*. at 2). The following exchange then occurred:

> The Court: Do you feel like you can perform, or do you want me to replace you with an alternate?
>
> Juror No. 88: Your honor, I don't want to be replaced but—and I'm usually strong when someone is butting up, but I don't want to be trialed (sic) for my decision.
>
> The Court: Well, whatever decision you make is your call.
>
> Juror No. 88: Yes, sir.

The Court: The issue is, are you able to perform your duties as a juror?

Juror No. 88: At this point, no.

The Court: Okay.  I'm going to honor your request and replace you then.

Juror No. 88: Thank you.

(Dkt. No. 212 at 2-3).

The Court was then prepared to sit down with the alleged problem juror pursuant to the same procedure agreed to by the parties for Juror No. 88.  The Court was informed that the previously unidentified juror was the juror with the medication issue and this juror had already left the courthouse.

The Court returned to the courtroom and confirmed that the juror with the medication issue was allowed to go home and had been replaced by an alternate.  As for the anxious juror, the Court explained that the juror "asked to be relieved and said she wasn't able to go forward . . . I granted her request to—for an alternate." (Dkt. No. 223 at 60).  The Court further stated that the issue with the allegedly problem juror had resolved itself because she had already gone home. (*Id.* at 61).  The Court then had the following exchange with defense counsel:

> Mr. Daniel: Judge, we would object not to the juror that was replaced for medication. We agreed with that. We agreed with that at the time. But the second juror that was replaced about the anxiety is the one we would like to take—make an objection to.
>
> The Court: You can make an objection.  That one—and there's a record—she is emotionally fragile.  She could hardly speak to me.  And she explained to me she was on anxiety medication and that she was not physically capable or emotionally capable of going forward.  I didn't think I had any choice. . . . [S]he was shaking when she was speaking with me.  There wasn't any confusion about that one.

(*Id.* at 61-62).

The Court replaced Juror No. 88 with an alternate and brought the jury back into the courtroom.  The jury now included two of the former alternates.  The Court gave the jury the following instruction:

> Ladies and gentlemen, obviously, you have had some changes in your ranks.  And the requirement is that you need to begin your deliberations again to bring your other two, the two jurors who have not been included into those discussions, because it needs to be the decision of all 12 of you. Obviously, the 10 of you are more advanced than the other two, but you need to go back into the deliberations and y'all walk through those again.

(*Id.* at 62).

The jury was then excused to return to the jury room at 8:33 p.m.  No party voiced any objection to the Court's instructions to the jury. (*Id*. at 62-63).

The Court was subsequently advised that the jury had a verdict and returned to the courtroom to allow the jury to announce its verdict.  At that point, defense counsel Matt Austin rose to note that his co-counsel, Mr. Daniel, objected to "swapping out the alternate." (*Id.* at 63).  The Court expressed surprise with the defense counsel's objection because they were "complaining about something on a procedure we had agreed to already." (*Id.* at 64).  The Government also voiced disagreement with defense counsel's objection, noting that that defense counsel first objected to the procedure "after [the Court] had already done what we agreed to do." (*Id.* at 64).  Mr. Austin observed that "it's a strange, fluid situation" and stated that he thought "we were just going to be interviewing the [jurors], not necessarily replacing them." (*Id*.).  The Court then had the following exchange with defense trial counsel Daniel and Austin:

> The Court: So you are now telling me that had I come back and told you that she was emotionally incapable of functioning and she asked me again to remove her, that you would have objected to that?
>
> Mr. Daniel:  I did object to it.
>
> Mr. Austin: Yes, Your Honor.  I think we would [have] stated that it's a hung jury.

The Court: Its not a hung jury.  I have alternates.

Mr. Austin: We think—we don't see how they could restart deliberations at this point this late in the game.

The Court: Or course, they can.  That's the process.  When you replace a juror, they have to restart deliberations.  I brought them in here and told them to restart it.

(*Id.* at 65).

The jury was then brought into the courtroom and a verdict of guilty on all counts was announced.  The jury was then individually polled at the Court's instruction and each juror affirmed it was his or her verdict. (*Id.* at 66-69).

Defendant submitted his initial post trial motion for a new trial on December 6, 2022, arguing that the Court had improperly replaced two jurors outside the presence of the Defendant, denying him the right to be present at all significant criminal proceedings. (Dkt. No. 224 at 13). Defendant further asserted that Juror No. 88 was replaced "based on her disagreement with the [other jurors]." (*Id.* at 13).  Defendant further argued that the Court should have made an "effort to encourage [Juror No. 88] to stay" and should have excused the deliberating jury that evening. (*Id.* at 14-15).  Finally, Defendant argued that the Court had failed to tell the newly constituted jury to begin deliberations "anew." (*Id.* at 16).

Several weeks later, new defense counsel (hereafter referred to as "Defense Team No. 2") made an appearance and filed a supplemental motion for a new trial.  (Dkt. No. 254).  Defense Team No. 2, in addition to repeating some of the arguments of Defendant's trial team in their original post trial brief, argued that Defendant's trial counsel had been ineffective because they "did not adequately understand the procedure proposed by the Court, did not appropriately articulate their objections, did not suggest their own proper procedure for handling these juror issues, and did not appropriately inform or advise Mr. Lafitte or ultimately act in his best interest."

9

(*Id*. at 4). They further contended that Defendant's trial counsel "unfortunately and incorrectly consented to the questioning of the juror *in camera.*" (*Id.* at 20). Defense Team No. 2 also criticized the Court for failing to exercise its "independent duty to ensure Mr. Laffitte's right to a fair trial" and criticized the Government for failing to consider Mr. Laffitte's rights when it did not "object to the process or urge the Court to proceed with appropriate caution and care." (*Id*. at 4, 16). Defense Team No. 2 also argued that the Court should have made further inquiry into the pressure Juror No. 88 was experiencing and her disagreements with other jurors. (*Id*. at 24-25). Finally, Defense Team No. 2 argued that the Court should have given an *Allen* charge rather than replace Juror No. 88. (*Id*. at 23-24).

The Government opposed Defendant's initial motion for a new trial arising out of the replacement of the two jurors with alternates, noting that the Court had followed the procedures consented to by the parties to address the various notes from the jurors. The Government asserted that Defendant's trial counsel acknowledged on the record that he agreed with the replacement of Juror No. 93 and that the Court exercised appropriate discretion in granting Juror No. 88's request to be replaced with an alternate. (Dkt. No. 238 at 16-18). The Government further asserted that the Court had properly instructed the jury to begin their deliberations again after the alternates were seated. (*Id*. at 23-27).

The Government also filed a supplemental response following Defense Team No. 2's memorandum arguing that Defendant's trial team had been ineffective in responding to the juror notes. The Government asserted that the Defense Team No. 2's criticism of Defendant's trial team's performance failed to meet either prong of *Strickland v. Washington*, 466 U.S. 668, 687 (1984) for establishing ineffective assistance of counsel. The Government further noted the Court's general reluctance to second guess counsel on strategic or tactical decisions. (Dkt. No. 260

at 6-7).  The Government observed that Defense Team No. 2 were not present during the trial and did not observe "what took place in the courtroom after the juror notes were read." (*Id*. at 9).

