```
            IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF SOUTH CAROLINA
                    CHARLESTON DIVISION

                        - - -

THE UNITED STATES OF AMERICA, : 2: 22-cr-658
                              :
                              :
      versus                  : August 1, 2023
                              :
                              :
RUSSELL LUCIUS LAFFITTE,      : (Pages 1 - 206)
                              :
              Defendant.      :
                              :

                        - - -
              TRANSCRIPT OF SENTENCING
      BEFORE THE HONORABLE RICHARD M. GERGEL
         UNITED STATES DISTRICT COURT JUDGE
                        - - -
```

**A P P E A R A N C E S:**

For the Government:        EMILY LIMEHOUSE
                           DENISE RELYEA
                           U.S. Attorney's Office
                           151 Meeting Street, Suite 200
                           Charleston, SC 29401

                           WINSTON D. HOLLIDAY
                           U.S. Attorney's Office
                           1441 Main Street, Suite 500
                           Columbia, SC 29201

For the Defendant:         MARK CARROLL MOORE
                           MICHAEL ANTONIO PARENTE
                           Maynard Nexsen PC
                           1230 Main Street, Suite 700
                           Columbia, SC 29201

                           CHERYL D. SHOUN
                           Maynard Nexsen
                           205 King Street, Suite 400
                           Charleston, SC 29401

```
For The Plyler's:          ERIC S. BLAND
                           Bland Richter, LLP
                           18 Broad Street,
                           Charleston, SC 29401

For Natasha Thomas:        JUSTIN BAMBERG
                           Bamberg Legal, LLC
                           104 Bridge Street
                           Bamberg, SC 29003

Court Reporter:            LISA D. SMITH, RPR, CRR
                           Official Court Reporter
                           P.O. Box 835
                           Charleston, SC 29401
```

     Proceedings recorded by mechanical stenography,
transcript produced by computer.

1    *(The following proceedings commenced at 10:00 a.m.)*

2        THE COURT:  Good morning.  Please be seated.

3        MS. LIMEHOUSE:  Good morning, your Honor.

4        THE COURT:  I see a standing lawyer.  Is the

5    government ready to call its next case.

6        MS. LIMEHOUSE:  I hope so, your Honor.  Emily

7    Limehouse, on behalf of the United States.  We're here in the

8    matter of United States of America vs. Russell Lucius

9    Laffitte; criminal docket number 9:  22-658.  Mr. Laffitte is

10   here today, represented by his attorneys, Mr. Mark Moore and

11   Mr. Michael Parente.  We're here for purposes of sentencing.

12       THE COURT:  Thank you very much.

13       Well, which of these able defense lawyers is going to

14   be doing most of the speaking.

15       MR. MOORE:  Well, your Honor, I'm going to be doing

16   some, but I think you'll be happy to know that I'm not going

17   to be doing it all, okay?  And so, Mr. Parente and Ms. Shoun

18   will be --

19       THE COURT:  You brought the A team out here today

20   with Ms. Shoun, huh?

21       MR. MOORE:  You know, I thought that I needed really

22   good able help.  And she's one of the best lawyers I know.

23       THE COURT:  Well, and not to say that Mr. Parente is

24   chopped liver either.  Okay.  Good to have everybody here.

25       Ms. Shoun, good to see you.

4

1          MS. SHOUN:  Thank you, your Honor.

2          THE COURT:  Yes, Ms. Limehouse.

3          MS. LIMEHOUSE:  We would like to put a matter on the

4     record, your Honor, if we may, to kind of deal with some *Fry*

5     issues that may pop up in the future, to prevent those, your

6     Honor.

7          THE COURT:  Okay.

8          MS. LIMEHOUSE:  After the defendant retained Mr.

9     Moore to represent him in these proceedings, we engaged in

10    some negotiations contemplating a joint resolution to this

11    case.  Of course, it was not a plea in the traditional sense

12    because Mr. Laffitte had already been convicted by a jury.

13    But the idea was that we would propose a joint resolution to

14    the Court.  In exchange for that joint resolution, the

15    defendant was going to make some concessions, most

16    importantly, admissions to the government as well as to the

17    Court, agreement to pay restitution, and to waive certain

18    rights he has to contest his conviction and sentence.  We'd

19    like to put those offers on the record, your Honor, and have

20    him confirm verbally that he was advised of those offers and

21    rejected them, so that we can prevent any claims about those

22    offers in the future.

23          THE COURT:  Ms. Limehouse, before we do that.

24          Ms. Perry, can we swear the defendant, please.

25          *(Defendant sworn.)*

5

1          THE COURT:  Very good.  Okay.  Ms. Limehouse,

2    proceed.

3          MS. LIMEHOUSE:  Thank you, your Honor.

4          Over the last few months, we extended two separate

5    offers.  The first offer was a joint sentencing recommendation

6    to a sentencing range of 70 to 78 months.  The government was

7    agreeing to recommend a term of 72 months' incarceration.  And

8    we were going to recommend that that term be served concurrent

9    to any time he received in the state system for similar

10   conduct.  In exchange for this recommendation, the defendant

11   would agree to waive all of his post-conviction rights, and

12   that includes an appeal and 2255, and he would further waive

13   any ineffective assistance of counsel claims that he has

14   against his prior attorneys.  If the Court refused to impose a

15   sentence within this range, he would be able to appeal his

16   sentence and have those rights to contest his conviction and

17   sentence under 2255.  This offer was contingent, however, on

18   the defendant taking full responsibility for his actions and

19   being able to be truthful with the government regarding his

20   conduct.

21         The second offer, your Honor, was a recommended

22   sentence range of 70 to 87 months, with the government

23   recommending an 87-month sentence.  Unlike our prior offer,

24   the defendant was not required to make admissions, but he

25   would have to make full restitution to all of the victims

6

within 60 days of the sentencing, including by liquidating his
assets, if necessary.  He would also agree to withdraw all of
his objections to the presentence report.  In exchange for
this sentencing recommendation, he would have to waive all of
his appellate and 2255 rights, including an ineffective
assistance of counsel claim against his prior counsel.

THE COURT:  Okay.  Mr. Laffitte, good morning, sir.

THE DEFENDANT:  Good morning.

THE COURT:  I want to confirm that you were aware of
both offer number one and offer number two.

THE DEFENDANT:  I was.

THE COURT:  And you had the opportunity to consult
with able counsel concerning your decision?

THE DEFENDANT:  Yes, sir, I was.

THE COURT:  And you made the decision to decline to
accept those offers; is that correct, sir?

THE DEFENDANT:  That is correct.

THE COURT:  Very good.  Thank you, sir.

MR. MOORE:  Your Honor, can I just say one thing
about that, if you don't mind?

THE COURT:  Yes, sir.

MR. MOORE:  I agree with Ms. Limehouse's summary of
the offers.  Obviously, Mr. Laffitte chooses to -- he wishes
to maintain his appellate rights and his 2255 rights.  That is
his decision, obviously.  And so --

7

1          THE COURT:  Mr. Moore, let me make it very clear to

2    you.  I am not a Judge who punishes a defendant for exercising

3    his constitutional right to a jury trial or to maintain his

4    rights for appeal.  And though we put on the record, for *Fry*

5    purposes, the offer and the confirmation that he received it,

6    but it has no weight in my sentencing decision.

7          MR. MOORE:  No.  And, your Honor, I completely

8    understand that.  I knew that well before I walked into the

9    courtroom.  I simply wanted, for clarification purposes, to

10   note that I've had detailed discussions with him; we've had

11   detailed discussions with him.  I just simply wanted to tell

12   your Honor why he's choosing not to take those offers.

13   There's also -- and Ms. Limehouse is correct that the offer

14   was a recommendation of a concurrent sentence in the state

15   system, if he pled guilty in the state system.  But we didn't

16   have sort of a package deal, if you will, with the state at

17   that point.  And so, I just simply tell your Honor those

18   things to give your Honor just a little more information for

19   the purposes of the record and the purposes of the record

20   only.

21          THE COURT:  You know, Mr. Moore, I've always been

22   perplexed a bit when I sentence first about whether I can bind

23   a state judge to make something concurrent anyway, because

24   it's the state's prerogative.

25          MR. MOORE:  Yes, sir.

1      THE COURT:  And if you had asked me that question, I

2  would have made it clear that, though I could recommend it to

3  a state colleague, normally, to avoid that problem -- as you

4  know, you're experienced in this -- would be to have a global

5  resolution with state and federal court.  But had that offer

6  come in front of me, I would have made it clear to the

7  defendant that I had no authority to bind a state judge.

8      MR. MOORE:  Yes, sir.  And I completely understand

9  that.  And I actually explained that to Mr. Laffitte.

10      THE COURT:  Very good.

11      MR. MOORE:  Okay.

12      THE COURT:  Very good.  Okay.  Mr. Moore, I want to

13  confirm, sir, that you've had a chance to review the

14  presentence report?

15      MR. MOORE:  We have.  We have had an opportunity to

16  review the presentence report and its addendums.  And we have

17  some objections.  We have a couple that we have notified

18  your Honor -- I think to the probation officer and the

19  government -- that we have withdrawn.  But we --

20      THE COURT:  Well, we're going to go through that.

21      MR. MOORE:  Yes, sir.

22      THE COURT:  And I want to confirm you've had a chance

23  to speak to your client concerning those objections.

24      MR. MOORE:  I have.  And my client has had an

25  opportunity to read the presentence report and read any and

9

1    all addendums.

2           THE COURT:  Very good.

3           Mr. Laffitte, sir, I want to confirm that you've had

4    a chance to review the presentence report?

5           THE DEFENDANT:  I did, your Honor.

6           THE COURT:  And you've had a chance to consult with

7    your counsel concerning that report?

8           THE DEFENDANT:  Yes, sir.

9           THE COURT:  And those objections?

10          THE DEFENDANT:  Yes, sir.

11          THE COURT:  Very good.  Okay.

12          Mr. Moore, because there are numerous objections,

13   we're going to go through this real slow.  You're going to

14   identify each objection, and you're going to refer me to a

15   paragraph number, because I've got to respond to the

16   objections.  And if Mr. Parente is standing up because he

17   knows it and you don't, that's fine with me too.

18          MR. MOORE:  He's probably going to help me, because

19   he is going to be the one who's going to deal with the

20   objections themselves, your Honor.

21          THE COURT:  That's fine.

22          MR. MOORE:  We are withdrawing an objection to the --

23          THE COURT:  Let's go through the ones you are

24   objecting to and then we'll just say everything else, those

25   are the objections.  Let's have a finite list of these

1    objections which you have.

2            MR. MOORE:  Then I'm going to let Mr. Parente address

3    that, your Honor.

4            THE COURT:  Okay.

5            Good morning, Mr. Parente.

6            MR. PARENTE:  Good morning, your Honor.

7            THE COURT:  He gives you all the fun job, doesn't he?

8            MR. PARENTE:  Yes, sir.  And, your Honor, just for

9    clarification, when you say "reference to a paragraph," you

10   mean in the revised PSR; is that correct?

11           THE COURT:  Yes, in the revised PSR.

12           MR. PARENTE:  Okay.  So, your Honor, our first

13   objection relates to the sophisticated means of the scheme

14   that is referenced in paragraphs 142, 163 and 172 of the

15   revised PSR.

16           THE COURT:  Okay.

17           MR. PARENTE:  And would your Honor like to hear --

18           THE COURT:  I want to get a list, and then what we're

19   going to do -- the format we will use is, I will hear from

20   defense on their -- explain their objection, I will hear from

21   the government concerning its response, and I will rule

22   objection by objection, okay?

23           MR. PARENTE:  Okay.  Thank you, your Honor.

24           So, continuing with the list, the second objection

25   that we're maintaining is abuse of position of trust.

1    Enhancement is noted in paragraphs 146, 166, and 174 of the

2    revised PSR.

3            THE COURT:  I'm sorry.  146?

4            MR. PARENTE:  146, 166 and 174.

5            THE COURT:  Okay.  Good.

6            MR. PARENTE:  And, your Honor, the final objection

7    relates to advocating for a mitigating role reduction, which

8    was not referenced in the PSR.  And that is an objection that

9    we raised with the probation office.

10           THE COURT:  And, Mr. Parente, are there any other

11   objections that you are asserting to the presentence report?

12           MR. PARENTE:  We also have objections to the loss

13   amount, your Honor --

14           THE COURT:  Okay.

15           MR. PARENTE:  -- as well as the restitution, fine,

16   and forfeiture amounts.

17           THE COURT:  Loss amount.  Okay.

18           MR. PARENTE:  And those amounts for loss are included

19   in paragraph 144 of the PSR.

20           THE COURT:  And in regard to the loss objection -- by

21   the way, you object to loss, the restitution, and the fine; is

22   that correct?

23           MR. PARENTE:  And there was a forfeiture -- this

24   might have been separate from the PSR, but there was a

25   preliminary order of forfeiture filed by the government that

1    we also object to.

2            THE COURT:  Okay.  Now, for the loss amount, tell me

3    specifically what matters in the loss amount that there is an

4    objection.

5            MR. PARENTE:  So, your Honor, I think we have a

6    global objection to the total loss amount.  And I will be

7    prepared to go into detail on the loss amounts.  I believe our

8    main objection is to the $680,000 payment as double counting,

9    as the full amount of the settlement is also included, as we

10   detailed in our sentencing memorandum.

11           THE COURT:  Are there any other objections to the

12   loss amount?

13           MR. PARENTE:  We have an overall objection to the

14   amount of the settlements being attributed to Mr. Laffitte.

15           THE COURT:  Well, you need to be specific, Mr.

16   Parente.  What are your objections?

17           MR. PARENTE:  Yes.  So, the $325,000 settlement.

18           THE COURT:  That's Natasha Thomas?

19           MR. PARENTE:  Yes, your Honor.

20           THE COURT:  Okay.

21           MR. PARENTE:  Related to Hakeem Pinckney, it's

22   $309,581.46.

23           THE COURT:  Okay.  What else?

24           MR. PARENTE:  And related to the Arthur Badger case,

25   it's $1,325,000.

1          THE COURT:  Okay.  Any others?

2          MR. PARENTE:  In terms of the fees that Mr. Laffitte

3    received in those cases, we are withdrawing our objection in

4    terms of restitution for those amounts.  And Mr. Moore will

5    discuss that.  But as far as the loss amounts go, we're

6    objecting to those being included as intended losses.

7          THE COURT:  Anything else?

8          MR. PARENTE:  And, your Honor, the final two

9    objections are to the $284,787.52 line of credit and the

10   $750,000 loan.

11         THE COURT:  Anything else?

12         MR. PARENTE:  That covers all the loss amount,

13   your Honor.

14         THE COURT:  Any other objections?

15         MR. PARENTE:  And --

16         THE COURT:  We're going to deal with restitution

17   separately.

18         MR. PARENTE:  Yes.  Restitution is similar.

19         THE COURT:  And I'm going to deal with restitution,

20   fines, and forfeiture separately.

21         MR. PARENTE:  Yes, your Honor.  So, those are all of

22   the --

23         THE COURT:  So, that's the list of all objections to

24   the PSR; is that correct?

25         MR. PARENTE:  Yes, your Honor.  That's correct.

1      THE COURT:  Okay.  So, let's go from the top.

2  Sophisticated means.  Let me hear the argument regarding why

3  the defense objects.

4      MR. PARENTE:  Yes, your Honor.  So, the government

5  argues that this enhancement applies because the scheme

6  involving Mr. Murdaugh was complex.  It involved shell

7  companies, it involved deceiving judges, lawyers, his law

8  partners and others in order to execute and conceal the

9  scheme.  However, it's important to note that Mr. Murdaugh was

10  the one who hid the thefts from everyone.  He hid it from law

11  enforcement, from the victims, from his law partners, from the

12  courts, and he hid it from Mr. Laffitte.  Everyone, including

13  Mr. Laffitte, were shocked to learn about those crimes when

14  they were uncovered.  Mr. Murdaugh may have used Mr. Laffitte

15  in order to execute and conceal the scheme, but as Mr.

16  Murdaugh testified in his state court trial, he did not inform

17  Mr. Laffitte of the means of the scheme.  The scheme may have

18  been sophisticated as it related to Mr. Murdaugh and how he

19  moved money around, but Mr. Laffitte did so unknowingly,

20  unintentionally, and it was not foreseeable to Mr. Laffitte

21  that those means were being used.

22      Your Honor, the Fourth Circuit makes it clear that

23  sophistication requires more than just concealment and

24  complexities that are inherent in the fraud itself, and that

25  fraud, per se, is inadequate for demonstrating the complexity

1    of the scheme.  Your Honor, there's inherently an aspect of

2    concealment in all fraud cases, as well as this one, and the

3    Fourth Circuit has recognized as much, specifically for bank

4    fraud cases.  Virtually, all bank fraud cases involve some

5    level of misrepresentation and hiding of assets and

6    misrepresentations to banking institutions.  As I mentioned,

7    Mr. Murdaugh did not disclose the fact that he was stealing

8    the settlement proceeds to Mr. Laffitte.  And that disclosure

9    does not constitute a finding of sophisticated means as it

10   applies to Mr. Laffitte.

11        In terms of concealment, the government introduced

12   much evidence during the trial that came from Mr. Laffitte's

13   work e-mail, came from Mr. Murdaugh's work e-mail as well.

14   And using that, they were openly discussing the checks and

15   amounts and things like that.  There was not that added level

16   of concealment required for the sophisticated means

17   application here.  The concealment that the government

18   discusses in their sentencing memo is inherent in the

19   underlying conviction itself.  And they're predicated on the

20   idea that Mr. Laffitte didn't have authorization from the

21   Board or the full executive committee to make certain loans or

22   payments.  And I believe the government argues that those same

23   facts that led to the conviction are now constituting a

24   sophisticated scheme enhancement.

25        THE COURT:  Very good.

1          MR. PARENTE:  Thank you.

2          THE COURT:  From the government?

3          MS. LIMEHOUSE:  Thank you, your Honor.  I'll first

4    sort of address the specific objections claiming that these

5    are all Mr. Murdaugh's actions, that Mr. Laffitte didn't have

6    any knowledge of them.

7          THE COURT:  I think I heard that at trial, Ms.

8    Limehouse.

9          MS. LIMEHOUSE:  I heard it a few times, and I think

10   the jury heard it, most importantly, and squarely rejected it.

11         THE COURT:  And if he was completely uninformed and

12   had no intent, the jury would have acquitted him.

13         MS. LIMEHOUSE:  And that's correct, your Honor.  He's

14   been convicted here today of conspiring with Mr. Murdaugh to

15   the steal funds from Mr. Murdaugh's clients.  That's why we

16   are here.  And so, these general objections that try to

17   relitigate his guilt shouldn't take the day, to begin with.

18         When we talk about the specific sophistication of

19   both the scheme with Mr. Laffitte and Mr. Murdaugh, as well as

20   Mr. Laffitte's own conduct with respect to Counts 4 through 6,

21   we are talking about the highly complex and sophisticated

22   scheme that spanned more than eight years.  And this

23   sophisticated and complex scheme involved vulnerable

24   individuals, misrepresentations to courts, law partners, bank,

25   family members, and the vulnerable victims themselves.  They

1    made misrepresentations in court documents to get Mr. Laffitte
2    appointed to serve as a conservator and personal
3    representative for some of these vulnerable individuals.  And
4    those misrepresentations made these crimes possible.  They
5    then directed law firm employees and staff members to draft
6    checks in a certain way to further the conspiracy and to allow
7    them to conceal their conduct.  He structured transactions for
8    Mr. Murdaugh to avoid reporting requirements.  I think if you
9    look at the way that Mr. Laffitte and Mr. Murdaugh structured
10   Natasha Thomas's $25,000 check -- and that's Government's
11   Exhibit 198, slide 9 -- you see what is indicative of this
12   entire scheme, which is Mr. Murdaugh presenting a check to Mr.
13   Laffitte; that check is, of course, over $25,000 and would
14   trigger reporting requirements by Mr. Laffitte as a bank
15   executive, bank employee, if he were to cash that check that
16   day.  So, instead of cashing that check, he issues a money
17   order, and then he allows Mr. Murdaugh to take less than
18   $10,000 in cash on that same day.
19             THE COURT:  Remind me which check that was.
20             MS. LIMEHOUSE:  That's the $25,245.08 check.
21             If we could pull up Government's 198, please, slide
22   number --
23             THE COURT:  And the victim there is?
24             MS. LIMEHOUSE:  Ms. Natasha Thomas.
25             THE COURT:  Yes.  Okay.

1          MS. LIMEHOUSE:  And this is Government's 198,
2     admitted during the trial, slide number nine.
3          What we see is on August 29th of 2012, Mr. Murdaugh
4     presents the $25,000 check from Natasha Thomas to Mr.
5     Laffitte.  And rather than allowing him to cash out that
6     $25,000 check in full, which would require Mr. Laffitte to
7     report that transaction, he splits it up into two separate
8     transactions, issuing a $16,000 money order and allowing Mr.
9     Murdaugh to take $9,000 in cash, just under that $10,000
10    reporting requirement.  And then he comes back the next day
11    with that $16,000 money order, and he, again, splits it in
12    two.  And he allows him to take out $9,000 again, just under
13    the $10,000 reporting requirement, and then he issues another
14    money order for just over $7,000.  And then that $7,000 money
15    order is negotiated five days later.  And that, to the
16    government, is just indicative of the scheme as a whole.  Mr.
17    Laffitte is using his position as a bank executive and bank
18    employee to allow Mr. Murdaugh to steal funds in a complex and
19    sophisticated way that conceals the conduct itself.
20         When we talk about the way these funds were stolen,
21    not just the $25,000, but all of the funds stolen from Hakeem
22    Pinckney, Natasha Thomas and Arthur Badger, all of these
23    checks were drafted to the Palmetto State Bank.
24         THE COURT:  Yeah.  Talk about the 1.325 check that
25    was broken up, as instructed by the defendant.

1          MS. LIMEHOUSE:  That's correct, your Honor.  So, we
2    know that in November of 2012 -- November 19th, to be exact --
3    Mr. Arthur Badger signed the disbursement sheet.  Mr. Laffitte
4    testified during his bond hearing that he did, in fact, see
5    that disbursement sheet, which showed that he, at the Palmetto
6    State Bank, would receive $1,325,000 to structure a settlement
7    for Mr. Badger, and that he would also receive $35,000 as
8    personal representative.  Even though he wasn't a personal
9    representative for Arthur Badger, he would be receiving
10   $35,000.  That same day, November 19th, e-mails between Mr.
11   Murdaugh and Mr. Laffitte show that they met at the bank, and
12   then the following day, November 20th, Mr. Laffitte negotiates
13   his $35,000 personal representative fee that he took from that
14   settlement.
15          And if you fast forward a couple months to February
16   of 2013, Mr. Murdaugh e-mails Mr. Laffitte and asks that he
17   e-mail him separately to request that law firm staff recut
18   check number -- check number totalling $1,325,000 and lists a
19   couple amounts.  And he also requests that Mr. Laffitte do
20   some math for him on loans that he owes to Hannah Plyler, that
21   Mr. Laffitte extended from his conservatorship account.
22          If we can pull up Government's 38, please?
23          And this is the e-mail that Mr. Laffitte then sends
24   to Mr. Murdaugh separately.  So, he starts a whole new e-mail
25   chain after doing the math at Mr. Murdaugh's direction and

1    request.  And he asks him to recut the check in these

2    following amounts.  And then Mr. Murdaugh sends that e-mail to

3    law firm staff, and law firm staff issues --

4            THE COURT:  You ever hear any explanation why Mr.

5    Laffitte would be communicating with Mr. Murdaugh's own

6    bookkeeper?

7            MS. LIMEHOUSE:  Well, Mr. Laffitte is related to

8    Ms. Jeanne Secklinger.

9            THE COURT:  Oh, I understand.  But he didn't do it to

10   his sister-in-law --

11           MS. LIMEHOUSE:  Exactly.

12           THE COURT:  -- he did it at the request of Mr.

13   Murdaugh.  It struck the Court as highly unusual if one was

14   not in on the game --

15           MS. LIMEHOUSE:  Exactly.

16           THE COURT:  -- to be communicating to -- for Mr.

17   Murdaugh to ask Mr. Laffitte to take this $1.325 million check

18   and break it into four parts, and then rather than go to his

19   own bookkeeper, which I presume is down the hall, but to

20   engage Mr. Laffitte, the brother-in-law of the bookkeeper, in

21   the scheme.

22           And I might not remember correctly, but I think the

23   defendant, on the stand, said:  I know this looks bad.  I knew

24   when I saw it, it looked bad.  Yeah, it looks really bad.

25   There's no good explanation.  If you are completely unaware of

1     what's going on and not engaged in a criminal conspiracy, as

2     this jury found, then there's really no explanation why the

3     defendant would be communicating with Mr. Murdaugh's

4     bookkeeper.

5          MS. LIMEHOUSE:  Well, the reality is that he, as the

6     personal representative from the state, had to be the one

7     making that direction to the law firm, because his appointment

8     as personal representative was necessary and integral to this

9     conspiracy.

10          THE COURT:  Explain that.

11          MS. LIMEHOUSE:  He was the one that would have had

12     control over those funds.  He, at Palmetto State Bank, was

13     receiving that 1.325 to structure the settlement per client's

14     request, according to the disbursement sheet -- that's

15     government's 23.  And so, if it didn't come from him at

16     Palmetto State Bank, the law firm wouldn't have cut that check

17     in that way.  And so, he knew he had to instruct law firm

18     staff to cut the check in those ways, because he was the one

19     at Palmetto State Bank that would be receiving the 1.325.

20          THE COURT:  Okay.

21          MS. LIMEHOUSE:  So, the fact, though, that these

22     checks are drafted to Palmetto State Bank further shows the

23     sophistication of this conspiracy, and the fact that they used

24     these complex methods to conceal their conduct.  So, all of

25     these checks were originally drafted correctly to Russell

1       Laffitte as either the conservator or the personal

2       representative for these individuals.  And the general ledgers

3       from the law firm show that these checks were originally

4       drafted properly.  But they were voided and drafted to

5       Palmetto State Bank instead, which meant, rather than the

6       funds going to these conservator accounts, as they should

7       have, or to Mr. Murdaugh individually, if this money belonged

8       to him, it was sent to sort of a general holding account at

9       Palmetto State Bank, that could not be tied to Mr. Murdaugh,

10      that would not be tied to Mr. Laffitte, and that would allow

11      them to conceal the source and destination of these funds.

12             So, when we look at the sophisticated means

13      enhancement and the way the application notes define it, it

14      specifically addresses how transactions are concealed.  And

15      what's important about the Palmetto State Bank is that the

16      evidence at the trial showed that Mr. Murdaugh was not keeping

17      up with his finances, he was relying heavily on the defendant

18      to manage his accounts, to make sure he was getting out of

19      overdraft, to manage his loans and the repayment of these

20      loans.  There are e-mails where Russell explains to him

21      exactly what he's doing with his accounts and his loans, and

22      Mr. Murdaugh responds a couple days later and says:  Hold off,

23      I can't even follow this on my phone.  He was relying on the

24      defendant to manage all these transactions for him.  Mr.

25      Murdaugh did not know or appreciate the significance of

1    drafting these checks to the Palmetto State Bank.  The only

2    person who knew and appreciated and understood the

3    significance of these funds going to Palmetto State Bank was

4    the defendant, as a bank executive and a bank employee.  And

5    he knew that having these checks drafted to Palmetto State

6    Bank would help them to disguise the source and origin and

7    destination of these funds and conceal their conduct.  And we

8    know he knew that and he made a decision to have those checks

9    drafted in that way because it's the same way that his

10   conservator and PR fee checks were drafted.  And according to

11   his own testimony during trial, he didn't pay taxes on those

12   fees, and he knew he could hide it from the IRS, because those

13   checks were drafted to Palmetto State Bank rather than to him

14   individually.  And so, the way these checks were drafted are,

15   again, just further indicative of the complexity and

16   sophistication of the scheme.

17            And so, that's how we talk about Count 1.  But we

18   also see the sophistication of his own conduct in Counts 4

19   through 6, which had nothing to do with Mr. Murdaugh, except

20   for --

21            THE COURT:  He's not involved at all.  These are

22   misapplication of bank funds.

23            MS. LIMEHOUSE:  Exactly right.  He's not charged,

24   he's not a coconspirator.  This is just Mr. Laffitte's

25   conduct.  And Count 4, of course, is $680,000 payment.  And in

1    Count 4, which he is charged with willfully misapplying bank

2    funds, we know that he paid the law firm in a desperate

3    attempt to cover up his conduct and hopefully prevent them

4    from uncovering his role in this conspiracy and further

5    investigation.  And he did that by lying to his family and to

6    the bank, and by disguising this as an agreement to settle

7    some civil claims, when, in reality, that was never what

8    happened with that $680,000 payment.

9            And then, of course, we have Count 5, the $750,000.

10   That's two transactions of $350,000 wire to Chris Wilson, Mr.

11   Murdaugh's lawyer; and a $400,000 transfer that he made after

12   the bank started asking questions.  And Mr. Murdaugh was over

13   $367,000 in overdraft.  He issues him $400,000 of bank funds.

14           THE COURT:  That loan was for beach house

15   renovations.

16           MS. LIMEHOUSE:  That's what he claimed it to be.

17   Exactly.

18           THE COURT:  And he applied it himself to other

19   purposes.

20           MS. LIMEHOUSE:  After extending these two

21   transactions, the 350 and the 400, he creates loan documents

22   to make these two transactions look like legitimate loan for

23   purposes of beach-house renovations, backdating loan documents

24   and directing employees to backdate loan documents, to try to

25   conceal his own misapplication of $750,000.

1          And then, of course, lastly, with Count 6, that's the
2     line of credit for purposes of farming.  And what we saw is
3     that Miss Hannah Plyler was turning 18.  And Mr. Murdaugh owed
4     her over $284,000 on the loans Mr. Laffitte had extended.  But
5     Mr. Laffitte knew Mr. Murdaugh didn't have money to pay her
6     back, so he issued her a line of credit for purposes of
7     farming, then issued a money order to Ms. Plyler from that
8     line of credit and used the funds that were supposed to be
9     used for farming purposes to pay off Hannah Plyler.

10          So, not only is his conduct with Mr. Murdaugh in
11     Count 1 and the related counts, 2 and 3, sophisticated and
12     complex, but also his conduct in Counts 4 through 6.  And when
13     we look at -- according to the direction of the guidelines,
14     you don't look at isolated conduct, you look at the scheme as
15     a whole.  And we're talking about an eight-year scheme that
16     involved concealing and misrepresentations and deception.  Not
17     just general fraud, but a scheme that was highly complex and
18     sophisticated and really allowed them to get away with this
19     for as long as they did.

20          THE COURT:  Well, the application note to 2B1.1
21     relating to sophisticated means says:  "Sophisticated means,
22     especially complex, or especially intricate offense conduct,
23     pertaining to the execution or concealment of an offense."

24          Maybe I'm just simple, but this was an
25     extraordinarily complex criminal scheme that involved Mr.

1    Murdaugh; Mr. Laffitte, carrying two hats, as a bank officer

2    and as a fiduciary.  And the interplay of those allowed this

3    fraudulent scheme to go on for eight years.  I've sentenced a

4    lot of people under statutes for wire fraud.  This is as

5    sophisticated a crime as I've seen in my 13 years on the

6    bench.  I overrule the objection as to sophisticated means.

7            Mr. Parente, what's your next one?

8            MR. PARENTE:  Thank you, your Honor.  And relatedly

9    -- and I'll be brief on this one.  The abuse of position of

10   trust enhancement is our next objection.  We do not contest

11   that Mr. Laffitte, as your Honor has recognized, had a

12   fiduciary relationship.  He testified as much at trial that he

13   owed a duty to the victims.  But just the simple existence of

14   the fiduciary duty is not enough to apply this enhancement

15   under the Fourth Circuit's precedent.  There is a commentary

16   in the guidelines that discusses a bank executive's fraudulent

17   loan schemes, but the Fourth Circuit has gone on to say that

18   it's a very fact-based inquiry that must be determined,

19   because the enhancement is not designed around certain job

20   positions or job titles.