      2.     Legal Standards

Rule 24(c)(1) of the Federal Rules of Criminal Procedure authorizes a trial court to replace jurors with duly qualified alternates where jurors are "unable to perform or who are disqualified from performing their duties."  Trial courts are further authorized to retain alternate jurors after the jury retires to deliberate in the event that a member of the jury must be replaced. Rule 24(c)(3). In such a situation, "the court must instruct the jury to begin its deliberations anew."  *Id.*

Trial courts have broad discretion regarding the replacement of jurors.  Appellate courts have recognized that the trial judge is "in the best position to view a juror's demeanor and determine whether she is able to shoulder the obligations of jury service." *United States v. De Oleo*, 697 F.3d 338, 342 (6th Cir. 2012).  "Courts have not construed Rule 24(c)(1) to create such a high bar to replacing jurors," and it is rare to find a trial court abused its discretion in replacing a juror with an alternate. *United States v. Penn*, 870 F.3d 164, 170 (3rd Cir. 2017).  This has been particularly true in situations where a juror's mental or physical capacity to continue jury service is at issue.  *See United States v. Thompson*, 528 F.3d 110, 121 (2d Cir. 2008) (juror replaced after telling judge her nerves "were shot"); *United States v. Varnedore*, 73 Fed. Appx. 356, 360 (10th Cir. 2003) (trial judge determined that juror who suffered a painful injury and was on pain medication should be excused); *United States v. Huntress*, 956 F.2d 1309, 1313 (5th Cir. 1992) (juror in poor health became more ill during deliberations and was replaced); *United States v. O'Brien*, 898 F.2d 983 (5th Cir. 1990) (juror replaced with a recent history of depression).

A defendant has the right to be present at all stages of the criminal proceeding, including addressing an issue with the replacement of jurors.  *See United States v. Camacho*, 955 F.2d 950,

952-53 (4th Cir. 1992). A party can consent to a waiver of a known right, which includes a situation where a defendant, through counsel, consents to a procedure for the removal of a juror. *United States v. Spruill*, 808 F.3d 585, 598 (2d Cir. 2015). In such a situation, the defendant waives "any challenge to the district court's inquiry and removal of [the juror]." *Id*. at 599.

A trial court faces a very challenging situation where there is a need to address the replacement of a juror during deliberations. This situation can present a tension between two vital competing interests—the secrecy of jury deliberations and the defendant's right to a fair trial. In the seminal case of *United States v. Thomas*, 116 F.3d 606, 618 (2d Cir. 1997), the court found that "the secrecy of deliberations is the cornerstone of the modern Anglo-American jury system," and it is critical that any inquiry by a trial court during deliberations not reveal the substance of jury deliberations. To allow disclosure of the substance of jury deliberations "poses a threat to adjudicatory finality" and would undermine the free exchange of ideas that is essential to the functioning of the jury system. *Id*. at 619. The *Thomas* court observed that "[w]e recognize that this standard [] buttressing the core principle of secrecy of jury deliberations" may impair the ability of the court to conduct an adequate investigation, but "[t]o open the door to the deliberation room any more widely" would "in our view, destroy the jury system itself." *Id.* at 622; *see also United States v. Ebron*, 683 F.3d 105, 125 (5th Cir. 2012); *United States v. Symington*, 195 F.3d 1080, 1086 (9th Cir. 1999). Consequently, when a trial court finds it necessary to question a deliberating juror, it must be "careful to avoid any disclosure of the content of deliberations." *United States v. Boone*, 458 F.3d 321, 329 (3d Cir. 2006).

### 3. Discussion

The arrival in short order of four notes from jurors was certainly unusual, and the Court promptly consulted with counsel to determine if a common course of action could be agreed to by

the parties.  Defense counsel initially raised the question of whether the jury could be sent home for the evening.  The Court stated that it was unwilling to send the jury home when it appeared to be deliberating and there was no indication that the jurors were at an impasse. The Court and counsel then addressed jointly each of the communications received from the jury and a common course of action was consented to by all counsel.  These discussions occurred in open court with the Defendant present.

Regarding Juror No. 93, who was on a strict timeline to take her medication, the parties agreed that she should be replaced by an alternate.  The first time there was any objection regarding the replacement of Juror No. 93 was in post-trial motions.  Defendant now claims that the replacement of Juror No. 93 was done outside the presence of the Defendant.  This is simply untrue. The full discussion and plan agreed to for the replacement of Juror No. 93 was in the presence of the Defendant.  As the court observed in *Spruill*, where defense counsel actively participates in the plan adopted by the court for the replacement of a juror, this "manifest[s] true waiver of any challenge to the district court's inquiry and removal of [the juror]." 808 F.3d at 599

Regarding Juror No. 88, the anxious juror who requested that she be replaced with an alternate, the Court expressed concern with any process that brought the juror into the courtroom because it would likely heighten her already high level of stress.  The Court made it clear, however, that it would not undertake any procedure in which the Defendant was not present unless consented to by all counsel. (Dkt. No. 223 at 58).  Both defense and the Government counsel agreed to the Court addressing Juror No. 88's request to be replaced with an alternate *in camera*.  The only issue with Juror No. 88 was whether the Court would honor her request to replace her with an alternate. Before departing the courtroom, the Court stated that it intended to speak with Juror No. 88 and to

13

"take action" on her request to be replaced. (*Id.* at 60).  There was no objection to the Court's plan of action.

The Court met with Juror No. 88 in a nearby courtroom with a court reporter and the courtroom deputy present.  Upon entering the room, it was obvious that Juror No. 88 was under considerable stress and initially asked the Court to wait to allow time to compose herself. (Dkt. No. 212 at 2).  The Court began the discussion by reading out loud Juror No. 88's note requesting that she be replaced with an alternate, which ended with an offer to provide any additional information.  The Court indicated a willingness to receive any additional information she wished to share but told Juror No. 88 not to "tell me anything about the deliberations themselves." (*Id.* at 2).  Juror No. 88, after a brief exchange, expressed concern about jury deliberations and was clearly prepared to share details with the Court.  The Court stopped any discussion about the details of jury deliberation by stating that "the issue is, are you able to perform your duties as a juror?"  She responded, "at this point, no."  The Court then advised her "I'm going to honor your request to replace you then."  Juror No. 88 then responded, "thank you." (*Id.* at 3).

The Court was then prepared to sit down *in camera* with the allegedly troublesome juror to make a very limited inquiry into whether she was considering matters from a prior jury service or refusing to follow the law as charged by the Court.  The Court was advised that this juror was the one with the medication issue and had already been sent home by agreement of the parties. The Court returned to the courtroom and confirmed that Juror No. 93 had been allowed to go home and had been replaced by an alternate.  The Court then reported that the Court had honored Juror No. 88's request to be replaced by an alternate and that it had become unnecessary to question the allegedly troublesome juror because she had already been replaced by an alternate. (Dkt. No. 223 at 60-61).

14

Defense counsel at this point raised an objection to the replacement of Juror No. 88. The Court and Government counsel expressed surprise because defense counsel had plainly agreed to the *in camera* questioning of the juror and for the Court to "take action" on the juror's request to be replaced. (*Id.* at 64). The Court explained that Juror No. 88 was in obvious distress and advised the Court that she was not capable of performing her duties as a juror. The Court stated to defense counsel: "[W]e agreed that I would interview [Juror No. 88] and I would make a decision. . . . [N]ow, after the fact [you] want to change that. You are a little—moment late." (*Id.*) Defense counsel stated that if Juror No. 88 was determined to be incapable of performing her duties, he thought the Court would declare a hung jury. (*Id.* at 65). No such scenario had been raised previously by defense counsel, and the Court explained "it's not a hung jury. I have alternates." (*Id.* at 65).

Defendant now makes various challenges to the replacement of Juror No. 88. First, Defendant argues that the replacement of Juror No. 88 was done outside the presence of the Defendant. The Defendant, through counsel, agreed to the process used by the Court to question Juror No. 88 *in camera* and to take action on the request of the juror to be replaced. Defendant was present throughout the entire discussion that led to the adoption of this procedure. As discussed in *Spruill*, a defendant, through counsel, who agrees to a procedure for the replacement of a juror, waives his right to object to the juror's replacement which followed that procedure. *Spruill*, 803 F.3d at 598.

Second, Defendant contends this Court should have tried to encourage Juror No. 88 to remain on the jury and delved into her concerns about jury deliberations. (Dkt. Nos. 224 at 14; 254 at 11, 25). This misapprehends the role of the trial court when having any discussion with a juror while the jury is deliberating. Numerous well-reasoned decisions have made it clear that a trial

judge who finds it necessary to speak with a juror during jury deliberations must avoid any discussion regarding jury deliberations. *See, e.g.*, *Boone*, 458 F. 3d at 329; *Symington*, 195 F.3d at 1086; *Thomas*, 116 F.3d at 618, 620.