21            And then fraud, alone, does not show that -- is not

22   enough that the victim had confidence in the defendant.  And

23   so, while we don't argue that there was a position of trust,

24   we do object that there was an abuse based on that position of

25   trust.  Mr. Laffitte did not leverage that fiduciary

1     relationship in order to defraud the victims.

2            THE COURT:  Government's response?

3            MS. LIMEHOUSE:  Thank you, your Honor.  The

4     government finds it interesting that, in the objection to the

5     abuse of trust enhancement, they claim that because Mr.

6     Laffitte didn't even meet any of these individuals, surely he

7     didn't have a relationship of trust.  Yet, they also argue

8     that his personal representative and conservator fees

9     shouldn't be accounted for his loss because they were for

10    services rendered.  And the reality is that, although he

11    violated his trust with these individuals and the fiduciary

12    relationship that he owed them, and was appointed to serve by

13    the Court, he still had that position of trust, and that

14    position of trust is what enabled him to commit these crimes.

15            As we said, they made misrepresentations to the Court

16    to have him appointed as a conservator and a personal

17    representative.  And without his service in those roles, Mr.

18    Murdaugh and Mr. Laffitte would not have been able to steal

19    these funds.  So, his role in that position of trust was

20    absolutely essential to the commission of these crimes.  He

21    was entrusted as a fiduciary with the management and oversight

22    of the victim's settlement and funds, yet, he never even met

23    them.  And so, just because he violated that trust, doesn't

24    mean he did not have that role to begin with.  And as the

25    Court pointed out, sort of two hats, it's the bank executive

1    and the fiduciary as a conservator and PR.

2         And so, when we look at the abuse of trust

3    enhancement and the application notes, it talks about how it's

4    characterized by professional or managerial discretion.  And

5    we look at the discretion that the defendant had as a bank

6    executive, and that's what allowed him to commit these crimes

7    with Mr. Murdaugh.  He had broad discretion, and that

8    discretion allowed him to personally negotiate hundreds of

9    thousands of dollars in checks, it allowed him to structure

10   these transactions, it allowed him to have these checks

11   drafted to Palmetto State Bank to conceal their conduct, and

12   it allowed him to extend these fraudulent loans and authorize

13   hundreds of thousands of dollars in wire transfers only

14   because of his position of trust in the bank.  And so, his

15   position of trust both as a bank executive and as a fiduciary

16   were essential to these schemes and to the furtherance of

17   these crimes.  And so, we believe it's an appropriate

18   enhancement.

19        THE COURT:  Application note 3B1.3, abuse of position

20   of trust says:  Public or private trust refers to a position

21   of public or private trust characterized by professional or

22   managerial discretion, i.e. substantial discretionary judgment

23   that is ordinarily given considerable deference.  Persons

24   holding such a position are ordinarily subject to

25   significantly less supervision than employees'

1    responsibilities are primarily nondiscretionary in nature."

2         This is, to me, plainly applicable for this

3    situation.  The defendant was in two positions of trust, both

4    as a bank officer and as a fiduciary over the accounts of very

5    vulnerable individuals.  These individuals -- one was a

6    quadriplegic.  Many of them were minors.  They were people who

7    had suffered severe injuries.  They were grieving from the

8    loss of loved ones.  This was really -- this was a serious,

9    severe abuse of public trust.  And I overrule that objection.

10         Mr. Parente, next?

11         MR. PARENTE:  Thank you, your Honor.  And the final

12    enhancement of the role reduction for the mitigating role, we

13    believe that Mr. Laffitte is entitled to a two-level reduction

14    under that guideline as a minor participant.  We're not

15    arguing that Mr. Laffitte was a minimal participant or

16    somewhere in between.

17         THE COURT:  How about Counts 4 through 6, Mr.

18    Parente?  He's the only one charged with those offenses.

19         MR. PARENTE:  Yes, your Honor.  And I believe the

20    application of this role applies to the overall scheme.

21    Counts 4 through 6 had some times with Mr. Murdaugh and the

22    overall scheme covering --

23         THE COURT:  But you agree with me it's not a

24    mitigating role as to Counts 4 through 6, because he's the

25    only one involved?

1    MR. PARENTE:  As to those roles specifically.  But I

2    believe that the role encompasses the entire scheme.

3    THE COURT:  So, if he has a mitigating -- I don't,

4    frankly, agree with your mitigating analysis as to the

5    Counts 1 through 3.  But to 4 through 6, so you're saying that

6    unless you can show that his role wasn't mitigating as to

7    every count, that he gets a mitigating role?  Is that your

8    argument?

9    MR. PARENTE:  So, I believe that the totality of the

10   circumstances, that the whole scheme shows that he was a minor

11   participant in that.  The 4 through 6 are related to

12   transactions that were involved in the conspiracy count of

13   Count 1.

14   THE COURT:  Okay.  Ms. Limehouse?

15   MS. LIMEHOUSE:  Thank you, your Honor.  The

16   guidelines sort of set forth a non-exhaustive list of factors

17   for the Court to consider in determining --

18   THE COURT:  It does.

19   MS. LIMEHOUSE:  -- whether to apply the minor role

20   reduction under the guidelines.  And so, I'll just briefly go

21   through these factors.  But first, I want to point out that,

22   in their objections, they claim that the defendant did not

23   benefit from the scheme.

24   THE COURT:  $400,000, Ms. Limehouse.

25   MS. LIMEHOUSE:  Yes.  Over $400,000 in fees, most of

1   which he did not pay taxes on.  So, it's tax-free income.  He

2   extended himself loans at favorable interest rates, totalling

3   over $350,000.  He then used those loans for his own personal

4   expense, putting in a pool, renovating his beach house, paying

5   off his credit cards, and paying off the loan that he had

6   obtained at a much higher interest rate at a different bank.

7   Now, I don't know what a benefit is if that's not a benefit.

8          And, of course, we talk about his specific financial

9   and pecuniary benefit, but also the benefit to the bank as a

10  whole, by his own testimony.  He claims Mr. Murdaugh paid

11  millions in fees over the course of their relationship, that

12  his law firm was the largest private customer of the bank, and

13  that maintaining that relationship between the law firm and

14  the bank was incredibly important to him individually, and to

15  the bank professionally.  So, he did benefit from this scheme.

16         We talk about the scope and structure of activity,

17  and the defendant's knowledge of understanding the scope and

18  structure of that activity.  The defendant was the only person

19  who saw where this money was coming from and where it was

20  going.  He had a full understanding as a person appointed to

21  protect these funds, knowing how much these individuals were

22  supposed to receive, and where that money was supposed to be

23  going, and the person that personally negotiated every single

24  one of these checks that went everywhere else at Mr.

25  Murdaugh's direction and at his benefits.

32

1      The next factor is the disagree to which he was

2   involved in the planning and organizing.  Again, I will point

3   the Court to our argument over issuing these checks to

4   Palmetto State Bank.  The government believes that's Mr.

5   Laffitte's decision, because Mr. Murdaugh would not and could

6   not have known of the significance of drafting those checks to

7   Palmetto State Bank, and, again, how he was able to avoid

8   paying his taxes because of the way these checks were drafted.

9   He was the one, according to all the evidence presented during

10  the trial, that managed all of Mr. Murdaugh's finances.  He

11  covered his overdraft, he extended him loans, he made sure

12  those loans were paid off.  He kept the activity, the criminal

13  activity, organized.

14      The next factor is his decision-making authority.  He

15  made the decision, according to his own admissions, to

16  negotiate every single one of these checks.  He made the

17  decision on how some of these stolen funds would be used,

18  because he issued these loans from Ms. Plyler's

19  conservatorship account, and he used those stolen funds to pay

20  back the loans that he had extended from Hannah Plyler's

21  account.  And he was the one tracking those loans and the

22  repayment.

23      And then lastly, if we look at the nature and extent

24  of his participation in this scheme, again, he negotiated

25  every check.  We heard testimony from the defense's own

1    witness, Mr. John Peters.  And he said any one of those

2    checks, he or a bank teller at Palmetto State Bank, would

3    never had negotiated in the way that Mr. Murdaugh requested

4    him to do it.  And so, the nature and extent of his

5    participation is wide ranging, far reaching, and covers the

6    entire conspiracy.  There is no doubt that this would not have

7    happened without Mr. Murdaugh, but it could not have happened

8    without Mr. Laffitte.

9              THE COURT:  Well, you know, there is a designation --

10   not applicable here -- for leadership, where additional

11   factors are added because the person is the so-called kingpin

12   or leader.  I haven't seen Mr. Murdaugh's PSR -- he hasn't

13   pled in front of me -- but I would anticipate that might be an

14   enhancement he would get.  But, because someone gets the

15   leader designation, doesn't mean everybody else is a

16   mitigator.  That's just an additional thing.  And I think Mr.

17   Murdaugh was the leader.  But the evidence here is just

18   overwhelming that Mr. Laffitte was an integral part of this

19   operation.

20             And, Mr. Parente, you want to say something, sir?

21             MR. PARENTE:  Your Honor, if I could briefly respond

22   to the factors that Ms. Limehouse just discussed?

23             THE COURT:  Sure.  Be glad to hear from you.

24             MR. PARENTE:  And I think your Honor just mentioned

25   that the government argues that Mr. Laffitte was an integral

1    part, necessary and essential to the scheme.  But the Courts
2    have recognized that, just because someone is essential to the
3    scheme, does not automatically --
4             THE COURT:  That, alone, is not enough.  It's got to
5    be -- you can measure, and I was about to walk through each of
6    those factors under the application note for 3B1.2 --
7             MR. PARENTE:  Yes.
8             THE COURT:  -- to discuss those.  But you're
9    absolutely correct.  If it was just, I mean, a single -- I've
10   had situations in cases where a person involved in a single
11   episode is sort of essential for the crime to have occurred
12   but was, otherwise, a very minor character in the story.
13   Yeah, even though he may have been essential.  But the factors
14   here are very different from that.
15            MR. PARENTE:  Yes, your Honor.  And I will address
16   those factors.  But I think the classic case where a
17   mitigating role reduction comes up is with a drug courier.
18   And they're often granted this role reduction if they're
19   unknowing of the type, and quantity, and exact scheme of the
20   drugs that they're transporting.
21            THE COURT:  Right.  The mules -- so-called mules, the
22   common feature is they don't know who has arranged it.  They
23   pull up into a parking lot in New York City, somebody puts
24   something in their trunk, they have no idea what it is, and
25   they drive to Florida, and when they go through I-95, an

1   officer pulls them over, and they don't have any idea.  That

2   does not describe this eight-year scheme and Mr. Laffitte's

3   involvement in that eight-year scheme.

4           MR. PARENTE:  And, your Honor, I think it goes to

5   some of the factors that Ms. Limehouse discussed earlier about

6   the decision-making authority that Mr. Laffitte did not

7   exercise.  We saw the example of the Arthur Badger checks that

8   were sent earlier.  Mr. Murdaugh sent Mr. Laffitte an e-mail

9   saying, here are the amounts that I would like this check to

10  be recut as, you know, and the remainders go here and here.

11  And Mr. Laffitte simply sends an e-mail following that

12  direction.

13          THE COURT:  I think he does more than that.  I

14  thought there was some changes he made.

15          MR. PARENTE:  I believe there was some --

16          THE COURT:  He calculated, I think, the overdrafts

17  and so forth, if I remember correctly.  Mr. Parente, you're a

18  little disadvantaged since you weren't here for the trial.

19  But I will tell you, I remember that.  And I don't think

20  that's helpful to your client, to talk about that

21  communication with the defendant -- with Mr. Murdaugh's

22  bookkeeper.  That, to me, was a fingerprint of personal

23  engagement that was very damaging to him.  And as I mentioned

24  earlier, I recall Mr. Laffitte acknowledging on the stand how

25  bad it looked.  He's right, it looked really bad.

1          MR. PARENTE:  Understood, your Honor.  And I agree

2    with you.  But just simply making the point that he was

3    following direction.  He was not exerting his own authority.

4          THE COURT:  He's the fiduciary.  He's in charge.

5    It's his discretion to do these things.  And as a bank

6    officer, he doesn't work for Mr. Murdaugh.  He has a fiduciary

7    duty to his bank, to the Board.  You know, did Mr. Murdaugh

8    exercise a lot of discretion?  Sure, he did.  Did Mr. Laffitte

9    exercise a lot of discretion?  Yes, he did.

10         MR. PARENTE:  Yes, your Honor.  And I think just the

11   overall application of this reduction talks about the

12   comparison between defendants engaged in the same scheme.  And

13   looking at Mr. Murdaugh, compared to Mr. Laffitte, the

14   millions of dollars that Mr. Murdaugh pocketed personally, Mr.

15   Laffitte did receive --

16         THE COURT:  How much?

17         MR. PARENTE:  -- fees -- I'm sorry?

18         THE COURT:  How much did Mr. Laffitte obtain from his

19   participation in this scheme?

20         MR. PARENTE:  I think overall from the fees he

21   collected over a period of time was over $400,000.

22         THE COURT:  Thank you.

23         MR. PARENTE:  Thank you, your Honor.

24         THE COURT:  Let me refer back to -- Ms. Limehouse was

25   referring to the role of 3B1.1, aggravating role and

1    mitigating role.  And it says:  "Factors the Court should

2    consider" -- and this is not an exhaustive list -- "include

3    the exercise of decision-making authority."  That's number

4    one.  A lot of it here in the role both as a bank officer and

5    as a fiduciary.  "The nature of participation in the

6    commission of the offense."  We talked about that extensively.

7    "The recruitment of accomplices."  Not applicable here.  "The

8    claimed right to a larger share of the fruits of the crime."

9    Not applicable here.  "The degree of participation in planning

10   or organizing the offense."  He definitely is involved in

11   that.  "The nature and scope of the illegal activity."  Eight

12   years of one of the state's most notorious financial crimes.

13   And "the degree, control and authority exercised over others."

14   His control was over the bank funds and the funds from the

15   victims.

16          I'm supposed to evaluate here the totality of

17   circumstances.  And I find that a mitigating role is not

18   indicated here.  And I overrule that objection.

19          Next?

20          MR. PARENTE:  Thank you, your Honor.  That's it for

21   our enhancements and role reduction arguments.

22          THE COURT:  Okay.  Next, loss amounts.  Let's go

23   through those.  You first mentioned the $325,000 taken from

24   Natasha Thomas.  Why should that not be part of the loss?

25          MR. PARENTE:  So, your Honor, I'd like to address the

38

1  settlement amounts collectively, if that's okay with

2  your Honor.

3          THE COURT:  I've got to tell you, it doesn't help me

4  much.  This is a granular decision.  I've got to address each

5  of these.  So, you can later address the global, but I want

6  you to do the specific.

7          So, $325,000 by Natasha Thomas, why should that not

8  be considered part of the loss?

9          MR. PARENTE:  So, your Honor, it goes to our memo

10 that we submitted relying on the decision in *United States vs.*

11 *Banks* about the attended loss.  Mr. Laffitte did not intend

12 those to be losses to the victims, and it was not reasonably

13 foreseeable to Mr. Laffitte that those --

14         THE COURT:  That he's giving a man with no security,

15 who is doing massive overdrafts, and he's giving him unsecured

16 loans, he doesn't think that's foreseeable, that it might not

17 get paid back?

18         MR. PARENTE:  It could be, your Honor.  But Mr.

19 Laffitte -- I think the testimony came out at trial was that

20 Mr. Laffitte did not reasonably foresee that these losses were

21 a --

22         THE COURT:  That's not the evidence I remember.  I

23 thought it was very a foreseeable consequence of Mr.

24 Murdaugh's absolutely irresponsible spending.  It's never been

25 quite explained where all that money went.  But it was massive

1    amounts of money.  You've got to remember, Mr. Murdaugh was a

2    highly paid attorney, and he's taking all this additional

3    money.  And if the issue is foreseeability, I overrule that

4    objection.

5           Any other objection to the Natasha Thomas?

6           MR. PARENTE:  Thank you, your Honor.  That's our

7    objection to the settlement amounts.

8           THE COURT:  Okay.  And then the next is Hakeem

9    Pinckney.

10           MR. PARENTE:  The same argument as in our sentencing

11    memorandum for all the settlement amounts, your Honor.

12           THE COURT:  You know, of course, the same situation.

13    He's loaning money out to an extremely irresponsible spender,

14    over-drafting huge amounts in the bank.  I overrule the

15    objection as to the loss regarding Hakeem Pinckney.

16           Next?

17           MR. PARENTE:  And, your Honor, next is the

18    $1.325 million settlement related to the Badger settlement.

19    And, your Honor, with this settlement, there was $152,054.24

20    that went through Bank of America that did not go through

21    Palmetto State Bank.  And so, for those reasons, we believe

22    that that is not a reasonably foreseeable loss attributable to

23    Mr. Laffitte.

24           THE COURT:  Well, I believe he broke up the check,

25    did he not?

1          Isn't this the one we've been talking about, a

2     breakup of the check, Ms. Limehouse?

3          MS. LIMEHOUSE:  Yes, your Honor.  So, originally he

4     sent Exhibit 38, the e-mail, to --  or, Mr. Murdaugh made the

5     request to Mr. Laffitte to have those checks be recut.  He

6     then, in Exhibit 38, requested Mr. Murdaugh, who forwarded it

7     to the law firm.  Those checks were split up.  But I would, of

8     course, reference to the disbursement sheet, indicating that

9     he would be getting the full 1.325 that he was responsible for

10    receiving.  And so, these checks were broken up eventually

11    into 14 separate checks.  Mr. Laffitte negotiated 12 of them.

12    Two of them were negotiated with the Bank of America.  But

13    when we talk about the definition of loss under the

14    guidelines, it's reasonably foreseeable pecuniary loss.

15         THE COURT:  He facilitated the theft of the

16    1.325 million.  That's the government's view?

17         MS. LIMEHOUSE:  That's correct, your Honor.

18         THE COURT:  And part of that was the money that went

19    to the Bank of America?

20         MS. LIMEHOUSE:  That's correct.

21         THE COURT:  I overrule the objection as to the loss

22    regarding Arthur Badger's funds.

23         Okay.  You want to talk about the fees?

24         MR. PARENTE:  Yes, your Honor.  In terms of the fees,

25    there's a total of $110,000.  These are fees that were listed

41

1    in the disbursement sheets that Mr. Laffitte received for his

2    work as conservator or personal representative on these

3    accounts.

4         THE COURT:  Tell me what he did for Mr. Hakeem

5    Pinckney.

6         MR. PARENTE:  Your Honor, for some of the cases, Mr.

7    Laffitte will discuss that later -- Mr. Moore will address

8    that.

9         THE COURT:  I need for you to address it now, because

10   you're claiming it's not a loss.  What did he do?

11        MR. PARENTE:  I think those fees, you know, he set up

12   those accounts and looked over those.

13        THE COURT:  And gave the money to Mr. Murdaugh.  Did

14   he meet with Mr. Pinckney?

15        MR. PARENTE:  I don't believe so, your Honor.

16        THE COURT:  Did he go to the nursing home where he

17   was a quadriplegic?

18        MR. PARENTE:  He did not, your Honor.  He set up the

19   structure for the account.

20        THE COURT:  He set up the what?

21        MR. PARENTE:  The structure.

22        THE COURT:  What are you talking about, the

23   structure?

24        MR. PARENTE:  I believe --

25        THE COURT:  You're not talking about a structure like

42

1    an annuity structure.

2          MR. PARENTE:  I think it was set up to work that way

3    when the loans were made.

4          THE COURT:  Well, a structure is a device that is an

5    annuity under the tax laws.  By the way, you know, one of the

6    sort of flaws of all this that I would have thought others

7    might have identified is that a structure must be paid

8    directly by the defendant to the annuity company for it to be

9    tax free.  And to turn it over to the plaintiff and have a

10   plaintiff buy it is basically legal malpractice.  That would

11   be just -- it turns a very good investment into a bad one.

12   So, I'm not going to attribute to Mr. Laffitte knowledge of

13   that.  There's no evidence he was familiar with the tax laws

14   relating to this.  But I do hold it that he was -- Palmetto

15   State Bank didn't create annuities.  They didn't -- there's a

16   very formal process for an annuity.  And there's no suggestion

17   that he did that.  So, I don't recall that Hakeem Pinckney was

18   supposed to be a structure, but he basically, you know,

19   allowed Mr. Murdaugh to take the money.  And this is, you

20   know, part of Count 1, a conspiracy, jointly undertaken

21   criminal enterprise.  The jury found him guilty beyond a

22   reasonable doubt.  I sustained that verdict in post-trial

23   motions.

24         So, let's look at what these fees are.  He's

25   performing his duty as a fiduciary by facilitating the theft

43

1    of the funds.  And he wants to be paid?  He doesn't want that

2    to be part of the loss here?  I don't know, Mr. Parente.

3    That's a pretty tough order -- tough argument to make.

4              MR. PARENTE:  I understand, your Honor.  Thank you.

5              THE COURT:  I overrule your objection as to the fees.

6    What's next?

7              MR. PARENTE:  Your Honor, next is the $680,000 check

8    that was made to PMPED Law Firm to pay half of the Arthur

9    Badger's settlement funds and half of Mr. Laffitte's PR fee.

10             THE COURT:  Okay.

11             MR. PARENTE:  So, your Honor, two points on the

12   $680,000.  First, our position is that that is not an actual

13   loss to Palmetto State Bank, as was noted in the draft PSR,

14   that those funds remain with Palmetto State Bank -- I'm sorry,

15   those funds remain with the law firm.

16             THE COURT:  They're with the law firm.

17             MR. PARENTE:  Correct.  And the --

18             THE COURT:  The law firm is holding them.

19             MR. PARENTE:  That's correct, your Honor.

20             THE COURT:  Possession is nine/tenths of the law,

21   right?  Who's got the money right now?

22             MR. PARENTE:  Correct.  And --

23             THE COURT:  You think if the bank went over and said,

24   hey, guys, can you give us that 680 back, what do you think is

25   going to happen?

1          MR. PARENTE:  Well, it was noted in the draft PSR

2     that it should have been returned to the bank, but that

3     remained with the law firm due to ongoing civil litigation.

4          THE COURT:  We get that.  We get that this is

5     restitution, where you're actually getting offset for this,

6     for part of the restitution.  And I take it your second

7     argument is double counting; is that correct?

8          MR. PARENTE:  It's double counting and the intended

9     loss of that, as I think Ms. Limehouse mentioned earlier was

10    intended to preemptively settle a lawsuit, and it was

11    negotiated with the law firm for that amount.

12         THE COURT:  Mr. Laffitte's a bank president.  I've

13    never heard someone paying that kind of money without a

14    release, without a negotiated settlement, without consulting

15    his lawyer.  It didn't prevent anybody from suing anybody.  It

16    just handed the money over.  And as I recall, the folks from

17    the law firm were surprised that someone -- and took it.  I

18    mean, sure, you offer me 680K, sure, I'll take it.

19         And as to the double counting, let's look at that

20    issue for a second.  Loss is different from restitution, in

21    that loss tries to measure the crime at the time of its

22    commission.  And there are two crimes here:  One is the theft

23    of the 1.325 million.  That's Count 1.  And then there is the

24    misapplication of bank funds, which is -- help me.  Is that

25    Count 4 or 5?

1        MS. LIMEHOUSE:  The 680 is Count 4, your Honor.

2        THE COURT:  Count 4.  That's a different crime -- two

3    crimes.  Now, when we get to restitution, there's an offset.

4    But for the loss, it's not double counting.  It's two crimes.

5    Both of them count for a loss.

6        Anything else about the 680?

7        MR. PARENTE:  That's all, your Honor.  Thank you.

8        THE COURT:  I overrule the objections as to 680.  I

9    also find that the loss was foreseeable.

10       Go ahead.  What's the next one?

11       MR. PARENTE:  Your Honor, the next one is the

12   $750,000 loan to Mr. Murdaugh.

13       MS. LIMEHOUSE:  Your Honor, if I may, there's one

14   other kind of nuance they argued about a $17,500 check that he

15   should get credit for in a deduction of loss.  I just want to

16   make sure that's either not an issue anymore or the Court's

17   addressed it.

18       THE COURT:  Are you addressing this?  He paid it

19   after the crime was detected, so it normally wouldn't be

20   reduced from the loss as another distinction between loss and

21   restitution, but he gets credit in restitution.

22       Are you making any argument regarding loss concerning

23   the $17,500?

24       MR. PARENTE:  That was part of the 680,000 that was

25   made from the bank, and then Mr. Laffitte personally

1    reimbursed the 17,5.

2          THE COURT:  Well, are you arguing it shouldn't be

3    counted as part of the loss, even though he didn't pay it

4    until after the crime was detected?

5          MR. PARENTE:  I think it was paid -- well, my memory

6    would be that it was paid before law enforcement's detection

7    while Mr. Laffitte was involved in the internal investigation,

8    when --

9          THE COURT:  Right.  It was all coming out, and he

10   raced over, first, with the $680,000 check, and then

11   subsequently with the 17,5.

12         I overrule that objection.  Next?

13         MR. PARENTE:  Thank you, your Honor.  So, the next is

14   the $750,000 loan to Mr. Murdaugh.  I think the government

15   argues that this was an unauthorized loan that was not

16   collateralized.

17         THE COURT:  Beach house.

18         MR. PARENTE:  Correct, your Honor.

19         THE COURT:  Was it used for the beach house

20   renovations?

21         MR. PARENTE:  In the end, it was not.

22         THE COURT:  What do you mean, "in the end?"

23         MR. PARENTE:  Mr. Laffitte believed that it was

24   getting used for renovations, that there were checks going out

25   to -- that appeared to be going out to contractors.

47

1          THE COURT:  Who wrote the check to Mr. Wilson?

2          MR. PARENTE:  Your Honor, the payments of 400 and 350

3     came from Mr. Laffitte.

4          THE COURT:  I'm sorry?

5          MR. PARENTE:  They came from Mr. Laffitte.

6          THE COURT:  Yeah.  He paid them out of the loan he

7     had represented to be for beach house renovations, correct?

8          MR. PARENTE:  That's correct.

9          THE COURT:  I overrule that objection.  What else?

10         MR. PARENTE:  And the last one, your Honor, is the

11    $284,000 -- $284,787.52.

12         THE COURT:  What was that used for?

13         MR. PARENTE:  That was the advance on the farming

14    line of credit.

15         THE COURT:  Was it used for farming?

16         MR. PARENTE:  It was used to pay off overdraft fees.

17         THE COURT:  Overdrafts?

18         MS. LIMEHOUSE:  It was to pay off a loan he extended

19    from Hannah Plyler's conservatorship.

20         THE COURT:  That's what I remember.  It was Hannah

21    Plyler's money.  She had turned 18 years old.  And he was in a

22    desperate shape, so he took something represented as a farming

23    loan and used it to pay off money that had been looted out of

24    Hannah Plyler's account.

25              Is that what happened.

1          MS. LIMEHOUSE:  That's correct, your Honor.

2          MR. PARENTE:  Yes, your Honor.

3          THE COURT:  I overrule the objection.

4          MR. PARENTE:  Thank you, your Honor.  That's it with

5   respect to the loss amounts.

6          THE COURT:  Are there any other objections to the

7   PSR?

8          MR. PARENTE:  Your Honor, the only remaining

9   objections deal with restitution, fine and forfeiture.

10         THE COURT:  Okay.  So, I will get to those and I will

11  announce a guideline as to restitution, fine and forfeiture

12  later in this proceeding.  But I have ruled upon all

13  objections -- overruled all objections and I adopt the

14  presentence report as the findings of fact for purposes of

15  sentencing.  The total offense level is 31.  The criminal

16  history category is one.  The guideline range is 108 to

17  135 months.  Supervised release, two to five years.  And

18  special assessment is $600.

19         Now, let's address the issue of restitution.  Do you

20  have objections to restitution?

21         MR. PARENTE:  Yes, your Honor.  We believe, first of

22  all, that any restitution judgment should be joint and several

23  with Mr. Murdaugh, as the other coconspirator in this case.

24         THE COURT:  Hold on a second.  Okay.  Let me get a

25  list, and then we'll do it methodically.  So, the first one is

49

1    joint and several with Murdaugh on all --

2              MR. PARENTE:  Yes, your Honor.

3              THE COURT:  -- including Counts 4 through 6?

4              MR. PARENTE:  That's assuming that he pleads guilty

5    or is found guilty.

6              THE COURT:  He was found guilty of those.

7              MR. PARENTE:  For 4 through 6 -- I'm sorry,

8    your Honor?

9              THE COURT:  Should it be joint and several regarding

10   Counts 4 through 6, since only the defendant was charged with

11   misapplication of bank funds?

12             MR. PARENTE:  Not for those amounts, your Honor.

13             THE COURT:  So, we're only talking about Counts 1

14   through 3, correct?

15             MR. PARENTE:  That's correct.  And I think the

16   government has noted in their chart which counts are -- that

17   they --

18             THE COURT:  Do you dispute their allocation?

19             MR. PARENTE:  I do not, your Honor.

20             THE COURT:  Have we marked that as part of the

21   record?

22             MS. LIMEHOUSE:  I have.  But we have not moved to

23   admit it, your Honor.  At this point, we move to admit

24   Government Sentencing Exhibit 5.  These were numbers that were

25   presented to the Court in a revised restitution memorandum on

1    July, the 25th, 2023.  These numbers are the same.  We just
2    added a column to indicate whether the restitution amount
3    should be ordered joint and several with Mr. Murdaugh.
4            THE COURT:  Is there an objection to Government's
5    Exhibit 5?
6            MR. PARENTE:  No objection, your Honor.
7            THE COURT:  Very good.  Hand it to Ms. Perry.  I want
8    to look at it.
9            And Exhibit 5 has some revised numbers regarding
10   restitution that differ from the presentence report somewhat
11   lower than the original presentence report.  And I wanted to
12   reflect those.  And I take it that that's what we're talking
13   about.  We're not talking about the original number, which was
14   4,352,582.78.  We've now moved to a different figure, which is
15   $3,555,884.80.
16           Ms. Limehouse, am I correct the government has
17   revised its position on that?
18           MS. LIMEHOUSE:  That's correct, your Honor.
19           THE COURT:  And that reflects, according to Exhibit
20   5, $2,348,868.66 restitution to Palmetto State Bank; and for
21   the law firm, restitution in amount of 1,207,016.14.  I wanted
22   to make that clear for the record.
23           Okay.  Mr. Parente, we're making a list here of the
24   restitution objections.  We've got joint and several with
25   Murdaugh.  I thought the government had indicated as to

1   Counts 1 and 3 that it was joint and several.  So, do we have
2   a dispute?
3          MR. PARENTE:  We don't have a dispute, your Honor, on
4   those counts.  Yes, your Honor.
5          THE COURT:  Okay.  So, that one's resolved.  What
6   else do you have in terms of objections to restitution?
7          MR. PARENTE:  So, your Honor, I would just like to
8   notify the Court -- we mentioned this in our sentencing
9   memorandum -- that we're withdrawing our objection as to the
10  internal investigation fees and attorney's fees.
11         THE COURT:  Well, let me say this.  I want you to
12  identify what you're objecting to.  Knowing what is and is not
13  doesn't help me much.  Just tell me which objections are still
14  being asserted today.
15         MR. PARENTE:  Yes, your Honor.  So, a few particular
16  points here.  I mentioned the $152,000 that went through Bank
17  of America instead of Palmetto State Bank for the Badger
18  settlement.  We believe that those should not be included in
19  the restitution.
20         THE COURT:  So, that is in the --
21         MR. PARENTE:  That's in the 1.325, your Honor.
22         THE COURT:  Yeah.  And I've already addressed that,
23  that it was part of an ongoing criminal scheme, and it was a
24  jointly undertaken criminal enterprise.  And I overruled that
25  objection.  What else?

1        MR. PARENTE:  Your Honor, the $284,000 line of credit

2    has been reduced to $150,000, pursuant to a settlement

3    agreement between the bank and the co-receivers of the

4    Murdaugh Estate.  And that was a voluntary civil settlement

5    that was entered into that the parties agreed on Mr. Laffitte

6    was not a party to that.  And so, we believe that that should

7    not be attributable to restitution from Mr. Laffitte.

8        THE COURT:  Okay.  And that's your only objection to

9    the -- they reduced the number from 284 to 150, correct?