The Court made it clear at the outset of the brief encounter with Juror No. 88 that she could not discuss jury deliberations. The only issue for the Court under Rule 24(c)(1) was to determine if she was unable to perform her duties or was otherwise disqualified from performing her duties. After observing Juror No. 88's demeanor, her note to the Court, and her responses to the Court's questions, it was obvious that she was unable to perform her duties as a juror. Further, by advising the Court she was not capable of performing her duties, she effectively disqualified herself as a juror. Indeed, if the Court had allowed Juror No. 88 to remain on the jury and she had voted with the other jurors to convict Defendant on any count, the motion before the Court from Defendant would have been to set aside the verdict because Juror No. 88 was not a competent juror.

Third, Defendant argues that Juror No. 88 was replaced because of her disagreement with other jurors. This is simply untrue. The only reason the Court found it necessary to speak with Juror No. 88 was because she indicated that she was anxious and needed to be replaced with an alternate. The Court's singular focus was on Juror No. 88's ability to perform her duties as a juror. When Juror No. 88 advised the Court she was unable to perform her duties and it was apparent from her demeanor she was in significant emotional distress, the Court agreed to honor her request to be replaced.

Fourth, Defendant argues that the Court should have given an *Allen* charge. An *Allen* charge is appropriate where the Court has been informed that the jury is at an impasse. The standard *Allen* charge, which must be properly balanced to avoid jury coercion, urges all of the jurors to consider the opinions and thoughts of the other jurors while they continue to deliberate

16

with the goal of reaching a verdict. *See United States v. Allen*, 164 U.S. 492 (1896); *United States v. Burgos*, 55 F.3d 933, 935-36 (4th Cir. 1995). The jury had not informed the Court that it was at an impasse, and an *Allen* charge at this point would have been premature.

The supplemental filing by Defense Team No. 2 is a curious document because, by arguing that Defendant's trial team was ineffective regarding the replacement of Jurors 93 and 88, Defense Team No. 2 essentially admitted the Government's argument that Defendant's trial counsel had consented to the procedures adopted by Court and waived any right to subsequently object to the replacement of the jurors which followed those procedures.[1] To establish that a criminal defendant was denied effective assistance of counsel, he must show that his attorney's performance fell below an objective standard of reasonableness and that a reasonable probability exists that but for that ineffective assistance the result would have been different. *Strickland*, 466 at 694. To show an attorney's performance fell below an objective standard of reasonableness, the error must be "so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment." *Harrington v. Richter*, 562 U.S. 86, 104 (2011). The district court must apply a strong presumption that counsel's representation is within a wide range of reasonable professional assistance. *Id*. A defendant seeking to establish ineffective assistance of counsel must also "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689. Courts have shown a marked reluctance to accept an attorney's tactical decision as evidence of ineffective assistance. *Hutchins v. Garrison*, 724 F.2d 1425, 1436 (4th Cir. 1983). The issue of ineffective assistance of counsel

---

[1] Representing a criminal defendant is not like tag team wrestling, where a new member of the team comes into the ring after the first member of the team suffers reverses and needs relief. There is only one client, the defendant, and he is bound by the actions of his counsel acting on his behalf at that time. Defendant does not get a "do over" by replacing his first trial team with a new set of lawyers when he was not able to obtain the results he desired.

17

comes down to "unreasonableness under prevailing professional norms" rather than whether defense counsel's actions deviated from best practice or the common custom. *Strickland*, 466 U.S. at 689.

To establish prejudice, a defendant seeking to establish ineffective assistance of counsel must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 693. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* It is not enough to show that "errors had some conceivable effect on the outcome of the proceeding," rather, counsel's errors must be "so serious as to deprive the defendant a fair trial, a trial whose result is reliable. *Id*. "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010).

The performance of Defendant's trial counsel in addressing the issue of the juror notes and developing a common plan of action was well within professional standards and there was not the slightest suggestion of ineffectiveness. Defense trial counsel were actively engaged in the discussions with the Court and Government counsel, and their client, a sophisticated businessman, was sitting at counsel table throughout these discussions. While the issues presented to the Court were unusual, with the quick succession of multiple juror notes, defense counsel deliberately addressed the issues and consented to the procedures adopted and implemented by the Court. The record before the Court does not remotely approach the first prong of *Strickland* for ineffective assistance of counsel.

The Government correctly notes that Defense Team No. 2 was not present when the juror notes were presented or when trial counsel had to exercise their best professional judgment about the proper course of action. The defense trial team had to make certain tactical decisions in real time without the benefit of knowing the outcome of the trial. Defense Team No. 2 prepared their

supplemental brief six weeks after the verdict in the calm confines of their office and came to their considered judgment that Defendant's trial team was ineffective.[2]  This was certainly not the impression of the Court that evening or presently.

Defendant's argument about prejudice regarding the replacement of Juror No. 88 also does not meet *Strickland* standards.  Juror No. 88 stated in her note that due to her anxiety she was "unable to clearly make my decision." (Dkt. No. 205 at 5).  This is the only contemporaneous evidence in the record regarding where Juror No. 88 stood that evening.  Jury deliberations were still ongoing, and it is essentially unknowable how Juror No. 88 would have ultimately voted on any of the six counts.

Defendant further contends that the Court did not properly charge the newly constituted jury that they must begin their deliberations "anew."  Rule 24(c)(3) provides that "if an alternate replaces a juror after deliberations have begun, the court must instruct the jury to begin its deliberations anew."  After bringing the jury into the courtroom with the two former alternates, the Court directed the jurors "to begin your deliberations again" because the verdict "needs to be the decision of all 12 of you." (Dkt. 223 at 62).  No party voiced any objection with the Court's charge that evening.  Defendant now claims the Court's charge failed to use the term "anew" or state that the deliberations needed to begin with a clean slate. (Dkt. No. 224 at 16). The Government notes that the terms "again" and "anew" are interchangeable. (Dkt. No. 238 at 24). The Court finds the charge was consistent with Rule 24(c)(3).

---

[2]  The Court is reminded of a ditty favored by President Kennedy: "Bullfight critics ranked in rows crowd the enormous plaza full; but only one is there who knows and he's the man who fights the bull."  President John F. Kennedy, National Foreign Policy Conference for Editors and Radio TV Public Affairs Broadcasters, November 22, 1963, http://tiny.cc/9qm4vz.

Defendant's late objection to the Court's charge for the jury to begin their deliberations again is a backdoor challenge to the length of time of deliberations after the alternate jurors replaced Jurors 88 and 93.[3]  The difficulty for Defendant is that there is no minimum time required for jury deliberations, and any inquiry into the details of jury deliberations is strictly prohibited. *See Wilburn v. Eastman Kodak Co.*, 180 F.3d 475, 476 (2d Cir. 1999) ("A jury is not required to deliberate for any set length of time.  Brief deliberation, by itself, does not show that the jury failed to give full, conscientious or impartial consideration of the evidence."); *Guaranty Serv. Corp. v. Am. Employers' Ins. Co.*, 893 F.2d 725, 729 (5th Cir. 1990) ("If the evidence is sufficient to support the verdict, the length of time the jury deliberates is immaterial.").

The two alternate jurors who joined the jury were duly vetted and selected during the jury selection process, sat in the jury box with the other jurors for the entire trial, received the Court's charge, and were retained by the Court in the event a member of the jury needed to be replaced. Once the verdict was announced, all 12 jurors were polled in open court and all jurors confirmed it was their verdict.  The Court finds that the length of deliberations is not a basis to overturn the jury's verdict.

In sum, the Court denies Defendant's motion for a new trial on the basis of the replacement of Juror Nos. 88 and 93.  The Government and Defendant, through counsel, consented to the procedures adopted by the Court, which were fair and reasonable under the circumstances. Further, the Court finds the claims of Defense Team No. 2 that Defendant's trial counsel was ineffective in addressing the replacement of jurors and that Defendant was prejudiced by these alleged errors are wholly without merit.