10        MR. PARENTE:  Yes, your Honor.  And I appreciate the

11    government's willingness to --

12        THE COURT:  They've reduced it, right?

13        MR. PARENTE:  They have, your Honor.  And we very

14    much appreciate that.

15        THE COURT:  Let me see.  I got documents yesterday I

16    requested from probation about this.  My understanding is the

17    bank had a security interest in Moselle, and there are these

18    Murdaugh receivers appointed by a state court.  And the

19    Murdaugh receivers, for all practical purposes, are Murdaugh

20    now.  And so, they needed to have some cooperation between the

21    Murdaugh receivers and the bank to facilitate the liquidation

22    of this asset to pay off these loans.  And the Murdaugh

23    receivers demanded 150,000 of the $1.696 billion-dollar

24    recovery from the sale of Moselle.

25        Ms. Limehouse, do I have that right?

1          MS. LIMEHOUSE:  That's correct, your Honor.  So,

2    there were two loans that were secured by Moselle, both of

3    which were lines of credit.  At the time that this agreement

4    was entered into, the outstanding balance on both of those

5    lines of credit was well over $2 million.  They entered into

6    an agreement with the co-receivers in which the bank would

7    receive over $1.6 million towards the principal of that

8    outstanding balance.  If you look at the last two pages of

9    Government's Sentencing Exhibit 3, which is attached to our

10   restitution memorandum, it sets forth the outstanding

11   principal balance of those loans, corresponding to the portion

12   of the principal that the bank received pursuant to

13   liquidation of that asset.  And the difference is $170,000.

14   So, the bank was still owed $170,000 in principal on those two

15   lines of credit.

16          THE COURT:  No interest.

17          MS. LIMEHOUSE:  That's correct.  If you included

18   interest, it would be well over 400,000.  So, we're just

19   talking about the outstanding principal that was still owed on

20   those two lines of credit after the bank received its interest

21   upon the sell of Moselle.  And so, the 150 is $20,000 below

22   that outstanding principal balance, and that is the amount

23   that the bank still had to pay the receiver in principal in

24   order to enter into this agreement and be able to collect

25   anything on the sale of Moselle.

1          THE COURT:  Well, you know, to call it a voluntary

2     settlement is kind of ridiculous.  There's nothing much

3     voluntary here.  You've got a party, the Murdaugh receivers,

4     who can block the liquidation of Moselle.  They can

5     effectively block it, or they can litigate the issue.  And a

6     deal was worked out.  If I were a receiver, I'd probably be

7     wanting a piece of it too.  The receivers have all these debts

8     of Mr. Murdaugh, the third party, that they're trying to

9     satisfy.  So, they work out this number.  Now, the question

10    is:  Why is that number having to be worked out?  Because of

11    the criminal scheme engaged in by Mr. Murdaugh and the

12    defendant.  It's a direct consequence of the criminal conduct

13    here.

14         And I overrule the objection as to the $150,000.  I

15    think your client got a break, frankly.

16         MS. LIMEHOUSE:  I would like to note one thing just

17    for the record.  We learned yesterday that the 150 is actually

18    the outstanding principal balance.  And both of those loans

19    had force-placed insurance on those properties for obvious

20    reasons, valued at 10,000 for each of those lines of credit.

21    The bank agreed to reduce the outstanding principal balance by

22    the cost of those workspace insurance policies, $20,000.  So,

23    that 150 is directly tied to the outstanding principal balance

24    of those two lines of credit.

25         THE COURT:  I overrule the objection as to the 150.

1          Mr. Parente, what's next?

2          MR. PARENTE:  Your Honor, the final argument that I

3    would like to make is that there was a $500,000 payment made

4    on behalf of Mr. Laffitte to release him from civil claims

5    related to these cases.  And we believe that that $500,000

6    should be an offset to the restitution.

7          THE COURT:  I'm not familiar with this.  Slow down.

8    I don't know anything about this.

9          MR. PARENTE:  It's related to the Pinckney and Thomas

10   civil cases.  It was a $500,000 payment to release Mr.

11   Laffitte from those claims.

12         THE COURT:  He was in a lawsuit with Pinckney and who

13   else?

14         MR. PARENTE:  And Thomas, your Honor.

15         THE COURT:  And so, these victims sued him directly?

16         MR. PARENTE:  That's correct.

17         THE COURT:  And he paid $500,000 to be released?

18         MR. PARENTE:  I believe it came from his father, but

19   on his behalf.

20         THE COURT:  Yes.  $500,000, correct?

21         MR. PARENTE:  That's correct, your Honor.

22         THE COURT:  And it would have been presumably for

23   breach of fiduciary duty, which entitles a potential

24   prevailing party to act on punitive damages, correct?

25         MR. PARENTE:  That's correct, your Honor.

1          THE COURT:  And he paid $500,000, and he wants that

2     as an offset?  I overrule that objection.  It's directly as a

3     result of his criminal conduct.  That was between him and

4     these victims in that lawsuit.  I overrule that objection.

5          MR. PARENTE:  Thank you, your Honor.

6          THE COURT:  Anything else?

7          MR. PARENTE:  And just lastly, I believe that the

8     government has addressed most of the double-counting issues

9     that we raised in our objections.  To the extent there are any

10    double-counting issues left, we object to those.

11         MR. MOORE:  One moment, your Honor?

12         THE COURT:  Yes, sir.

13         MR. PARENTE:  And, your Honor, the government has

14    agreed that the 680 should be an offset --

15         THE COURT:  Yeah.  It's an offset.

16         MR. PARENTE:  -- to the restitution amounts.

17         THE COURT:  And by the way, Mr. Parente, for your

18    benefit, I saw the original drafts and objected to it myself.

19    I thought that somebody was deserving an offset in

20    restitution, and it was done.

21         MR. PARENTE:  Thank you, your Honor.

22         THE COURT:  Yes.  Okay.  So, as to the restitution,

23    the Court has overruled the objections of the defendant.  And

24    the Court finds that the restitution is in the amount of

25    $3,555,884.80.

1          Now, let me make it easy regarding fines.  I think

2     the significant amount of funds due to the victims would be

3     impaired if I imposed a fine.  The guideline is 30,000 to

4     $300,000.  And the Court's way to protect the ability of the

5     victims to obtain restitution, I decline to impose a fine.

6          So let's save that argument, Mr. Parente.

7          MR. PARENTE:  Thank you, your Honor.  Very much

8     appreciate it.

9          THE COURT:  We're now down to forfeiture.

10         MR. PARENTE:  Yes, your Honor.  And, again, we

11    appreciate the government being reasonable in providing us

12    with updated figures on the forfeiture.  The amount currently

13    is $116,340.03.  And that represents fees for Malik Williams

14    and Hannah Plyler, starting in 2010.  As your Honor noted, we

15    believe this is an excessive amount on top of the restitution

16    and that, you know, Mr. Laffitte, as Mr. Moore will discuss

17    later, is planning to repay the fees that he received in this

18    case.

19         THE COURT:  In which case?

20         MR. PARENTE:  As related to Thomas Badger and

21    Pinckney.

22         THE COURT:  The counts of conviction?

23         MR. PARENTE:  Yes, your Honor.

24         THE COURT:  And what you're suggesting is that, since

25    Malik Williams and Hannah Plyler were not specifically --

58

1    these funds were repaid, as I recall.  That's why the

2    government did not seek specific counts as to that.

3         Am I right about that?

4         MS. LIMEHOUSE:  That's correct, your Honor.

5         THE COURT:  So, let me say this, Ms. Limehouse.

6    Let's address this.  I'm a little cold on Malik Williams and

7    what the defendant actually did.  I clearly recall, as to

8    Hannah Plyler, he went and helped her buy a house.  He was

9    much more engaged.  I thought it was a real contrast to what

10   he did for the other victims.  Surely, he knew what a real

11   fiduciary was supposed to do.  And I think his conduct

12   regarding Hannah Plyler was very commendable in that regard.

13   There are other parts, loaning the money out and taking money,

14   that I didn't think was good.  But he did do that.

15        So, I do note that Malik Williams and Hannah

16   Plyler -- that the transfer of the funds is in the indictment.

17   It's mentioned in the indictment.  And I take it the

18   government's view is that's sort of part of the overall

19   criminal scheme; is that it?

20        MS. LIMEHOUSE:  That's correct, your Honor.  And the

21   defendant, while he is required to pay restitution for the

22   victims that should sustain an actual loss, that we've already

23   discussed, he has never had to personally disgorge himself of

24   the ill-gotten gains of that scheme.  And so, while we gave

25   him the benefit, so to speak --

1          THE COURT:  Well, he's going to have to do it as to

2     Natasha Thomas, and Hakeem Pinckney and Arthur Badger.  We got

3     that.  But the struggle I'm having here is, the government

4     points out, well, we didn't seek these funds from Hannah

5     Plyler and Malik Williams because that money got paid back.

6          MS. LIMEHOUSE:  That's correct, your Honor.

7          THE COURT:  I'm just struggling a little bit why we

8     take his fees.  I notice a bulk of these fees actually are

9     paid before the criminal scheme begins.

10         MS. LIMEHOUSE:  Well, if I can pull up an Exhibit

11    that we can just use, because, you know, when we talk numbers,

12    it's better to have a visual.

13         THE COURT:  I completely understand.  It's probably

14    that last page in your restitution order.

15         MS. LIMEHOUSE:  That's correct.

16         THE COURT:  It has to be one of the most confusing

17    charts I've ever seen.

18         MS. LIMEHOUSE:  I'll take credit for it, your Honor.

19         THE COURT:  But I did figure it out.  It took me a

20    minute, and eventually was not that helpful.

21         MS. LIMEHOUSE:  Fair enough.  Fair enough.

22         Government's 198, page 14.  So, we gave Mr. Laffitte

23    the benefit of the fees related to Angela and Alaina and

24    Justin Plyler, because there weren't loans extended from these

25    counts, and we don't have any evidence, and evidence wasn't

1   presented during the trial, that he mismanaged those funds.

2   But the first sort of fees we request is a little over $91,000

3   from fees he that took from Hannah Plyler.  And this was the

4   first sort of lump sum fee he took as a five-percent --

5           THE COURT:  You want to throw up that chart?  Can we

6   do that?  There it is.

7           MS. LIMEHOUSE:  Yes.  So, the first fee requested is

8   the first Hannah Plyler fee on the second line of April 20th.

9   And that's the lump sum that Mr. Laffitte took from the

10  settlement that Hannah Plyler received.  And then what he

11  continues to do is give himself fees for the management of

12  that conservatorship.

13          THE COURT:  Ms. Limehouse, let's start with that.

14  The 91,455 that you're referring to is April 20, 2000 what?

15  Is it '9, '10?  What is it?

16          MS. LIMEHOUSE:  It's 2009.

17          THE COURT:  Okay.  According to the indictment, it

18  says from 2011 forward.

19          MS. LIMEHOUSE:  That's correct, your Honor.  It's the

20  government's position that he mismanaged Hannah Plyler's --

21  all of the amounts held in her conservatorship accounts.  And

22  so, he received these --

23          THE COURT:  So, he was paid at this point.  It was

24  for services he was going to provide, not just services

25  provided at that point?

1    MS. LIMEHOUSE:  And while we admit he did a lot more
2    for Hannah Plyler than he did for any of the other victims,
3    rather than properly manage those funds, he extended himself
4    loans at favorable interest rates to pay off his own personal
5    expenses.  And then, of course, he extended unsecured loans to
6    Alec Murdaugh, without any notice to Hannah Plyler or approval
7    from Hannah Plyler or her guardians or anyone else, all to his
8    own benefits.  And he's never had to disgorge himself of those
9    fees.
10    And I think what's most indicative about sort of the
11    validity and legality of these fees and whether he should be
12    able to keep them, is that if you look at the last grouping of
13    fees from Hannah Plyler in 2015, she was turning 18, and, of
14    course, he owed her a substantial amount of money on the loans
15    that he had extended himself from her conservatorship account.
16    And what he did, rather than pay those loans back in full, is
17    he credited himself what he claimed to be owed for managing
18    her money.  And so, he reduced the amount that he owed her on
19    those loans by amounts he claimed he was owed in conservator
20    fees and, of course, got a loan from Johnny Parker to pay off
21    the remainder of it.
22    So, when I look at the legitimacy and legality of
23    these fees, we see how he's actually collecting them and how
24    he's using them, and it's really just for his own continued
25    personal benefit to pay off the loans that he owes her.  And,

1   of course, she didn't know that this is how he was collecting

2   and attributing his fees.  And so, we think that all of Hannah

3   Plyler's conservator fees should be included in the

4   forfeiture, and he should be required to disgorge himself of

5   the ill-gotten gains he received on this part of the scheme.

6           And then, of course, the Malik Williams

7   conservatorship accounts --

8           THE COURT:  Remind me about those.

9           MS. LIMEHOUSE:  Sure.  So, Malik Williams was not a

10  client of Alec Murdaugh.  He was actually a client of Paul

11  Detrick, another partner at the law firm.  And Mr. Laffitte

12  was appointed to serve as a conservator for Malik Williams.

13  Comfortably, he managed a much smaller amount of the --

14          THE COURT:  Didn't he loan the money to Mr. Murdaugh?

15          MS. LIMEHOUSE:  He did.  He actually took it out of a

16  CD, where there would be security in Mr. Malik Williams'

17  conservatorship account, and he loaned it all to Mr. Murdaugh

18  in an unsecured loan that he then paid back within weeks from

19  stolen funds.  And so, rather than properly manage the

20  conservatorship account from Malik Williams, as he was charged

21  to do, he mismanaged the money, just like he did with Hannah

22  Plyler.  So, we think he should be required to disgorge

23  himself of his ill-gotten gains in this scheme.

24          THE COURT:  Mr. Parente, how much time would Mr.

25  Laffitte estimate he spent on behalf of Hannah Plyler as a

1   fiduciary?

2           MR. MOORE:  Can you give us a moment, your Honor?

3           THE COURT:  Take a moment.

4           *(Discussion held off the record.)*

5           MR. PARENTE:  Your Honor, Mr. Laffitte estimates

6   about 160 hours or so, at a minimum, on the Plyler

7   conservatorship.

8           THE COURT:  You want to detail to me what he did for

9   that 160 hours?  That's four weeks of work, full time.

10          MR. PARENTE:  Your Honor, you mentioned some of the

11  things I think those came out at trial, that Mr. Laffitte

12  engaged in with -- with --

13          THE COURT:  I mean, I heard his description at trial.

14  I just am surprised it's that high.

15          MR. PARENTE:  Your Honor, I think the big issue with

16  the criminal forfeiture here is that the indictment states

17  that the conspiracy began on or about July of 2011.  And

18  because this is criminal forfeiture, it has to be tied to the

19  conviction.

20          THE COURT:  You see, this is the point I was trying

21  to sort of flesh out.  He's paid in 2009 as a conservator,

22  sort of up front for services.  And then he engages in

23  allowing Murdaugh and himself to borrow money from Hannah

24  Plyler in a manner that is very disloyal to her, as it was

25  disloyal for Malik Williams.  So, yes, that's why I'm trying

1   to ferret out here -- I don't see anything for Malik

2   Williams -- but as to Hannah Plyler, maybe there's some offset

3   there on that amount.  I'm trying to kind of figure that out.

4   So, talk to your client.  160 hours sounds very high to me,

5   from what he described at trial.  Y'all revisit and tell me

6   what he did.

7            MR. PARENTE:  And, your Honor, I do have -- just

8   based on the timing of the issues, based on the timing of the

9   indictment, if you take the amounts that are listed on the

10  right-hand side of the screen for 2015 -- those are all

11  clearly after the period in the indictment -- that total is

12  about $22,000 during the conspiracy period.  I would also like

13  to note, your Honor, that -- you made a comment earlier about,

14  you know, the fine and victims having priority.  The criminal

15  forfeiture would go to the government.  Obviously, they could

16  use it as restitution if they wanted to.  But, you know, there

17  is going to be an ability-to-pay problem at the end of the day

18  here.

19           THE COURT:  I'm not sure that's true.

20           Ms. Limehouse, what about the effect?  How would the

21  forfeiture money be applied?

22           MS. LIMEHOUSE:  I first want to just address this

23  whole 160-hour argument.

24           THE COURT:  Yes.

25           MS. LIMEHOUSE:  We remember how he was spending those

1   160 hours:  Drafting promissory notes for these bogus loans to

2   Alec Murdaugh and himself; moving all of these funds around to

3   try to have Hannah paid off and get Alex's funds back in the

4   green.

5           THE COURT:  I'm sure it was time consuming.

6           MS. LIMEHOUSE:  It was incredibly time consuming.

7   And that's time that he chose to spend, without Hannah

8   Plyler's approval or consideration whatsoever.

9           THE COURT:  See, that is why I was asking the

10   question -- I'm going to come back to Mr. Laffitte on this.

11   But what did he do specifically for Ms. Plyler?  Not what he

12   did in marshaling all these funds, moving them around like a

13   chessboard.  What did he do specifically for her?  I know he

14   made a trip to, I believe, Columbia or Lexington, something

15   like that, for a house.  Was this more than one trip?  I'm

16   just not sure.

17           MS. LIMEHOUSE:  Which she reimbursed him for.

18           THE COURT:  I'm sorry?

19           MS. LIMEHOUSE:  When he made the trip to Columbia, he

20   was reimbursed out of the conservatorship account for that

21   trip.

22           THE COURT:  How was he reimbursed?

23           MS. LIMEHOUSE:  He reimbursed himself.

24           THE COURT:  At an hourly rate?

25           MS. LIMEHOUSE:  That's my understanding, yes.  And

1    paid for his lunch out of her conservatorship.  So, I don't

2    know how you can parse through what was legitimate --

3              THE COURT:  Well, I think you can parse some.  I

4    mean, you know, there is this issue.  I'm trying to figure out

5    exactly what he did.  And if I can't come up with that, I may

6    assess, once I get a description, a reasonable estimate of

7    what.  And then we're going to figure out a reasonable hourly

8    rate.  And we may offset that.

9              Yes, Mr. Moore.

10             MR. MOORE:  Can I just say one thing, your Honor?

11             THE COURT:  I welcome it.

12             MR. MOORE:  I hate to interrupt Mr. Parente's flow,

13   but your Honor asked the question of Ms. Limehouse about

14   restitution and forfeiture.  My understanding is -- and things

15   may have changed since I left the department -- you can apply

16   forfeited funds to restitution, but it is a complicated,

17   complex process that requires the approval of certain folks.

18             MS. LIMEHOUSE:  We do not intend to do that, because

19   we think that would be a windfall for the defendant.  He has

20   more than enough assets to satisfy forfeiture and restitution.

21   And if that were a problem, we would, of course, prioritize

22   the restitution and make sure that the victims were paid

23   before seeking forfeiture.  But he has plenty of assets to

24   satisfy both of our requests.

25             THE COURT:  You know, the PSR, which I've adopted as

1    the findings of fact for purposes of sentencing, shows he has

2    assets of $10 million and liabilities of 5 million.  But I've

3    just assessed restitution of $3,555,884.  So, there should be

4    sufficient funds, so I'm not sure that's a factor.

5         I know Mr. Parente is talking to Mr. Laffitte.  Why

6    don't we just take a break -- I don't want to kill my court

7    reporter -- and give Mr. Parente and Mr. Laffitte a chance to

8    talk about it.  And then when we come back in about

9    10 minutes, let's sort out a reasonable estimate for this.

10   Because I'm prepared to give offsets.

11        MR. MOORE:  Thank you, your Honor.  Yes, sir.  And I

12   will want to be heard for just a moment after the break, about

13   the point that Mr. Parente made, which is this is a -- I

14   understand that the government wants Mr. Laffitte to disgorge

15   this money.  I understand that, okay?  As a logistical matter,

16   I understand it.  But, again, this is criminal forfeiture that

17   we're talking about, and it has to relate to the convictions

18   in the indictment.  That's the point I wanted to make.

19        THE COURT:  Well, it does, because it's mentioned as

20   part of the conspiracy.  It's in the indictment.  The conduct

21   regarding Hannah Plyler and Malik Williams is referenced in

22   the indictment and constitutes some of the underlying facts

23   supporting the criminal conspiracy.  I was at the trial here.

24   And, plainly, all this moving the money around, Hannah

25   Plyler's money and Malik Williams, to a lesser extent because

1    it was a smaller amount, was pretty carefully featured during

2    the trial.

3              MR. MOORE:  And, your Honor, I do not quibble with

4    those facts.  I do not quibble with those facts.  My point is

5    simply a legal point, which is if he got these conservator

6    fees before the government alleges that the conspiracy began,

7    I don't know that, legally, they are entitled to anything

8    under criminal forfeiture that he received prior to the date

9    of their alleged conspiracy.

10             THE COURT:  Here's the flaw of that argument, Mr.

11   Moore:  He is paid $91,000 in April of 2009.

12             MR. MOORE:  Yes, sir.

13             THE COURT:  Sort of an advance for services he is

14   going to render to this minor child.

15             MR. MOORE:  Yes, sir.

16             THE COURT:  And that continues after the conspiracy,

17   and is part of the conspiracy.

18             MR. MOORE:  I understand that.

19             THE COURT:  So, I'm trying to sort out what part of

20   his conduct was before the -- you know, that involved

21   assistance to Ms. Plyler before or after the conspiracy, and

22   what part facilitated the improper transfer of these funds?

23   And that's what I'm trying to sort out here.  And I'm trying

24   to give your client a break here by --

25             MR. MOORE:  I recognize that and I appreciate it.

1          THE COURT:  And so, you know, let's give Mr. Laffitte

2     and Mr. Parente a little time to sort that out.  And let's get

3     a sort of itemization of trips made and that kind of thing.

4     And then I'm concerned about -- you know, I'm trying to figure

5     out how he was paid for those, and how much he was paid, and

6     how it was calculated.  I'm interested in all that, okay?

7          MR. MOORE:  Thank you, your Honor.

8          THE COURT:  Thank you.  We'll take a break.

9          *(Recess.)*

10          THE COURT:  Please be seated.

11          Ms. Limehouse, would you put back up that chart?

12          MS. LIMEHOUSE:  Yes, your Honor.

13          THE COURT:  Okay.  Mr. Parente, have you had a chance

14     to sort out a bit about specific things that the defendant did

15     on behalf of Ms. Plyler -- Hannah Plyler?

16          MR. MOORE:  Your Honor, do you mind if I take this

17     one?

18          THE COURT:  You got it.

19          MR. MOORE:  Okay.  So, let me first tell you that we

20     had a brief discussion with the government at the break.  And

21     I understand what you're doing, and we very much appreciate

22     that.  You were trying to give him credit where credit is due,

23     and we very much appreciate that.  And so, I have a list of

24     some of the things that he's done, okay?  And I can go through

25     those, some of which probably are later in the day and I don't

1   really think addresses your Honor's questioning and concern.

2          In discussions with Ms. Limehouse and Mr. Holliday, I

3   withdraw all my objections, including the legal one that I

4   just mentioned to your Honor -- and I know your Honor

5   disagrees with me on the law on that -- but with a 33-percent

6   discount of that fee for the Plyler fund.

7          THE COURT:  What's the government's view on that?

8          MS. LIMEHOUSE:  Yes, your Honor.  We understand where

9   the Court's heading.  And because this has nothing to do with

10  making the victims whole, but is really just about disgorging

11  himself of fees, to the government's benefit, we agreed to a

12  33-percent reduction on that $91,000 Plyler fee collected on

13  April, the 20th.

14         THE COURT:  So, what would be the net forfeiture now

15  with the 33-percent discount?

16         MS. LIMEHOUSE:  I like his calculator.

17         MR. MOORE:  I could probably do that.  But what I

18  would just simply suggest, your Honor, because your Honor

19  doesn't have to enter the preliminary order of forfeiture --

20         THE COURT:  Right.  I'll sign an order of forfeiture,

21  but I'd like to know what the number is.

22         MR. MOORE:  We'll get you that number, if you'll give

23  us just a little bit.

24         THE COURT:  Okay.  Very good.

25         MR. MOORE:  Because we need to take the third of that

1    91 and add the Malik figure to the top of that.

2              MS. LIMEHOUSE:  I just want to make sure we get the

3    math right.

4              THE COURT:  Y'all do it, and we'll come back to it.

5    Y'all remind me before we end.

6              Are there any other objections from the defendant

7    regarding any aspect of the presentence report that we have

8    not already addressed and ruled upon?

9              MR. MOORE:  There are none, your Honor.

10             THE COURT:  Very good.  Okay.  And I have announced

11   the calculations for the total offense level, criminal

12   history, guideline range, special assessment and restitution.

13   And I will do forfeiture once the parties -- and I commend the

14   parties for working it out.  I think that's a reasonable

15   result under the circumstances, recognizing that, unlike some

16   of the other individuals for which the defendant performed

17   fiduciary services, there was evidence he did things on behalf

18   of Hannah Plyler.

19             Okay.  Does the government have any objection --

20   well, the government has no objection to the presentence

21   report; is that correct?

22             MS. LIMEHOUSE:  No objections, your Honor.

23             THE COURT:  Very good.  Okay.  Mr. Moore, I'm glad to

24   hear from you regarding sentencing.

25             MR. MOORE:  So, you want to hear from us, not the

1  government first; that is correct?

2  THE COURT:  That's the way it goes.  I hear from

3  defendant first, yes, sir.

4  MR. MOORE:  Okay.  All right.  I will tell your Honor

5  that I do think we have the math for you.

6  THE COURT:  Good.  What's that number?

7  MR. MOORE:  I believe that when you reduce these fees

8  by a third and add the Malik Williams figure, it's $85,245.02.

9  THE COURT:  Okay.  I want the government to confirm

10  that, and then we will do that.  Usually the government

11  submits me a proposed order of forfeiture.

12  MS. LIMEHOUSE:  Yes.  We will send a revised

13  preliminary order of forfeiture to Ms. Perry.

14  THE COURT:  Very good.  Okay.  Let me hear from you

15  regarding sentencing.

16  MR. MOORE:  Yes, sir, your Honor.  Can I tell you how

17  I intend to proceed, and make sure that --

18  THE COURT:  You know, you're in charge here.  So,

19  it's your own presentation.  You're the captain of your ship.

20  MR. MOORE:  Well, thank you, your Honor.

21  First off, we appreciate the fact your Honor is

22  allowing us the opportunity to present as to the appropriate

23  sentence.  And I understand that the government is going to

24  have something to say after we go.  And I hope your Honor will

25  give us a brief moment to --

73

1          THE COURT:  I'm going to give you a chance to reply.
2     Don't worry about that.
3          MR. MOORE:  Okay.  And at what point does your Honor
4     wish to hear from Mr. Laffitte?  Because he is going to
5     exercise his right of allocution.
6          THE COURT:  As part of your presentation, I'll be
7     glad to hear from Mr. Laffitte and anyone that you wish to
8     call on his behalf.  I will also hear from the government and
9     any victims it wishes to offer.
10          MR. MOORE:  Yes, sir.  Yes, sir.
11          So, as I think your Honor said earlier, you know, we
12     are operating in a bit of a disadvantage because we weren't
13     here at trial.  But we are hoping and we're trying to
14     compensate for that disadvantage.  And so, how we intend to
15     proceed, your Honor, is to talk about Russell Laffitte as a
16     person, okay, and to talk about Russell Laffitte as a person
17     and to tell your Honor some things that your Honor didn't hear
18     at trial.  And I understand why your Honor didn't hear those
19     things at trial, right?  I understand that.  And as your Honor
20     knows, we have provided your Honor with a large number of
21     letters.
22          THE COURT:  I've read them all.
23          MR. MOORE:  And I know that your Honor has, okay.
24     And some of those people who've written your Honor letters are
25     here to speak today.

74

1          THE COURT:  If they wish to the speak, I'm glad to

2     hear from them.

3          MR. MOORE:  And so, what we want to do is, Ms. Shoun

4     is going to present the witnesses in the order in which they

5     -- and they're not really witnesses, but they're here to speak

6     on Russell Laffitte's behalf.

7          THE COURT:  Normally -- let me just tell you how we

8     do it.  I bring anyone who wishes to speak to the podium, and

9     they speak.  I don't have a lot of lawyer involvement in this.

10     I'll do that both as to -- I won't have the government

11     questioning the victims here.  They will come and they will

12     share with me what they wish to share.

13          MR. MOORE:  Yes, sir.  There are nine of them, so Ms.

14     Shoun is sort of like responsible for keeping them in order.

15          THE COURT:  Don't worry.  I can keep them in order.

16          MR. MOORE:  And then Ms. Shoun is going to talk about

17     some of those things, and then I'm going to come back and talk

18     about the 35th.

19          THE COURT:  And, you know, I've got to say, I think

20     this is an appropriate approach.  We spent an awful a lot of

21     time talking about the defendant's criminal conduct, but we

22     haven't talked a lot about his family background, his service

23     to the community.  You know, in some ways, maybe Mr.

24     Laffitte's legacy will entirely be governed by memory of these

25     unfortunate events.  But there's more to that, I know that.

1    And I read with care your 3553(a) factors and the information

2    that you provided and I welcome hearing anymore you want to

3    offer me.

4            MR. MOORE:  Thank you, your Honor.

5            So, without further adieu then, we're going to ask

6    the witnesses to come in and speak.  And then we will proceed

7    from there.

8            THE COURT:  Very good.

9            MR. MOORE:  So, Ms. Shoun?

10            MS. SHOUN:  May it please the Court, your Honor.

11            THE COURT:  Always good to have you in my courtroom.

12            MS. SHOUN:  Thank you, your Honor.  It's so good to

13   be here.  I recognize it's a little unusual under these

14   circumstances.  Your Honor, we do have a list of nine

15   individuals.  Would your Honor like me to present that list to

16   the Court?

17            THE COURT:  No.  I just think you call them up, and

18   then I'll let them make a statement.  And if I have any

19   questions of them, I'll ask them.

20            MS. SHOUN:  Thank you, your Honor.  I appreciate it.

21   The first individual we'd like to come forward, please, is

22   Reverend Thomas Kelly.

23            THE COURT:  Thank you for being here, Reverend.  Good

24   to have you here, sir.

25            REVEREND THOMAS KELLY:  Thank you, sir.  Thank you

1    for letting me be here today.

2            Before I moved to Hampton County -- I've been a

3    pastor there for 29 and a half years -- I was part of an

4    independent banking family.  My mother was in banking.  And I

5    understood the Laffitte's.  The Laffitte's were always -- that

6    was kind of a very loose fraternity.  And the Laffitte's were

7    always seen as very trustworthy, hard-working people, people

8    that were very much a part of the community to make the

9    community a better place.  When I moved to Hampton County

10   approximately 29 and a half years ago, I began to bank with

11   the Laffitte's; began to know Charles, first of all, and then

12   Russell and his sister, Grey.  And I got to know them very

13   well.  Later on, my wife began to teach with Susie, Russell's

14   wife.  And that was before Russell and Susie got married.  I

15   still remember the day that they got engaged, and I went by

16   the school and congratulated them.  And not before long,

17   Russell asked me, he said:  Would you do the honors of

18   marrying Susie and myself?

19            THE COURT:  I figured that was coming.

20            REVEREND THOMAS KELLY:  That was right.  And I had

21   the privilege of marrying them.  And we did a lot of things

22   together, Russell and Susie and I.  We were friends together.

23   We've been out to eat together.  We've been in each other's

24   homes.  They've come to my daughter's baptism.  I've been a

25   part of their children's baptism.  Even though I'm baptist and

1    they're Episcopalian, we are --

2              THE COURT:  You don't hold it against them.

3              REVEREND THOMAS KELLY:  That's right.  You can't live

4    in the south and not be a little bit Baptist.

5              THE COURT:  That's right.

6              REVEREND THOMAS KELLY:  But anyway, we did that.  And

7    I can remember one of the most caring things I ever saw about

8    Russell.  My daughter had a little girl crush on Russell.  And

9    I remember one day we were in Russell's house, and my daughter

10   picked up one of Russell's turkey calls and she didn't know

11   what to do with it.  And Russell, you could tell this wasn't

12   the first time he had done this with a child.  He walked and

13   got behind her and took one hand and cupped the call in hers

14   and the strike in the other, and he taught her what it was

15   like to call a turkey.  I remember that so very vividly.