---

[3] The jury, with the two former alternates, began deliberating at 8:33 p.m. and returned a verdict at 9:22 p.m. (Dkt. No. 223 at 63).

B.     The Alleged Error in the Indictment Regarding the Reference to the Estate of
       Donna Badger and the Court's Warning During Closing Argument
       Which Limited Defense Counsel's Ability to Argue Regarding this Alleged
       Error:

The Second Superseding Indictment (hereafter "Indictment") made multiple allegations

regarding Defendant's role in facilitating the theft of client funds by Alex Murdaugh.  These

allegations included references to settlements obtained by Murdaugh for the Estate of Donna

Badger and Arthur Badger. *See* (Dkt. No. 61 at ¶¶ 8(f), 8(h), 8(i), 8(j)(i-ix), 8k, 12(c), 14, 16).  The

Indictment stated that Murdaugh obtained settlements for both Arthur Badger and the Estate of

Donna Badger and that any reference to the settlement of Arthur Badger or the Estate of Donna

Badger "will be referred to collectively as the Estate of [Donna Badger] throughout the . . .

Indictment." (*Id*. at 3 n. 1).  Defendant argues that treating the settlement of the Estate of Donna

Badger to include the personal injury settlement of Arthur Badger was confusing to the jury and

constituted legal error. (Dkt. No. 224 at 18-23).  Defendant further argues that the Court prevented

his trial counsel from arguing this alleged error to the jury in closing argument. (*Id*. at 23-24).

A little factual context regarding this issue is important.  Arthur Badger and his wife, Donna

Badger, were involved in a severe collision with a United Parcel Service vehicle, resulting in

Donna Badger's death and Arthur Badger's significant personal injuries.  Murdaugh brought a

wrongful death lawsuit on behalf of the Estate of Donna Badger and a separate personal injury

lawsuit on behalf of Arthur Badger.  Civil settlements were reached in both cases, with Arthur

Badger recovering $3.125 million and the Estate of Donna Badger recovering $4.6 million.  Arthur

Badger disclaimed any interest as a beneficiary of his wife's estate, which allowed the couple's

minor children to recover the full amount ultimately paid to the Estate of Donna Badger.

Defendant was appointed to serve as the personal representative of the Estate of Donna Badger.

The settlement sheet for the settlement of Arthur Badger's case provided that $1.35 million was to be paid to Palmetto State Bank for the funding of a structured settlement. The Indictment alleged that Murdaugh directed Defendant to email him and request that his law firm cut the $1.35 million payment into a series of smaller checks, and the Defendant, as part of a conspiracy to commit wire and bank fraud, complied with that request by sending Murdaugh an email asking that the law firm cut nine separate checks totaling the $1.35 million. (Dkt. No. 61 ¶ 8(i)). The Indictment further alleges that the issuance of those nine checks facilitated Murdaugh's theft of $1.35 million in client funds. (*Id*. ¶ 8(j)(i-ix)). The Indictment further alleged in Counts 2 and 3 that Defendant committed bank and wire fraud by negotiating and/or distributing funds at the direction of Murdaugh he knew were the property of the Estate of Donna Badger. (*Id.* ¶¶ 14, 16).

Defendant argues that the claims of the Estate of Donna Badger and the claims of Arthur Badger were legally distinct and referencing them collectively constituted legal error and was confusing to the jury. This argument fails to recognize the plain statement in the Indictment, which recognized that the claims of the Estate of Donna Badger and claims of Arthur Badger were separate settlements, but that for purposes of the Indictment when the Estate of Donna Badger was referenced this included both the Estate's settlement and Arthur Badger's settlement. (*Id*. at 3 n. 1). The Court in its closing charge explained to the jury that any reference in the Indictment to the Estate of Donna Badger included the separate settlement of her husband, Arthur Badger. (Dkt. No. 222 at 115). The defining of a term or phase in a legal document to have a specific meaning in that document is a common practice, and the Court finds that the language of the Indictment and the Court's charge adequately explained this to the jury.[4]

---

[4] Defendant's objection to the definition provided in the Indictment, which he claims created potential jury confusion, ignores the fact that the Defendant and Murdaugh at times treated the settlements of Arthur Badger and the Estate of Donna Badger as interchangeable. For instance,

Defendant also argues that the references in the Indictment to "the Estate of [Donna Badger] and/or the Estate's beneficiaries" did not include Arthur Badger because he was not a beneficiary of the estate, having disclaimed an interest in his wife's estate in favor of his children. (Dkt. No. 224 at 23). This ignores the fact that the Indictment defined the "Estate of Donna Badger" to include any recovery received by Arthur Badger, making the fact that Arthur Badger was not a beneficiary of his wife's estate immaterial. (Dkt. No. 1 at 3 n. 1).

Defendant further objects to comments made by the Court during Defendant's closing argument which he alleges prevented his counsel from arguing that allowing the settlement of the Estate of Donna Badger and the settlement of Arthur Badger to be referred to collectively was legal and factual error. (Dkt. No. 224 at 23). This issue was discussed in some detail during the charge conference. The Court ruled that the definition provided in the Indictment was adequate to clear up any possible confusion and agreed to insert language into the Charge that "under the charges pending, Arthur Badger and the Estate of Donna Badger are referred to collectively as the Estate of Donna Badger." (Dkt. Nos. 222 at 114-17; 223 at 17). Despite the Court's ruling on this matter, defense counsel sought to argue in his closing argument that the stolen client funds had not come from the Estate of Donna Badger. After defense counsel stated "unless you have a broader definition of what the estate means," the Government objected because this clearly conflicted with the wording of the Indictment and the Court's charge on the law. The Court reminded defense counsel that "the definition of Footnote 1 on page 3 of the [I]ndictment says that it includes both

---

the personal representative fee for the Estate of Donna Badger was paid out of the settlement proceeds of Arthur Badger, and six of the checks cut from the $1.35 million from the Arthur Badger settlement funds (which the Government alleged facilitated the theft of the client funds by Alex Murdaugh) stated "Estate of Donna Badger" on the memo line. (Dkt. No. 198 at 147-49; GX 023, 029, 030).

the Badger Estate and Arthur Badger," and defense counsel responded, "I understand." (Dkt. No. 222 at 221).

Defendant argues in its post-trial motion for a new trial that the language of the Indictment created a risk that the jury would believe that Defendant had breached a fiduciary duty to Arthur Badger when he had no fiduciary relationship with him. (Dkt. No. 224 at 23). But the Indictment does not allege that Defendant breached a fiduciary duty to Arthur Badger, and defense counsel argued, without objection from the Government, that Defendant was "not charged with violating his fiduciary duties." (Dkt. No. 222 at 215).

The Court finds that the language of the Indictment adequately explained that any reference to the "Estate of Donna Badger" included any settlement proceeds from the separate settlement of Arthur Badger. This was also explained in the Court's Charge. The Court finds no merit to Defendant's objection to the language of the Indictment or the Court's statement to defense counsel during his closing argument following the Government's objection.

> C.    Court Rulings Regarding Alleged Disagreement Among
>        Palmetto State Bank Board Members as a Motive for
>        Their Adverse Testimony Against Defendant:

Defendant contends he is entitled to a new trial because he sought to offer evidence about alleged disagreements among Palmetto State Bank board members over the possible sale of the bank as a motive for their adverse testimony against Defendant and the Court "shut down the entire line of questioning." (Dkt. No. 224 at 26). The Government opposes, asserting that Defendant raised the issue of motive of board members only during the testimony of the last board member witness called by the Government, Becky Laffitte, and that Ms. Becky Laffitte testified on cross examination regarding this issue. (Dkt. No. 238 at 33-36).