16             Not long after that, Russell called me one day after

17   the children were up a little bit, and he said:  I need you to

18   do me a favor.  And I said:  What's that, Russell?  He said:

19   Would you serve on the Hampton County Special Needs and

20   Disabilities Board?  Russell and I served on that board.  If

21   you are ignorant to what that board does, we look out for

22   people that have special needs.  Each county has one.  You

23   have to be appointed by your representative.  It is a process

24   to be a part of that board.  And Russell and I served on that

25   board.

1          Also, I would bank with Russell.  And I would go in.

2    And I know our church banked with the Laffitte's.  And we had

3    a very, very good relationship with them.  But I do remember

4    going in many times.  It didn't matter the station of that

5    person's life, their age, their gender, their race, their

6    creed, Russell always took time for them.  That's the kind of

7    person Russell was.

8          Someone asked me not long ago about Russell with all

9    this going on:  How do you feel about Russell?  And I'll end

10   with this.  The Bible makes a statement about the Holy Spirit.

11   And it said:  "He stands closer than a brother."  I would put

12   my life, my family's life, the life of my church, all in the

13   hands of Russell Laffitte.

14         THE COURT:  Well, Reverend, I think you've probably

15   said this in many a sermon:  "We hate the sin, not the

16   sinner."

17         REVEREND THOMAS KELLY:  That's correct.  But I would

18   put my last dollar on the table and turn my back if Russell

19   Laffitte was in the room and know it would be there.

20         One last thing I did when Russell was in banking and

21   he realized he had to move up the ladder and he had to get an

22   advanced degree, he came to me and he asked me to proctor his

23   degree.  It was from Troy State University in Alabama.

24   Russell came to my house and took his exams.  Russell was

25   always honest and trustworthy as I watched him take those

1   exams.  That was the person that Russell Laffitte was.  The

2   only thing -- one of the biggest things that I hate about all

3   this is nobody ever got to hear about the person that Russell

4   Laffitte really is.

5           THE COURT:  Well, Reverend, we're going to hear it

6   today.

7           REVEREND THOMAS KELLY:  Thank you.

8           THE COURT:  Thank you, sir.

9           MS. SHOUN:  Your Honor, if I might ask Russell's

10  mama, LaClair Laffitte, to come forward.

11          THE COURT:  And who is this fine young man who

12  escorted you here, Ms. Laffitte?

13          MS. LACLAIR LAFFITTE:  This is my grandson, Luke

14  Laffitte.

15          THE COURT:  Okay.

16          MS. LACLAIR LAFFITTE:  Your Honor, I come before you

17  today as an 84-year-old mother who just wants you to know my

18  son, to know who you are sentencing today.  It is hard to

19  envision life without Russell.  He has been the lynchpin of

20  our family for many years, for his brother, with health

21  issues; for his sister, as a single parent; and for Charlie

22  and me, especially now that we're getting older.  I could tell

23  you a hundred incidents to try to show you who Russell is and

24  why I need Russell, why our whole family needs Russell, but no

25  one wants to hear a mother just rambling about her children.

1    So, I'll give you just one little example.

2           One morning, I was headed out to the dentist out of

3    town on a two-lane road that just had lots of commercial

4    traffic.  And while going, I met an oncoming big dump truck.

5    I pulled a little far to the right, and the front wheel

6    dropped off the pavement.  No alarm.  I just gently tried to

7    pull it back on.  I pulled it back a little bit farther, and

8    nothing is moving as I am drifting down into a very deep

9    ditch.  I looked up and saw a telephone pole dead in front of

10   the hood.  Before I could even react to that, there was a

11   bang.  The rearview mirror popped off the side, and the car

12   just gently rested on the telephone pole.  I was scared to

13   move, because I thought the car was going to flat turn over.

14   But my telephone was resting just gently on the center

15   console.  I called 911 to reassure her I was okay.  But I was

16   leaning.  I kept saying:  I might turn over in this ditch.

17   Then I called Russell:  Russell, I've had a wreck.  He

18   replied:  Are you all right? Where are you? Is the car able

19   to move?  And I answered:  Fine.  I gave him my directions

20   where I was.  And I said:  No, the car can't move.  I'm on my

21   way.  Click.

22          The deputies came, and Russell arrived with a

23   rollback just minutes behind him.  The deputies had gotten me

24   out of the car.  And that was a struggle, because I was

25   scared.  I said:  If you make me move this car, it's going to

1    turn over.  They were two wonderful men.  And they kept

2    saying:  Don't worry, Russell will be here soon.  He's coming.

3    And he was.  When he arrived, they stopped the traffic, they

4    loaded the car on the rollback, and I was safe.  I was safe in

5    Russell's truck.  And we were headed back to Hampton, thanking

6    God for the promised prompt law enforcement officers and for

7    the response of a very caring son.  This is Russell in a

8    nutshell.  What am I going to do without him?  What are we

9    going to do without him?

10        And, Judge Gergel, as I told you in my letter, I will

11    miss Russell's daily calls and visits.  I will miss his

12    old-lady jokes and his kisses on top of my head.  I will miss

13    knowing that he would drop any and everything to tend to his

14    daddy and me, and to his precious Susie, Carter and Luke and

15    more.  Believing that God has a plan for our family, I just

16    need to hope -- just to hope -- that I can live long enough to

17    be able to hug Russell as a free man.  I pray, Judge Gergel,

18    with all my heart, that your mercy will prevail.

19        THE COURT:  Thank you, ma'am, for being here.

20        MS. LACLAIR LAFFITTE:  Questions?

21        THE COURT:  I have no questions.

22        MS. SHOUN:  Your Honor, Mr. Jernigan.  Alex Jernigan.

23        THE COURT:  Very good.

24        MR. ALEX JERNIGAN:  Good morning, your Honor.

25        My name is Alex Jernigan.  I'm from Seminole County

82

1    in southwest Georgia, down in the corner of the state.

2    Unfortunately, my hometown was made famous 50 years ago, when

3    six members of one family were murdered by three escaped

4    convicts.  I tell you this because I saw firsthand as a young

5    child how a small community could be rocked by a horrific

6    crime.  The Alday murders shook my community much like the

7    Murdaugh family murders have shaken Hampton County.  I come to

8    you today as a friend of Russell Laffitte for roughly 13

9    years.  I work in the financial services industry.  And the

10   first eight years of my 30 years of my career, I was a banker.

11   I sat behind a desk, I loaned money, just like my friend,

12   Russell.

13        Russell and I first met in 2010, while I was

14   attending a banking convention.  I would characterize the

15   first few years of a friendship as a very casual one, in that

16   we saw each other at conventions, I stopped by his bank a few

17   times, I met him in Hampton.  But in January of 2014, my world

18   was rocked forever when I lost my 17-year-old son in a boating

19   accident on Lake Seminole.  Russell was not someone I thought

20   to call during my tragedy.  But three days later, I received a

21   call from him that has forever changed my life.  You see,

22   Russell is an avid reader.  I learned that day he starts his

23   morning between 5:30 and 6:00 o'clock, and he begins his daily

24   learning by learning about his community and his extended

25   community, and their needs and where he is needed.  That

1   morning, he read that a young life was taken too soon, a life

2   he thought may have been connected to me.  Russell called to

3   see if this was my son and what he could do to help.  That

4   day, there was nothing he could do.  But the next week, he

5   called again, and the next week, he called again and then

6   again.  Russell probably called me every month for the first

7   two years of my grief.  He called a guy six hours away just to

8   make sure I was okay.  During that time, I lost friends I had

9   known my entire life, because they didn't know or care to know

10  about my family's grief.  Russell was a support line that I

11  desperately needed.  I was invited to the family farm.  My

12  family stayed in the 100-year-old farmhouse, and we shared

13  stories and we shared our grief.

14          Fast forward to October 2018.  Hurricane Michael

15  leaves our community devastated by Cat 5 winds.  Again,

16  Russell was one of the first to call.  He asked how long we

17  would be without power, and I told him I thought three to

18  four weeks.  The following day, he calls.  He says:  I'm one

19  hour away.  What's the quickest way to get to your house?  You

20  see, Russell had called a friend who had a generator to power

21  my entire home.  He and his daughter, Carter, were coming to

22  help.  Five hours after that call, my house had power, with

23  the exception of AC, the only house powered in my

24  neighborhood.  Probably 30 of my neighbors could now take

25  baths and showers for the next three to four weeks.

1      The following day, he and Carter get up and they pick

2  up limbs for 12-plus hours before leaving to drive six hours

3  back to Hampton.  But that wasn't enough for Russell.  He saw

4  how much work I had to do.  So, two days later, another

5  gentleman shows up at my house with a tractor from the

6  Laffitte farm.  Russell calls me and says:  Keep it for a

7  month, clean up as many trees as you can at your place and

8  then loan it to the neighborhood.  That's the type of person

9  Russell Laffitte really is.

10      Your Honor, I could tell you more and more stories,

11  but I know my time is limited.  What I want you to know is

12  Russell is a good man, a God-fearing man, a man that his

13  community has and can rely on, one that puts family and

14  neighbors first in all his decisions, a very humble man.  Our

15  gentle giant.

16      When this began, Russell was 18 months away from

17  being named chairperson of a national banking trade

18  association, elected by his peers from around the United

19  States, the second banker in the state of South Carolina to

20  hold that honor, an honor that would take him to the halls of

21  Congress to advocate for the industry that he loves the most,

22  community banking.  He has now lost that honor.  He's lost his

23  banking career that he was extremely proud of.  He's been

24  stripped of his profession.  He has lost all standing in the

25  banking community.  He's been made an example of.  He and his

1    family have lost so much to this tragedy.

2         Your Honor, I just ask that you please find mercy in

3    your sentencing.  Russell and his family have lost enough.

4    Please don't take him from his family and friends for a long

5    period of time.  Thank you.

6         THE COURT:  Thank you very much, Mr. Jernigan.

7         MS. SHOUN:  Your Honor, Russell Laffitte's wife,

8    Susie Laffitte.

9         MRS. SUSANNE LAFFITTE:  Your Honor --

10        THE COURT:  I don't have to thank you for being here,

11   you've been here every moment through all of this.

12        MRS. SUSANNE LAFFITTE:  Yes.  He's very important to

13   us.  And he's been by our sides every moment, every time we've

14   needed him.  My name is Susie Laffitte and I am Russell

15   Laffitte's wife.  Because I do not trust my memory today, and

16   I fear that I may get a little emotional, I've prepared a few

17   notes to guide me along the way.

18        Russell and I have two children.  Our oldest child,

19   Carter, is 20 years old; and our son, Luke, is 18 years old.

20   As you determine our family's future today, please consider

21   that Russell is so many things to so many people, not only in

22   our family but also in our community.  Living without him in

23   our daily lives will be the most difficult transition we could

24   ever imagine.  I ask that you consider the positive impact

25   that Russell has had on so many lives as you make your

1    decisions here today.

2         Before I continue to talk about my husband and how

3    much he means to me and our family, please understand that I

4    recognize that today is not just about my husband and our

5    family.  I realize that there are people in this courtroom who

6    have lost so much and who have been deeply affected.  My

7    husband, Russell, realizes it too.  And I know he does,

8    because I see it when he does not sleep well, when he's lost

9    weight from lack of appetite, and when he constantly questions

10   himself as to why he didn't do a better job for all of the

11   victims.

12        Twenty-three years ago, Russell and I went on our

13   first date in February.  Two months later, much to the

14   surprise of many people, including me, he asked me to marry

15   him.  In fact, he asked me three times, because I wasn't quite

16   sure that he was serious.  I said yes, and I can honestly say

17   that I love and admire him more and more each day.  Russell is

18   a loving, thoughtful, considerate and supportive husband.  In

19   fact, in September, when a close family friend got married,

20   she asked me to contribute her something borrowed for her

21   wedding day, because she respected our relationship and our

22   marriage and hoped to model her marriage on that.

23        Russell has always encouraged me and helped me to

24   grow in numerous ways.  When we got married, getting my

25   master's in education was a professional goal for me.  We are

1   in a rural district, and that is not always an easy task to
2   accomplish, especially many years ago before online learning.
3   Our school district arranged a partnership with a college from
4   Massachusetts to offer a master's degree program at one of our
5   local schools.  At the time the program was scheduled to
6   begin, I was pregnant with our first child, Carter.  While I
7   was interested in the program, I was extremely nervous about
8   being a new mom, a kindergarten teacher, and taking on an
9   additional commitment, and especially about leaving my newborn
10  for an entire weekend once a month while I attended classes.
11  Russell's encouragement is the reason that I took the leap of
12  faith, joined the program and accomplished my professional
13  goal.  In return, he developed a very, very close bond with
14  Carter that has continued to grow stronger over time.  This is
15  just one example of the continuous love and support that
16  Russell has shown not only me, but our entire family.

17          In addition to being a caring husband, Russell is
18  also a devoted father.  He's a teammate.  We parent together,
19  sharing responsibilities, duties and decisions.  He is an
20  active hands-on dad, who plays a large part in our children's
21  daily lives.  In fact, on many occasions when Luke and Carter
22  have a problem to discuss or a big decision to make, their dad
23  is the first person they call.  He is a dad who volunteers to
24  coach baseball, manage the concession stands, but he is also
25  proud to wear his cheer-dad T-shirt.  In addition, Russell has

spent many, many hours outdoors with our children and instilled in them a love of nature.  Not only has he made our children a priority, he has modeled kindness, generosity, hard work, giving back to our community, and always being ever mindful of the needs of others.  In fact, I was in a local restaurant just a week ago for lunch, and two gentlemen stopped by my table on two separate occasions to tell me what an impressive well-mannered, hard-working young man our son, Luke, has become.  I attribute Luke's character largely to the role model that Russell has provided our children and the time he has invested in being a father.

The one thing that frightens me the most about the drastic changes our family faces is parenting without Russell by my side each step of the way, helping to make daily decisions, helping to guide Carter and Luke through the challenging years of young adulthood, and being there to have daily lighthearted loving conversations with Carter and Luke. You see, your Honor, Russell is definitely their hero.

Russell is the glue that holds our family and extended family together.  He is also referred to as the favorite child by both of his siblings.  And my mother has fondly named him "Precious," because she considers him absolutely precious to her and our entire family.  Russell and I have three elderly parents.  His parents are 84 years old, and my mom is 76 years old.  They all live nearby in Hampton

1    County.  Once again, Russell is typically the first person

2    they call when they need help or advice, whether it be help

3    with cell phone issues, even when my mother's on the phone

4    with me, reminding me to tell Russell to call her about her

5    cell phone issues; whether it is to retrieve them after a car

6    accident, or simply to come and change a light bulb and be the

7    tall guy.  He is also a family member who has worked

8    tirelessly after bank hours and on many weekends since I have

9    been married to him, to help his father maintain the family

10   farm.

11          Russell was the first person our niece, Lillie,

12   called when she recently hit a deer with her car.  To be

13   honest, Unc, as he is known by many, is usually the first

14   person that members of every generation of our family reach

15   out to for help or advice.  Russell's kindness, generosity,

16   and devotion do not end with our family.  He grew up in

17   Hampton County and he has always been Hampton County proud.

18   In fact, if you ask him, it is not Hampton County, it is God's

19   country.  He insists on shopping locally, living locally and

20   supporting our community.  One of Russell's greatest

21   attributes, which he learned from his mother, is that he is

22   ever mindful of the needs of others in our community.

23          The first year our son, Luke, played little league

24   football, there was a young player on his team who did not

25   have practice clothing.  He had one pair of football pants

that did not have a belt, and he held them up with one hand as he tried his best to participate in practice. Russell noticed his need and immediately purchased practice clothing for the young player and passed it along to the coach to donate to the family anonymously.

I cannot express with words how challenging it will be to transition to this new life of not having Russell in our life daily. I will miss him and all the joy he brings to our home every single day. His mother, father and siblings will grieve his absence. Our extended family and their friends will feel an aching void. Our community will suffer a devastating loss. We will adjust one day at a time and we will grow stronger. God has a plan and a purpose and he will reveal it to us. However, my greatest concern of all is our children, Carter and Luke. They have been blessed to have the unconditional daily love and interaction of an amazing supportive father. Carter recently wrote to her dad, "I dread the day that I did not just SnapChat you or show up to hang out in the turkey woods, but I know you will be home with us eventually." I worry about them having to navigate the crucial years of young adulthood without the guidance and daily interaction of their father. As an educator, I have witnessed, firsthand, detrimental consequences of fatherless homes.

As you look around this courtroom today, it is clear

91

1   that Russell Laffitte has made a positive impact on his

2   family, his community, and many people of multiple

3   generations.  I ask that you have compassion and return

4   Russell to our family and to our community as quickly as

5   possible.  Thank you for your time and attention.

6            THE COURT:  Thank you, Mrs. Laffitte.

7            MS. SHOUN:  Your Honor, if I might ask Sheila Platts

8   to come forward.

9            MS. SHEILA PLATTS:  Good afternoon, your Honor.

10           THE COURT:  Good to have you here.

11           MS. SHEILA PLATTS:  I am Sheila Platts.  I met

12   Russell in high school, close to 40 years ago.  And I want to

13   share with you and this Court and give you a glimpse of the

14   community person that I've known him to be.

15           Russell is someone who contributes in a myriad of

16   ways, and it's usually his love for Hampton County and also

17   the example that his parents have set for him for his entire

18   life.  As a volunteer in our school system for many years, I

19   observed lots of moms who stepped up to the plate.  Russell is

20   one of the few dads who was present during spring festival

21   fundraisers, loading and unloading tables, setting up tables

22   and just helping us get everything together for those events.

23   He's one of the three or four dads who was there to stay until

24   the end, helping clean up, making sure that others weren't

25   left to do the labor alone.  Russell is one who has always

1  supported our schools, whether his children were attending

2  there or not.  He's the volunteer who would make sure the

3  concession stand was stocked and ready to go for little league

4  games and then stand over the hot fryers and grills, cooking

5  and serving families.  Through the years, Russell has

6  supportively and actively taken part of our two-county

7  Festival of Trees fundraiser for hospice, as well as Relay For

8  Life events, which support the American Cancer Society,

9  helping us fight for a cure.  He has served on the

10  disabilities board in Hampton, and the list goes on.  There

11  are many, many, many ways that Russell has volunteered and

12  supported.

13          I wish everyone in the courtroom could know the

14  Russell that I know.  He's a generous man.  He's a fine

15  gentleman and also a gentle man.  He's the person who's never

16  hesitated to lend a helping hand.  He's the community member

17  who contributes and is appreciated.  He's the supportive and

18  dependable son, brother, and uncle who is adored.  Russell is

19  the loving and attentive husband, who is cherished by his

20  wife, Susie.  He's a super proud and doting father and

21  husband, who is respected by his amazing children, Carter and

22  Luke.  Susie referred to the friend who wanted to borrow an

23  item for her daughter's wedding.  That was my daughter.  She

24  was engaged on New Year's Eve of 2021 and married this past

25  September.  Immediately upon her engagement -- I'm a planner,

1    so I went ahead and I wrote her a letter in January for her

2    wedding in September, and just listed the things, something

3    borrowed, something blue, you know, the whole thing.  And

4    immediately, Russell and Susie were the couple -- no other

5    thoughts, they were the couple I wanted her "something

6    borrowed," because they are the couple who demonstrates the

7    love that I want my daughter to have throughout her marriage.

8    You see, he is that valued friend who makes you feel like

9    family.  He's the genuine man that my children call "Uncle

10   Russell."

11            I know others have suffered throughout this ordeal,

12   but please do not think that Russell and his family have not.

13   They've suffered greatly.  And I know that they anticipate

14   more difficult times ahead.  I pray daily -- multiple times

15   daily -- that Russell would be shown mercy.  And now before

16   you, your Honor, I'm begging you to please show him that mercy

17   I've been praying for.  Please consider the words and the

18   hearts of the people who are here supporting him in this

19   courtroom, the people who are in the overflow room, and the

20   people who couldn't be here today.  There are many, many, many

21   people who couldn't be here.  Consider the words and the

22   hearts of all of us, in support of the man that we know to be

23   an upstanding, respected, helpful, contributing member of his

24   community.  Thank you.

25            THE COURT:  Thank you, Ms. Platts.

1          MS. SHOUN:  Your Honor, if I might ask Apostle
2    Herbert Brown to come forward?
3          PASTOR HERBERT BROWN:  Good evening.
4          THE COURT:  Good to have you here, sir.
5          PASTOR HERBERT BROWN:  Thank you.  I'm not here to
6    give a sermon today.
7          THE COURT:  I've heard a few, by the way, during
8    sentencing.
9          PASTOR HERBERT BROWN:  I know when preacher's stand
10   up, people sometimes draw their feet up.
11         THE COURT:  Yes, sir.
12         PASTOR HERBERT BROWN:  So, I'm not here to do that.
13         Thank you all for having me today.  I've been a
14   pastor in the community where we live for the past 24 years.
15   I first met Russell many years ago at a local automotive shop,
16   Jimmy Butler's Auto Sale.  This tall guy came and seemed like
17   he was in a rush to get what he needed to get done and get
18   back to work.  And he was introduced to me through one of the
19   men that worked there, and I had a few words with him.  And
20   later on, as I was going in the bank, since I had met him at
21   the automotive shop, I would see him then in his office.  So,
22   I thought I had the right then to just go into the office
23   every now and again and interrupt his work schedule, just to
24   say something to him.  And he appreciated that.  I wasn't
25   there, and I've never done any banking orders or things like

95

loans or anything through Russell.  I've always had just the opportunity to -- and I believe the favor of just sitting in Mr. Charlie's office, talking to him.  And they have helped us with our finances as far as securing our loan for the ministry that we now have.

And so, Russell and I would talk about hunting, which I never do and never have done; trips he would take, and the banking business and how stressful it would be sometimes.  And I would talk to him about ministry, and he would listen.  And I'm going to say that again, because that's going to come up later on in what I got to say.  Russell would listen to what I would say.  And he gave his attention to me.  And after we would share our hearts and our thoughts in our hearts, I asked him could I pray.  And he would:  Of course.  Go ahead, please.  And I would pray with him.  And this would go on over years.

So, when I heard about what has been going on in Russell's life here with this case, I took time out to personally pray for him.  And by faith, I believe God told me to go and visit Russell.  And this time it wouldn't be at the bank, it would be in a personal setting, and that setting became his home.  So, I got his number from his mom and I called Russell and asked him could I visit him.  I told him who I was.  He said:  Oh, yeah, Pastor Brown, I know you. Please, you're welcome to come to my home.  I said:  Okay.

1   Where is that?  And he told me.  Well, I went by and saw him

2   that day.  He was out doing something, but I met his wife,

3   Susie.  That was a strange occasion, because here it is a

4   Black man driving to your house, I don't know who you are.

5   But she welcomed me there.  And she said:  Oh, Russell talks

6   so highly of you.  Thank you for coming by, but he's not here

7   today.  And I said:  I'll come back by.  And so, I went back

8   by, and Russell was there in the yard doing yard work.  And he

9   took time off to stand out in the yard and talk with me for I

10  know an hour.

11          And so, when they moved from Varnville to the farm, I

12  went back before the Lord, and I said:  Lord, why am I going

13  to Russell?  I need help with this.  Because I'm not Russell's

14  friend, because friendship with me takes a long time to be

15  developed for me to call somebody my friend.  I'm not

16  Russell's co-worker.  I'm not Russell's family member.  But I

17  just need to know my purpose for going to Russell so that

18  something could get accomplished in the spirit of God.  And

19  this is what the Lord told me -- I know he did.  And I know

20  I'm talking like I'm spiritual, and some of you may be

21  thinking:  How do you hear from the Lord?  But anyway, God

22  told me, through the spirit of God, saying:  I want you to

23  present yourself to him as a man of thought, but as a man of

24  repentance and forgiveness.  And so, when I went to his home,

25  I told him some stories of my life before I became a pastor,

1    some of my failures and fallings after I became a pastor, and

2    how I truly knew that if I repented unto God, God would

3    forgive me; and not only forgive me, but he would recover me;

4    and not only recover me, but he would still use me for his

5    glory; that life just wasn't over after you made a mistake or

6    done wrong.  And Russell listened.  Russell listened intently

7    to me and he would begin to share his life with me.

8         I was never there to hear about this case.  As a

9    matter of fact, Russell and I have shared very little

10   information about this case, because I knew that wasn't my

11   purpose for being there.  I wasn't there to be nosey or

12   inquisitive about what was going on with him.  I was there to

13   make sure he understood that he was hearing a man and looking

14   at a man that had made mistakes.  And God forgave him, and God

15   will do the same for Russell.  And God will do the same for

16   all of you who need to be forgiven of failures, because a part

17   of being successful is failing.

18        So, the Russell Laffitte I have gotten to know over

19   the last few months has shown himself to be a man with great

20   concern and care for his wife, Susie; his two children; his

21   family, especially his mom and his dad.  Russell cares deeply

22   about his mom and his dad and also the people of the

23   community.  Every time I go to his house or I run into him or

24   chat with him on the phone, Russell would always ask me:

25   Pastor Brown, is there anything I can do for you?  I say:

1    Well, if it could ever be, I'll let you know.  And I took that
2    seriously and I think he's sincere about that, because he's a
3    man that offers his help in service to people.

4            So, today, I say this in my final sayings:  I pray
5    that my life, as a man of repentance of my sins and my faults,
6    be an example to Russell, as a man of faults -- because none
7    of us are perfect -- but also as man of repentance.  And I
8    truly believe, through repentance, each and every one of us
9    will be given the opportunity to still have a purposed life.
10   It may not be exactly what we want it to be or how we want it
11   to be, but sometimes you're moved from one thing to the thing
12   God really needs you to be in.  And sometimes we don't want to
13   accept that simply because it wasn't our desires.

14           So, I say to the Court, thank you all for having me
15   today.  And may the mercy of the Courts and God be upon
16   Russell Laffitte.

17           THE COURT:  Thank you, sir.

18           PASTOR HERBERT BROWN:  Thank you.

19           MS. SHOUN:  Your Honor, if I might ask Mr. Nix -- Jim
20   Nix -- to come forward?

21           THE COURT:  Yes, sir.  Thank you for being here.

22           MR. JIM NIX:  Thank you, your Honor.  My name is Jim
23   Nix.  I've known Russell since the early '80s, when we were in
24   high school.  But for the past 20 years, I've considered
25   Russell one of my very best friends.

1          As you've heard today, Russell is the type who would

2     drop whatever he's doing to lend a helping hand.  I'll give

3     two examples.  One, we were coming back from Charlotte one day

4     on a business trip.  My transmission goes out on my truck in

5     Columbia, left on the side of the road.  It just so happens,

6     Russell calls:  Hey, what you up to?  Broke down on the side

7     of the road.  No questions asked.  I'm on my way.  Hangs up

8     the phone.  Ten minutes later, he says:  Exactly where are you

9     at?  I'm on the way.  He comes and gets me.  He has a car

10    hauler and pulls my truck back to Hampton, where I live.  No

11    questions asked.  Another example, me and my son were in the

12    Savannah river one early morning in January, duck hunting.

13    Boat motor goes out.  One call.  Thank God, I had service.

14    One call.  Russell's on the way to fish us out the river.

15          Russell, as you've heard, gives himself to the

16    community.  You know, you've already heard how he helps out

17    local organizations, kids, sports, coaching, helping with the

18    concession stands, you know, cooking, staying up all night

19    cooking for the rotary club, different events, high school.

20    Russell is a very thoughtful man.  So, one example me and my

21    wife noticed very early on in our relationship with Russell

22    and Susie is that if we go out one night, go out to dinner or

23    whatever, the next morning, we always get a phone call:  Hey,

24    just enjoyed last night.  You know, it never failed, he would

25    always call the next day to say how much he enjoyed our

1    company.  And that meant a lot to us.

2         I consider Russell a family man.  This is evident in

3    the promise he made to Susie whenever they first started

4    having kids.  He made a promise that he would try to be home

5    every night for supper.  One day, I asked Russell:  Why did

6    you make that promise?  It was weird to me.  And he said,

7    because when he was coming up, his dad would close down the

8    bank and then he'd have to go work on the farm, and it would

9    be late at night when he would get back home.  And Russell

10   missed that interaction with his father, having supper with

11   him at night.  And to my knowledge, every night, Russell had

12   supper -- unless he was traveling -- with Susie and the kids.

13   He's kept that promise for 20 years.

14         And, you know, your Honor, you've heard everything

15   that everybody said.  I can only keep talking, but we just ask

16   leniency from the Court on Russell and his family.

17         THE COURT:  Thank you for being here.

18         MR. JIM NIX:  Thank you.

19         MS. SHOUN:  Your Honor, next I would ask Ms. Carter

20   Laffitte to come forward.

21         CARTER LAFFITTE:  Your Honor, I stand before you

22   today proud to be Russell Laffitte's daughter and still proud

23   to be Russell Laffitte's daughter after sitting in the

24   courtroom for most of the trial last November.  I wasn't here,

25   I was next door taking a school exam.  I knew how difficult it

1    would be to balance my class work, as a student at the

2    University of the South Carolina, and to be here for the

3    duration of the trial.  But I knew the importance of being

4    here for my father and my family in a time of need, something

5    I've learned from my dad's support and so many others that

6    you've heard about today.

7          The man you will read about in the media and the man

8    we heard about in November is not the man I know.  The man I

9    know calls me "Ding Dong" and sends me Sargie's *(phonetic)*

10   bird dogs almost every morning.  He's instilled in me a shared

11   love for Hampton County and its community, a community he

12   tirelessly advocated for as their banker.  I've personally

13   mowed the lawn at Palmetto State Bank more times than I can

14   count, and I worked there as a teller from the time I was able

15   until last December.  I worked at the bank while we navigated

16   the COVID-19 pandemic under my father's leadership.  And I've

17   seen the unique challenges of serving such an economically

18   depressed area, like Hampton and Allendale County.  My

19   father's exemplary leadership and his service to the bank, his

20   dedication to his employees, customers and every one that the

21   bank serves, inspired me to return to Hampton, post grad, as a

22   fifth generation community banker.  Safe to say, that all

23   changed in January of 2022.

24         Throughout our family's ongoing legal battle, my

25   mother has insisted that we go to therapy and seek a safe

place to discuss our ever-changing reality.  In our first
meeting with our counselor, he told me he noticed when Hampton
was mentioned to my dad and myself, that we were both visibly
upset, and asked why I felt that was.  I know why that is.  My
father and I both love Hampton, because, to us, it's not just
the home of the Murdaugh's, or a place with little to see or
do.  Hampton, to us, is being within five minutes of our
favorite people, our immediate family, and 15 minutes of our
favorite place to farm.  That is his haven and the home to our
favorite past time, turkey hunting.  I'll spare you the
stories.  You've heard a lot of them.  Hampton, to us, is
where we were born, where we live, and where we plan to die.
I've always known I have my father's full support.  Most
people would tell you that I'm "Little Russell," and call me
"Russellette."  He's a great dad to Luke and me, but he's a
father figure to so many more, who affectionately call him
"Unc."

When Aunt Platt and Lillie came to South Carolina
after my aunt and uncle's divorce, Lillie, my cousin, like
most 13-year-olds, did not handle it well.  I've witnessed
numerous times when my father went to talk to Lillie and just
sit with her.  Dad even offered her to move in our house and
live in my room with two twin beds.  Lillie and Luke, just
10 days apart, have both graduated now, and it was only
fitting that Unc escort Lillie for her senior homecoming last

1  fall.  My dad has welcomed my friends and our family like

2  they're his own kids, something he was blessed to be able to

3  do.

4       I have felt the gravity of my father's pending

5  imprisonment every day since last November 22nd.  But it is

6  not just me.  His love and support are far reaching, and his

7  absence will be just as far reaching.  I've seen my friends

8  sit in my dad's office and tell them about their new

9  boyfriends, and they bake him red velvet cakes for his

10 birthday.  They've written him notes of support, telling him

11 how much they miss walking into his office in the bank and

12 just seeing his smile.  He has touched the life of them all.