Four Palmetto State Bank board members testified in the Government's case, all family members of Defendant. Jan Malinowski, the current president of the bank, was asked about a 2020 board retreat at which there was a discussion about selling the bank. Mr. Malinowski testified that he was not aware of such a discussion. (Dkt. No. 199 at 130-31). Defense counsel then indicated he wanted to provide Mr. Malinowski some additional information and the Court sustained the Government's objection because it was not proper for defense counsel to testify. The Court explained, "you can put the evidence in, but you can't be a witness. You're the lawyer." (*Id.* at 131). Mr. Malinowski then, when asked if he remembered any discussion at the bank's 2020 retreat, stated that he remembered discussing a number of options regarding the bank's future, including "future growth of the institution, both internally and through acquisition, but also attempting to find out what the current value of the bank was as is." (*Id.* at 131). No further questions were asked about a possible bank sale to Mr. Malinowski.

Spann Laffitte, another bank board member, was asked on cross examination about a discussion about selling the bank during the 2020 bank retreat. Mr. Spann Laffitte testified "I don't think anyone was in favor." (Dkt. No. 218 at 189-90). After a few more questions, the Court stated "I'm struggling with relevance of this. We've got to stay on this case. Whether the bank is going to be sold or not, unless you can link up why that's relevant." Defense counsel simply responded, "[i]t's going to take us awhile." (*Id*. at 192). After several more questions, which provided no evidence that the possible sale of the bank had any relevance, the Court sustained the Government's objection. (*Id*. at 193).

Another bank board member, Dr. Lucius Laffitte, was asked several questions about board actions surrounding the decision to terminate Defendant as the bank's president. When asked for an explanation of relevance at sidebar, defense counsel explained the board members "didn't have

all of the facts and made bad decisions and didn't understand what was going on. And there's a segment of the Board that rallied against him and didn't operate—they misunderstood what was going on." (Dkt. No. 218 at 213). The Court allowed defense counsel to continue questioning Dr. Laffitte on these issues. (*Id*. at 214). No mention was made during the cross examination of Dr. Laffitte of any alleged dissent among board members regarding the possible sale of the bank.

The final board member witness called by the Government, Becky Laffitte, was asked about disagreements among family members on the board concerning the sale of the bank. The Government objected on the grounds of relevance and defense counsel responded "goes to motive to testify. It goes to the very motive." (Dkt. 218 at 308). The Court then allowed the witness to respond to the question. Ms. Laffitte testified that before she joined the board, Defendant's father, the chairman of the board, asked her what her position was regarding the sale of the bank. She responded that she had no position because she had not had the opportunity "to figure out what's going on. . . . I can't tell you what I'm going to do because we don't know what the future holds." (*Id*. at 309-10). Defense counsel asked no further questions about the possible sale of the bank. (*Id*.).

Later in the trial, during the defense case, the Court had a discussion with counsel that referenced the 2020 bank retreat and its potential relevance to the alleged motive of bank board members who had testified in the Government's case. The Court pressed defense counsel for specifics. (Dkt. No. 220 at 193-96). Defense counsel had nothing material to offer connecting the bank retreat discussion to the testimony of the bank board members. The Court repeated its earlier ruling that the Defendant had failed to demonstrate any relationship between a discussion at a 2020 bank retreat and the testimony of bank board members at Defendant's 2023 trial. Further, the

Court stated that the evidence was not admissible under Rule 403 because of potential jury confusion. (*Id*. at 202).

The bottom line was that defense counsel failed to raise any possible relevance of a 2020 bank retreat discussion as a motive for the adverse testimony of bank board members until the cross examination of Becky Laffitte. The Court then allowed the witness to be questioned on the matter. The various board members who testified in the Government's case, all relatives of Defendant, explained that their decision to terminate Defendant was based upon his conduct surrounding actions he took as a fiduciary for Alex Murdaugh's clients and Defendant's decision to pay $680,000 to Murdaugh's former law partners for his (the Defendant's) involvement in transactions which resulted in the theft of client funds. The Court finds Defendant's contention that he is entitled to a new trial based on the Court's rulings related to bank board member testimony wholly without merit.

        D.      <u>The Court Ruling Regarding Deposits Made by Alex Murdaugh into a Bank of America Account</u>:

Defendant sought to admit evidence of a criminal scheme of Alex Murdaugh which did not involve the Defendant or any of the charges against him. This scheme allegedly involved Murdaugh titling an account at Bank of America using a name closely related to a structured settlement company, Forge Consulting, and depositing and then stealing funds out of that account. During the cross examination of a former Alex Murdaugh partner, Ronnie Crosby, defense counsel asked if Alex Murdaugh had fooled a lot of "good, smart people," and Crosby agreed that he did. (Dkt. No. 199 at 229-30). Defense counsel then approached the bench at side bar and indicated he wanted to bring up the Forge Consulting scheme and the Bank of America account. The Court ruled that that the Bank of America account was unrelated to the pending charges and Crosby had already acknowledged he had been fooled by Murdaugh. (*Id*. at 230).

27

Later, during the defense case, defense trial counsel made a reference to the Court not allowing the Defendant to put in evidence about the Forge Consulting scheme that included the use of a Bank of America account. The Court asked defense counsel to explain in more detail what he asserted to the be the relevance of this scheme by Murdaugh that did not involve any of the pending charges and in which Defendant played no role. Defense counsel responded that the scheme with the Forge account involved "Bank of America accepting the same checks" that were sent to Palmetto State Bank. (Dkt. No. 220 at 197). The Court responded that the Bank of America situation was completely different from the pending charges against Defendant because the pending charges involved Defendant's role as a fiduciary over accounts in which client funds were allegedly stolen. Bank of America simply accepted deposits in an account opened by Alex Murdaugh and was "not a conservator or have a fiduciary relationship regarding these clients." (*Id*. at 198). The Court further explained that the Bank of America account involved "a completely unrelated scheme involving Alex Murdaugh." (*Id*. at 199). The Court stated that bringing into this already complex case a series of unrelated transactions that involved a fundamentally different situation had the strong potential to mislead the jury, produce jury confusion, and was not relevant to the pending case. Thus, the Court ruled that the Bank of America/Forge account transactions were kept out under both Rules 401 and 403 of the Federal Rules of Evidence. (*Id*.). The Court denies Defendant's motion for a new trial on the basis of its rulings related to the Bank of America/Forge Account transactions.

E.    The Court's Refusal to Charge an Advice of Counsel Defense:

Defendant argues that the Court erred by failing to instruct the jury on an advice of counsel defense. (Dkt. No. 224 at 29). To be entitled to an advice of counsel defense, "the defendant must establish (a) full disclosure of all pertinent facts to an attorney, and (b) good faith reliance on the

28

attorney's advice." *United States v. Westbrooks*, 780 F.3d 593, 596 (4th Cir. 2015) (emphasis removed); *United States v. Powell*, 680 F.3d 350, 356 (4th Cir. 2012). While the burden of proof for establishing the willfulness of Defendant's conduct rests with the Government, *Westbrooks*, 780 F.3d at 596, only when a defendant establishes a proper evidentiary foundation for an advice of counsel defense at trial will the court instruct the jury on the law governing the defense, *Powell*, 680 F.3d at 356-57. Necessary for the defense is, of course, evidence of actual advice given to and relied on by the defendant. *See U.S. v. Polytarides*, 584 F.2d 1350, 1352 (4th Cir. 1978) ("A crucial element in the defense of acting upon the advice of counsel is that defendant secured the advice on the lawfulness of his possible future conduct."); *United States v. Okun*, No. CRIM. 3:08-CR-132, 2009 WL 414009, at *8 (E.D. Va. Feb. 18, 2009) (noting that the "substance of the advice must reasonably be susceptible to an interpretation that would negate knowledge or intent").