13      As you heard from Mr. Alex Jernigan, my dad made the

14 trip to Donalsonville, Georgia, which took us almost 11 hours

15 because we had to drive over the power lines, to clean up

16 after Hurricane Michael hit south Georgia.  I was right there

17 in the passenger seat, because, as you can probably tell, he

18 and I are attached at the hip.  But most importantly, he told

19 us the importance of helping others if you're able.  That is

20 just one example.  My dad has always been willing to help the

21 community.  After a devastating tornado in 2020, he served

22 food to those affected in Hampton County and then lended all

23 of our farming equipment to anyone that was in need, to help

24 clear debris.  He truly has a giving heart.  He's always

25 wanted to serve the community, and especially Hampton.

1      When many businesses and their leaders in our area

2  began to move to Beaufort and Bluffton, dad remained

3  steadfast.  He once told me:  Hampton is where the bank is,

4  and it is where we will be.  The community loves him back.  If

5  you look around this room, if you walk down the hall, you

6  would see that.  You can hear that in the letters on his

7  behalf.  He has so many people surrounding him, and he has

8  touched so many lives.  You should also know, my dad is a

9  simple man, not a man driven by material possessions.  His

10 favorite three things in the world, are my mom, our family and

11 our farm.  Those are his words, not mine.  It is heartbreaking

12 to think that this weekend might have been the last time that

13 my dad and granddaddy rode aimlessly around the farm.  And it

14 pains me to know that dad will never get to see the trees in

15 the early spring again and the turkeys gobbling.  Our family

16 has gone through so much, but we will heal.

17     I ask the Court to consider the further damage and

18 heartbreak that will come in determining my father's sentence.

19 Please consider his two parents in their 80s.  We'd like to

20 believe they're as invincible as they act, but we know our

21 time with them is limited and precious.  Please consider his

22 two biological children, Luke and myself, and a few more who

23 consider him a father or call him Unc.  Dad's mentorship,

24 support and love, and his simple presence at so many important

25 life events will be a tremendous loss to my grandparents, my

105

1    mom, my brother and me, but so many more.

2         My dad walked me down the hall to Ms. Perdue's

3    classroom on the first day of kindergarten.  And I hope one

4    day that he will be able to walk me down the aisle.  The

5    impact of losing him will be irreversible.  I conclude with

6    this:  Dad raised me to value family and community above all

7    else, to stand strong for what you believe in and never back

8    down from a fight.  Those are qualities I admire deeply in

9    him.  My dad is a man who only wants to work hard for the rest

10   of his days, living a simple life, and loving his family and

11   community, as he has always done.

12        I thank your Honor for your time and ask that you

13   please consider the effect of removing one of Hampton County's

14   few loyal supporters will have upon the community.  The effect

15   of taking away a son from elderly parents, who he's ever

16   wanted to make proud; the effect on my mom, of taking away her

17   emotional support, companion and partner in every sense for

18   the last the 23 years; and the effect of the emptiness that

19   Luke and I will experience when our dad is removed from us.  I

20   ask that you show mercy on my father and my family.  Thank

21   you.

22        THE COURT:  Thank you.

23        MS. SHOUN:  Ms. Virginia Breen.

24        VIRGINIA BREEN:  Hello, your Honor.

25        THE COURT:  Good to see you.

1        VIRGINIA BREEN:  My name is Virginia Harper Breen.

2    And I am here today to tell you about the Russell Laffitte

3    that I know.  I am from Estill, a small town, 13 miles away

4    from Hampton, the county seat.  In small towns, we rely on one

5    another.  And Russell has always been a family friend.  Our

6    fathers and grandfathers did business together.  But it wasn't

7    until my father passed away suddenly that I really got to know

8    him.

9        My family has been in the timber business in the

10   Lowcountry for many years, and we have always had a strong and

11   active banking relationship with the Laffitte's.  My father,

12   Andrew Harper, was a healthy, active, vibrant 61-year-old man

13   when he got caught in a riptide on Hilton Head and drowned.

14       THE COURT:  And a friend of mine.

15       VIRGINIA BREEN:  It feels impossible to find words

16   that convey accurately how devastated my brother and I were in

17   August of 2017; devastated and shocked by grief and loss, but

18   also overwhelmed at being unexpectedly pushed into taking over

19   my father's business.  The financial complexities were

20   daunting.  At the time, Russell reached out unsolicited to us.

21   He sat us down and essentially said:  I know this is complex.

22   Yes, there are many unknowns, but I am going to help you

23   figure this out.  Y'all can do this.  He was true to his word.

24   He spent hours over the ensuing weeks and months helping us

25   untangle and understand my father's finances, how my father's

1    finances were set up, talking about what worked well for my

2    father and other clients in the timber business and what he

3    recommended we do.  He gave us confidence that we could carry

4    on without my father, when doing so felt like such an

5    impossibility.

6         One of the things that I love about Hampton County is

7    that when you're having a business conversation, there is

8    nothing ruder than getting to the point.  Before you can get

9    down to business, some conversation is required.  I hesitate

10   to call it small talk, because it's more intentional in nature

11   than that.  And so, that is how I really got to know Russell

12   beyond my father's business.  We talked about his family,

13   hunting, farming, but mostly we talked about Hampton County in

14   our conversations before we actually addressed the business at

15   hand.  And during these conversations, I got to know what I

16   expect many people from the area don't know, and that is how

17   passionately he was fighting for Hampton County from his

18   position at the bank.

19        As you, no doubt, know, Judge Gergel, Hampton is a

20   poor county.  An estimated 24 percent of residents lived below

21   the poverty line in 2021.  It's also shrinking.  Since 2010,

22   the population has declined by 16 percent.  And since my

23   childhood, many, many businesses have shuttered.  Russell

24   loves to talk about Hampton County.  And he has been

25   passionate about giving small businesses in our area the best

shot of staying open.  He did everything in his power to keep

the Ford dealership in Estill in business, because he felt

like Hampton County benefitted from having a dealership

selling new cars.  He tirelessly supported the family that

owned one of Estill's two grocery stores.  That store happened

to be within walking distance of the poorest neighborhood, and

Russell felt strongly that it should stay open, since many of

the nearby residents had no transportation.

          In my letter to you, I mentioned how tirelessly he

worked for clients in the early days of the pandemic to secure

paycheck protection program funding for them, even though it

wasn't particularly lucrative to the bank.  Russell told me

more than once that he had a duty to shareholders to be

profitable, that he had just as much of a duty to the area to

support it.  We frequently spoke of the teens of Hampton

County needing a place to go socialize where they can stay out

of trouble.  In our view, that place was the roller skating

rink.  But it had long since closed.  Russell secured

donations from Palmetto State Bank and others in the community

to have the theater on Main Street in Hampton reopened, with

the promise that they would screen movies for the youth.  That

was his place for them to go.

          There is one last point that I'd like to make to you

today that, to me, speaks volumes about Russell's character.

I mentioned the 16-percent decline in the county's population

1  since 2010.  The truth is, the middle class and professionals

2  had been leaving the area for decades.  There aren't many jobs

3  to be had.  But maybe even more than that, there aren't many

4  conveniences.  It's merely an hour's drive to go see the

5  doctor outside of the ER, to go to a movie theater, or just

6  purchase new clothes or shoes.  Even professionals who are

7  still employed in the area live elsewhere.  I'm telling you

8  all of this because I think that it's significant that Russell

9  stayed.  The majority of his professional contemporaries have

10 not.  He stayed because he loves Hampton County and he sees so

11 much in it that is worth trying to save.  It is on the

12 shoulders of men and women like Russell Laffitte that towns

13 such as Hampton and Estill stay afloat.  I don't make that

14 statement lightly, Judge Gergel.

15        It is my hope today that you consider this pattern of

16 high character and service to others, these immense

17 contributions that Russell has made to a community that so

18 many overlook as too far gone to save, in your sentencing

19 decision.  Thank you.

20        THE COURT:  Thank you for being here.  Good to see

21 you.

22        MS. SHOUN:  That's the last individual we have

23 scheduled to speak before your Honor.

24        THE COURT:  Okay.  I think Mr. Laffitte wanted to

25 speak?

1          MS. SHOUN:  Your Honor, if I might ask for the

2    Court's indulgence, just to make a few comments to the Court,

3    of course, at the Court's discretion as to how your Honor

4    would like to handle this.

5          THE COURT:  Well, I'm completely fine.  I think maybe

6    you might want to speak after all the persons who are

7    appearing first.  Then I think it would be a better time for

8    you or anyone on your team who wishes to speak.

9          MS. SHOUN:  We appreciate that.  Thank you.

10         THE COURT:  Yes.  So, does Mr. Laffitte wish to speak

11   now?

12         MR. MOORE:  He wishes to speak, but I think he would

13   -- if your Honor would allow us, he'd like Ms. Shoun to go,

14   then me to go before he speaks, if that is something that

15   your Honor will allow.  But we'll do it obviously however

16   your Honor wants.

17         THE COURT:  I think it's better to put up all of the

18   witnesses and then I'll hear from the lawyers.  That's my

19   preference.

20         MR. MOORE:  And so, is your Honor going to take a

21   short break after this?  I'm asking you --

22         THE COURT:  The answer is yes.  I'm trying to the

23   finish up all the folks who will be speaking on behalf of the

24   defense, and then I was going to break.  And if you wish to

25   speak after lunch, that would be fine.

1          MR. MOORE:  Thank you, your Honor.  Then Russell

2   would like to exercise his right of allocution and to speak

3   briefly to your Honor.

4          THE COURT:  Very good.  Mr. Laffitte.

5          THE DEFENDANT:  Thank you, sir.

6          Judge Gergel, I want the Court to know how much I

7   regret the fact that I stand here today and how much I regret

8   the actions and failures on my part that have led me here

9   today.  I never dreamed I'd be standing before a Judge as a

10   defendant.  This whole process has been incredibly hard for so

11   many people, for the victims, my family, and all the people

12   here today.  I'm sorry that I've been part of putting you all

13   through this.

14          There are a number of things that I'd like to say,

15   but I feel that I can't, because of where we are with this

16   case and the multiple state prosecutions and civil lawsuits

17   pending.  What I do want to say though, your Honor, and to

18   everyone who's been involved in this case, is know how sorry I

19   am for the errors in my judgment and the fact that my mistakes

20   and my failures to ask the right questions brought me here.  I

21   apologize for making the decision to loan myself and Alec

22   Murdaugh money from Hannah's account.  I realize my own

23   mistakes and judgment, and now I see that my failures as

24   conservator helped defraud the victims.  For that, I am truly

25   sorry.

1          I'd also like to address each of the victims, Ms.

2    Pamela --

3          Can I turn around and speak?

4          THE COURT:  You may.  Yes, sir.

5          THE DEFENDANT:  Ms. Pamela and to the Pinckney

6    family, I can't imagine, as a father, losing a child.  I am

7    sorry for the loss of Hakeem and my failure to pay appropriate

8    attention to his needs.  I did not do my job as conservator as

9    I should have.  And because of my failures, he suffered.  And

10   I wanted you to know how sorry I am.

11         Alaina, I apologize for the hardships you've gone

12   through, the loss of your mother and your brother.  If I have

13   to relive it in my trial, I can't imagine having to go back

14   through that, reliving of that tragedy in this court.  My

15   actions and my decisions to make loans out of your account

16   caused this.

17         Natasha, I heard your testimony in court.  I was

18   touched by it.  And I was struck by my own failures to handle

19   your conservatorship appropriately.  I wish I had taken more

20   time to get to know you and what you needed.  And I wish I had

21   paid more attention to the details of your conservatorship.

22   And because of this, your settlement was also stolen.

23         To Arthur Badger and his family, I'm truly sorry for

24   the loss of Ms. Donna.  I apologize for being a part of you

25   having to relive the horrors of your loss due to the theft of

1    your settlement.

2        And Malik Williams, I'm also sorry for your injury

3    and for making a loan out of your account.  I regret not

4    spending more time with you and getting to know you and all of

5    my conservatorship people.  I'm not exactly sure how to say

6    that, but all the people that I represented, I should have

7    taken more time to get to know y'all.  And that is my fault.

8        And to the employees and customers at Palmetto State

9    Bank, I am deeply sorry that I let them down.  My own failures

10   and my own actions brought me here.  It was my honor to be the

11   fourth generation Laffitte to run the bank.  I was looking

12   forward to doing great things for the bank and the community

13   that we served.  And I failed my bank that my family operated

14   for generations and those it served.  If I could do it over

15   again, obviously we would do things differently.

16       And also to my family, Susie, Carter, Luke, Mom, Dad,

17   Charles, all the people who've stood by me throughout this

18   process and who've shown up here today to support me, it means

19   more to me than you'll ever know.  Thank you for your support,

20   your prayers and many kindnesses to me and my family.  I love

21   all of you.

22       I appreciate you giving me this opportunity to speak

23   today, your Honor.  In closing, I do ask for mercy that you

24   can show today, not so much for me, but for my family, whom I

25   love.

1          THE COURT:  Thank you, Mr. Laffitte.

2          Okay.  What we're going to do is -- as I sort of

3    indicated in my exchange with Mr. Moore, we'll take a break

4    now.  We'll be back at 2:00 o'clock.  And at that time, I'll

5    hear any arguments Ms. Shoun or Mr. Moore or Mr. Parente wish

6    to make, and then I'll hear from the government, and then I'll

7    impose sentence.

8          For now, we stand at recess.

9          MS. SHOUN:  Thank you, your Honor.

10         MR. MOORE:  Thank you, your Honor.

11         *(Lunch Recess.)*

12         THE COURT:  Please be seated.

13         Okay.  I'll be glad to hear from defense counsel.

14         MS. SHOUN:  May it please the Court, your Honor.

15         THE COURT:  Yes.

16         MS. SHOUN:  Your Honor, I'm pretty confident that

17   this Court is a little confused at our participation, or at

18   least what's --

19         THE COURT:  I'm not the slightest bit confused.  Good

20   lawyers for a tough case.

21         MS. SHOUN:  It seems a bit of an anomaly to

22   your Honor and I'm sure to many in the courtroom, including

23   Ms. Limehouse.  But if I do my job here correctly today,

24   perhaps everybody here will understand a little better why I

25   am here.

1        This started because my dear friend and colleague,

2    Andy Hazelton, over a number of years, has been working with

3    Mr. Laffitte for a while.  And once the trial was over, Andy

4    called me -- because we do that frequently, we talk and we

5    share ideas and we share thoughts.  And he said to me:  If you

6    were in Russell's shoes and you decided to go with a different

7    direction, a different direction as far as counsel, who would

8    you call?  And I immediately said, Mark Moore.  And I said

9    Mark Moore not just because he's my law partner -- he is --

10   but also because he's my friend, and I know that he and Andy

11   share a passion for doing what they feel is the right thing to

12   do.  So, your Honor, that's how I became involved.  I was

13   actually in this from the beginning a little bit and

14   throughout -- your Honor is aware, this is not my -- this is

15   not my forte, this is not my area of practice.  But,

16   throughout, the team has connected with me from time to time

17   and asked me questions and just got some general thoughts.

18   Because, as my friend, Mr. Moore knows a lot about me that

19   many in this courtroom probably don't.  And he knows that I

20   see this through a lens -- and Russell said that to us before:

21   Everything you do in life is seen through a particular lens.

22   And if I might share my lens and how it affects this, mine is

23   multifaceted, your Honor.

24       First, I look at this primarily as a mom, because I

25   am a mom.  And I have been many things.  I've been lucky to

1   have many roles in life.  One is a law partner, one is a wife,
2   one is a daughter, one is a sister.  But the most important
3   role I have is as a mother.  It doesn't matter, at the end of
4   the day, how many cases I've won or lost, it doesn't matter
5   how many clients I've represented.  What matters in my life is
6   my children.  They're my legacy.  So, I do look at this from a
7   mom's perspective.
8           I also have another perspective, your Honor.  And I
9   think that's probably one of the reasons Mark asked me to get
10  involved.  I grew up in a tiny, tiny coal-mining community in
11  southern West Virginia.  So, much of what I've heard and seen
12  throughout this case is familiar to me.  It probably seems
13  surreal to many of us in the courtroom and especially surreal
14  to younger folks, because we live in a different world.  But
15  where I grew up and how I grew up was very, very different.  I
16  have two brothers much older than I.  And my whole family did
17  their banking at the Bank of War, which is located in War,
18  West Virginia.  And the Bank of War was probably a much
19  smaller version, a much more elementary version, of the
20  Laffitte's -- the bank where Russell was the fourth generation
21  banker.  But many of the things are the same.
22          When my brother was about to start his first job as a
23  schoolteacher, he went to the bank and said:  I need a car.  I
24  don't have a way to get to work.  And Mr. Dallorso was the
25  owner of the bank.  To this day, I have no idea what his real

1   role was, but he was just thought of as the owner of the bank.

2   And Mr. Dallorso said to my brother:  Well, how much money do

3   you need?  My brother said:  I don't know.  He said:  Well,

4   what's the car cost?  He told him what the car cost.  He said:

5   You got any other bills?  He said:  Well, I'll get paid in

6   30 days.  He said:  Do you have enough money for a tank of

7   gas?  And my brother said no.  So, that was added onto the

8   loan.  Knowing that I was going to have the opportunity to be

9   in this courtroom, I called my brother this weekend and just

10  asked the question:  Did the bank put a lien on the car?  He

11  said:  No, they didn't.  I said:  Well, how'd you get the

12  money?  He said:  Well, Mr. Dallorso looked at me and said,

13  well, I know Peg and Shorty Shoun -- my parents; no shock,

14  looking at me here, that my dad was referred to as "Shorty

15  Shoun."  But that's how it happened and that's how it worked.

16  So, while a lot of what has been said in the courtroom and a

17  lot of the transactions we've had the opportunity to analyze

18  may seem odd, they were not that different to the way I grew

19  up.

20          And it is about a lens, your Honor.  And like Mr.

21  Moore and like Mr. Parente, I did not have the opportunity to

22  hear the testimony at trial.  So, I understand that your Honor

23  has a far best knowledge than I, as does Ms. Limehouse and the

24  prosecution.  And I had a whole bunch of comments prepared to

25  present to your Honor, but I've been in front of you, Judge

1   Gergel, many times, and I know you've read everything that's

2   been in front of you.  And I know that you've listened very

3   soundly to all the people who've spoken in this courtroom.

4           If I could just take a moment to very briefly -- and

5   it will be brief, your Honor -- go over a couple of the things

6   in the letters that were presented to the Court, because, as

7   your Honor mentioned before, this is the opportunity for the

8   Court to learn a little more about Russell that the Court did

9   not have the opportunity to learn before.

10          The letters will show, as has those who've spoken to

11  us today, that the Russell here is a different Russell than

12  what has been portrayed both in the media and, to a

13  significant extent, in the original trial of this case.  He is

14  a son, a husband, a father, a brother.  He's also an uncle.

15  He's called "Unc" by many.  And he's called Unc or Uncle

16  Russell by two very, very important people, and that's Lillie

17  and Clair Henderson.  Those are Russell's nieces.  Their mom

18  is Russell's sister, Grey.  When they were young, their dad

19  took a job in Hawaii, and so the family was separated by

20  necessity for a while.  Ultimately, Lillie and Clair and their

21  mom moved to Hawaii, where their dad was then working.  But

22  shortly after going there, their parents hit a rocky spot and

23  they ended up divorcing.  And as frequently happens, it was

24  very tough on the children, particularly on Lillie.  Clair

25  managed to get through it a little bit better than Lillie did.

1    But Lillie had a hard time.  And when Lillie and her mom moved

2    back, it was tough for her.  And Russell became her father

3    figure.  She ran away from home.  Didn't sound like she got

4    far and it didn't sound like she stayed long, but Russell went

5    to find her.  And as you heard Carter say, Russell would just

6    sit with Lillie sometimes.  He would allow Lillie to talk if

7    she felt like it, or not talk if she didn't feel like it.

8    That was the father role he played to both Lillie and Clair,

9    so much so, as your Honor heard, he did escort Lillie in her

10   senior homecoming.

11        There were others that have written letters to

12   your Honor, and I know that your Honor has read those.  But

13   they also show Russell as a friend.  You heard Mr. Jernigan.

14   You heard Mr. Nix earlier today.  You didn't hear from Mr.

15   Barnes, but Mr. Barnes wrote to your Honor.  Mr. Barnes has

16   known Russell for years and years and years and done work,

17   interior decorating work, at his home and at his office.  And

18   Mr. Barnes was in the middle of his own life crisis, and that

19   is a separation from his partner of decades.  And Russell

20   stepped in to protect Mr. Barnes from very harmful activity.

21   He protected him.  And he didn't have to do that, but he did.

22   He is a friend.

23        Your Honor also saw a letter from the Gerald's, Terry

24   and Wendy Gerald.  They have a farm.  And I think they

25   actually farm part of the Laffitte's property.  And Terry's

1    dad fell very ill with cancer.  He was in the midst of cancer

2    treatment, which included some surgeries, and he was very

3    concerned about being able to harvest the crops.  But as he

4    had done on lesser dramatic occasions, he called on Russell,

5    and Russell helped with that harvest.  He went and helped with

6    the farm.  And as Terry indicated in his letter, he doesn't

7    think he could have gotten that done, but for Russell's help.

8            Your Honor also received letters from the Sanchez's,

9    who wanted to be here today, but they live in Miami.  But they

10   did write to the Court.  They've known Russell and his family

11   for around 25 years.  They get together with the family

12   several times a year, including on Thanksgiving.  They have

13   property next door to the Laffitte's farm.  And Russell will

14   call them -- if there's going to be a freeze, he calls and

15   says:  Are your pipes covered?  Do I need to go over?  What do

16   you need me to do?  And he goes over and he helps them with

17   that.

18           And one of my favorite letters was from Juanita

19   Woods.  And Juanita's mama worked for the Laffitte's,

20   Russell's parents, for a number of years.  And Juanita has

21   come in and worked for them from time to time too.  And her

22   story was, I thought, a poignant one, because when Russell and

23   Susie were getting married, Russell went out and bought what

24   he thought was going to be an outfit that Juanita's mama

25   loved, because he wanted her to be at the wedding.  She was

1   like his second mom.  And he goes out and buys her a skirt and

2   jacket.  And Juanita's mama was like: Uh-uh, I do not wear

3   skirts.  But she did.  She wore it for Russell and she wore it

4   for Susie, and she wore it for the Laffitte family, because

5   they had been good to her, and she knew they were good people

6   and she wanted to please them.  And, Russell, again, was a

7   friend.

8           There's also a Russell in the community.  And that's

9   the Russell who has volunteered his time and his efforts for

10  various charities, including Relay for Life.  He has worked on

11  the disabilities board, as your Honor has heard.  He supported

12  the schools, as Ms. Platts has represented to the Court, being

13  one of the few dads who would show up and help, when usually

14  it's the moms there doing the work and the heavy lifting.  His

15  work with Relay for Life was written about by Wyman Manning

16  *(phonetic)*; and his work on the disabilities board, also

17  addressed by Beth Chafin.  And significantly, there's a

18  Russell that's a part of the community.  And Carter talked

19  about that.  Carter talked about how important community is to

20  her dad, and thus, to her.

21          And people like Kash Patel.  He came here.  He had

22  started a business, was thinking about growing his business,

23  but decided he wanted to leave Hampton.  And Russell convinced

24  him that Hampton was a good place to be, to stay there.  Jenks

25  Rhodes, who's the CEO of Rhodes Motor Company there, is also a

1    customer at Palmetto State Bank and leans on Russell, not just

2    as a professional but also as a friend.

3           Your Honor, these individuals who addressed

4    professional relationships and business relationships with Mr.

5    Laffitte had one thing in common:  Either before or during

6    those relationships, they were friends with Mr. Laffitte; they

7    grew to know him and respect him.  And despite my years of

8    doing this, I cannot come close to the eloquence of those who

9    spoke to your Honor earlier today.  But I will tell you that

10   Pastor Brown was impactful.  I will tell you that his faith in

11   what can happen was impactful.  And if we look at Russell

12   Laffitte as a member of the community and somebody who loved

13   and loves Hampton, I will say, your Honor, I share something I

14   didn't realize before today with many of these people who look

15   up to Russell, and that's a respect for him for what he did

16   and for what he tried to continue to do.  Because, your Honor,

17   I left my little, tiny coal mining town about two weeks after

18   I graduated from high school, I went off to college, I got a

19   law degree, I've had a law practice, but I have one regret, I

20   did not go back.  Russell went back because that community

21   means so much to him.  Russell wanted to see it grow.

22          He's been so influential in his children.  Carter

23   wants -- wanted at least -- to follow in his footsteps and go

24   back and be the next generation banker at the bank.  Luke's

25   getting ready to enter into a forestry program when he starts

1    college in the fall.  And that comes from the influence of his

2    dad's love of nature and the outdoors.  Susie looks at Russell

3    with special eyes, because that's her husband of decades.  And

4    the loss is significant that she faces, because he's been an

5    active parent, a participating dad, a supportive partner.  And

6    the important part of that is partner.  And as your Honor

7    mentioned, she's been here every day that Russell has been

8    here.  It's a true partnership that people like Ms. Platts

9    recognized and want to emulate.

10            And if I could then come full circle, your Honor,

11   because I started this off by saying my most significant role

12   in life is as a mother.  So, I look at Ms. LaClair with

13   special fondness.  And I recognize even now that, as we age

14   and as our kid's age, our roles begin to reverse a little bit.

15   The children become a little more like parents, and we become

16   just a little more like children, perhaps.  And the

17   significance, to me, is the loss to many, and especially

18   Ms. LaClair.  We hope Ms. LaClair and Mr. Charlie will stay

19   with us for much much longer, but we also know realities.  And

20   the potential loss to Ms. LaClair and Mr. Charlie are huge.

21            So, your Honor, this is not my comfort zone, speaking

22   at a sentencing, but people are my comfort zone.  And,

23   your Honor, I ask for the Court to consider all those who have

24   spoken and all of the many people --

25            If I might just ask raised hands for people in

1    support of Russell.

2         There's more in the overflow room and there's more

3    that couldn't be here.  So, Russell admits, your Honor, to

4    some mistakes and some gaps in judgment.  And the mercy that

5    we request goes to many, not just Russell.  And I appreciate

6    your Honor listening to my regards.

7         THE COURT:  Thank you.

8         Mr. Moore?

9         MR. MOORE:  Yes, sir, your Honor.  And I'm going to

10   try to be brief.  I'm going to try.  But I will tell

11   your Honor --

12        THE COURT:  I wouldn't bet on it.

13        MR. MOORE:  I said I'm going to try.  I will tell

14   your Honor that giving us a lunch break at the time you did,

15   did allow me to trim a lot out of my introduction.

16        THE COURT:  I thought it would give you more energy,

17   so I was reluctant to do it.

18        MR. MOORE:  It may have given me more energy, but I

19   recognized that there are some things that I needed to trim.

20   And now that I know that we go first and the government goes

21   next, I'm going to save some remarks for reply.

22        You know, when Ms. Shoun talks about a lens, okay, I

23   may not be the oldest lawyer in this courtroom, but I can

24   guarantee you that I'm probably the oldest lawyer in this

25   courtroom who has primarily, for most of their career,

1    practiced in the federal criminal courts.  Spent a long time

2    as a prosecutor, and I've been lucky to switch roles later in

3    life, but, you know, thankfully, never too late.  And, you

4    know, I remember a time when the guidelines were mandatory,

5    okay.  And I thought that was a really great thing when I was

6    a young prosecutor, 27 years of age.  And I saw some --

7              THE COURT:  Bet you don't like it right now.

8              MR. MOORE:  I don't.  But the thankful thing is --

9              THE COURT:  I don't like them either.  So, you and I

10   -- I don't like mandatory guidelines.

11             MR. MOORE:  And the thankful thing is, they're not

12   mandatory.

13             THE COURT:  Yep.

14             MR. MOORE:  I remember judges that I practiced in

15   front of who are no longer with us, who didn't like them very

16   much, because they had been operating under a system without

17   mandatory guidelines.  And at 27, I thought this was a great

18   thing.  Well, at 61, I'm glad that it's changed, because

19   your Honor has the ability -- and, indeed, the duty -- to

20   consider a number of other things other than the advisory

21   sentencing guidelines range.  And so, we have tried to speak

22   to Russell Laffitte as a person.  And I'm going to try to

23   speak to a few other things and take a little bit of your

24   time.

25             You know, Judge, this is a difficult sentencing for

1    me.  It's difficult for everybody in this courtroom, no doubt,

2    the victims as well.  I've never been in a situation of

3    addressing a judge with a defendant who's gone to trial and

4    been convicted where I wasn't the lawyer who was at the trial.

5    I have, on two occasions in the Southern District of New York,

6    addressed a judge after trial convictions in which I was the

7    lawyer.  And it's a little different, as I'm sure your Honor

8    knows.  But it's a solemn duty.

9         And, you know, we want to speak to you about Russell

10   Laffitte.  Because I will tell your Honor that I've spent a

11   lot of time with Russell Laffitte since January of this year.

12   And I've come to know Russell Laffitte.  And I will tell

13   your Honor that, you know, when your Honor tried this case is

14   November, as you know, my October, as was your Honor's, was

15   occupied with something else.

16        THE COURT:  I was busy that fall.

17        MR. MOORE:  You were extremely busy.  You're

18   frequently busy, your Honor, but you were extremely busy that

19   fall.  And, you know, while I pay attention to things that are

20   going on in cases where I'm not involved, I can't tell you

21   that I paid a ton of attention to this case, just finishing

22   that redistricting case, and I had a little health issue.  But

23   I followed things.  Of course, I do think I'm smart enough to

24   realize that you don't believe everything you read in the

25   media and certainly not the blogosphere.

127

1          THE COURT:  I tell the jurors they have the best seat

2     in the house, Mr. Moore.  Whether they've read or don't read

3     the newspaper during the trial, we've got the best

4     information.

5          MR. MOORE:  You're absolutely right about that,

6     Judge.

7          But so, when we were approached about potentially

8     taking over this case -- and we were primarily at that point

9     of talking about a potential appeal -- I wasn't a hundred

10    percent that Russell Laffitte and I were going to get along.

11    And, you know, I had talked to some friends and people that I

12    really respect.  They might have formed some opinions about

13    him.  And, you know, I had heard the word -- perhaps in the

14    media and perhaps other places, using the words "arrogant" to

15    describe Russell Laffitte.  I've come to know Russell Laffitte

16    pretty well and I can tell you that the Russell Laffitte I

17    know is so completely separate and apart from the word

18    "arrogant."  A little stubborn --

19          THE COURT:  He wasn't tried for being arrogant.

20          MR. MOORE:  I understand that, Judge.  I understand

21    that.  He's a little stubborn, okay, and he's a little naive

22    on occasion, okay, but he is not an arrogant person.

23          And, you know, this is a difficult argument to make.

24    And there is no doubt, okay, when you look at the evidence at

25    trial -- but you also look beyond the evidence at trial --

1    that Russell did not act appropriately in his duties as a

2    conservator with respect to any of these victims.  There is no

3    doubt about that, okay?  He realizes it, okay?  He has

4    accepted responsibility for that.  And I understand that the

5    government's primary focus in their sentencing memorandum is a

6    lack of acceptance of responsibility.  And while there are

7    certain things --

8           THE COURT:  Mr. Moore, let's talk about that just for

9    a second.

10           MR. MOORE:  Yes, sir.

11           THE COURT:  You know, understandably in your

12    responses, you expressed concern that Mr. Laffitte was being

13    punished for exercising his right to go to trial.  And I told

14    you at the beginning of this process, I do not hold it against

15    him for that.  The government can do as they wish.  Of course,

16    the rules -- the guidelines -- punish, to some degree, by not

17    giving the defendant acceptance, because he hasn't accepted

18    responsibility.

19           MR. MOORE:  They do, your Honor.

20           THE COURT:  And I figure that's enough.  I don't need

21    to be piling stones on the defendant.  But, you know, I've

22    heard a lot of things about the good deeds Mr. Laffitte has

23    done.  And I'm sure all are accurate.  But there's a broader

24    picture here that came out during this trial in which there

25    was an elaborate criminal scheme in which there wasn't just

1    bad judgment, there was complicity, for which he was richly

2    compensated.  Was he the number-one bad guy in this scheme?

3    No.  Did he make criminal errors, not just errors of judgment?

4    Yes.  I took very seriously the post-trial motions.  If I had

5    felt there was not evidence to support the conviction, I would

6    have, without reluctance, set it aside.  I did not.  I thought

7    he was guilty of all six counts.