Defendant never testified regarding any specific legal advice which he relied upon prior to undertaking the actions which provided the factual basis for the six counts of the Indictment. During the charging conference, the Court asked defense trial counsel repeatedly to identify specific advice Defendant received from an attorney related to the counts charged in the Second Superseding Indictment. (Dkt. No. 222 at 127-41). Trial defense counsel failed to identify any such advice. *See, e.g.*, (*Id.* at 127-131) (arguing as to Count Four, misapplication of bank funds, that Ronnie Crosby provided Defendant legal advice but failing to specify what said advice consisted of); *see also* (Dkt. No. 238 at 39) (quoting numerous instances during the charging conference where trial defense counsel was asked but could not articulate specific advice Defendant received during the alleged attorney-client relationships). Defendant's instant briefing likewise fails to identify any specific legal advice on which he allegedly relied. *E.g.*, (Dkt. No. 224 at 30) (citing a 2009 email from attorney Ronnie Crosby to a third-party introducing Defendant as

29

"a client of our firm" but failing to articulate what advice Crosby gave Defendant and what count of the Indictment the alleged advice concerns).

By contrast, the Government cites testimony from Defendant's cross examination where Defendant explicitly states he did not rely on Murdaugh as his attorney. While testifying about stolen settlement funds, Defendant stated, "I did receive those checks. And at the—what do you call it?—at the direction of my attorney, which I did not recognize those checks for what they were, and at the direction of my attorney, I cut them into other things." (Dkt. No. 222 at 36). When asked to clarify that he was acting at his attorney's direction, Defendant responded, "Yes, ma'am. He was the attorney for the clients so, yes, ma'am." (*Id.*). The Government then pointed out that Defendant could not be relying on Murdaugh as the victim's attorney when he negotiated said checks unless he knew that the stolen funds belonged to the victims. (*Id.* at 36-37) ("A: I relied on him to negotiate those checks. . . . Q: You can't be relying on him as the conservator unless you know that those funds belonged to Natasha Thomas and Hakeem Pinkney; isn't that right?"). Defendant then recanted his prior statement that Murdaugh acted as his attorney. (*Id.* at 37) ("Well, I guess I misspoke. I'm sorry. I was not relying on him as my attorney.").

The Court denies Defendant's motion for a new trial based on the Court declining to charge an advice of counsel defense. Defendant did not put forth any evidence during trial that he received legal advice from an attorney or relied on that advice at any point during the time alleged in the Indictment. Defendant's own testimony shows as much. Accordingly, the Court denies Defendant's request for a new trial on this basis.

Further, the Court finds it unnecessary under these circumstances to conduct an evidentiary hearing on any matters raised in Defendant's motion for a new trial, and Defendant's motion for an evidentiary hearing is denied. (Dkt. No. 231).

## Rule 29 (c) Motion for Acquittal

1. Legal Standards

Defendant moves for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 (c) based on the insufficiency of the Government's evidence as to all six counts charged in the Indictment. (Dkt. No. 224 at 32-35). The Government filed a response. (Dkt. No. 238). For the reasons stated below, Defendant's motion for a judgment of acquittal is denied.

Rule 29(c) permits a defendant to move the trial court for a judgment of acquittal. Fed. R. Crim. P. 29(c). On motion, the court must determine whether there is "substantial evidence (direct or circumstantial) which, taken in the light most favorable to the prosecution, would warrant a jury finding that the defendant was guilty beyond a reasonable doubt." *United States v. MacCloskey*, 682 F.2d 468, 473 (4th Cir. 1982). "A defendant challenging the sufficiency of the evidence faces a heavy burden." *United States v. Banker*, 876 F.3d 530, 540 (4th Cir. 2017) (citing *United States v. Foster*, 507 F.3d 233, 245 (4th Cir. 2007)). A court must view the evidence in a light most favorable to the government and inquire whether any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. *United States v. Wilson*, 118 F.3d 228, 234 (4th Cir. 1997). A reviewing court is not entitled to assess the credibility of witnesses or weigh the evidence. *Id*. Where the evidence supports differing reasonable interpretations, the jury decides which interpretation to believe. *Id*. The court "must assume that the jury resolved all contradictions in favor of the Government." *United States v. Barronette*, 46 F.4th 177, 203 (4th Cir. 2022). The Court will review the sufficiency of the evidence as to each count in the Indictment.

2. Discussion

A. Count 1 Conspiracy to Commit Wire Fraud and Bank Fraud:

In Count One, Defendant was charged with conspiracy to commit wire fraud and bank fraud. (Dkt. No. 61 at 10-11). The alleged conspiracy was that Defendant and Murdaugh engaged in a scheme to defraud Murdaugh's personal injury clients, and to obtain money and property by materially false and fraudulent pretenses, representations, and promises by making misleading statements, and omitting statements. (*Id.* at 3). To further the conspiracy, Murdaugh requested that Defendant serve as the conservator or personal representative for his personal injury clients. (*Id.* ¶ 8(a)). In this role, Defendant extended loans from the conservatorship account of Hannah Plyler to himself and Murdaugh. Following the settlement of a civil lawsuit, Murdaugh asked Defendant to email him and request for the Law Firm to re-cut Arthur Badger's settlement check into smaller separate checks. (*Id.* ¶ 8(h), 8(j)). Defendant negotiated and distributed checks from funds stolen from other personal injury clients Hakeem Pinckney, Natasha Thomas, and the Estate of Donna Badger to pay back the Plyler loans. (*Id.* ¶¶ 8(b), 8(c), 8(d), 8(e), 8(f), 12).

The Government was required to prove the following elements beyond a reasonable doubt: (1) two or more people entered into a conspiracy, agreement, or understanding to commit an unlawful act; (2) at some point during the existence or life of the conspiracy, agreement, or understanding, the Defendant knew of the unlawful purpose of the agreement; and (3) the Defendant joined the agreement willfully with the intent to further the unlawful purpose. (Dkt. No. 223 at 16-21). Defendant argues the evidence was not sufficient to show Defendant knew of or furthered Murdaugh's unlawful scheme to steal from clients because Defendant only received court approved conservator fees and implemented transparency when he negotiated checks for Murdaugh. (Dkt. No. 224 at 32). The Court will review the sufficiency of the evidence as to this issue.

The record contains substantial evidence that Defendant and Murdaugh conspired to obtain money by fraudulent representations or pretenses to defraud Murdaugh's personal injury clients. Defendant was appointed as conservator or personal representative for several of Murdaugh's personal injury clients where he received over $450,000 in fees. (GX 198 at 14). Defendant extended loans to Murdaugh from Hannah Plyler's conservatorship account that were repaid with checks Defendant negotiated from funds Murdaugh stole from clients. At trial, Defendant testified that he negotiated each check and money order from the stolen client funds from Murdaugh's personal injury clients Arthur Badger, Hakeem Pinckney, and Natasha Thomas that passed through Palmetto State Bank. (Dkt. No. 222 at 24). In December 2011, Defendant negotiated settlement checks that belonged to Hakeem Pinckney and Natasha Thomas for $309,581.46 and $325,000. (*Id.* at 30-31). Upon receipt of the settlement disbursement checks, Defendant negotiated and distributed the funds at Murdaugh's direction to Murdaugh's wife, Murdaugh's boat, Defendant's father, Murdaugh's father, and to repay loans Defendant extended to Murdaugh from Hannah Plyler and Malik Williams' conservatorship accounts. (*Id.* at 30-32).

In addition, in August and September 2012, Defendant broke down $25,245.08 in settlement funds that belonged to Natasha Thomas into smaller amounts for Murdaugh's use. (*Id.* at 38-39). Defendant admitted this was structuring. (*Id.*). In February 2013, Defendant deposited $151,726.05 into Hannah Plyler's conservatorship account with money that belonged to Arthur Badger and/or the Estate of Donna Badger to pay off Murdaugh's unsecured loan that Defendant extended from Hannah Plyler's conservatorship account. (*Id.* at 47). The evidence was sufficient for a reasonable factfinder to find the Defendant willfully joined the conspiracy with the intent to steal client funds or defraud. Considering that Defendant re-cut and negotiated settlement checks at Murdaugh's request and the financial benefit Defendant derived by serving as the conservator

or personal representative for Murdaugh's personal injury clients, the jury could reasonably infer Defendant knew the unlawful purpose of the conspiracy. *United States v. Millender*, 970 F.3d 523, 529-30 (4th Cir. 2020); *United States v. Bajoghli*, 785 F.3d 957, 966-67 (4th Cir. 2015) (evidence of financial gain is particularly probative in a fraud case to establish the defendant's intent to defraud.).