8              MR. MOORE:  Yes, sir.

9              THE COURT:  And I was glad to hear him apologize.

10   So, when he asked me if he could turn and speak to the

11   victims, I thought that was very healthy thing for him to do.

12   These were extremely vulnerable people.  Their family members

13   were victims of horrible, tragic events in their lives; death,

14   people widowed, lost their parents.  It was horrible to

15   vulnerable people.  And he treated them like they were players

16   on a chessboard, moving that money around.  He was making

17   money, Murdaugh was making money.  And it's a very different

18   picture than the one that these good people from Hampton

19   County have brought in today.  And, you know, one of the

20   multiple factors under 3553(a) is the characteristics of the

21   defendant.

22             MR. MOORE:  Yes, sir.

23             THE COURT:  That is a very positive thing for much of

24   this defendant's life.  But there are other factors:  The

25   nature of the specific crime; the seriousness of the crime;

1    the need for deterrence, both general and specific; just

2    punishment.  These are other factors, among many, that I have

3    to consider under the 3553(a).  And as much as you have

4    focused on one of those factors, which, if I were you, I would

5    have done exactly the same thing --

6                MR. MOORE:  And I'm not done, Judge.  But, yes, sir.

7                THE COURT:  Ms. Limehouse is going to get up and talk

8    about those factors.

9                MR. MOORE:  I'm sure she is.  And I'm going to try to

10   talk about them for a few minutes myself.

11               THE COURT:  Well, it's good.  But, you know, you've

12   read my post-trial order.

13               MR. MOORE:  I have.

14               THE COURT:  And I don't think there's any secret --

15   you read the transcript.

16               MR. MOORE:  Yes, sir.

17               THE COURT:  There were, perhaps, choices he could

18   have made earlier that could have avoided some or all of this,

19   but it didn't happen.

20               MR. MOORE:  And I wasn't here then, Judge.  And I

21   wish I had been, but I wasn't.  So --

22               THE COURT:  Yeah.  Well, you know, it's easy to

23   criticize others.

24               MR. MOORE:  I'm not criticizing others.

25               THE COURT:  I want you to know that I thought the

1    defense counsel at trial did a very fine job.

2            MR. MOORE:  Yes, sir.

3            THE COURT:  In fact, they were dealt a very difficult

4    hand, a very difficult hand.

5            MR. MOORE:  I don't disagree with that.

6            THE COURT:  And these were very able lawyers.  I had

7    a lot of respect for them.  I still have respect for them,

8    like I have respect for you, Mr. Moore, and your team.  But

9    this is like the least pleasant aspect of my job, because

10   every time I sentence someone, I send their families to

11   prison.  Not just them -- not just the defendant, I send the

12   families.  And I know the consequence it has for the spouse,

13   for the children, for the parents.  And that weighs heavily.

14   But if we're going to have a rule of law in our society, we've

15   got to have accountability.  And we've got to deter -- I don't

16   think Mr. Laffitte will ever commit another crime in his life.

17   He has been chastened beyond what anyone could be chastened.

18   But there is a strong need for general deterrence about people

19   who are fiduciaries who abuse that trust.  And someone called

20   it making an example.  No.  It's general deterrence.  You

21   know, I have some defendants in front of me -- Mr. Moore, some

22   you prosecuted -- in which they're not deterrable, right?

23   They're just going to keep committing crimes.

24           MR. MOORE:  There are some that are not deterrable;

25   your Honor is correct.

1    THE COURT:  White-collar criminals are, by and large,

2    deterrable, because if they ever had the idea they would face

3    the consequences, they wouldn't do it.  So, among the factors

4    I have to consider is:  How do I help deter this type of

5    tragedy again?  And believe me, it is a tragedy.  And, listen,

6    the good folks from Hampton County -- good God -- they've had

7    the death of two beloved members of their community killed by

8    the father, husband, who was a prominent member of the

9    community, whose family led a legendary role in the community;

10   and the president of their bank has been found guilty of six

11   counts of federal crimes.  I am sure they are devastated.  But

12   there's got to be justice, there's got to be accountability.

13   And my unhappy task is to balance all of these factors under

14   3553(a) to impose a sentence which is sufficient but not

15   greater than necessary to accomplish the purposes of the law.

16   That's what I'm focusing on here:  How do I balance all of

17   this?  By denying it existed doesn't get us anywhere.

18            MR. MOORE:  Yes, sir.  And, your Honor, to the extent

19   that you've read our pleadings, are you hearing us saying that

20   we're denying it existed?  That is not what we mean to

21   communicate.  I knew before I walked into this courtroom that

22   your Honor would not hold against Russell Laffitte the fact

23   that -- and I was responding more to the government sentencing

24   memorandum.  I knew that your Honor would not impose a trial

25   tax, which I've heard other people say before, that, going to

1   trial, you get a trial tax.  I knew your Honor would not do

2   that.  I know that.  I knew your Honor would not hold against

3   him the motions that he filed, or the fact that he has

4   insisted that he is, in fact, not guilty of this crime.  I

5   knew your Honor would not hold that against him.  And very

6   confidently, your Honor will not.  And I understand that your

7   job is very, very difficult, because you have to balance the

8   person that you saw at trial, okay, and the acts that you saw

9   at trial, as against the other parts of his life.  And as

10  your Honor says, you have to look at the general deterrence

11  factor.  And I understand that, okay?  So --

12          THE COURT:  I may be channeling some of your

13  arguments when you were a prosecutor.

14          MR. MOORE:  And, you know, I have to --

15          THE COURT:  You were not known to be a softy, Mr.

16  Moore, as I recall.

17          MR. MOORE:  I was not.  I was not.  And, you know,

18  Judge, when I was an --

19          THE COURT:  Frankly, Ms. Limehouse is a lot more

20  sympathetic to defendants than you were, Mr. Moore.

21          MR. MOORE:  I don't know that I agree with that, your

22  Honor.  I don't know that I agree with that.

23          MS. LIMEHOUSE:  It's on the record now, Mr. Moore.

24          MR. MOORE:  I don't know that I agree with that,

25  your Honor.  You didn't have me in your courtroom as a

1    prosecutor that often.

2              THE COURT:  No, I didn't.

3              MR. MOORE:  But I wasn't a softy, Judge; I was not.

4    And when I was a young AUSA, I had another AUSA who was a lot

5    more senior to me tell me -- he had been in the military.  And

6    he said, you know, in the military, some days you're a defense

7    lawyer and some days you're a prosecutor, okay?  And when you

8    do that, you see both sides of the fence.

9              THE COURT:  That's why JAG officers are great

10   lawyers.

11             MR. MOORE:  That is exactly why JAG officers are

12   great lawyers.  And I said to that lawyer, who had been a JAG

13   lawyer, that's the craziest thing I've ever heard.  Now, I

14   said that when I was 28 or 29.  Well, at 61, that's one of the

15   smartest things I've ever heard, okay?  I wish that someone

16   had made me defend people before they gave me the authority to

17   prosecute them at the ripe old age of 27, because I think I

18   would have done some things differently.

19             And I understand what your Honor says when you talk

20   about putting someone in prison, it's not just the person.  I

21   didn't think so much about my actions and how they impacted

22   family members and friends, but I see it now and I see it

23   crystal clear.  And I know your Honor considers those things

24   in imposing sentences.  And I appreciate the fact that

25   your Honor does.

1    With respect to specific deterrence, your Honor has

2  said what you said about specific deterrence --

3    THE COURT:  Don't waste your time.

4    MR. MOORE:  I don't need to say anything else about

5  it.

6    With respect to general deterrence, I understand

7  your Honor's point.  The point is:  How much time does Russell

8  Laffitte need in order to provide general deterrence and to

9  balance the need to provide general deterrence with all of the

10  other 3553(a) factors, okay?  And looking at the --

11    THE COURT:  I've got to look at the whole totality,

12  not any one of them --

13    MR. MOORE:  Right.

14    THE COURT:  -- all of them together.  And then I have

15  to fashion a sentence which is sufficient but not greater than

16  necessary, without undue focus on any one of those factors.

17    MR. MOORE:  Right.  And I've heard your Honor loud

18  and clear about the offense here.  And, you know, I don't

19  think that I'm going to score any points with giving you my

20  little view --

21    THE COURT:  You will not.  You will not.

22    MR. MOORE:  -- so, I think I just need to move on,

23  okay, with respect to factor A.

24    With respect to factor B, there have been a lot of

25  people and a lawyer, who's a better lawyer than I am, who've

1    said a lot about that and done it a lot more effectively than

2    I could, okay.  I do know that, in the government's sentencing

3    memorandum, they talked about the characteristics of the

4    defendant.  They spent a lot of time talking about the fact

5    that they believe he's told so many lies and that they believe

6    this video.

7            THE COURT:  I'm sorry.  The what?

8            MR. MOORE:  The video -- the interviews that Russell

9    gave, you know, in advance of trial.

10           THE COURT:  Okay.

11           MR. MOORE:  And I'm just going to listen to what Ms.

12   Limehouse says about that and save my reply for that.  But --

13           THE COURT:  I've got to say, I haven't -- you know,

14   that wasn't a real big issue at trial.  I was more judging on

15   the conduct --

16           MR. MOORE:  Yes, sir.

17           THE COURT:  -- and on what happened.  And, you know,

18   y'all haven't spent much time talking about it.  And if I were

19   in your shoes, perhaps I wouldn't either.  But there are

20   things that happened, like calling a loan -- a beach house

21   loan and using it for other purposes, in clear violation of

22   misapplication of bank funds; taking a loan devoted for

23   farming and paying off loans that had been taken from a minor

24   child.  I mean, writing Mrs. Secklinger on behalf of Mr.

25   Murdaugh to break up a check, I mean, that's a coconspirator

1   if there ever was one.  Those are things I've got to sort of

2   weigh.

3           MR. MOORE:  I understand.

4           THE COURT:  And I think, by not talking about them

5   and not sort of acknowledging -- frankly, the closest you've

6   come is Mr. Laffitte, himself, coming in here and apologizing.

7   And he said he couldn't say more because of pending state

8   charges and civil suits.  And let me say, I took from that

9   that if he was unleashed from those burdens, he would have

10  more readily acknowledged his criminal responsibility.  But he

11  made his choice to go to trial, he was convicted, we're here

12  now.

13          MR. MOORE:  Yes, sir.

14          THE COURT:  And we've got to impose a sentence.

15          MR. MOORE:  And, your Honor, as you said, I'm not

16  going to convince you of -- I'm not going to change

17  your Honor's mind about any of the evidence that was presented

18  at trial, and so that's why I'm not doing it.  I realize that

19  this offense was serious, okay.  No doubt that the offense was

20  serious, okay.  I realize it.  I get it.  I'm here to talk

21  about the other factors, because I know that that's what

22  your Honor has to weigh, is the seriousness of the event.  He

23  has a guidelines range that's been established, and a whole

24  lot of enhancements that have been applied.  And so, I'm here

25  to talk about the other factors.

138

1        And so, one of the factors that I want to talk about
2   for a moment is punishment is not only going to jail, which
3   your Honor knows.  It's a big part of punishment, but it's not
4   only about going to jail.  And he and his family have already
5   been significantly punished.  He has state charges pending,
6   okay.  And back in the day, when I was an AUSA, you know, you
7   didn't see so much of federal and state authorities filing
8   almost similar -- substantially similar indictments.  We tried
9   to work those things out.  And, look, I know the prosecutors
10  in this case, I know the prosecutors in the state case.  I've
11  worked both with and against most of them.  And I think that
12  they are all exceptionally talented, exceptionally ethical,
13  exceptionally capable lawyers.  I wish that Russell had been
14  prosecuted in one venue and not two.  But --
15        THE COURT:  What defense lawyer wouldn't?
16        MR. MOORE:  Well, that's true, your Honor.  And, you
17  know, when I was thinking about making an argument, you know,
18  I went back and reread *Gamble v. United States*.  And, of
19  course, I believe that Justices Ginsburg and Rorschach had the
20  better argument on that day, but, unfortunately, it didn't win
21  the day.  So, the fact is, because there is a separate
22  sovereign exception to the double-jeopardy rule, that can
23  happen.
24        THE COURT:  Mr. Moore, I can't predict, with any
25  confidence, what the state courts will do --

1      MR. MOORE:  Yes, sir.

2      THE COURT:  -- but it has been my experience, which

3  has been considerable over the years, that when there are such

4  pending charges, they tend to -- and if I impose a sentence

5  which they think sufficiently addresses the criminal

6  culpability, they tend to pass.  They just do.  They don't go

7  to trial just for the sport of going to trial.  Now, whether

8  the circumstances here will take that out of the mainstream of

9  what normally happens, I can't say.  But, you know, I've had

10 criminal defense lawyers say to me:  Don't get too light on

11 the sentence, because I'm scared they'll keep prosecuting me

12 in state court.  So --

13     MR. MOORE:  I'm not going to say that to you today,

14 Judge.

15     THE COURT:  But, you know, in my heart of hearts, I

16 wish this all was one global resolution.  And I'm sure you've

17 endeavored to do that, without success.  And part of the

18 problem is, normally when we get a global resolution, it's

19 associated with a guilty plea.

20     MR. MOORE:  I understand.

21     THE COURT:  And when you don't do that, you kind of

22 lead with your chin.  You know, frankly, the prosecutors

23 aren't as receptive to a global resolution.  And I cannot

24 control what a state judge would do or what the state

25 prosecutors would do.  I'm going to impose a just sentence

1    which I think is sufficient but not greater than necessary.

2    And it would be my hope that the state prosecutors would defer

3    to that; I have no control over it, however.

4           MR. MOORE:  Yes, sir.  I guess my ultimate point

5    there is that, the simple fact that he has to defend himself

6    in both jurisdictions means he has to spend more money on

7    lawyers in both jurisdictions and means that he has to think

8    about the consequences of those.  And one of the things that

9    is a little different about this case, particularly in a fraud

10    case, is he's wearing two ankle monitors, okay?  Not just one,

11    but two.  He's wearing an ankle monitor for the state case,

12    and he's wearing an ankle monitor for the federal case.  He's

13    had those ankle monitors on and he has had his ability to move

14    around freely, restricted and restricted substantially, for a

15    year.

16           THE COURT:  He also got bond, which allowed him to be

17    out.

18           MR. MOORE:  Yes, sir.

19           THE COURT:  And, you know, that's a benefit not all

20    defendants have.

21           MR. MOORE:  I understand that, your Honor.  I guess

22    the point I'm making is that I would ask your Honor to

23    consider those facts when you ultimately decide the

24    appropriate punishment.  When we talk about punishment,

25    financial punishment is a punishment, as your Honor well

1    knows.  Your Honor has established a loss amount, and

2    your Honor has established restitution, and your Honor will,

3    no doubt, at some point, issue a restitution order that we'll

4    probably talk about towards the end of this proceeding.  He's

5    more financially able to pay that restitution judgment than

6    will Alec Murdaugh.  And so, the lion share of the financial

7    penalty, even if your Honor imposes joint and several

8    liability, which we hope you will do, and which we

9    respectfully request that you do, Alec Murdaugh is the one who

10   profited far more than Russell Laffitte, as I think your Honor

11   acknowledged.  Russell Laffitte will be the primary person --

12        THE COURT:  I thought y'all had worked out -- y'all

13   didn't have a dispute about how we were going to allocate

14   between -- that Counts 1 through 3 were joint and several, and

15   Counts 4 through 6 -- I don't think that's in dispute.

16        MR. MOORE:  Right.

17        THE COURT:  Counts 4 through 6 were solely committed

18   by the defendant, and he is solely responsible.

19        MR. MOORE:  That's correct, your Honor.  But, again,

20   for Counts 1 through 3, they're jointly and severally liable,

21   that's a substantial restitution judgment for those.  And the

22   likely person who's going to pay those is going to be Russell

23   Laffitte and not Alec Murdaugh.  And so, I ask your Honor to

24   consider that, because, affording just punishment and

25   affording general deterrence, those factors should, we

142

1    respectfully submit, be considered.

2            He and his family have been subjected to a whole lot

3    of scrutiny from the media, most of it negative.  Certainly

4    not the only case that that's happened with your Honor.  I've

5    seen it before myself in other cases.  But it's been

6    substantial here.  Russell Laffitte is a household word -- or

7    if not, he's known as the "Murdaugh banker."

8            THE COURT:  Actually, you know, you say that.  I was

9    drawing a jury, and we really thought that we were going to

10   have trouble drawing a jury because everybody knew who he was.

11   Very few jurors had any idea who he was.

12           Obviously, the family has been traumatized by this

13   whole scenario, right?  I mean, let's face it.  He has not

14   achieved the infamy of Mr. Murdaugh, nor should he; very

15   different circumstances.  But, you know, you get involved, Mr.

16   Moore, in one of the greatest public scandals in modern South

17   Carolina history, and you're not going to come out looking

18   that good.  Just the way things are.

19           MR. MOORE:  Yeah.  And I understand that, your Honor.

20   I understand that.  But I felt like I needed to make those

21   points.  Because, I'll tell you, shortly after I took on this

22   case, I went to a conference, and people were coming to me and

23   saying:  So, you're representing the Murdaugh banker?  People

24   who I hardly even knew.  So, it has gone beyond the corners of

25   our state, as your Honor knows.  Unfortunately, the Murdaugh

1    name is known not just nationally but internationally.  And he

2    is tarnished by that, and he's tarnished in part because of

3    his own actions.  And I agree with that.

4            THE COURT:  Correct.  Correct.

5            MR. MOORE:  He's tarnished in part because of his own

6    actions.  But I simply ask, when you look at general

7    deterrence, okay, the fact of what has happened to him is

8    already known to the public.  And that general deterrence

9    factor is there, as I believe one of our -- Mr. Jernigan spoke

10   to.

11           As your Honor just mentioned, you know, this has been

12   one of the most infamous cases in the state's history, okay?

13   It comes shortly on the hills of the *SCANA* case, which was

14   touted by the United States Attorney's Office and the Attorney

15   General's Office as perhaps the largest financial fraud case

16   in the state's history.  And the numbers there dwarf the

17   numbers here.  And I understand that numbers don't tell the

18   whole tale, Judge, okay.  But as your Honor knows, in that

19   case, the CEO of *SCANA* got a 24-month sentence, which was

20   recommended as an 11(c)(1)(C) by the feds and the state.  And

21   so, I ask your Honor to take that into consideration when

22   your Honor is thinking about the need to avoid unwarranted

23   sentencing disparities.

24           THE COURT:  I consider those very different

25   circumstances.  It is worthwhile to consider unwarranted

144

1    sentencing disparities.  That is a fair factor.  And one of

2    the things I have consulted is the data from the sentencing

3    commission about individuals with similar -- with two people,

4    1.1 conviction, total offense level of 31, criminal history of

5    one.  I don't know if you've looked at that data.

6              MR. MOORE:  I've looked at some of it.  And --

7              THE COURT:  I've got the four-year numbers.

8              MR. MOORE:  And does your Honor wish to share with me

9    your views on --

10             THE COURT:  I'm happy to share with you.  I believe

11   the -- and, again, this is just, you know, one of the many

12   considerations regarding unwarranted disparity.  These are 89

13   individuals who did not receive a 5K1.1 for substantial

14   assistance.  One hundred percent received a sentence of

15   imprisonment in whole or in part.  The length of imprisonment

16   imposed was 85 months, and the medium length of imprisonment

17   was 87 months.  Eighty-nine individuals in America, 2018 to

18   2022.

19             MR. MOORE:  Yes, sir.

20             THE COURT:  That tells me, since the guidelines are

21   108 to 135 months, that my colleagues have frequently varied

22   downward in these fraud cases.  And one of the factors is

23   that, when you have multiple enhancements, as occurred here,

24   that, while each enhancement individually may be reasonable,

25   sometimes the combined nature of all those enhancements

1    produces a sentence greater than is necessary.

2         MR. MOORE:  Yes, sir.  That's something that -- I

3    know you're not forecasting what your Honor intends to do, but

4    that is the sentiment with which I agree.  Because I know

5    your Honor reads everything, okay.  We filed yesterday a

6    notice of supplemental or additional --

7         THE COURT:  I read all the cases.

8         MR. MOORE:  I know you did.

9         THE COURT:  And you cited my cases.

10        MR. MOORE:  I did.  And I didn't want to bring them

11   up without your Honor having the ability to read them.

12        THE COURT:  I'm very familiar with those cases.

13        MR. MOORE:  Because, the cases, except for the ones

14   that we cited -- except for your Honor's cases, are all

15   financial fraud cases, all cases where defendants went to

16   trial, okay, defendants were convicted at trial, and

17   defendants ultimately received variant sentences, some of very

18   significant lengths, as your Honor knows.

19        The two times that I've addressed a judge after

20   trying a case and losing it, has been in the Southern District

21   of New York.  They were both fraud cases but very different

22   type frauds cases.  They were the NCAA basketball cases.  And,

23   you know, you see things from other districts, and you go,

24   gosh, I wish we did that here.  And in the Southern District

25   of New York, the probation office recommends sentences and

1    sometimes recommends variant sentences.  And in those cases,

2    we tried those cases, guidelines range is in the first case at

3    33 to 41 months.  My client was given a six-month sentence

4    after a trial conviction.  In the other case, similar

5    guideline ranges, he received a three-month additional

6    sentence.  What I say about that is to say that judges

7    frequently vary.  And I'm asking your Honor to consider

8    varying in this case when you look at the totality of the

9    circumstances and you look at all of the factors under

10   3553(a), which I know your Honor will.

11          And I won't spend a ton of time talking about the

12   parsimony provision, but the parsimony provision is sort of

13   wrapped into or baked into the 3553(a) factors as a whole.

14   And the issue is for your Honor to impose a sentence that is

15   sufficient but not greater than necessary to accomplish the

16   statutory purposes of sentencing.  I think that a guideline

17   sentence is greater than necessary to accomplish statutory

18   purposes of sentencing here.

19          One of the things you heard Ms. Limehouse say at the

20   beginning of this is the offers that she's made to us.  And

21   they were gracious offers, and I appreciate them.  She didn't

22   have to make them, and I understand that.  But when the

23   government makes that, I think they say to the Court that a

24   sentence of 72 months, which was the first offer, their

25   recommendation, or a sentence of 87, which was their second

1    recommendation, without any sort of acknowledgment of guilt,

2    is a sentence that is sufficient but not greater than

3    necessary to accomplish the statutory purposes of sentencing.

4            With respect to your Honor's own cases, okay -- and I

5    know they're not fraud cases that I cited to your Honor, but

6    those are cases that echo sentiments of other judges that we

7    cited in fraud cases which talk about the fact that the

8    guidelines themselves are very punitive, very significant, and

9    very serious.  And that can be a reason to vary.

10           THE COURT:  Well, let me just say, so we don't get

11   into my individual sentencing decisions --

12           MR. MOORE:  Yes, sir.

13           THE COURT: -- because every one is individual.  One

14   of them involved a fellow whose guidelines under a child

15   pornography -- child abuse case was 50 years.  I thought it

16   was excessive.  It was basically a life sentence.  And though

17   he had done terrible things, I didn't think a 50-year sentence

18   was appropriate, and it was the combination of multiple

19   legitimate enhancements.

20           MR. MOORE:  Yes, sir.

21           THE COURT:  There was one about a guy who robbed some

22   jewelry stores.  And he had done similar crimes.  Bad guy.  He

23   had, as I recall, like a 70-year sentence under the

24   guidelines, whatever it was.  And I cut him down to 30 years,

25   which will basically -- he'll leave jail as an elderly person.

148

1    Every one of these cases.  So, to talk about cases of jewelry

2    store robbers, or sex perverts, or NCAA players, is not

3    appropriate regarding this crime.  We're looking at an

4    elaborate financial fraud that went over eight years.  It was

5    methodical, it was systematic, it was abusive.  I judge it on

6    its own merits, individual to this defendant.  And to throw in

7    random cases as different examples, frankly, doesn't help me

8    very much in reaching a sentencing decision.

9         MR. MOORE:  Well, I looked for a case that's exactly

10   on all fours with this one, and I can't find one.

11        THE COURT:  I tried probably more cases than any

12   other judge in our district, and I haven't had one like this.

13   Now, have I had a lot of cases?  Yes, I have.  But this one

14   has certain specific qualities that are distinct, and that was

15   the reason I consulted the sentencing commission's data,

16   because it's not unique in the country.

17        MR. MOORE:  Yes, sir.

18        THE COURT:  And it's kind of interesting.  You were

19   saying that the 87 months that the government offered you,

20   without an admission of guilt, you thought was sufficient but

21   not greater than necessary.  And I just gave you numbers of 85

22   and 87 months in the statistics.

23        MR. MOORE:  You did.

24        THE COURT:  And I'm just saying, you know, all that's

25   data to consider.

1      MR. MOORE:  I understand.  And I also understand that

2  your Honor is going to consider all that and your Honor is

3  going to think long and hard about the right sentence that you

4  think ought to be imposed --

5      THE COURT:  For Mr. Laffitte.

6      MR. MOORE:  -- for Mr. Laffitte, for the offenses for

7  which he stands convicted, and for the person he is, and for

8  the other sentencing factors that are at play here.

9      THE COURT:  Correct.

10      MR. MOORE:  And so --

11      THE COURT:  Mr. Moore, let's -- you can give a reply,

12  but I want to hear from the government, if I could, please.

13      MR. MOORE:  Yes, sir.  Thank you.

14      THE COURT:  Thank you.

15      MS. LIMEHOUSE:  Thank you, your Honor.  May it please

16  the Court.  We've spent a lot of time today talking about

17  Russell Laffitte, and individual numbers, and checks.  And

18  what we've lost is the voice of the victims.  And that's what

19  we want the Court to hear first.  So, thankfully, some of them

20  have joined us here today so that you could hear their stories

21  beyond financial impacts of the defendant's crimes, but really

22  the personal impacts that they still deal with today.

23      So, first I'll ask Hannah and Alaina Plyler and their

24  attorney, Eric Bland, to speak.

25      THE COURT:  Very good.  I'll be glad to hear from the

1    Plyler sisters.

2           Good to see you again.

3           HANNAH PLYLER:  Yes, sir.  My name is Hannah Plyler

4    and I'm a victim of Russell Laffitte.

5           Russell Laffitte was someone who I once trusted very

6    much.  He was someone I thought was protecting my settlement

7    money as my conservator and not letting anyone near it.  But

8    he did the exact opposite, all while I was young and unaware

9    of his crimes.  The trust was in March 2015, when I turned 18

10   years old, and it was time for him to hand over many files in

11   my settlement money that he had to quickly come up with right

12   before my 18th birthday.  I know why now the conversations

13   went away, thanks to my wonderful attorneys, who discovered

14   the crimes that took place by Russell Laffitte.

15          The crimes Russell committed is something I have to

16   live with every single day.  My settlement money from the

17   tragic car accident I was involved in, that took the life of

18   my mom and my brother, was misappropriated and stolen from me

19   by Russell Laffitte.  He took my money, loaned it out to

20   himself, he also loaned some of it to Alec Murdaugh so he

21   could clear up his overdraft fees, and then he loaned it out

22   to other individuals as well, without me ever knowing or ever

23   being aware he was doing this, or him ever having permission

24   from anyone, including me.  I will always have to live with

25   the fact that my settlement money was returned to my

1    conservatorship account by Russell stealing again from another

2    victim's conservatorship account.  So, therefore, it was paid

3    back by stolen funds.

4         My family and I are very affected by this case,

5    because they have to see me go through these emotions that

6    open old wounds that I thought were healed, and listen to me

7    have to talk about and pretty much relive the most horrific

8    time of my life, July 16th, 2005, the day I lost my mother,

9    Angela, and my brother, Justin.

10        Russell has really shown what kind of person he is.

11   He has shown zero remorse, and there have been no apologies,

12   until today.  Being such a young age at the time, Russell

13   thought it was a good idea to take advantage of me.  So, now

14   it's only right for him to be punished for the crimes he

15   committed.

16        THE COURT:  Thank you, Ms. Plyler.

17        ALAINA PLYLER:  Good afternoon, Judge.

18        THE COURT:  Good to see you again.

19        ALAINA PLYLER:  Yes, sir.  Likewise.

20        First of all, thank you for your time and your

21   patience through this trial.  I appreciate you allowing me and

22   the other victims the opportunity to express the impacts that

23   we have faced over the past few years.

24        As this Court heard my testimony that I gave, I was

25   involved in a horrific motor vehicle collision on July 16th,

1    2005, which did take the life of my mother, Angela Lynn

2    Plyler, and my 14-year-old brother, Justine Lewis Plyler.  I

3    was just a 12-year-old girl; and my sister, Hannah, she was

4    only eight.  My life as I knew it changed within seconds.  I

5    had a long road of recovery ahead of me.  And I'm not

6    necessarily referring to just the physical healing.  I'm

7    referring to the mental healing, learning to process grieving

8    alone while trying to meet the needs of my surviving

9    eight-year-old sister, Hannah.  I always felt alone, but I

10   never wanted Hannah to feel alone.  I took her under my wing

11   and essentially became a mother figure to her.  I had no

12   support system for years, no family or parental guidance.  At

13   12 years old, that's detrimental.  But I wanted to make sure

14   that Hannah knew I was there.  I felt unwanted by my family.

15   I thought I burdened my family with my physical and emotional

16   injuries resulting from the car crash.  My father would often

17   question why wouldn't God allow him to keep his son.  And

18   hearing that as a little girl made me feel like my dad would

19   have chosen my brother's life over mine.  And quite honestly,

20   after the hell that I went through after my mom and brother

21   died, I began questioning God too.  Why not me?  Life was

22   really hard.  I felt as if I had lost both of my parents.  I

23   lived in survival mode for years because of it.  It's all I've

24   ever known.

25            We were also being manipulated by some of our family

members, mainly for monetary purposes.  Around the age of 15,
I was advised by my attorney at the time, Alec Murdaugh, that
there was no one in my family that he and the courts trusted
to be in control of the awarded money from my lawsuit.  And
honestly, I agree.  Alec Murdaugh notified me that his good
friend, Russell Laffitte, was appointed by a judge to become
my and my sister's conservator.  It was my understanding that
he would be the one to oversee our accounts and protect our
money, since it was believed that my family would have misused
it.  It didn't take long for me to open up to Russell once he
took over the role as our conservator.  I had to explain to
Russell why I needed funds, no matter how embarrassing the
reasoning was.  Sometimes it was for school clothes, sometimes
it was for school activities, sometimes it was so I could have
a meal at night.  I was very vulnerable because I was so young
and inexperienced.  Sometimes I felt like a homeless person
begging for change to find my next meal.  I was so defenseless
and I was so young.

          And as young as I was, I began to look at Russell as
a father figure, solely because I needed something.  He
provided it most of the time.  I would ask Russell for
permission to go to school functions before asking my father,
because Russell had the final say.  My dad was remarkably
absent, and Russell was only a call away.  I quickly began to
trust Russell and I looked up to him.  I thought he genuinely

had the best interests of me and my sister.  It was the only
sense of stability that I had, and it felt safe.  This
continued throughout the remainder of my childhood.

When I was 17, I had to purchase a home because we
didn't have anywhere to live.  Whenever I felt like there was
a problem, I knew Russell would help find a solution.  And on
my 18th birthday, I drove to Palmetto State Bank.  Grant it,
we never lived in Hampton County.  We were always from
Lexington County.  So, I drove to Hampton -- so, I'm not a
part of this community that we've heard so much about.  But
when I did drive to Palmetto State Bank, that's where I met
Russell in his office.  And I was prepared to spend my 18th
birthday going over all my documents with Russell and to
understand the state of our financial affairs.  I was
expecting to hear how proud he was of me, because it seemed to
be what most mentors, parents or influential people in one's
life would do when someone you cared about becomes an adult.
Today was the first day I heard Russell say he was proud of
me, and accepting an apology from him.  Honestly, I needed to
hear it from someone, but I didn't.  It was a big deal to me;
however, it was clear that turning 18 was not a milestone
celebration for Russell.  I was given several binders and
informed how my funds would be wired, and pretty much a good
luck.  I had no guidance whatsoever.  I went from begging for
$5 one day to having over a half a million dollars in my

1    account the next day, with no structure or advice.  I was

2    given several binders with hundreds of documents that I didn't

3    understand.  I remember feeling that it was a bittersweet

4    feeling, but I was sad.  Eventually, everyone does leave me.