### B. Count 2 Bank Fraud:

In Count Two, Defendant was charged with bank fraud for negotiating and distributing a check totaling $101,369.49 to Hannah Plyler, knowing the funds belonged to the Estate of Donna Badger and/or the Estate's beneficiaries. (Dkt. No. 61 at 3 n.1, 12).[5] The Government was required to prove the following elements beyond a reasonable doubt: (1) the Defendant knowingly executed or attempted to execute a scheme or artifice to obtain any of the moneys, funds, credits, assets, securities, or other property owned by or under the custody of a financial institution by means of false and fraudulent pretenses, representations, or promises; (2) the false or fraudulent pretenses, representations, or promises were about a material fact; (3) the Defendant executed and attempted to execute the scheme with the intent to defraud; and (4) at the time of the execution of this scheme, the financial institution was federally insured. (Dkt. No. 223 at 21-25). Defendant challenges the sufficiency of the evidence that Defendant sought to obtain bank property by means of a fraudulent pretense or representation to obtain money that belonged to Arthur Badger. (Dkt. No. 224 at 21, 33). The Court will review the sufficiency of the evidence as to this issue.

The record contains sufficient evidence for a reasonable jury to find that Defendant sought to obtain bank property by means of a false and fraudulent pretense or representation. A relational

---

[5] The Indictment defined Arthur Badger and the Estate of Donna Badger collectively as "Estate of D.B." (Dkt. No. 61 at 3 n. 1).

component must exist between the alleged false statements or representations and the obtaining of

bank property.    *Loughrin v. United States*, 573 U.S. 351, 362-63 (2014).  "The criminal must

acquire (or attempt to acquire) bank property 'by means of' the misrepresentation." *Id.* at 362-63.

This "typically indicates that the given result (the 'end') is achieved, at least in part, through the

specified action, instrument, or method (the 'means'), such that the connection between the two is

something more than oblique, indirect, and incidental." *Id.* at 363.

In this case, Defendant was appointed to serve as the personal representative of the Estate

of Donna Badger.  (GX 112).  The settlement sheet for the settlement of Arthur Badger's case

provided that Defendant would collect a personal representative fee of $35,000 and $1.35 million

would go to Palmetto State Bank in the form of a structured settlement.  (GX 023).  The Law Firm

subsequently issued a check to Palmetto State Bank with "Arthur Badger-Personal Representative

Fee" in the memo line.  (GX 119).  At Murdaugh's request, Defendant emailed Murdaugh and

asked that Jeanne Seckinger, the Chief Financial Officer of the Law Firm at the time, re-cut the

Badger $1.35 million settlement check into the following amounts: (1) "$388,687.50"; (2)

"$151,726.05; (3) "$75,000.00; (4) "709,586.45."  (GX 037, GX 038, GX 039).  Defendant broke

down the amount totaling $709,586.45 into several smaller checks at Murdaugh's request that

facilitated the theft of $1.35 million in client funds.  (GX 029, GX 030).  For example, one such

smaller check that totaled $101,369.49, and included the memo line: "Estate of Donna Badger"

was deposited into Hannah Plyler's conservatorship account to repay a loan Defendant extended

to Murdaugh.  (GX 029, GX 030).

Defendant testified he would not have looked at the memo line as it is for the writer of the

check to recall what the check is written for.  (Dkt. No. 221 at 161).  A longstanding compliance

officer with Palmetto State Bank testified that the memo line "should be looked at" as part of the

whole when negotiating a check. (Dkt. No. 220 at 23-24). He testified that any bank teller at Palmetto State Bank would have known not to negotiate checks in the manner Defendant did. (*Id.* at 25). The evidence was sufficient for a reasonable factfinder to find the Defendant, as personal representative for the Estate of Donna Badger, re-cut Arthur Badger's $1.35 million settlement check into smaller amounts, and negotiated a check for $101,369.49 in Badger settlement funds to repay loans he extended to Murdaugh from Hannah Plyler's conservatorship account.

### C. Count 3 Wire Fraud:

In Count Three, Defendant was charged with wire fraud for distributing $33,789.83 belonging to the Estate of Donna Badger and/or the Estate's beneficiaries to Murdaugh's personal account, affecting a financial institution. (Dkt. No. 61 at 13). The Government was required to prove the following elements beyond a reasonable doubt: (1) the Defendant knowingly devised or intended to devise a scheme or artifice to defraud for obtaining money or property by means of false or fraudulent pretenses, representations, or promises; (2) the false or fraudulent pretenses, representations, or promises were about a material matter; (3) the Defendant acted with the intent to defraud; (4) in advancing, furthering, or carrying out this scheme, the Defendant transmitted or caused to be transmitted by wire communication in interstate or foreign commerce any writings, signs, or signals, and (5) the scheme affected a financial institution. (Dkt. No. 223 at 25-29). Defendant argues Count Three is untimely because a ten-year statute of limitations for wire fraud only applies when the scheme to defraud affected a financial institution. (Dkt. No. 224 at 33). Defendant argues the evidence is insufficient to demonstrate Defendant obtained bank property by means of a fraudulent pretense or representation to obtain money that belonged to Arthur Badger. (*Id.* at 21, 33). The Court will review the sufficiency of the evidence as to these issues.

36

As alleged in Count Three, in 2013 a check totaling $33,789.83 was made out to Palmetto State Bank and referenced the Estate of Donna Badger in the memo line.  (GX 029).  The deposit slip stated "Donna Badger" but listed Murdaugh's account number and the funds were deposited into Murdaugh's account.  (*Id*.).  These funds were part of the $1.35 million in Badger settlement funds that Murdaugh and Defendant re-cut into smaller checks.  (GX 037, GX 038, GX 039, GX 029, GX 030). When the stolen client funds were discovered in 2021, Defendant cut a check for $680,000 from Palmetto State Bank and delivered it to the Law Firm to cover half of the stolen Badger settlement funds plus half of the personal representative fee Defendant received from Arthur Badger.  (GX 014; GX 014a.)  The $680,000 was a financial loss to Palmetto State Bank.  (Dkt. No. 199 at 35); (Dkt. No. 218 at 165).  The evidence was sufficient for a reasonable factfinder to find that Defendant engaged in wire fraud when he deposited $33,789.83 of Badger settlement money into Murdaugh's account, and this conduct caused a financial loss to Palmetto State Bank.

The record contains substantial evidence that the scheme to defraud affected a financial institution, thereby giving rise to a ten-year statute of limitations for wire fraud.  The statute of limitations for wire fraud is five years, except for wire fraud schemes that affect a financial institution, in which case the statute of limitations is ten years.  *See* 18 U.S.C. §§ 3282, 3293.  A bank is affected by a scheme to defraud if the bank is victimized by the fraud, rather than the scheme's mere use of the financial institution in the transfer of funds.  *United States v. Ubakanma*, 215 F.3d 421, 426 (4th Cir. 2000).  The $33,789.83 of stolen Badger settlement funds were deposited into Murdaugh's account.  (GX 029).  This sum was incorporated into the $680,000 check Defendant delivered from Palmetto State Bank to the Law Firm to account for the Bank's liability in the misappropriated Badger settlement funds.  The $680,000 payment operated as a financial loss to Palmetto State Bank.  (Dkt. No. 199 at 35).  There was sufficient evidence for a

reasonable factfinder to find that Defendant engaged in wire fraud when he deposited Badger settlement funds into Murdaugh's account, and that such conduct victimized the Bank because he used Bank money to repay the misappropriated funds.