5    I processed my feelings by convincing myself that I was never

6    his daughter, this was all business.  Even though I cared

7    about Russell, I cared about his advice and his opinions, he

8    didn't care about my wellbeing, he didn't care where I ended

9    up in life.  And like most people, I felt like I was just

10   another dollar sign to him.

11            Once I turned 18 in 2011, the communication between

12   me and Russell ended quickly.  I processed my feelings,

13   believing that everyone did eventually leave, just like my

14   mom, my brother, my dad, my grandmother, and just like Russell

15   did.  I was accustomed to the feeling of being rejected and

16   abandoned.  But I grew up and I faced other obstacles in life.

17   In May of 2016, I was a single mother to a set of two-year-old

18   twins, and I lost my house and everything in it to a house

19   fire.  Everything I ever owned.  My home and everything inside

20   were total losses.  I contacted Russell to let him know,

21   because, really, I needed someone to talk to.  I needed

22   something that felt familiar, but what I really wanted was my

23   mom.  I felt lost and hopeless.  I called Russell because I

24   knew I was going to need a copy of all of my documents again.

25   And I asked him if he'd be willing to send me another copy.

1   And he agreed and said we'd get around to it.  From May of

2   2016 up until two years later, I requested documents numerous

3   times and never got them.  But out of the blue in 2020, I

4   received a very small portion of documents from Russell.  I

5   knew it was only a fraction of what I was supposed to receive,

6   but something was better than nothing.

7          In October of 2021, I received a random call from

8   Russell.  The phone call was from Russell, advising that SLED

9   had requested my documents from my conservatorship, and since

10  he had made copies for SLED, he would go ahead and send it to

11  me as well.  So, totalling five years.  It took five years

12  later to receive my documents.  This was another reminder that

13  I was not a priority of his.  As this case unfolded, I began

14  to see Russell for who he truly was.  For years, I felt like I

15  wasn't good enough.  I felt like I was a burden to everyone,

16  including Russell.  I felt undeserving.  As more information

17  surfaced, and Hannah and I became more aware of the fraud and

18  the unlawful conduct being committed by Russell, there were

19  many wounds reopened, a lot of emotions which resurfaced,

20  which I thought were already handled.

21          I feel like I'm reliving the worst days of my life

22  again.  My anxiety has resurfaced since this trial started,

23  causing me to become medicated again.  My mental health has

24  suffered from this.  And I feel like I'm reliving the

25  beginning again.  I find myself crying like that little girl

1    who felt so alone and lost 15 years ago.  My heart absolutely

2    breaks for that little girl that I once was.

3         Some of the most influential people in the Lowcountry

4    took the most advantage of me, my sister, and many other

5    victims.  And we were just little girls.  I was an easy target

6    and I was vulnerable to those men.  Not for sympathy, but did

7    no one realize what my sister and I had gone through?  We were

8    babies watching our family die.  We were babies wondering

9    where we were going to lay our heads down.  We were wondering

10   where our next meals were going to come from.  We were babies

11   staying up at night wondering if our daddy would make it home

12   or not, or if he also died in a car wreck.  We were babies

13   begging for love and guidance.  Didn't you think we had been

14   through enough?  Didn't you feel compelled to help keep these

15   girls safe, instead of allowing your friends and family to

16   reap the benefits of the brutal death of our young mother and

17   our 14-year-old brother?  Grown trusted men took absolute

18   advantage of two hurting girls.  Did you not think that they

19   had been through enough?  I didn't sign up to be a victim.  I

20   didn't ask to have my life story broadcasted either.  I never

21   wanted sympathy.  I tried to keep this chapter in my life

22   closed forever.  It's full of hurt, and it's full of sorrow,

23   pain, disappointment, and emotions that I really can't

24   explain.  Russell put himself in this position, and he put my

25   sister and me in this position as well.  Painful emotions.

1   The mental health medication readministered due to reliving

2   the worst years of my life.  My nightmares of the car wrecks

3   have returned, after not having them for 10 years.  Russell's

4   decisions to do what he did also caused me to suffer the

5   consequences.  Not one time have I been asked by Russell how

6   was I doing.  And honestly, I'm not okay.  But I won't stay

7   that way.  I'm hurt by Russell.  I've been betrayed.  And I

8   have this impression that Russell didn't think that Hannah and

9   I were worth it or maybe not good enough.  But I'm here to say

10  that we are worth it and we are good enough, and so are those

11  other victims sitting over there, and so are the other victims

12  that aren't here with us today, my mother and my brother

13  included.  All of the other victims were worth it.  Not one of

14  us deserved any of this.  We all have been through enough

15  pain.

16          My past does not define who I am.  I'm not that

17  little girl anymore.  I'm a bigger person now.  And I'll admit

18  that I forgive Russell and I pray for him and his family

19  often.  I would never take advantage of someone's

20  vulnerability like that, the way it has been taken away from

21  me and the other victims, because I'm better than that.  I

22  believe in our justice system because I've devoted my life as

23  a detective to preserve law and order, but I'll never forget.

24  Thank you, your Honor.

25          THE COURT:  Thank you.

1          Mr. Bland?

2          MR. BLAND:  Your Honor, as often is the case, what we

3     have here is the tale of two men.  For the first part of the

4     day -- the morning -- we heard a very generous man, a very

5     charitable man, definitely a man that is beloved by those that

6     he associates with in his community, people that are willing

7     to stand up and talk on his behalf.  But we also have another

8     side of Russell, a side that hasn't been talked about.  That's

9     the side that took money from the girls to build a swimming

10     pool at his house.  That's the Russell that took money to pay

11     off a loan at seven and a quarter percent that he had with

12     South State Bank, and then only paid the girls two to

13     three percent interest at a time when he was charging, as a

14     banker, the girls 18 to 26 percent, anywhere from automobile

15     loans or litigation loans.

16          Is he the same Russell who fired his first set of

17     lawyers and, in his post-trial brief, blamed the conviction on

18     his lawyers?  Is he the same Russell that blamed your Honor

19     for how the jury ultimately reached a verdict and criticized

20     you?  That is what we're dealing with today.

21          I don't look at Russell so much as a banker, I look

22     at him as an officer of the Court, because that's who a

23     conservator is.  A conservator takes an oath to preserve and

24     to conserve.  He agrees to act just like a lawyer and follow

25     the rules of the Court.  The Russell that we know is a Russell

that operates in the dark. Character speaks when no one's looking. And Russell took advantage of these young girls and other victims. You're going to hear from Mr. Bamberg and his clients, as well as Arthur Badger.

He jeopardized our banking system. The sanctity and integrity of our banking system is so vitally important to our country and our economy. And I know I heard another advocate talk about, well, in small towns, this is how you do it, you know, you can get a loan and you don't have to put up the lien, or you can get the money first and then get the mortgage to your house. That's never happened for me. I asked Mr. Richter *(phonetic)*, it's never happened for him. I don't know too many people it happens for. You know who it happens for? The most favored in a community, not the rank and file. What we didn't see here is the normal, everyday people that make up Hampton County, the people that work hard for a living, that work by the hour. Those are the people that I didn't see coming and standing up for Russell Laffitte.

I have tremendous empathy and sympathy for his young children. I have children too, a boy and girl. I have tremendous sympathy for his parents and, most of all, his wife. It is sad. But he made the decision to go to trial and put this case before a jury of his peers. And a jury of his peers made the decision. And you are required to follow the law in that decision, and we trust that you will. This is not

1    a time when sympathy should prevail, it's a time for law.

2    That's what this case is about now:  What does the law

3    require?

4              So, you know, I could sit here, and we could talk

5    about, you know, the two faces of Russell, the TV appearances

6    that he did before the trial, but that wasn't really part of

7    it.  But for us, it is a part of it.  It shows who Russell is.

8    And the Russell that we know is the Russell that continues to

9    this day, fighting the civil lawsuit that these girls filed.

10   Today was great.  Heard the first apology we ever heard.  But

11   was an apology given today because it had to be given?  The

12   time to give that apology was when he was on the witness

13   stand, or the time to give that apology is when he did those

14   two videos that were put on for propaganda purposes.  And he

15   never apologized to our clients on those videos and, to my

16   knowledge, Mr. Bamberg's clients.

17             So, your Honor, I think what we have is, all he had

18   to say was no.  He was the guardian of the gate.  There's

19   always going to be Alex Murdaughs out there, people that are

20   wolves in suits.  But he had the ability just to say no.  But

21   by loaning money to himself, he justified, well, now I'll loan

22   it to the lawyer for these clients, and somehow it will be

23   okay.  In our society, sometimes we let our guard down when

24   those who come before us are wearing a suit, or they come

25   before us and they're a prominent person in the community.

162

1    And we say, no, that person's never going to do that.  The

2    rules are applied equally to everybody that comes before you,

3    whether they're of prominence, whether they're a Judge Gergel,

4    or they're an Eric Bland or a Ronnie Richter, and you're

5    always applying the same, and you follow the rules that a

6    fiduciary -- a fiduciary -- is supposed to perform, not put

7    your own interests above your clients or your wards.  The same

8    rules that apply to a lawyer, apply to a fiduciary.

9            So, we are confident, my clients are confident, that

10   he's going to receive a just sentence, a sentence that returns

11   the sanctity to our banking system, the sanctity, if you are

12   going to accept a conservatorship, to follow the rules.  Thank

13   you.

14           ALAINA PLYLER:  Thank you, your Honor.

15           THE COURT:  Thank you.

16           MS. LIMEHOUSE:  We ask Natasha Thomas and her

17   attorney, Justin Bamberg, to speak.

18           THE COURT:  Hello, Ms. Thomas.  Good to see you.

19           NATASHA THOMAS:  Hello.  Good to see you.

20           THE COURT:  Mr. Bamberg, good to see you again, sir.

21           MR. BAMBERG:  Good to see you, your Honor.

22           NATASHA THOMAS:  Your Honor, my name is Natasha

23   Thomas.  I ask that you please give Russell the sentence that

24   he deserves.  Myself and others trusted him in doing what was

25   right for me and my wellbeing while I was going through

1    something traumatic in life.  He took my trust and betrayed

2    me.  He didn't do this all by himself, he did it with the help

3    of Alex.  Not only did this entire process reopen wounds that

4    I was finally trying to close in my life, it made me relive

5    one of the most worst days that happened to me in my life.

6    That does not feel good at all, and that is not a money thing.

7            As I stood and gave my testimony months ago, telling

8    the truth was easy.  Having to talk about what happened to me

9    and my family was very hard and hurtful.  And the only reason

10   I had to do that was because Russell chose to commit crimes,

11   instead of doing right by me as a minor then.

12           I just wanted to stand before you and give a few

13   words of how I feel, and I would like my attorney to say a few

14   more words on my behalf as well, if you would please allow it.

15   Thank you.

16           THE COURT:  I certainly will allow it.  I couldn't

17   keep Mr. Bamberg quiet if I wanted to.

18           MR. BAMBERG:  Well, your Honor, thank you.  Nobody

19   takes joy in standing up here today.  And this has been a long

20   process.

21           THE COURT:  Yeah.  Your more common experience would

22   be trying to protect people from a sentence, correct?

23           MR. BAMBERG:  Correct.  Correct.  You know, I think

24   the only one who's probably happy that I'm up here with my

25   slow southern drawl is the court reporter.

1    We heard a lot earlier about, you know, what impact

2    Russell being sentenced will have on his family and his

3    friends.  And myself, my clients, everyone understands the

4    pain that they may feel as a family and as close friends.  But

5    today, that's something Russell will have to deal with after

6    today, his actions that led to the pain that people close to

7    him may be feeling.  Today is about him having been tried and

8    convicted of breaking the law, and about the victims of those

9    crimes.  When we talk about white-collar crime, it's always

10   this thing like it's just about money, it's money went

11   missing.  There were real victims here, who suffered real

12   physical harm.

13       THE COURT:  And who were very vulnerable at that

14   point in their lives.

15       MR. BAMBERG:  Extremely vulnerable.  And Tasha -- and

16   I'm so proud of her when she took the stand.  I can't imagine

17   what it feels like, as a young woman, to have to move the hair

18   over her eye so a jury can understand that she lost vision in

19   her eye.  We think about Hakeem Pinckney.  And to really

20   understand just the gravity of the decisions that were made --

21   it's not some, I'm a conservator and I'm just going to

22   misappropriate some money, okay.  And Ms. Pinckney is going to

23   speak after me.  Hakeem struggled his entire life.  He had a

24   hard life.  At three years old, he lost his hearing and became

25   deaf.  And he overcame it.  He graduated from high school.  He

1    gets in this horrible accident.  And now he is a -- not just

2    deaf --

3              THE COURT:  Quadriplegic.

4              MR. BAMBERG:  -- he can't move.  He can't move

5    anything from his neck down.  He's in what is now Pruitt in

6    north Augusta.  And you have these individuals that these

7    folks trusted to look out for their best interests.  Sitting

8    there and listening to Russell checked on somebody about water

9    pipes or loaned his tractor, or went to southern Georgia,

10   these are all things that take effort.  Not once did he, as

11   conservator, check on Hakeem in the nursing home.  Not once

12   did he check on Tasha.  Not once.  Even when Hakeem was found

13   in that room, deaf, unable to move, suffocating to death

14   because the ventilator was unplugged, Ms. Pinckney didn't get

15   a single message from her son's conservator, a carrier pigeon,

16   anything.  Things that take very little to no effort.  And he

17   owed them that.  That's the type of suffering that people had

18   to endure because of his fails.  It's not just, I breached a

19   duty.  And, yes, the apology is very much appreciated, and

20   they've waited a very, very long time for that.  But there's a

21   difference between acceptance and remorse.

22             And, your Honor, when I was a kid, and my grandmother

23   died, my mom was left with two things from her.  One was a

24   necklace that she never took off, the second was this lamp

25   that had this glass flower petals on it.  My brother and I

were breaking the law of our house, which was:  You don't play

inside.  They didn't play that.  And we broke the lamp.  I

knew as a young child how much that meant to my mom.  I knew,

your Honor, that it was just us.  We could have lied about it.

We could have said it was an accident.  We could have said we

were vacuuming and knocked it over.  I felt true remorse about

having broken that, because I know how important my grandma

was to our family and to my mom.  And when she came home, we

told her the truth.  It didn't matter if we got the brakes

beat off of us, it didn't matter if we were put on punishment

for a year, it didn't matter if we lost our ability to play

sports.  Nothing mattered, because true remorse and acceptance

isn't conditioned on whether you get a benefit from it, at the

end of the day.  And I wish that, prior to Tasha getting on

the stand, prior to any of this, prior to law enforcement even

calling, it was easy to pick up the phone and it would have

took little effort.

         So, your Honor, we're just asking that the sentence

be commensurate with the crime, with the damage done.  It's

not just money that was missing.  Money can be replaced.

There are other damages that these victims suffered.  And the

general deterrence aspect is important.  And I would just echo

everything Attorney Bland said:  The banking industry, our

legal industry, everything, is being looked at under a

microscope.  And this is one of the worst things that I've

167

seen.  I'm a lot younger than Eric, or yourself, or other
lawyers involved, but this is, by far, the worst thing that
I've seen.  And I think the sentence has to be commensurate
and justice finally be done for these people, because it's
been -- you know, it may be eight years of fraud scheme, but
they've been dealing with this since the moment that tire
separated and their vehicle rolled over and changed their life
forever.  Thank you, your Honor.

THE COURT:  Thank you, Mr. Bamberg.

Thank you, Ms. Thomas.

MS. LIMEHOUSE:  Lastly, your Honor, we ask that
Ms. Pamela Pinckney, Hakeem's mother, speak.

THE COURT:  Ms. Pinckney, thank you for being here.

PAMELA PINCKNEY:  You're welcome, sir.  Good
afternoon, your Honor.  I stand before you today in the most
humblest way that I know how, because God has made me to be
humble.

And to Mr. Russell Laffitte, I forgive you but I will
never forget you, or I can't live this day.  I can't live any
day of my life not thinking about what I went through in my
past.  My life from 2009 up until this point has been a roller
coaster.  The loss of my son, Hakeem, it took an impact on my
life.  If it wasn't for God, I don't think I'd be living.  God
has sustained me and given me the strength I needed to endure
to get through the suffering and the pain and the hurt of

losing my son through a tragic car accident we were in; and on
top of that, being neglected in a nursing home, wanting to
come home.  Every time I go to see him, he cries:  Mama, I
want to come home.  Mama, I want to come home.  Here it is, I
was still in the recovery process of trying to heal, two
broken ankles, a broken knee, a broken femur, a broken
shoulder, a broken neck.  Took me two years to recover, to
learn how to walk again.  And through me going through my
healing process, I did not heal properly because I needed to
make sure that I get to the facility to check on my son,
Hakeem, to make sure that he was okay.

His career has ended because of the car accident.  He
was selected to play semi-pro football the year that we had
the accident.  In 2009, before he graduated, his school won
the deaf championship.  He was the MVP player of the year.  He
said his dream was to play NFL football.  That was his dream.
So, I did the best to the knowledge of my ability to try to
bring my son home and to make his wishes come true, to be
home, because he was a quadriplegic on a ventilator, not able
to the hear clearly or move around on his own.  So, I wanted
to make it, as a parent, my business to get my son home, so
that we could take care of him and give him the proper care
that we feel that he needed.  And he was taken away from me.

And Mr. Russell Laffitte robbed us.  He took our
rights away.  He just took our -- he just shattered my heart

1   into pieces.  I'm broken mentally, physically and emotionally.

2   I will never heal from this.  It's like every day I wake up,

3   I'm just living my son's death all over again.

4        And I say to the victims:  May the joy of the Lord be

5   y'all's strength, okay?

6        That's all, your Honor.

7        THE COURT:  Thank you.

8        MS. LIMEHOUSE:  Thank you, your Honor.

9        The victims can really paint the picture of the

10  nature and circumstances of this offense better than I ever

11  could.  I'm going to spend not too much time on the nature and

12  circumstances of the offense, but what the victim's have

13  expressed to you, your Honor.  We've spent a lot of time

14  litigating these enhancements, talking about the nature and

15  circumstances of the offense.  But I think it's important to

16  highlight that the defendant was the only person in a position

17  to stop Alec Murdaugh.  And rather than stop Alec Murdaugh, he

18  enabled him and he bankrolled him and he set him up for a

19  financial position from which he had to steal from these

20  vulnerable individuals to make his finances right.  And it's

21  the defendant who's responsible for putting Alec Murdaugh in

22  that position.

23        I want to briefly just address your Honor's

24  expression about the enhancements and how, in some of these

25  financial fraud cases, the combined effect of the enhancements

1    might create a higher guideline range.  But I think, as we've

2    litigated these enhancements, they are all specifically

3    applicable to certain aspects of this scheme and to the

4    defendant.

5         THE COURT:  They definitely are.  Each one is

6    appropriate.  You know, each one individually, Ms. Limehouse,

7    is absolutely supported.  The question I have from time to

8    time -- and you've been before me when I've raised this --

9    where I've said the combined effect produces a sentence that

10   in some cases -- not all, some -- the sentence is more than is

11   sufficient and is greater than necessary.  So, I look at every

12   case individually.  And the guidelines, we start with, and we

13   look at the guidelines, and then we consider all the factors

14   under 3553(a), balancing some which are very adverse to the

15   defendant, and some which favor them.  And then I determine

16   whether a guideline sentence is appropriate, and if not, what

17   the sentence should be.  I do that in every case.

18        MS. LIMEHOUSE:  Yes, your Honor.  And the government

19   believes that this is one of those cases where the combined

20   impact of those enhancements does not create a result that is

21   more than necessary --

22        THE COURT:  I picked that up from your brief.

23        MS. LIMEHOUSE:  -- to effectuate the purposes of

24   sentencing.  I'd like to speak about the history and

25   characteristics of the defendant, because I think that's where

1    they spent the most time.  And I think we've spent a lot of

2    time --

3              THE COURT:  Can you blame them not spending it on the

4    other factors?

5              MS. LIMEHOUSE:  It's indefensible, your Honor.  I

6    mean, your rulings on the post-trial briefs say it all.  The

7    evidence is overwhelming, it's egregious.  These victims could

8    not have been more vulnerable when they were victimized by the

9    defendant and Mr. Murdaugh.  And so --

10             THE COURT:  You know, Ms. Limehouse, one of the

11   initial objections raised by the defense was that the Court

12   should not agree to an enhancement for vulnerable adults

13   because, although Mr. Laffitte thought Mr. Hakeem Pinckney was

14   a quadriplegic, at the time he stole the money, he had

15   actually died, and, thus, he couldn't be vulnerable anymore

16   because he was dead.  I had to read it three times to believe

17   anybody would make such an objection.

18             MS. LIMEHOUSE:  I'm glad you were as offended as the

19   government.

20             THE COURT:  And, fortunately, there was good judgment

21   to abandon that.  But it did reflect a lack of remorse.  These

22   were very vulnerable people.  Every one of these was a broken

23   person.  And he was their fiduciary.  He was their protector.

24   He had a duty of loyalty to them and he breached that.  He

25   violated that.  And he engaged in a criminal scheme at their

1    expense.

2    MS. LIMEHOUSE:  We believe it speaks volumes that the

3    apology comes two years too late, and on the day that

4    your Honor is faced with making this difficult decision of

5    fashioning a sentence that's sufficient but not greater than

6    necessary.  They've been waiting to hear that apology for

7    years.  The defendant has talked about the financial impact to

8    him and his family of his conduct, and the financial

9    punishment, as they put it, and financial devastation, as they

10   put it in the sentencing memorandum.  And they've come today

11   with $92,500 in funds to pay towards restitution in what they

12   say is symbolic of --

13   THE COURT:  I don't know about that.  Tell me about

14   that.

15   MS. LIMEHOUSE:  Well, I believe Mr. Moore will

16   probably speak of this in his reply.  But I want to talk about

17   the defendant's financial picture and ability and claims of

18   financial devastation.  Financial devastation is Natasha

19   Thomas, at 18 years old, going to a bank to get a loan at

20   18 percent from her conservator -- not knowing he was her

21   conservator -- just so she could go to school.  That's

22   financial devastation.  Financial devastation is Arthur

23   Badger, after burying his wife and being left to care for

24   their six children by himself, being forced to make the

25   difficult decision to sell their annuities for pennies on the

1    dollar just to provide for them, because the defendant and

2    Alec Murdaugh stole more than $1.325 million from them.  That

3    is financial devastation.  That is financial punishment.  The

4    defendant stands before your Honor reporting more than 10 and

5    a half million dollars in assets.  The financial punishment to

6    the defendant pales in comparison to the financial impacts on

7    his victims.

8         Now, the government has heard, as your Honor has, the

9    many people who've spoken on his behalf, family, friends,

10   community members, and we do not minimize or doubt the genuine

11   devastation that his family and friends feel as a result of

12   his conduct, and the continued impact that they face after the

13   Court's decision.  All of the people who spoke from the

14   community and from his family and his friends, it's really

15   just further indicative of the power and influence the

16   defendant had in Hampton County.  And it highlights how he was

17   able to exploit that position of power and influence to commit

18   these crimes.

19        Everyone trusted him.  Everyone who spoke today

20   trusted him.  Everyone who's in this courtroom today trusted

21   him.  The law firm trusted him.  His bank trusted him.  His

22   family members, who worked at the bank and were on the board,

23   trusted him.  Judge Odom trusted him.  But none of them knew

24   any of the actions that brought him here today.  Even the

25   actions that he's admitted to on the stand -- he's admitted to

1    negotiating all of these checks that were stolen -- they

2    didn't know he did that, regardless of whether he knew those

3    checks represented stolen funds.  They didn't know that he had

4    extended Alec Murdaugh over a million dollars in unsecured

5    loans out of a child's account.  They didn't know that he

6    extended himself more than $350,000 in loans out of the same

7    child's account.  And they didn't know that he used these

8    funds to cover Alec Murdaugh's overdraft and to bankroll his

9    extravagant spending.  None of these individuals knew that

10   until everything came to light.  And he's admitted that

11   conduct.  And, of course, none of these individuals knew the

12   defendant intentionally failed to report these fees on his

13   taxes because he could get away with it.  They would have all

14   been surprised to learn the defendant committed any of that

15   conduct when it happened.  And surely, they're surprised to

16   learn about the conduct that the jury convicted him of.

17           And the reality is, we cannot reconcile the Russell

18   Laffitte that all of these people have talked about today with

19   the Russell Laffitte that these victims talk about, the people

20   who were at their lowest moments in life not getting a call

21   from Russell Laffitte to advise them on their finances and how

22   to make smart decisions with their settlement funds; not to

23   help them when they were in their deepest times of need, like

24   he has for these community members.  The defendant has to be

25   sentenced for the conduct that these victims know about, not

1    all of these community members who have come to speak on his

2    behalf.  And the reality is, every person your Honor sentences

3    hears pleas from family and friends, who see the defendant on

4    their best day.

5         THE COURT:  And, you know, Ms. Limehouse, you've

6    heard me many times say:  When I sentence someone, I sentence

7    their entire family.  They miss critical family occasions,

8    they miss the guidance of the parent, they're not with their

9    aging parents.  But if we don't have accountability, we don't

10   have the rule of law.

11        MS. LIMEHOUSE:  Exactly right, your Honor.  And the

12   reality is, but for the death of Mallory Beach and the murders

13   of Alec Murdaugh's wife and child, I don't think the defendant

14   ever would have been held accountable for his conduct, because

15   his position of influence and power in Hampton County allowed

16   them to get away with it for over a decade.  The defendant

17   said, when he made pleas to this Court, to show mercy "not for

18   me," but for his family.  But your Honor has to sentence him.

19        THE COURT:  I don't sentence his family directly, I

20   sentence him.  And I do believe that mercy is an element of

21   punishment in imposing a sentence.  But there's also the very

22   important element of justice.

23        MS. LIMEHOUSE:  Absolutely.  And Pastor Brown spoke

24   on Mr. Laffitte's behalf.  And I agree, it was very impactful.

25   But he spoke of repentance.  And that's the one thing we

1    haven't heard from Mr. Laffitte, not in his apology today and

2    not over the past two years.  And instead, what we've

3    continued to hear is minimizing his conduct, pointing the

4    finger at his coconspirator, blaming others, and admissions

5    today of failures as a conservator; but as the Court appointed

6    out, nowhere near real remorse and contrition for what he

7    actually did.  And Mr. Bamberg said it way better than I could

8    with his story of the lamp.  We've never heard that genuine

9    remorse from Mr. Russell Laffitte.  And that's what would

10   warrant anything below a guideline range, is genuine remorse

11   from Mr. Russell Laffitte, instead of what we've heard for the

12   last two years, which is lies, pointing finger, deflection and

13   minimization.  And the only explanation he ever gave to the

14   Court is that he didn't look at the memo lines and he made

15   failures as a conservator.

16          THE COURT:  And that, of course, was not credible.

17          MS. LIMEHOUSE:  Of course.  And you look at any one

18   of these checks -- and, of course, we know he negotiated more

19   than a dozen of them, any one of these checks, not only did

20   the memo lines reference these victims, individuals to whom he

21   owed fiduciary duties to manage these funds, but we look at

22   them coming out of a trust account, where either Alec Murdaugh

23   or any partner at that law firm were ever paid, they were

24   drafted by Palmetto State Bank, some holding account that

25   doesn't belong to any of these individuals or to Alec

1    Murdaugh, where these checks should never have been drafted.

2    Any one of them was covered in red flags, that even a bank

3    teller would not have negotiated.  And, instead, he negotiated

4    more than a dozen of them for Mr. Murdaugh's benefit.  And he

5    has not taken responsibility for that conduct.  And that's

6    what differentiates him, we present to the Court, from any

7    other defendant that usually stands before your Honor.  We

8    talk about sort of this continued minimization even today.

9    And like I said, we didn't hear remorse.  We've continued to

10   hear explanations about community banking and failures as a

11   fiduciary, but we have not heard him actually take

12   responsibility for his actions.

13         I want to talk a little bit about Mr. Moore

14   referencing the offers that the government made to Mr.

15   Laffitte.  We gave him the benefit of the doubt of hiring new

16   counsel and allowed him to start fresh, so to speak, which was

17   a huge extension of goodwill on the government's part.  And

18   that was mostly because these victims deserved some

19   finalization.  And that first offer was fully contingent on

20   him taking responsibility for his actions.

21         THE COURT:  Ms. Limehouse, you don't need to explain

22   to me.  I understood immediately the terms and the purpose.

23         MS. LIMEHOUSE:  Thank you, your Honor.

24         THE COURT:  For finality.

25         MS. LIMEHOUSE:  That's correct.  And the proposed

1    range, of course, we felt was sufficient but not greater than

2    necessary under those circumstances.

3    THE COURT:  I understood that completely.

4    MS. LIMEHOUSE:  And we are not here under those

5    circumstances.  We are, instead, here under circumstances

6    where, at every stage, from when he was first confronted by

7    bank employees and law firm employees, to when he was deposed

8    in civil litigation, proffered by the FBI in the South

9    Carolina Enforcement Division and the AG's office, where he

10   testified at a bond hearing, testified with the Office of

11   Disciplinary Counsel, testified in this trial and again here

12   today, that's all we have seen.  And there has not been any

13   genuine remorse or taking of responsibility.

14   I think the general deterrence component, your Honor,

15   is very important.  And I sense that from your Honor's

16   comments.  This is a case that could be repeated in most any

17   small county in South Carolina.  But, as I mentioned, the --

18   THE COURT:  It can be committed anywhere, where

19   someone is a fiduciary, holding the trust and controlling

20   funds for another.

21   MS. LIMEHOUSE:  That's correct.

22   THE COURT:  And, you know, it's not necessarily a

23   small town.  It could happen anywhere in this situation.  And

24   that's why I think deterrence is a very important element

25   here.  You've prosecuted a lot of people, Ms. Limehouse.  I

1    think you would agree with me that white-collar criminals are

2    probably the easiest to deter, because they would never, never

3    commit the crimes if they thought they were actually going to

4    be facing potential incarceration.  Some other folks, they

5    just accept incarceration as just part of the risk of being a

6    drug dealer or some other type of criminal activity.  That's

7    certainly not true for most white-collar criminals.

8         MS. LIMEHOUSE:  I agree.  I agree that they're the

9    easiest to deter.  But they're the most difficult to get, and

10   that's because they sit in positions of power and influence.

11   Mr. Laffitte has been given every single opportunity that the

12   world in South Carolina has to offer, unlike many defendants

13   that appear before your Honor.  And he's been able to hire

14   very esteemed counsel, twice now.

15        THE COURT:  I'm not going to hold it against him for

16   that.

17        MS. LIMEHOUSE:  But it shows how difficult it is to

18   get some of these defendants who've engaged in this

19   decades-long scheme that's complex and sophisticated.  And the

20   general deterrence message that you can send across South

21   Carolina for defendants who are similarly situated to the

22   defendant is a huge impact, your Honor, that when they do get

23   caught, that we will respond in kind and that we will show

24   that the justice system and the banking system does have

25   integrity, and that we are making them answer for their

1    crimes.

2           Mr. Moore claimed in his sentencing memorandum that

3    we're asking for a punishment for his maintaining his

4    innocence.  And we're not asking for a punishment, but we do

5    not believe he deserves a break.  And so, when we talk about a

6    variance or something that would warrant a sentence below the

7    applicable guideline range, we talk about factors that would

8    warrant such a variance.  And someone who has showed such a

9    lack of remorse does not deserve a below-guidelines sentence.

10   And so, for those reasons, we think a guideline sentence is

11   appropriate, your Honor.

12          THE COURT:  Thank you.  Okay.  To avoid killing my

13   court reporter, we're going to take about a 10-minute break.

14   And we will be back.  And I will, at that point, hear any

15   reply.

16          Mr. Moore, let's keep it brief.

17          MR. MOORE:  I will, your Honor.

18          THE COURT:  And then we will address the issue of

19   sentencing.

20          *(Recess.)*

21          THE COURT:  Ms. Limehouse, remind me of a couple

22   facts.