### D.  Counts 4-6 Misapplication of Bank Funds:

In Counts Four, Five, and Six, Defendant was charged with misapplication of bank funds. The Government was required to prove the following elements beyond a reasonable doubt: (1) the Defendant was an officer, agent, or employee, or connected in some capacity with Palmetto State Bank at the time charged; (2) the accounts of the Bank were federally insured at the time alleged; (3) the Defendant abstracted, purloined, or misapplied more than $1,000.00 in moneys, funds, or credits belonging to or entrusted to the care of the Bank; (4) the Defendant did so willfully; and (5) the Defendant did so with the intent to inflict financial injury to the Bank or to defraud the Bank.  (Dkt. No. 223 at 31-32).  Intent to injure or defraud can be established by proving, among other things, "that the defendant acted in reckless disregard of the Bank's interest."  (*Id.* at 32). "To act with intent to injure or defraud means to act with intent to deceive or cheat for the purposes of causing a financial loss to the bank, although it is not necessary that the bank has suffered an actual loss, or to bring financial gain or benefit to one's self."  (*Id.* at 32).  Defendant challenges the sufficiency of the evidence with respect to elements four and five.  (Dkt. No. 224 at 33-34). The Court will review the sufficiency of the evidence with respect to these elements.

The evidence was sufficient for a reasonable factfinder to find Defendant acted willfully and with the intent to inflict financial injury on or to defraud Palmetto State Bank as to Counts Four, Five, and Six.  (Dkt. No. 238 at 50).  Count Four alleged that Defendant willfully misapplied bank funds by distributing $680,000 of bank funds to the Law Firm, without notice to or consent from the bank's board of directors, knowing that he had fraudulently transferred the money to Murdaugh.  (Dkt. No. 61 at 14).  Defendant argues the jury should have believed his testimony

when he explained why he paid the Law Firm $680,000, and when he testified that he did not intend to harm his family's bank of which he was both the Chief Executive Officer and a shareholder. (Dkt. No. 224 at 33-34).

In October 2021, Defendant delivered a check for $ 680,000 to the Law Firm from Palmetto State Bank to account for Palmetto State Bank's half of the $1.35 million in stolen Badger funds. Defendant did not explain to Palmetto State Bank's board of directors that the $680,000 payment also included half of the $35,000 personal representative fee he received from Arthur Badger. (Dkt. No. 218 at 274-275); (Dkt. No. 204 at 209).   Nor did Defendant explain the circumstances surrounding the $680,000 check and the stolen Badger money.   Defendant did not disclose to the bank's board of directors that part of this payment included a check for $388,687.50 that Defendant cut to Johnnie Parker, a Partner at the Law Firm, to repay Badger settlement funds for a loan Defendant extended to Murdaugh. (Dkt. No. 204 at 203-04, 212). Defendant did not explain to the bank's board of directors that he negotiated hundreds of thousands of dollars in checks from Badger settlement funds to be deposited into Hannah Plyler's conservatorship account to repay loans he extended to Murdaugh. (Dkt. No. 204 at 205-206). The evidence was sufficient for a reasonable factfinder to find Defendant willfully used money that belonged to the Palmetto State Bank to repay loans he extended to Murdaugh with stolen Badger settlement funds.

With respect to "intent to injure or defraud", the evidence was sufficient for a reasonable factfinder to find that the Defendant misapplied bank funds with the intent to defraud Palmetto State Bank.   "Intent to defraud can be found from circumstantial evidence and is a question for the trier of fact." *United States v. Grainger*, 701 F.2d 308, 311 (4th Cir. 1983). The record reflects that Defendant acted with reckless disregard for Palmetto State Bank's interest when he paid $680,000 of shareholder funds to the Law Firm without the knowledge or approval of the bank's

board of directors; without obtaining a release for the payment; and without fully disclosing the specifics of the payment. (Dkt. No. 218 at 272-73). At trial, Becky Laffite, a board member of the bank testified that the bank is entangled in a lawsuit related to the misappropriated Badger funds. (*Id.* at 273). The evidence was sufficient for a reasonable factfinder to find to find Defendant had the intent to injure or defraud Palmetto State Bank.

Count Five related to a $750,000 loan Defendant extended to Murdaugh for beach house renovations in July and August 2021. (Dkt. No. 61 at 15). The loan was not discussed at the bank's executive committee meeting on July 13, 2021, or the bank's board of directors meeting on July 20, 2021. (Dkt. No. 199 at 5-6, 24). At Murdaugh's request, on July 15, 2021, Defendant authorized a $350,00.00 wire transfer to Chris Wilson, an attorney in Bamberg, South Carolina. (Dkt. No. 204 at 172-73). On August 9, 2021, $400,000.00 was deposited into Murdaugh's personal account to lift Murdaugh out of overdraft. By August 9, 2021, Murdaugh had amassed $367,784.67 in overdraft for expenses unrelated to beach house renovations. (Dkt. No. 199 at 8). At the August 12, 2021 executive committee meeting, the board of directors discussed the $750,000 loan, which was represented to be a loan for purposes of beach house renovations. (*Id.* at 12). The $340,000 wire transfer and $400,000 deposit were not discussed. (*Id.* at 10-13). At the August 17, 2021 board meeting, one board member commented that the "$750,000 loan did not appear to have been approved by the Executive Committee" to which Defendant explained "three of the five members approved the loan." (*Id.* at 23).

The collateral for the loan did not cover the amount of the loan. The loan was partially secured by Murdaugh's share of Green Swamp stock valued at $230,000.00, but said share was pledged elsewhere, and an anticipated second mortgage on the Edisto Beach house appraised at $730,000.00. (Dkt. No. 204 at 164-165); (Dkt. No. 199 at 11); (*Id.* at 10-14). Murdaugh never

made any payments on the $750,000 loan. (Dkt. No. 204 at 172). The evidence was sufficient for a reasonable factfinder to find that the Defendant acted with reckless disregard for Palmetto State Bank's interest when he extended a $750,000 under secured loan to Murdaugh without the consent or approval of the Palmetto State Bank.

Count Six related to Defendant's advance of $284,787.52 from Murdaugh's $500,000 farming line of credit to repay loans Defendant extended to Murdaugh from Hannah Plyler's conservatorship. (Dkt. No. 61 at 16). Defendant extended Murdaugh a line of credit for farming and then advanced the exact amount of money Murdaugh owed on Hannah Plyler's loans in the amount of $284,787.52. (GX 087, 057). Defendant issued a cashier's check to repay Murdaugh's loans and deposited the money into Hannah Plyler's account. (GX 095, 095a). Defendant emailed Murdaugh about the balance of the loans, "These are the loans outstanding. I have advance [sic] $284,787.52 from your credit line to pay these off. She turns 18 and I am closing the conservatorship." (GX 057); (Dkt. No. 219 at 40-41). Murdaugh emailed Defendant, "Also, I need to do whatever we have to do to activate my full credit line. . . . I had not figured the payoff for Hannah and the other loan when I was planning. When we paid those, it took most of the partial line you activated. . . . There are two pieces of equipment I need for planting." (*Id.* at 41-42). At trial, an FDIC expert testified that Murdaugh's farming line of credit should have been used for farming and using the loan funds to replenish funds taken from another account was not a proper use of the loan funds. (Dkt. No. 219 at 40-41). The evidence was sufficient for a reasonable factfinder to find that as the Chief Executive Officer of Palmetto State Bank, Defendant acted with reckless disregard for Palmetto State Bank's interest when he unilaterally extended over $284,787.52 from Murdaugh's farming line of credit to pay back unsecured loans he extended Murdaugh from Hannah Plyler's conservatorship account.

Viewing the evidence in a light most favorable to the Government and analyzing whether any rational trier of fact could find the essential elements of the crimes charged beyond a reasonable doubt, the Court finds Defendant has failed to meet his burden for judgment of acquittal pursuant to Rule 29(c).  The Court denies Defendant's motion.  (Dkt. No. 224).

## Conclusion

For the reasons stated above, Defendant's motion for a new trial, motion for judgment of acquittal, and motion for evidentiary hearing are **DENIED**.  (Dkt. Nos. 224, 242, 254).

**AND IT IS SO ORDERED.**


s/ Richard Mark Gergel
Richard Mark Gergel
United States District Judge

March 6, 2023
Charleston, South Carolina