23          MS. LIMEHOUSE:  Yes, your Honor.

24          THE COURT:  And if I'm getting my victims confused,

25   you'll let me know that.  I recall at some point, the Plyler

1    girls were sleeping in their car and were struggling and had

2    to go get a loan, and had got a high-interest loan.

3    Meanwhile, they were supposed to have a lot of money in their

4    trust account.  Am I remembering this right?

5              MS. LIMEHOUSE:  I think that's a little --

6              THE COURT:  I'm worried about my sequence of events.

7    That's what I'm worried about.

8              MS. LIMEHOUSE:  So, Alaina was sleeping in a car

9    because she didn't have anywhere to live.  So, that's when

10   Russell helped her buy a home.  Hannah did need a car at some

11   point in time.  And she had very specific requests she made to

12   get that car.  Her father and his girlfriend only had one

13   vehicle.  The girlfriend worked.  Hannah needed the car to get

14   to and from school.  Russell, with the Court's agreement,

15   denied her request to get the car.  Eventually, she was given

16   a car that he bought out of those conservatorship funds.  And

17   when we looked, there were sufficient funds -- at the time she

18   was denied the opportunity to purchase the car, there were

19   sufficient funds to buy the car in her account.  So, it wasn't

20   a situation that we expected to see, where there were no funds

21   because they had loaned the money to themselves, there were

22   funds in her account at the time.

23             THE COURT:  Just didn't get them.

24             MS. LIMEHOUSE:  That's correct.  Now, let me make

25   sure with the Plyler's that I'm not misstating anything.

182

1          That's accurate, your Honor.

2          THE COURT:  It does highlight, of course, the fact of

3     how victimized they were at this time.

4          MS. LIMEHOUSE:  Absolutely.  And especially when

5     juxtaposed with the people we heard speak today in their times

6     of need.  They had very clear times of need, and were not met

7     with the same response.

8          THE COURT:  I remember at trial the very touching

9     testimony of the two sisters on this issue.

10         Okay, Mr. Moore.  Glad to here from you in reply.

11         MR. MOORE:  Yes, sir, your Honor.

12         When we the talk about remorse -- and I'm going to

13    spend a moment on that -- I think Russell has demonstrated the

14    amount and degree of remorse that he can demonstrate, given

15    where we are, not only in this case but in others.  I think I

16    heard your Honor say earlier when you heard him speak, that if

17    he were unfettered, then he would be expressing more remorse.

18    And so, again, I think he has done what he believes he can do,

19    and I do believe it is genuine, and I do believe it comes from

20    the heart.  Now, on the timing of it, you know, I've been in

21    this case for six months.  I can't speak to a lot of those

22    other issues.  Do I wish -- does he wish that there had been a

23    vehicle for him to express remorse earlier?  He absolutely

24    does.

25         THE COURT:  Well, he had a way to do it.  He could

1     have pled guilty.  I think it's clear that he is guilty.  And

2     he could have done that.  And had he expressed that at his

3     guilty plea, he would have gotten acceptance of

4     responsibility, and he would have expressed remorse at his

5     sentencing.  So, some of his inability to express what you say

6     now is his genuine remorse is usually part and parcel of

7     actually admitting one's criminal responsibility.  Now, he has

8     every right to deny it, and I don't fault him for it, but it

9     just doesn't come off as sincere when one says, well, I did

10    all these things, yeah, I did them, I really feel badly about

11    it, but I am an innocent person.  He's not an innocent person.

12    And sometimes the reason the Court has to impose

13    responsibility is when the defendant won't accept it himself.

14    And that's what I intend to do.

15         MR. MOORE:  I understand that, your Honor.  I simply

16    wanted to address that remorse point.  With respect to imposed

17    responsibility and imposed accountability -- and I understand

18    accountability is what I've heard from Ms. Limehouse, I've

19    heard it from your Honor, it goes to the general deterrence

20    issue -- the question is:  How much --

21         THE COURT:  Is necessary.

22         MR. MOORE:  Yes, sir.  How much is necessary but not

23    too much?  I think that is the issue.  It is the primary issue

24    here today, at least as far as he is concerned.

25         THE COURT:  Well, it is certainly an important

1     factor.  And then to determine that, what is sufficient but

2     not greater than necessary, deals with all those factors under

3     3553(a).  One of them is deterrence.  One of them is the

4     magnitude of the offense itself, the nature and circumstances

5     of the offense, the seriousness of the offense.  What is a

6     just sentence?  What would protect the public from further

7     crimes?  All those things are factors under 3553(a).

8                MR. MOORE:  Yes, sir.

9                THE COURT:  And it's not just, how much will deter.

10    That is an important factor; it is not the only factor.

11               MR. MOORE:  And I understand that.  But it seems to

12    be an important factor to your Honor, and I understand why it

13    is.

14               THE COURT:  It is.  It is.

15               MR. MOORE:  Okay.  And so, that's why I'm spending

16    some time on it.  And there are two points that I would simply

17    like to make --

18               THE COURT:  Okay.

19               MR. MOORE:  -- which is, if this were a state court

20    case -- and it's not, okay.  If this were a state court case,

21    there's a state court statute that allows the sentencing judge

22    to give credit towards time served.  The only way you can do

23    that, the only way you can give credit for the ankle monitor,

24    if you will, and the conditions --

25               THE COURT:  I am not going to give credit for an

185

1    ankle monitor.  I'm sorry.

2                MR. MOORE:  Okay.

3                THE COURT:  Just drop that one.

4                MR. MOORE:  All right.  Another point that I have not

5    made, okay, is something that I learned in getting ready for

6    this sentencing, which is that, no matter what your sentence,

7    he will not be eligible for the lowest security facility in

8    the BOP; no matter what your sentence and no matter what his

9    criminal history category score is, because of the similar

10   pendency of these other state charges, they will bump him up a

11   security level, despite the fact that there has been no

12   adjudication.  Now, I've been practicing law for 30-something

13   years.  I didn't know that before, but I have learned it now

14   and I confirmed it with the Department of Corrections.

15               THE COURT:  I can't control the assignment practices

16   of the Bureau of Prisons.  That's beyond my control.

17               MR. MOORE:  I understand that, your Honor.  I'm

18   simply talking about --

19               THE COURT:  Let me just say for the record, I think

20   he's a low-security prisoner, okay?  How they rate him is

21   their business.  He is not likely to attempt to escape or to

22   commit violence against others.  You can take that transcript

23   and show it to the BOP.  But they have other factors that they

24   consider, and I don't make prison assignments.

25               MR. MOORE:  And I understand that, your Honor.  I'm

1    simply asking your Honor to consider that when you think about

2    your ultimate sentence, and, again, with respect to

3    accountability, how much time.  Three years is a lot of time

4    in jail, okay?  Five years is a lot of time in jail, okay?

5    Seven years is a lot of time in jail.  Eleven years is an

6    incredible amount of time in jail.  And so, when you think

7    about the sentence to be imposed, I would ask your Honor to

8    consider that you don't have to give him 10 years or more or a

9    guideline sentence in this case -- because the guidelines are

10   so high, you do not have to give him a sentence in that range

11   to achieve general deterrence and to achieve full

12   accountability for the crimes for which he has been convicted.

13          With respect to your Honor's comment about vulnerable

14   victim enhancement, don't blame him.  The only person to blame

15   is me for that initial --

16          THE COURT:  That had to be the worst objection I've

17   ever seen.

18          MR. MOORE:  As I said, blame me.

19          THE COURT:  To be honest with you, Mr. Moore, it

20   shocked me.  And I really don't hold it against him, because

21   only a lawyer could think of that.

22          MR. MOORE:  Well --

23          THE COURT:  Out of all due respect.

24          MR. MOORE:  And later on, these lawyers decided that

25   -- we rethought that.

1          THE COURT:  That was a good thought.

2          MR. MOORE:  Okay.  All right.  But I want to tell

3  you, that's on me, okay?  I take responsibility for that.

4          THE COURT:  And I'm not blaming him for it, it just

5  really -- you know, Mr. Laffitte was very engaged in his

6  defense.  He's not someone who just sits back.  I watched him

7  during the trial.  He's very well informed, he's very engaged.

8  He's a very intelligent person.  And he had to sign off,

9  presumably, on those.  And it bothered me he did it, but I

10  reached the conclusion that, at some point, cooler heads

11  prevailed on that particular objection.  I'm not holding it

12  against him, but it was deeply troubling to me at the time.

13          MR. MOORE:  And so, again, your Honor, blame me.

14  There was a time when I felt like we were drinking out of a

15  firehose, and I still feel that way to some extent.  But we've

16  had a lot of time to think, okay, and so I understand that.

17  So, blame me, don't blame him, and I appreciate the fact that

18  you're not.

19          And I have to say that this is, I think, the first

20  time I've heard an argument that the only way that Alec

21  Murdaugh could have done this -- it's not the only way that

22  Alec could have done this, but Russell Laffitte put Alec

23  Murdaugh into a situation where he had to steal these

24  settlement proceeds.  I don't think --

25          THE COURT:  No.  I didn't hear that.  That's not the

1    argument I heard.

2         MR. MOORE:  Okay.

3         THE COURT:  It is that this criminal scheme wasn't a

4    solo act and it couldn't have been a solo act.  It took a

5    team, and Murdaugh had a team.  And that team member -- that

6    coconspirator, per the jury to the Count 1 conviction, was the

7    defendant.

8         MR. MOORE:  So, with respect to this 93,500 --

9         THE COURT:  Yeah.  Tell me about that.  I want to

10   hear about that.

11        MR. MOORE:  So, Russell has paid back $17,500.  The

12   92,5 is 110, minus 17,5.  While he does intend to appeal --

13        THE COURT:  Just so we all understand what we're

14   talking about, the 110 involves the conservator PR fees of

15   Hakeem Pinckney, Natasha Thomas, and Arthur Badger?

16        MR. MOORE:  Yes, sir, it is.  Whether guilty or not,

17   okay, whether conviction is affirmed on appeal or not, he

18   believes that he ought to disgorge himself of those funds.  He

19   believes it is the appropriate thing to do because he has

20   mismanaged those conservatorships.

21        THE COURT:  That would be a generous description of

22   what happened.

23        MR. MOORE:  And so, my point is that that is why he

24   wants to make that payment.  He asks that that be credited

25   towards restitution.  And I understand that I can't control

1    how restitution is calculated, created or credited, okay, but

2    that is why we are making this payment, because of that.  And

3    I wanted your Honor to understand it and understand why we

4    were doing it.

5         THE COURT:  I think that's an appropriate thing for

6    him to do.

7         MR. MOORE:  And with respect to the argument that he

8    only treats people of the highest walks of life with

9    respect -- and that's probably over-arguing -- I just don't

10   think that evidence supports that here.

11        THE COURT:  Listen, he, in many aspects of his life,

12   was extremely generous with all types of people.

13        MR. MOORE:  And I --

14        THE COURT:  He also was incredibly cruel to some of

15   the most vulnerable people I have ever encountered.  I've got

16   to weigh all of that.

17        MR. MOORE:  And I wish I could give your Honor a good

18   answer for that, okay, I wish I could.  I know that he wishes

19   that he had done things very differently.  And, you know,

20   perhaps it's just Alec Murdaugh telling him, you don't have to

21   do anything, I got it -- now, Alec Murdaugh telling me that

22   you don't have to do anything, I got it, doesn't mean that I'm

23   justified in doing what he did, okay?

24        THE COURT:  Alec Murdaugh was not the conservator, he

25   was not the personal representative.  Mr. Laffitte was

1  appointed by a court.  He was an officer of the court.  He had

2  a duty of absolute loyalty to his beneficiaries, which were

3  these victims.

4          MR. MOORE:  And I'm sure that Mr. Laffitte wishes, if

5  he had it to do over again, he wouldn't have ever become a

6  conservator for anyone because he wasn't prepared to do it and

7  he didn't do it well.  And I agree with that and I understand

8  it.  And I know that that is something that your Honor is

9  going to factor into account when you sentence him.  I'm

10 simply asking your Honor to consider all of the factors under

11 3553(a).  You don't want me to repeat what I've said in my

12 sentencing memorandum or what I've said here today, that there

13 are two points that I would respectfully request that, when

14 your Honor sentences, that you recommend to the Bureau of

15 Prisons -- and I understand it's a recommendation only -- that

16 he be sentenced to FCI Jessup, to the facility that is

17 available to him at FCI Jessup, because it is closest -- it's

18 not the closest facility to his home, but I believe that it is

19 the closest facility to his home that will accommodate the

20 custody status that I believe he will require.  It does have a

21 --

22         THE COURT:  How far is it from his home?

23         MR. MOORE:  I beg one moment.

24         As the crow flies, because I've driven it, okay --

25 not for this case.  As the crow flies, it's less than an hour.

1    As you drive it, it is a little bit farther.  I beg one

2    moment.

3            It's about two hours, Judge.  It's about two hours.

4            THE COURT:  I mean, you know, the family is going to

5    be on the road all the time, I know that.

6            MR. MOORE:  Yes, sir.

7            THE COURT:  So, is there any closer?

8            MR. MOORE:  I don't think that he qualifies for

9    Estill, okay?  And it's the closest.  I don't think that he

10   qualifies for it.

11           THE COURT:  How about if I recommend the closest

12   facility to which he qualifies?  Because, I don't know how the

13   Bureau of Prisons assigns people.

14           MR. MOORE:  Yes, sir.

15           THE COURT:  You may know more than I do.  But I've

16   said on the record, I don't think he's violent, I don't think

17   he's dangerous, I don't think he would try to escape.  He, in

18   my view, uninformed about the Bureau of Prisons policies,

19   would qualify for the lowest level of security necessary.

20           MR. MOORE:  I will tell you, your Honor -- and I

21   understand your Honor's point.  I'd ask for Jessup.  And this

22   is why.  Because I think they have vocational programs too

23   that he wants to take advantage of.

24           THE COURT:  Okay.  I will do that.

25           MR. MOORE:  He really does.  And they also have an

192

1    RDAP program.  I don't know if he's going to be able to --

2                THE COURT:  Do you want me to recommend RDAP?

3                MR. MOORE:  I would ask that you recommend RDAP if

4    the Bureau of Prisons determines he's qualified, yes, sir, I

5    would.

6                MS. LIMEHOUSE:  I'm not sure that he would qualify.

7    He hasn't shown anything about drug abuse or substance abuse.

8                THE COURT:  Well, I don't want to invade some of the

9    aspects of the presentence report, but there is some family

10   history that might make that an appropriate request.  I don't

11   know of any harm by me recommending it.  He's been through a

12   lot, his family has.  I don't have any problem recommending

13   it.

14               Believe me, the Bureau of Prisons doesn't listen to

15   me much more than they listen to you, Mr. Moore.

16               MR. MOORE:  I understand that.  They didn't listen to

17   me as an AUSA, and they certainly don't listen to me now.  But

18   I would appreciate those recommendations.  And after

19   your Honor imposes sentence, there are a couple of other

20   things that we obviously may need to talk about.

21               THE COURT:  Okay.

22               MR. MOORE:  But I'm happy to answer any questions if

23   your Honor has any questions for me.  And before you do, let

24   me go step to my co-counsel and make sure that a better lawyer

25   than me doesn't have something else that I need to say.

1          THE COURT:  Or even two better lawyers than you.

2          MR. MOORE:  That's correct.

3          No, sir, your Honor.  I wish to thank you for the

4  care, consideration, and your patience in listening to us

5  today.

6          THE COURT:  Thank you very much.

7          The least attractive aspect of being a U.S. District

8  Court Judge is imposing a prison sentence.  I know of no

9  colleague who enjoys this part of the job.  But it is an

10 important part, and it is a duty that my colleagues and I take

11 very seriously.  And we are very deliberate about it.  I know

12 in state court they will convict someone and stand them up and

13 sentence them right there.  And we don't do that.  We have a

14 detailed presentence report.

15         We went through multiple versions, as defense counsel

16 brought issues to the attention of my probation officers.  And

17 now we've had a day-long hearing.  We try to be deliberate.

18 And there is no perfect magic to this, but our goal ultimately

19 is to impose a sentence which is sufficient but not greater

20 than necessary to accomplish the purposes of the law.  So, let

21 me announce the sentence, and then I want to explain the

22 Court's reasoning in imposing the sentence.

23         MR. MOORE:  Do you want us to stand?

24         THE COURT:  You may stand.

25         MR. MOORE:  Yes, sir.

1    THE COURT:  Having calculated and considered the

2    advisory sentencing guidelines, and having also considered the

3    relevant statutory sentencing factors contained in 18 United

4    States Code 3553(a), it is the judgment of the Court that the

5    defendant, Russell Lucius Laffitte, is hereby committed to the

6    custody of the Bureau of Prisons to be imprisoned for a term

7    of 84 months, consisting of 84 months as to Counts 1, 2, 3, 4,

8    5, and 6.  Said terms to run concurrently.  This term of

9    imprisonment shall run concurrently to the anticipated state

10   sentence for conduct related to the instant sentences of

11   conviction, as outside lined in paragraph 158 of the

12   presentence report.  I make the point that a state judge can

13   disregard my recommendation regarding that, but that is my

14   recommendation to the state court.  I frankly believe that the

15   84-month sentence is sufficient for all of these offenses that

16   are identical.  I don't know exactly what is in state court,

17   but the Court believes this sentence is sufficient but not

18   greater than necessary.

19        It is further ordered that the defendant shall pay

20   mandatory restitution in the amount of $3,555,884.80 to the

21   victims in this case through the Clerk of the United States

22   District Court, 83 Meeting Street; Charleston, South Carolina

23   29401.  Payments are due and payable immediately.  Interest on

24   restitution is waived.  It appears the defendant does not have

25   the ability to pay a fine, therefore, the fine is waived.  The

1   defendant shall pay the mandatory $600 special assessment

2   fees, which are due and payable immediately.  Upon release

3   from imprisonment, the defendant shall be placed on supervised

4   release for a term the of five years, consisting of five years

5   as to Counts 1, 2, 3, 4, 5, and 6.  Said terms to run

6   concurrently.

7           And, Mr. Moore, I make the point that, should the

8   defendant fully satisfy his restitution, I would consider --

9   assuming he has been compliant with the terms of supervised

10  release -- to consider a request to shorten that term.

11          MR. MOORE:  Thank you, your Honor.

12          THE COURT:  While on supervised release, the

13  defendant shall comply with the mandatory conditions of

14  supervision outlined in 18 United States Code 3583(d) and

15  sentencing guideline 5D1.3(a) and the standard discretionary

16  conditions outlined in sentencing guideline 5D1.3(c), as noted

17  in paragraphs 200 and 203 of the presentence report.

18          Standard conditions of supervision one through nine

19  serve the statutory sentencing purposes of public protection

20  and rehabilitation, pursuant to 18 United States Code 3553(a)

21  (2)(C) and (D).

22          Standard conditions of supervision 10 and 12 serve

23  the statutory sentencing purpose of public protection,

24  pursuant to 18 United States Code 3553(a)(C).

25          Standard condition of supervision 11 ensures that the

1    defendant does not engage in activities that may potentially

2    conflict with other conditions of supervision and that may

3    pose risk to the defendant's probation officer.

4            The defendant shall also comply with the following

5    special conditions for the reasons set forth in the

6    presentence report, which has previously been adopt by this

7    Court as the findings of fact for purposes of sentencing:

8    Number one, you must pay any remaining unpaid restitution

9    balance imposed by the Court in minimum monthly installments

10   of $2,000, to commence 30 days after release from custody, or

11   following the imposition of a sentence if a time-served --

12   actually, that is not applicable here.  The payments shall be

13   made payable to the Clerk of the United States District Court

14   and mailed to 83 Meeting Street; Charleston, South Carolina

15   29401.  Interest on any restitution and fine ordered is

16   waived.  Payments shall be adjusted accordingly, based on your

17   ability to pay, as determined by the Court.  This is a

18   mandatory provision.  This, in no way, modifies the ability of

19   the government, through its civil proceedings, to enforce

20   restitution.

21           Number two, you must not incur any new credit charges

22   or open any additional lines of credit without the approval of

23   the probation officer.  This condition is provided based upon

24   the nature of the offense to deter and detect potential future

25   economic crimes, to assist the defendant in getting control of

1    his financial situation, and to serve the statutory sentencing

2    purposes of public protection, deterrence and rehabilitation.

3          Number three, you must provide the probation officer

4    with access to any requested financial information and

5    authorize the release of any financial information.  The

6    probation officer may share the financial information with the

7    United States Attorney's Office.  This condition is provided

8    based upon the nature of the offense to deter and detect

9    future economic crimes, to assist the defendant in getting

10   control of his financial situation, and to serve the statutory

11   sentencing purposes of public protection, deterrence and

12   rehabilitation.

13          Now, I have made the decision to vary here downward

14   from a guideline sentence of 108 to 135 months to 84 months,

15   seven years.  I have determined that that condition, based on

16   all the factors under 3553(a), is sufficient but not greater

17   than necessary to accomplish the purposes of the law.

18          I want to discuss the 3553(a) factors.  I've

19   considered all of the factors in imposing in sentence.  I've

20   considered the nature and circumstances of the offense.  The

21   defendant engaged in a nearly decades-long criminal conspiracy

22   of fraud and deception, which victimized highly vulnerable

23   persons:  Minors, severely injured persons, grieving persons.

24   The defendant actively participated in the scheme that would

25   not have been possible without his role as a fiduciary over

1    the funds which were looted.

2          I've considered the history and characteristics of

3    the defendant.  He has no prior criminal history.  And I've

4    heard commendable events from very fine people who have come

5    here today.  I find that information credible.  He is a family

6    man.  He is a good parent, a good spouse, and active in his

7    community.

8          The offenses here are serious, methodical financial

9    crimes.  I believe this sentence promotes respect for the law

10   and imposes a just punishment without over-punishing the

11   defendant.  I believe the sentence affords an adequate

12   deterrence, protects the public from further crimes of this

13   defendant, and frankly, with a general deterrence, the crimes

14   of others.  And I believe it avoids unwarranted disparities.

15   I've made reference to the sentencing guidelines data, which

16   shows that actually this sentence of 84 months is very much in

17   the mainstream of similar sentences with identical total

18   offense levels and criminal histories.  I will say that my

19   colleagues around the country have generally varied somewhat

20   down to this sort of seven-to-eight-year level when imposing

21   these sentences, even though the guidelines are 108 to 135.

22   But I think it reflects the fact that sometimes the combined

23   effect of all properly accounted-for relevant factors, it is

24   in the mainstream.  And I think, frankly, I've kind of arrived

25   in my own mind about the range here and was not surprised that

1     it fell within the range that is often done by my colleagues.

2     It's just a factor to consider.  In the end, I weighed every

3     one of the 3553(a) factors to impose a sentence which is

4     sufficient but not greater than necessary.

5          We've allocated the -- and I've been told there is

6     not a dispute on the restitution, some which are joint and

7     several between Mr. Murdaugh and Mr. Laffitte, and some which

8     are solely Mr. Laffitte.  Government's Exhibit No. 5

9     identifies those, and I incorporate those as part of the order

10    in this matter.  I want to provide Mr. Laffitte his appeal

11    notice.

12         You have a right to file an appeal.  You must file an

13    appeal within 14 days of the entry of judgment.  Further, you

14    have a right to apply to appeal in forma pauperis, and the

15    clerk of court will prepare and file a notice of appeal upon

16    your request.

17         I find that voluntary surrender is appropriate here

18    and will continue the bond until voluntary reporting.  I

19    recommend FCI Jessup as a location for incarceration.  And I

20    will recommend the Bureau of Prisons consider RDAP.  That is

21    my sentence.

22         Are there further matters to come before the Court?

23         Mr. Moore, you mentioned there was something?

24         MR. MOORE:  Your Honor, I'm going to file a motion --

25    or I intend to the file a motion seeking an appeal bond.

1          THE COURT:  I will address that right now.

2          MR. MOORE:  Your Honor, you will not allow me to file

3    -- we have one that we can file within a few days.  I'm happy

4    to address it --

5          THE COURT:  You can address it right here.  We're in

6    the middle of all this.  Let's address it.

7          MR. MOORE:  So, your Honor, again, I would request

8    leave to file something supplemental with the Court, but we

9    would request that your Honor allow Mr. Laffitte to remain on

10   bond pending appeal.  We filed a motion -- his prior counsel

11   filed a motion for a new trial.  We filed some supplements.

12   Your Honor denied that request.  And I understand your Honor's

13   reasoning.

14         We believe that the issue of the removal of the two

15   jurors is specifically an issue that, if it were decided in

16   Mr. Laffitte's favor, could reverse this conviction.  And,

17   your Honor, I don't believe he's a risk of flight.  It's not a

18   mandatory detention case, as your Honor knows.  Your Honor has

19   agreed to let him remain out pending designation.  And so, for

20   all of those reasons, we move that an appeal bond is

21   necessary.  The government doesn't consent.  They told me that

22   they don't consent.

23         THE COURT:  Big surprise.

24         18 United States Code 3143(b) addresses this issue.

25   And the reason I don't need briefing is the law is very clear

1    on this.  To allow an appeal bond, I must make a finding that

2    there is a substantial question of law or fact likely to

3    result in reversal and order for a new trial.  I do not make

4    such a finding.  And, in fact, this whole issue about the

5    jurors that was part of the post-conviction motions was a

6    motion filed by you, Mr. Moore, claiming that the other

7    lawyers were incompetent for having consented to the very

8    decisions made by this Court regarding the jurors.  And the

9    government appropriately said, well, they basically admitted

10   our argument, which was that this was proper.  The jury

11   decisions were made close consultation of defense counsel and

12   government counsel and consented to by both.  I do not find

13   that it's likely that there will be a reversal.  And I deny

14   the appeal bond on that basis.

15             MR. MOORE:  Thank you, your Honor.  I take it that,

16   at the appropriate time, I will have to take that up with the

17   Fourth Circuit and see where we go.

18             THE COURT:  You always have a right to go to the

19   Fourth Circuit.

20             Yes, Ms. Limehouse.

21             MS. LIMEHOUSE:  A couple minor issues, your Honor.

22   We anticipate that there will be some litigation about Mr.

23   Laffitte's assets and his ability to satisfy restitution

24   judgment.  We intend to file motions to enforce the

25   restitution judgment and may, depending on prior to appeal or

1    after appeal, request that his assets be liquidated.  I would

2    in the meantime ask that your Honor order as a condition that

3    he not be able to liquidate those assets without court

4    approval.

5            THE COURT:  Which assets?  He's got to live.

6            MS. LIMEHOUSE:  Well, that's true.  He does have over

7    $6 million recorded assets in bank stock, and that's just

8    Palmetto State Bank stock.  And he also has a couple hundred

9    more thousand dollars in stock at Bank of America.  He also

10   has a significant amount over a million in 401K.  And then he

11   does have an interest in a family partnership, a 32-percent

12   interest, valued at slightly under $2 million.  We expect that

13   he will attempt to liquidate some of these assets to satisfy

14   attorneys' fees, particularly for his appeal.  And our

15   position would be that if he attempts to do so, we want to be

16   able to attach those funds to satisfy his restitution

17   judgment.

18           So, we'd ask that your Honor prevent him from making

19   any such decisions without the Court's involvement and

20   approval until we have a better understanding of exactly how

21   that restitution judgment is going to be enforced.

22           THE COURT:  What's the defense's response to that?

23           MR. MOORE:  Well, first of all, your Honor, I think

24   that the state bond that he's currently under prevents him

25   from liquidating those assets.  As I've told Ms. Limehouse,

203 of 206

1    he's not going to liquidate anything without my consulting the

2    government and without approaching the Court, if necessary.

3    And so, if your Honor says, I don't want you touching the 401K

4    and I don't want you touching the bank stock or dealing with

5    any issues with the bank stock without the permission of this

6    Court, I don't have any problem with that as a condition of

7    his bond going forward.  Because, I agree with Ms. Limehouse,

8    we're going to be coming to the Court and talking to the Court

9    about restitution.  It's not going to shock your Honor that we

10   probably have a difference of opinion as to whether or not

11   that restitution judgment should be executed during the

12   pendency of his appeal.  And so, that's an issue that we're

13   going to have to deal with the Court on.  And so, I don't have

14   any problem with your Honor imposing those conditions.

15            THE COURT:  Of course, we don't know if the

16   government's going to try to execute before an appeal is

17   final.  That's up to the -- and I think we can address it

18   then.

19            So, let me just make this -- sounds like the state

20   court may have addressed it, but let me address it.  I hereby

21   enjoin the defendant from transferring any of his --

22   liquidating or transferring any of his shares of stock in the

23   Bank of America or to Palmetto State Bank.  Also, money in the

24   escrow account of Nelson Mullins for the sale of the Forest

25   Drive home, the 401k, and the interest in the Laffitte family

1    partnership, I enjoin him from transferring or liquidating

2    those assets without further order of the Court.

3         Now, let's be candid here.  The defendant has a right

4    to pursue an appeal.  And we don't want -- I think that

5    there's evidence in the PSR -- I know this is from information

6    the defendant provided, hasn't been audited -- that he had

7    assets of $10 million in liabilities of five million, roughly.

8    And the restitution is 3.5 million.  To the extent that he

9    seeks to pay money that the government is satisfied there's

10   sufficient money securing the restitution, how he spends the

11   rest of his money is his business.  It's nobody else's

12   business.  And the Court wouldn't stop him from doing that.

13   So, I think we need to figure out what those assets are

14   actually worth.  And to the extent that we can secure those

15   assets, then he should be able to fund whatever he wants to

16   from his other resources.  The Court has no interest in that.

17   The government has no interest in that.  And what we're not

18   trying to do is prevent him from having an effective appeal.

19        So, let me say this.  You know, I make judgments

20   about the reasonableness of attorneys' fees all the time, Mr.

21   Moore.

22        MR. MOORE:  Yes, sir.

23        THE COURT:  And to the extent that you are seeking

24   resources that are subject to restitution, then I have to

25   evaluate, A, should we allow that -- and I probably would, to

1    some degree, if the other resources weren't sufficient, to

2    protect his right to an appeal, but it would be subject to a

3    reasonableness standard.  And I would have to the deal with

4    those as they come in.  And I've had that issue addressed on

5    multiple occasions in cases.

6        MR. MOORE:  And I understand that, your Honor.  And I

7    expect we're going to be addressing those issues with

8    your Honor in the next 30 to 60 days.

9        THE COURT:  I would urge y'all to try to work it out

10   among yourselves.  It seems to me that -- I don't think the

11   government has any particular interest in seizing funds that

12   are beyond the need for restitution.  And the simple answer

13   may be that he has additional other resources; I just don't

14   know that.  But if he doesn't, I'm still going to protect his

15   right to mount a defense.

16       MR. MOORE:  Yes, sir.

17       THE COURT:  And he has every right to do that.  And I

18   take no offense that whatever he says on appeal is part of the

19   system.  I always say, in this business, if you want a friend,

20   get a dog.

21       MR. MOORE:  Your Honor, a judge who's no longer with

22   us once told me when I worked for the U.S. Attorney's Office:

23   The government pays both of us but it doesn't pay us to agree

24   with each other.

25           And so, you know, the complicating issue here is, if

1    he liquidates assets, he gets a substantial tax liability.

2    And that's what makes this whole thing tricky.

3            THE COURT:  I understand the consequence of

4    liquidation of taxes.  And I just think it's something we'll

5    dig into as we proceed.  But I think the first step is for

6    both of you to try to work out what is a reasonable value of

7    assets, because it may make the entire issue academic.

8            Are there further matters that come before the Court?

9            MS. LIMEHOUSE:  One minor thing.  We've sent a

10   revised preliminary order of forfeiture to Ms. Perry.  And we

11   just ask that you incorporate it into your final judgment.

12           THE COURT:  I will do that.  That motion will be

13   granted.

14           Anything further?

15           MR. MOORE:  No, your Honor.  Nothing further.  Thank

16   you, your Honor.

17           MS. SHOUN:  Thank you.

18           THE COURT:  Very good.  This hearing is adjourned.

19           MS. LIMEHOUSE:  Thank you, your Honor.

20                       * * * * * *

21       I certify that the foregoing is a correct transcript from

22   the record of proceedings in the above-entitled matter.

23       s/Lisa D. Smith,                    8/17/2023

24   _____    _____
     Lisa D. Smith, RPR, CRR                Date

25