## No. 23-4509

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

────────────

### UNITED STATES OF AMERICA,
*Plaintiff-Appellee-Cross-Appellant,*

v.

### RUSSELL LUCIUS LAFFITTE,
*Defendant-Appellant-Cross-Appellee.*

────────────

On Appeal from the United States District Court for the
District of South Carolina, No. 9:22-cr-00658-RMG-1

────────────

### CORRECTED REDACTED OPENING BRIEF OF APPELLANT

────────────

Mark C. Moore
Michael A. Parente
MAYNARD NEXSEN PC
1230 Main Street, Suite 700
Columbia, SC 29201
Phone: 803.771.8900
mmoore@maynardnexsen.com
mparente@maynardnexsen.com

William W. Wilkins
MAYNARD NEXSEN PC
104 S. Main Street, Suite 900
Greenville, SC 29601
Phone: 864.370.2211
bwilkins@maynardnexsen.com

John C. Neiman, Jr.
MAYNARD NEXSEN PC
1901 Sixth Avenue N., Suite 1700
Birmingham, AL 35203
Phone: 205.254.1000
jneiman@maynardnexsen.com

*Counsel for Defendant-Appellant Russell Lucius Laffitte*

# TABLE OF CONTENTS

Table of Authorities ................................................................. iv

Jurisdictional Statement ........................................................ 1

Note on Redactions ................................................................ 2

Introduction .......................................................................... 3

Issues Presented .................................................................... 6

Statement of the Case ............................................................ 7

I.    Statement of Facts ...................................................... 7

    A.    Laffitte and the bank had a longstanding relationship with Murdaugh and his firm ........................ 7

    B.    Laffitte served as fiduciary to several Murdaugh clients ................................................................... 9

    C.    The law firm and Laffitte discovered Murdaugh's thefts ................................................................... 11

    D.    The bank made loans to Murdaugh through Laffitte ..... 16

    E.    A divided board voted to terminate Laffitte ................... 17

II.    Procedural History ..................................................... 18

    A.    The district court precluded questioning about director bias and denied Laffitte's motion for judgment of acquittal ......................................... 19

    B.    Problems arose during jury deliberations ...................... 21

    C.    The judge interviewed Juror #88, who said she was anxious ▮▮▮▮▮▮▮ and then summarily dismissed her outside Laffitte's presence ......................................... 27

    D.    The judge did not interview Juror #93, whose notes said she needed an antibiotic and felt "pressured to change my vote," and then summarily dismissed her outside Laffitte's presence .............................................. 28

E.    Less than 50 minutes after the district court replaced the jurors, the newly constituted jury voted to convict.................................................................. 30

F.    The district court denied Laffitte's motions for new trial and judgment of acquittal ...................................... 33

G.    The district court declined to consider the juror affidavits.................................................................... 34

H.    The district court denied Laffitte's second motion for new trial ...................................................................... 36

I.    The district court imposed a seven-year sentence .......... 37

III.    Rulings Presented for Review ................................................. 37

Summary of the Argument ...................................................................... 39

Argument ................................................................................................. 42

I.    The district court erred when it replaced Juror #88, who reported suffering anxiety                ........................................... 43

A.    The replacement of Juror #88 violated Laffitte's right to be present at all stages of trial.......................... 44

B.    The replacement of Juror #88 also violated Laffitte's right to a unanimous and impartial jury ...................... 50

II.    The district court erred when it replaced Juror #93, whose notes said she needed an antibiotic and was feeling "pressured to change my vote" ................................................ 57

A.    The testimony of Juror #93 on these matters is admissible........................................................................ 59

B.    The replacement of Juror #93 was error that independently requires reversal ..................................... 63

III.    The district court erred when it excluded evidence demonstrating Government witnesses' bias ........................... 66

IV.    The district court erred when it denied Laffitte's motion for judgment of acquittal on Counts 2 and 3............................ 70

Conclusion................................................................................... 74

Certificate of Compliance.......................................................... 76

Certificate of Service.................................................................. 77

# TABLE OF AUTHORITIES

## JUDICIAL DECISIONS

*Brady v. United States*,
  397 U.S. 742 (1970)..............................................45, 58, 59, 62, 63

..........................................................................55

*Chapman v. California*,
  386 U.S. 18 (1967)........................................................64

*Chavis v. North Carolina*,
  637 F.2d 213 (4th Cir. 1980)........................................68

..........................................................61

*Faretta v. California*,
  422 U.S. 806 (1975)........................................................44

*Johnson v. Zerbst*,
  304 U.S. 458 (1938)........................................................63

*Jones v. United States*,
  299 F.2d 661 (10th Cir. 1962).......................................49

..........................................................61

*Loughrin v. United States*,
  573 U.S. 351 (2014)........................................................71

*Murray v. Carrier*,
  477 U.S. 478 (1986)........................................................58

*Nelson v. State,*
    No. A23A1278,
    2023 WL 8588658 (Ga. Ct. App. Dec. 11, 2023)............................ 51

*North Carolina v. Butler,*
    441 U.S. 369 (1979)....................................................... 45

    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮....................................................... 55

*Quinn v. Haynes,*
    234 F.3d 837 (4th Cir. 2000)........................................... 67

*Ramos v. Louisiana,*
    140 S. Ct. 1390 (2020)...............................................51, 52

*Soliman v. Gonzales,*
    419 F.3d 276 (4th Cir. 2005)........................................... 72

*United States v. Abbell,*
    271 F.3d 1286 (11th Cir. 2001).....................................51, 52, 54

*United States v. Abel,*
    469 U.S. 45 (1984)...................................................... 68

*United States v. Arriagada,*
    451 F.2d 487 (4th Cir. 1971)........................................... 49

    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮....................................................... 54

*United States v. Brown,*
    823 F.2d 591 (D.C. Cir. 1987) ..................... 44, 51, 52, 53, 54, 64

*United States v. Brown,*
    996 F.3d 1171 (11th Cir. 2021) ....................................... 54

*United States v. Hanno,*
    21 F.3d 42 (4th Cir. 1994)............................................. 45

*United States v. Harvey,*
    791 F.2d 294 (4th Cir. 1986)........................................... 49

*United States v. Hernandez,*
        862 F.2d 17 (2d Cir. 1988)............................................................. 66

*United States v. Johnson,*
        400 F.3d 187 (4th Cir. 2005)..................................................45, 48

*United States v. Kemp,*
        500 F.3d 257 (3d Cir. 2007)....................................................51, 52

*United States v. Litwin,*
        972 F.3d 1155 (9th Cir. 2020) ........................................................ 57

*United States v. Mikalajunas,*
        186 F.3d 490 (4th Cir. 1999) ........................................................ 63

*United States v. Millender,*
        970 F.3d 523 (4th Cir. 2020) ........................................................ 70

*United States v. Moreno-Membache,*
        995 F.3d 249 (D.C. Cir. 2021) ...................................................... 48

*United States v. Nelson,*
        102 F.3d 1344, 1349 (4th Cir. 1996) ........................................... 43

*United States v. Olano,*
        507 U.S. 725 (1993)............................................... 46, 58, 63, 64, 65

*United States v. Ozomaro,*
        44 F.4th 538 (6th Cir. 2022)...................................................51, 52

*United States v. Petties,*
        42 F.4th 388 (4th Cir. 2022)......................................................... 49

*United States v. Runyon,*
        707 F.3d 475 (4th Cir. 2013)..............................................44, 45, 64

*United States v. Symington,*
        195 F.3d 1080 (9th Cir. 1999) ................................................51, 52

*United States v. Thomas,*
        116 F.3d 606 (2d Cir. 1997)....................................................51, 52

*United States v. Thomas,*
    724 F.3d 632 (5th Cir. 2013).......................................................... 46

*United States v. Turner,*
    198 F.3d 425 (4th Cir. 1999).......................................................... 69

*Wofford v. Woods,*
    969 F.3d 685 (6th Cir. 2020).......................................................... 52

## CONSTITUTIONAL PROVISIONS

U.S. CONST., amend. V............................................................................ 43

U.S. CONST., amend. VI.................................................................... 44, 50

## STATUTES AND ORDINANCES

18 U.S.C. § 1343...........................................................................18, 71

18 U.S.C. § 1344...........................................................................18, 71

18 U.S.C. § 3231............................................................................ 1

18 U.S.C. § 656.............................................................................. 18

28 U.S.C. § 1291............................................................................ 1

8 U.S.C. § 1343.............................................................................. 71

## RULES OF COURT

4TH CIR. R. 25................................................................................ 2

FED. R. APP. P. 4............................................................................ 1

FED. R. CRIM. P. 24.....................................................................43, 64

FED. R. CRIM. P. 31......................................................................... 51

FED. R. CRIM. P. 43......................................................................... 45

FED. R. CRIM. P. 52......................................................................... 65

███████████.................................................................35, 40, 56, 60

**TREATISES, JOURNALS, AND DICTIONARIES**

BLACK'S LAW DICTIONARY (4th ed. 1951)................................................ 72

# JURISDICTIONAL STATEMENT

The district court had jurisdiction over this criminal prosecution under 18 U.S.C. § 3231, and this Court has jurisdiction now. The district court entered a final judgment on August 2, 2023, documenting the conviction and sentence of the appellant, Russell Lucius Laffitte. JA2640. That judgment was an appealable final decision under 28 U.S.C. § 1291 because it disposed of all the counts from the Second Superseding Indictment. Laffitte filed a notice of appeal on August 8, 2023, within the 14-day window provided by Federal Rule of Appellate Procedure 4(b)(1)(a)(i). JA2652.

# NOTE ON REDACTIONS

The district court sealed many of the record documents that are significant to this appeal. They include documents whose consideration is indisputably proper, such as notes that jurors sent during deliberations and a transcript of the district court's *in camera* interview of a juror. But they also include juror affidavits whose admissibility is a matter of dispute. ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████. In accordance with Local Rule 25(c)(3), Laffitte is filing a sealed version of this brief highlighting the first type of sealed materials in ==yellow== and the second type in ==blue==. The public version redacts these materials entirely.

# INTRODUCTION

This appeal arises from an extraordinary criminal case in which the district judge's actions during jury deliberations created a fundamental defect in the trial and violated an innocent defendant's basic rights.

Russell Laffitte was one of many people who were caught in the web of deception weaved by Alex Murdaugh—a lawyer from Hampton, South Carolina, who eventually was convicted of murdering his wife and son and now has admitted to stealing millions from his clients. Before these horrific acts were known, Murdaugh was a respected community member and customer of the local bank where Laffitte was CEO. As Laffitte did with many others in this rural community, he extended Murdaugh loans, made deposits for him, and helped disburse his checks, not knowing Murdaugh was using some of these transactions to effectuate theft and fraud. Laffitte was indicted on federal charges, based on circumstantial evidence alone. At his nine-day trial, Laffitte testified that he was innocent, explaining that he did "not know in any way" that he was "helping facilitate the theft by Alex Murdaugh." JA1862-1863.

The jury began deliberating on the morning of November 22, 2022, the last day the courthouse was scheduled to be open before a three-day

Thanksgiving holiday. After the jurors had been deliberating for more than nine hours, at approximately 7:43 p.m., the judge revealed that he had received notes from jurors. The judge did not provide copies of the notes to the parties or disclose their full contents, but even the portions he read described a jury room that was toxic and a jury that was deadlocked.

One juror wrote that she needed an antibiotic and then, in a subsequent note, indicated that she was "[f]eeling pressured to change my vote." JA2271. The judge summarily rejected Laffitte's proposal to respond to those issues by adjourning until the next morning.

After receiving a third note from several jurors expressing concern about deliberations, the judge then received a fourth note from another juror, who asked to be removed because she was "experiencing anxiety and unable to clearly make my decision." JA2273. Laffitte and the Government assented to the judge's suggestion that they authorize him to privately interview jurors outside their presence.

4

At that point, the law required the district court to fully inform Laffitte what this juror had said, to allow Laffitte's attorneys to offer suggestions as to the appropriate response, and to afford them an opportunity to object to any action the judge proposed to take. Instead, the judge concluded his three-minute private interview of this juror by summarily replacing her with an alternate—outside Laffitte's presence, without conferring with his attorneys, and over his objection when he eventually learned what had transpired. The judge also summarily replaced the first juror, who had written the notes saying she needed an antibiotic and was feeling "pressured to change [her] vote," also outside Laffitte's presence, and without even meeting or talking with her. JA2271.

After deliberating for less than 50 minutes, the newly constituted jury reached a guilty verdict on all counts, making clear that during the previous nine hours the two replaced jurors had been casting votes to acquit. Their replacement by the judge deprived Laffitte of rights essential to criminal-justice proceedings: the right to an impartial and unanimous jury, and the right to be present with counsel at every stage. For these reasons and others discussed below, this Court should reverse.

5

# ISSUES PRESENTED

**I. "Anxiety** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ **juror.** Did the district court err in replacing Juror #88, outside the presence of Laffitte and over his objection, after she told the judge she had asked to be dismissed because she felt anxious ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮?

**II. "Antibiotic/pressured to change my vote" juror.** Did the district court err in replacing Juror #93, with whom the judge did not speak, after receiving notes saying she "[n]eed[ed]" an "antibiotic" ▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮ _____ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮?

**III.  Witness bias.** Did the district court err in refusing to admit evidence that bank board members who testified that they were critical of Laffitte were biased because Laffitte opposed selling the bank?

**IV.  Insufficient evidence of fraud.** Did the district court err in denying Laffitte's motion for judgment as a matter of law on Count 2 for bank fraud and Count 3 for wire fraud due to the lack of evidence that Laffitte made false or fraudulent statements or utilized fraudulent devices in connection with the transactions?

# STATEMENT OF THE CASE

## I.    Statement of Facts

The Second Superseding Indictment asserted six counts: three alleging that Laffitte was complicit in Murdaugh's thefts of client funds; and three alleging that, in transactions involving Murdaugh, Laffitte willfully misapplied funds belonging to the bank. JA37-43. The trial that resulted in a deadlocked jury spanned 9 days, more than 2,100 transcript pages, and more than 300 exhibits. The facts most pertinent to the appeal are below.

### A.    Laffitte and the bank had a longstanding relationship with Murdaugh and his firm

Palmetto State Bank is a Laffitte family business and a type of financial institution commonly referred to as a "community bank." JA590. The bank's current CEO, a Government witness, testified that a community bank "differs in concept from a large national bank." JA590. "The best way to characterize it" is as a "Main Street bank." JA590. These banks "raise deposits in the" communities where they "have offices" and turn those deposits "around and make loans to individuals and small

businesses in those communities." JA590-591. More than national banks do, they focus on "relationship banking one-on-one." JA591.

Until the fall of 2021, one of Palmetto State Bank's most important one-on-one relationships was with Alex Murdaugh. Before that September, "everyone thought Alex Murdaugh was one of Hampton County's finest citizens." JA695. Murdaugh's grandfather and father had both served as Circuit Solicitor, and he had been an Assistant Solicitor. JA697-698. Murdaugh was one of the "mid to higher earners" at a local personal-injury firm, and the firm and Murdaugh were among the bank's most significant customers. JA1666-1667. A firm partner stated that "there couldn't be a better banking relationship" than the one he had with Laffitte. JA790.

Although Laffitte did not "run in the same social circles" as Murdaugh, he was Murdaugh's "primary contact" when he "had a banking need." JA446; JA623. The relationship "[s]eemed to work well." JA623. Murdaugh often earned "over a million dollars" annually, but because the firm deferred most compensation until "between Christmas and New Year's," he frequently bridged the gap by taking out loans. JA455; JA542. One bank board member testified that Murdaugh "paid us over $4 million

in interest" on these loans over the years, making it worthwhile to give him "a little leeway" when he "overdraft[ed]" his account. JA1666; JA1669. "[T]hat's what a community bank does," she explained: "we work with our people." JA1669.

## B.    Laffitte served as fiduciary to several Murdaugh clients

With their one-on-one relationship working so well, Laffitte agreed—in an effort "to help my friend, my customer"—to serve some of Murdaugh's clients in a fiduciary capacity. JA1855. Laffitte obtained the bank chairman's blessing to perform these functions "outside of the bank" because it "didn't have a trust department." JA1854.

On that understanding, Laffitte served as conservator or personal representative in three Murdaugh cases that are relevant here. First, he served as conservator for Alania and Hannah Plyler, two children for whom Murdaugh obtained a multi-million-dollar recovery after an automobile accident. JA458-467. Second, he was personal representative for the estate of Donna Badger, who died in an automobile accident in which her husband Arthur, also a Murdaugh client, was injured. JA488-489. Third, he was conservator for Hakeem Pinckney and Natasha Thomas,

two other Murdaugh clients injured in an automobile accident. JA2873-2879.

As conservator, Laffitte was appointed by the probate court to safeguard and invest recoveries obtained by Murdaugh clients who were incapacitated or had not reached the age of majority. JA782. His compensation was "based on what the Court determine[d] to be reasonable." JA1769. That amount was $60,000 for Pinckney, $15,000 for Thomas, and over $200,000 for the Plylers. JA1328; JA2873-2878. He also received what the law firm labeled a "Personal Representative Fee" of $35,000 when Arthur Badger settled his case. JA2886; JA3137. But that was a mistake due to the law firm's court filings listing the fee "in the wrong place." JA2005. Laffitte was personal representative for the estate of Badger's deceased wife Donna, but did not have a fiduciary relationship with Badger himself. JA1889.

One expert witness called by the defense, a former probate judge, testified that conservators can generate interest income for their wards by "loan[ing] money from" their accounts. JA1774. South Carolina law allows conservators to "borrow[] money" themselves "from the assets of [their] ward[s]." JA1777-1778. So after seeking guidance from the local

probate judge that the practice was permissible, Laffitte made loans from Hannah Plyler's conservatorship account, to be paid back with interest, to both Murdaugh and himself. JA507; JA534-535. The Government specified during opening statement that the Second Superseding Indictment did "not allege" that loans Laffitte extended from conservatorship accounts "were illegal." JA191.

## C. The law firm and Laffitte discovered Murdaugh's thefts

The indictment instead sought to tie Laffitte to Murdaugh's misappropriations of client funds held by his law firm. In 2021, Murdaugh's firm discovered, in the words of one of his partners, that "he wasn't who we thought he was." JA847. In "early September," the firm's CFO notified Laffitte that Murdaugh had been "stealing funds" from his clients—from Arthur Badger, in particular—and that the firm had terminated him as a result. JA495-496.

Laffitte's response, in the CFO's words, was "disbelief," and he agreed to help her determine the extent of Murdaugh's theft. JA499-503. She needed his assistance because, while she "could see" that the checks Murdaugh had drawn from Badger's funds at the law firm "were written

to Palmetto State Bank," she could not determine what subsequently happened. JA503.

When Laffitte reviewed the bank's records, he became, as he told the jurors, "nauseous, furious and every other emotion that you could imagine." JA1894. The documents showed that eight years before, Murdaugh had deceitfully tricked him into sending an email concerning a check that—unbeknownst to Laffitte—Murdaugh had drawn from Badger's funds.

That sequence of events began when Murdaugh emailed Laffitte in February 2013, asking him to email back a request that a $1.325 million check issued by the firm "be re-cut" into four smaller checks, with one being for "[w]hatever the amount I owe on Hannah [Plyler] loan." JA2933. Laffitte assumed Murdaugh was asking him to send that email because "[t]here was no way" for Murdaugh himself to know the amount of the loan payoff. JA2006. So Laffitte "emailed it to him," calculating it as $151,726.05 and asking Murdaugh to have the firm's CFO "re-cut" the check in the other amounts requested. JA2006; JA2932. Murdaugh then forwarded Laffitte's email to his firm administrators, who voided the previous check—which, Laffitte was unaware, was drawn from Badger's

funds—and wrote new ones, which Murdaugh signed and made payable to "Palmetto State Bank." JA529-531; JA2885-2888; JA2932; JA3297.

Murdaugh then separately "brought in" three of those checks to the bank and converted them to his own use. JA1895. He first delivered a check for $75,000, asking that the funds be put into a money order to his father. JA1895; JA2888. The next day, he delivered the $151,726.05 check and applied it to his Plyler loan. JA1895; JA2886-2887. About a month later, he delivered a third check, for $388,687.50, which he used to obtain a money order to his law partner. JA1895-1899; JA2888.

The fourth and final check, which was for $709,586.45, was never deposited by Murdaugh. His firm reversed it seven months later and issued several smaller checks in its stead. JA3297. Murdaugh delivered one for $101,369.49 to the bank in October 2013, and applied it to his Plyler loan balance. JA2892-2893. The following January, he delivered another check for $33,789.83, which he deposited into his personal account. JA2903-2904. Murdaugh deposited most of what remained of Badger's funds at various other times and had the bank distribute the funds elsewhere. JA2889-2908.

13

Laffitte readily acknowledged that, based on his review of the records, he helped with "every one of the transactions" involving the Badger funds. JA1900. But he further testified that he did not know these funds were stolen and "would not have been in any part of it if" he had known. JA1901. He explained that he would "look at probably anywhere from 50 to 100" customer checks each day and that it would "not be unusual," if "you want to get a money order or make a loan payment or anything else," to "make the check to Palmetto State Bank" as Murdaugh's firm had. JA1899-1900. Although the first three checks had Badger's name in the memo line, Laffitte "wouldn't have looked at" the line because it is not a reference for the bank, but instead for "the writer of the check to remember what they wrote the check for." JA1900. Laffitte also "didn't notice" that on the later checks—for \$101,369.49 and \$33,789.83—the firm had written "Donna Badger estate" on the memo line. JA1906; JA2890-2892.

Once it was apparent what Murdaugh had done, Laffitte concluded that the bank had liability, and he "wanted to settle it." JA1939. His perspective was that a "client that thought he had money at Palmetto State Bank had lost money," and "[w]e needed to make him right." JA1941. The bank's bylaws by their terms gave him "full authority" as CEO "to execute

14

on the Corporation's behalf any and all contracts" and "agreements." JA2954. He contacted Murdaugh's law firm, offered to cover $680,000, and prepared a cashier's check payable to the firm. JA1940-1943; JA2872. He informed the bank's "Executive Committee on the same day" and "notified the Board the following morning." JA1941; JA2867.

A month later, the law firm's CFO uncovered evidence that Murdaugh also had stolen money from Natasha Thomas and Hakeem Pinckney. JA519-520. Much "like on Badger," once Laffitte realized what Murdaugh had done to Thomas and Pinckney, he "wanted to throw up." JA1923. He had been conservator for those clients and had signed "distribution sheets," which were court filings by the firm documenting where their recoveries would go. JA2873-2881. But Laffitte explained that when Murdaugh delivered checks to the bank in the amounts of $325,000.00, $309,581.46, and $25,245.08, Laffitte did not "recognize those were stolen funds." JA1994. Laffitte believed that this "was the start of the theft because" Murdaugh had written the checks "to Palmetto State Bank knowing we wouldn't recognize it." JA1925. "If it came in" payable to "Russell Laffitte as conservator," he explained, "we wouldn't be sitting here today." JA1925.

Laffitte again believed that the bank should "try to settle, just like" it "had done" before. JA1923. But the day he was to bring the board a settlement proposal, the bank received a "notice of intent to sue" that pretermitted the discussion. JA1924.

## D.    The bank made loans to Murdaugh through Laffitte

While Laffitte was indicted on charges alleging that he was complicit in Murdaugh's thefts from those clients, Laffitte also was indicted on separate charges that when he made two loans to Murdaugh, he had misapplied bank funds.

The first involved a $500,000 line of credit the board "voted to approve" in 2015. JA1957. Laffitte testified that Murdaugh had secured this line of credit through mortgages on various pieces of farm property, and the loan documents stated that the purpose was "farming." JA1957-1958. Murdaugh then immediately took advances on the line of credit, including one for $284,787.52 to pay off a loan Laffitte had extended him from Hannah Plyler's conservatorship account. JA678; JA1953; JA3133-3136. Laffitte testified that he "had no concerns" about the advances because Murdaugh's farm "was worth about $3 million." JA1957.

The second of those loans was for $750,000, which Laffitte—along with the board chairman and its secretary—approved in 2021, before any allegations of Murdaugh's misconduct were made. JA1936. The bank's documents stated that the loan's purpose was for beach-house renovations, and Laffitte mistakenly assumed that several checks Murdaugh recently had written had gone to the contractor. JA1936. Laffitte testified that he knew that the entire $750,000 was not "all going to the house," but that was not a problem because the "house was worth a lot more than 700,000" and the bank had taken "additional collateral" worth "about 230- to $250,000." JA1936-1937.

## E.    A divided board voted to terminate Laffitte

These events eventually led to an internal bank investigation and a board vote to remove Laffitte as CEO. Four board members, all relatives of Laffitte and called by the Government, testified that they had voted to terminate him in light of concerns about Murdaugh's client thefts, the $680,000 settlement payment, and the beach-house loan. JA368; JA682-684; JA1092-1093; JA1164-1165. The three board members who did not vote to remove Laffitte—his father, brother, and sister—testified in his defense. JA1574.

17

## II.   Procedural History

Laffitte was indicted six months later. JA7. A Second Superseding Indictment alleged the six counts on which he was tried. JA28.

The first three accused Laffitte of being a knowing and willing participant in Murdaugh's thefts. Count 1 alleged that Laffitte furthered a conspiracy to commit bank and wire fraud by negotiating and distributing the $151,726.05 Badger check, the $309,581.46 Pinckney check, and the $325,000 and $25,245.06 Thomas checks. JA37-38. Count 2 was for bank fraud, alleging that Laffitte violated 18 U.S.C. § 1344(2) by negotiating and distributing the $101,369 Badger check. JA39. Count 3 was for wire fraud, alleging that Laffitte violated 18 U.S.C. § 1343 by negotiating and distributing the $33,789.83 Badger check. JA40.

The remaining three counts alleged that Laffitte had knowingly misapplied the bank's funds in violation of 18 U.S.C. § 656. Count 4 alleged that he did so when he prepared the $680,000 check for the law firm. JA41. Count 5 alleged that he did so when he initiated the $750,000 loan. JA42. Count 6 alleged that he did so when he extended Murdaugh the $500,000 line of credit. JA43.

**A.    The district court precluded questioning about director bias and denied Laffitte's motion for judgment of acquittal**

At trial, the district judge correctly instructed the jury that if Laffitte had acted in good faith, he would have "a complete defense." JA2259. But the judge made several rulings before and during trial that prejudiced Laffitte's defense.

The first, before trial, precluded Laffitte from calling Murdaugh to the stand. JA335-336; JA3301-3303. At the time, Murdaugh had not been indicted on federal charges, but he was awaiting trial on state charges regarding the murder of his wife and son. Laffitte's counsel informed the district court that originally "Murdaugh was very willing to testify on Russell's behalf and say that he had nothing to do with this," but "ultimately reconsidered" and indicated that he would invoke his Fifth Amendment privilege against self-incrimination. JA335-336. The district court ruled that Laffitte could not call Murdaugh to the stand "strictly to have him take the Fifth," but stated that should Murdaugh "change his mind and say he wasn't invoking the Fifth," then the situation would be "completely different." JA336.

A second set of rulings precluded Laffitte from eliciting testimony that board members the Government had called to testify were biased

because they had disagreed with his position on whether to sell the bank. When Laffitte's counsel explained during the cross-examination of one board member that this line of questioning went "to motive to testify," that witness said she was "happy to answer," and the district judge said, "Go right ahead." JA1194. But when Laffitte attempted to ask similar questions of his own witnesses and to introduce an email from the chairman about this issue, the judge ruled that "you can't be impeaching with extrinsic evidence" and that the testimony was "irrelevant" and could confuse the jury. JA1556-1557; JA1561; JA1608-1609; JA1620-1623; JA1674-1681; JA1684-1686; JA3300.

Laffitte's examination of the witnesses drew frequent objections from the Government, which the district judge was quick to sustain. On one occasion, the Government objected to questions on one ground, only to have the judge sustain them on another. JA1033-1034. The judge interrupted defense counsel's cross-examination at another time to ask the Government, "Do you have an objection?" and—when the Government obliged—announced, "Sustained." JA388. At other times, the judge interrupted questions from defense counsel without any objection from the

Government, interjecting, "sustained." JA1574; JA1795. At one point the judge told the Government, "You don't even need to object." JA435.

The district court denied Laffitte's motions for judgment of acquittal at the close of the Government's case and after the defense rested. JA106; JA1467-1481; JA2067-2071.

## B.   Problems arose during jury deliberations

The jury began deliberating at 10:20 a.m. on Tuesday, November 22, which was the last day the courthouse was scheduled to be open that week due to the Thanksgiving holiday. JA2266; JA2272. More than nine hours later, at 7:43 p.m., the district judge indicated that he had received notes from jurors. JA2270. While the judge read portions of those notes to the parties, he did not read them in their entirety or make them available until after the verdict was rendered. JA3407.

The judge said the first two notes were from the "same juror," although he said he had "no idea" who authored them. JA2272.

The judge recited from the first note: "Need antibiotic at 19:21. I could delay one to two hours." JA2271. By that point it was 22 minutes after "19:21," so the note appeared to have been sent earlier that evening.

The judge then recited from the second note: "Feeling pressured to change my vote." JA2271. ███████████████████████

███████████████████████     _____

The judge stated that his "instinct" was "that we have alternates and," strikingly, that "we should get to a verdict"—by which he meant that they should get to a verdict **that night**. JA2271. Without indicating whether he or anyone on his staff had talked with the juror about making arrangements to retrieve the antibiotic—and without indicating how he knew her gender—the judge represented that it was "not practical to get her medicine and drive back." JA2271. While the Government "agree[d]," Laffitte's counsel asked, "Judge, can they just come back in the morning?" JA2271.

The judge did not immediately answer, but subsequently rejected the suggestion. Saying nothing about the juror's remark about feeling "pressured," the judge stated that "we don't have an issue of them not deliberating." JA2271. He then said "the better course is -- that's why we

have alternates," but he "want[ed] to hear" from the parties. JA2272. The Government replied that "[e]specially with the impending holiday ahead of us, we would like for them to continue to deliberate tonight." JA2272. The judge concurred, reasoning "if I tell people that they have to come back tomorrow, I don't think that's in anybody's interest." JA2272.

The judge then received a third note, which he said "raises an entirely different issue." JA2272. He began reading: "Dear Judge, we are writing this to express a shared concern." JA2272. He continued to read:

> On page 11, your final charge to us states that if you let fear or prejudice or bias or sympathy interfere with your thinking, there is a risk that you will not arrive at a true and just verdict. A juror's previous court experience is influencing that juror's ability to discuss the trial in a group setting. That juror has made comments on having been bullied as a juror on previous trials and will not consider the evidence in this trial. The juror is hostile to hearing any debate from certain other jurors, and the juror disagrees with your final charge and specifically the definitions you've provided. We respectfully ask that you consider speaking to this issue so that we are able to proceed with deliberations.

JA2273 The judge told the parties that the note's authors "[m]ay be all the other jurors." JA2273.

23

As the judge was reading the third note, he was handed a fourth. JA2281. He recited that note as follows: "Your Honor, can you please call an alternate as I am experiencing anxiety and unable to clearly make my decision?" JA2273. "That's a different juror," the judge explained. JA2273. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓.

Representing that he had "fully disclosed all my notes," the judge told the parties that, if a juror told him they were "unwilling to consider the evidence because of prior court experience, I would remove the juror." JA2273-2274. He said he had "no idea if that's the same juror as the one who has written me about her medicine." JA2274. The judge again solicited "suggestions." JA2274. The Government responded that "you need to put two alternates to replace both of those jurors." JA2274.

After discussing the third note's allegation that one juror would not deliberate, the judge said his "inclination would be to speak to that juror." JA2276. The judge suggested that "the best way for me to do it is for me and a court reporter and my deputy, just to create a record of this, and simply ask the juror in a conference room, you know, is there a problem."

JA2276. "[I]f there's not," the judge stated, "I'm going to keep her delib-
erating." JA2276.

As to the juror who sent the first two notes—saying she needed the
antibiotic and felt "pressured to change my vote"—the judge stated, "I
think the one with the medicine we need to send home" because "[s]he
needs her medicine." JA2277.

"The person with the anxiety," the judge added, "that's a concern
for me too." JA2277. The judge reasoned that "[t]he defendant's rights
are protected by having 12 functioning jurors," and it would be a problem
"having somebody who says I can't do it anymore." JA2277.

"But," the judge concluded, "I want to hear from everybody before I
make a decision, because I think we are on virgin territory." JA2277. He
elaborated, "I've never had this experience." JA2277.

The Government responded that "we have three different situa-
tions." JA2277. The one "with the medicine," the Government posited,
"cannot risk someone's health," and "should be allowed to go home."
JA2277. "The person who cannot follow the law," the Government said,
should be "struck for cause." JA2277. Turning to "the third one," the "anx-
ious" juror, the Government said "your suggestion as far as speaking --

25

speaking to the juror, finding out whatever, I think that's still a viable juror, the third one." JA2278.

Observing that "I don't want anybody else ganging up on somebody and trying to bump them off a jury," the judge stated, "I've got to confirm" whether one of the jurors was in fact not deliberating. JA2277-2278. The judge explained that "I can't rely on someone else's account." JA2279. "[W]ith the consent of the parties," the judge continued, "we are going to set up a place where I will take a court reporter, and without anyone present but the court reporter, I will create a record." JA2279. "And," the judge concluded, "I will ask the juror if there's a problem." JA2279.

The Government then "request[ed] that you maybe do the same thing with the juror who's reporting being anxious," reasoning, "[t]his sort of environment could be contributing to the anxiety that could be alleviated depending on how you decide to handle the jurors." JA2279. The judge immediately responded, "Do I have the consent of the parties for me creating a record to question the juror?" JA2279. The Government stated, "Yes, as long as it's on the record, we have no objection," and Laffitte's counsel responded, "Yes, you do have the consent." JA2279.

The judge stated, "I'm going to take action," and left the courtroom. JA2281. He did not directly address Laffitte or ask him whether he understood the process, his rights, or the court's intentions.

**C.    The judge interviewed Juror #88, who said she was anxious ████████████████████████████████████████ and then summarily dismissed her outside Laffitte's presence**

The record shows that from "8:20 p.m. to 8:23 p.m." the district judge conducted a three-minute *in camera* interview with the author of the fourth note, Juror #88, who had asked the judge to call an alternate because she was experiencing anxiety. JA2281.



**D.    The judge did not interview Juror #93, whose notes said she needed an antibiotic and felt "pressured to change my vote," and then summarily dismissed her outside Laffitte's presence**

The judge did not meet with or talk to Juror #93, who had written

that she "[n]eed[ed] an antibiotic at 19:21" and was "[f]eeling pressured

to change my vote." JA2281.

28

**E.    Less than 50 minutes after the district court replaced the jurors, the newly constituted jury voted to convict**

The district court reconvened at 8:27 p.m. JA2281. The judge first reported that the "juror regarding the medicine" had "been replaced and has been allowed to go home." JA2281. The judge did not tell the parties that he had not talked to her. The judge also said he "spoke with the juror expressing anxiety" and "granted her request to -- for an alternate" because "she said, I cannot do my duties." JA2281. The judge stated that his dismissal of these jurors had "resolved" the issue concerning the juror who allegedly would not deliberate, "so I didn't have

to address it." JA2282. The judge did not indicate precisely how he knew this issue had been resolved.

The Government said, "Thank you," but Laffitte's counsel "ma[d]e an objection." JA2282-2283. Counsel stated that "we would object not to the juror that was replaced for medication" because "[w]e agreed with that at the time"—even though the record does **not**, in fact, reflect any prior statement from counsel agreeing to the replacement of that juror. JA2282-2283. Regardless, counsel stated, the "second juror that was replaced about the anxiety is the one we would like to take -- make an objection to." JA2283.

The district judge responded, "You can make an objection," but "[t]hat one -- and there's a record -- she is emotionally very fragile" and "could hardly speak to me." JA2283. "And she explained to me," the judge continued, "she was on anxiety medication and that she was not physically capable or emotionally capable of going forward." JA2283. The judge represented that "[w]e never got into what's going on in the jury room or anything like that." JA2283.

31

With that, the judge said, "Let's bring the jury in." JA2283.

The record shows "the jury return[ing] to open court at 8:31 p.m." JA2283. The district court informed it "you've had some changes in your ranks," and "the requirement is that you need to begin your deliberations again to bring your other two, the two jurors who have not been included, into those discussions." JA2283. The district court had the jurors "return to the jury room" at 8:32. JA2283-2284. They reached a guilty verdict in less than 50 minutes, returning to the courtroom at 9:22 p.m. JA2283-2284.

Before they came back, Laffitte's counsel reiterated the "objection earlier to swapping out the alternate." JA2284. Laffitte's counsel said "it's akin for moving to a mistrial," and "object[ed] to replacement of one juror." JA2284. The district judge answered, "we agreed I would talk to the juror, who could hardly speak, she was so emotionally upset," she "asked me to remove her," and "I was doing exactly what we all agreed I would do." JA2284-2285. Laffitte's counsel responded, "We thought you were coming back to tell us what the juror said or to give us what your decision would be so that we could object to it." JA2286. The judge replied, "You

know, folks, to come in after the fact here, after the Court laid it all out and we agreed on a process, I thought it was very clear, and I did -- but there's a record of her I don't think anybody would really question." JA2286-2287.

### F. The district court denied Laffitte's motions for new trial and judgment of acquittal

Following the verdict, Laffitte filed a motion for new trial or judgment of acquittal, arguing that it was "error to not provide an alternative option apart from replacing" both Juror #88 and Juror #93. JA2299. The motion also asked for a new trial based on the district court's refusal to admit the "evidence involving dissent and disagreement within the Bank." JA2316. The motion renewed the request for a judgment of acquittal. JA2326. Laffitte filed a separate motion seeking an evidentiary hearing "on the jury issues." JA2336.

After the Government responded, new counsel for Laffitte appeared, filing a sealed reply and supplement                                    .

JA21; JA3329-3355. ████████████████████████████

████████████████████████████████████████████

██████████████████████████

The district court denied these motions without a hearing. JA2396.

It held that Laffitte had "agreed to the process used by the Court to question Juror No. 88," the one who had expressed anxiety, "and to take action on the request of the juror to be replaced." JA2410. The district court also ruled that Laffitte had further "agreed" that Juror #93, who had written that she needed an antibiotic, "should be replaced." JA2408. The district court reaffirmed its other rulings as well. JA2421-2437.

**G.    The district court declined to consider the juror affidavits**

Laffitte's original counsel also had separately filed, two weeks after their motion for new trial, a request to seal affidavits executed by Juror #88, Juror #93, and the jury foreperson. JA2328-2332; JA2393; JA3356-3369. Laffitte also requested a hearing on these issues ████████████

████████████████████████████████████████████

██████████. JA2336; JA3423-3428.

████████████████████████████████████████████

████████████████████████████████████████████

35



## H.  The district court denied Laffitte's second motion for new trial

Murdaugh eventually waived his Fifth Amendment privilege at his murder trial in state court. His testimony absolved Laffitte of blame for the charges in this case:

> Russell Laffitte never conspired with me to do anything. Whatever was done was done by me. . . . And I know, but you keep talking about stuff I did with Russell Laffitte, but what I want to let you know is that I did this and I am the one that took people's money that I shouldn't have taken and that Russell Laffitte was not involved in helping me do that knowingly. . . . If he did it, he did it without knowing it.

36

JA2449-2447. Laffitte filed a motion with the district court, arguing that this testimony was newly discovered evidence warranting a new trial. JA2438. The district court denied the motion without a hearing, reasoning that, even though Murdaugh's previous invocation of the Fifth Amendment privilege had precluded Laffitte from calling him in his defense, the new testimony could not warrant a new trial because "[i]t is difficult to imagine a less credible witness" than Murdaugh. JA2484.

## I.   The district court imposed a seven-year sentence

After a sentencing hearing, the district court imposed a sentence of 84 months imprisonment and 5 years of supervised release as to each count, "said terms to run concurrently." JA2641.

## III.  Rulings Presented for Review

The four issues in this appeal present the following erroneous rulings for this Court's review:

I.     The district court's dismissal, outside of Laffitte's presence, of Juror #88, who said she was anxious ████████████████████ ████████ (JA3311); its failure to sustain Laffitte's objection once he learned of the dismissal (JA2282-2283); its failure to declare a mistrial

37

(JA2284-2287); its denial of a new trial on this issue (JA2408-2415) ████
███████████████████████████████████████████.

**II.**   The district court's dismissal, outside of Laffitte's presence, of Juror #93, who said she needed an antibiotic (JA2281)████████████ ███████████████████████████; its denial of a new trial on this issue (JA2407-2415)██████████████████████████████████.

**III.**  The district court's sustaining of the Government's objections to evidence of board-member disagreements (JA1556-1557; JA1561; JA1608-1609; JA1620-1623; JA1674-1681; JA1684-1686); and its denial of a new trial on this issue (JA2419-2422).

**IV.**  The district court's denials of Laffitte's motions for judgment of acquittal on Counts 2 and 3 (JA1467-1481; JA2067-2071; JA2429-2433).

## SUMMARY OF THE ARGUMENT

**I.** The district court erred in replacing Juror #88, who reported anxiety ███████████████████████████████████ and a reversal on all counts must follow.

**A.** The replacement of Juror #88 violated Laffitte's Fifth Amendment right to be present at all critical stages of trial. The district judge obtained the parties' consent only to **interview** Juror #88 outside their presence, not to replace her. ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

█████████████████████████

**B.** The replacement of Juror #88 separately violated Laffitte's Sixth Amendment right to a unanimous jury, which precludes courts from granting deliberating jurors' requests to be replaced if the record discloses a substantial possibility that they are asking due to their views of the merits. ████████████████████████

████████████████████████████████████████

The quick verdict that followed makes the prejudice to Laffitte clear.

**II.**  The district court also committed reversible error in replacing Juror #93, who reported needing an antibiotic and feeling "pressured to change my vote." The statement from Laffitte's counsel that "[w]e agreed with that at the time" was—in addition to being after-the-fact and un-supported by anything counsel had said—not a knowing and intelligent act. It correspondingly was not a valid waiver of Laffitte's rights.

**B.**  Because her dismissal was unwarranted and there was no valid consent on Laffitte's part, the replacement of this juror outside his pres-

ence was plain Fifth Amendment error. It also was plain Sixth Amendment error because her statement that she felt "pressured to change my vote" created more than a reasonable possibility that she had reached out to the district court due to other jurors' reactions to her decision. These circumstances and the verdict seriously affected these proceedings' fairness, integrity, and public reputation.

**III.**  A new trial also is required because the district court erroneously precluded Laffitte from introducing evidence that bank board members had voted to terminate him because he did not want to sell the bank. It is axiomatic that a defendant may introduce extrinsic evidence to establish bias on the government witnesses' part. It also is axiomatic that this sort of evidence is relevant in a criminal prosecution.

**IV.**  Finally, the district court erred in denying Laffitte's motion for judgment of acquittal on Counts 2 and 3. Both counts required the Government to establish that Laffitte had obtained property by means of a false statement or other fraudulent device. For the transactions those counts addressed, the Government offered no evidence that Laffitte did anything that amounted to fraud.

41

# ARGUMENT

A court's holiday schedule cannot justify an intrusion on a criminal defendant's constitutional rights, and the events leading up to this verdict marked a serious injustice. The jurors heard Laffitte testify to his innocence over the course of two days, and they began deliberating on the morning of November 22. They deliberated late into the evening without reaching a verdict. The notes the district court then received describing the "pressure[]" one juror felt to change her vote, and its *in camera* interview of the juror who expressed anxiety ██████████████ ████████ set off alarm bells that something was seriously awry in the jury room.

But rather than address those issues, the district judge said his "instinct" was to find a way to "get to a verdict" that night. JA2271. An appropriate response would have been to instruct all the jurors to treat each other with respect. And in light of what was at stake for Laffitte, an especially appropriate response would have been to advise the jurors that they could, as Laffitte's counsel had suggested, "just come back in the morning" and resume deliberations after a night's rest. JA2271.

42

Instead, without notice to Laffitte and his attorneys and outside their presence, the judge removed both jurors. That facilitated rapid-fire guilty verdicts on all six counts, in less than 50 minutes. This action by the district court was the capstone on a trial that had been fundamentally unfair to an innocent defendant. The result should not be allowed to stand.

## I.   The district court erred when it replaced Juror #88, who reported suffering anxiety ███████████ ████████████████████

While the district court's removal of both jurors was error, its dismissal of Juror #88, who said she was experiencing anxiety ███████████ ██████████████████████████ is reason enough, by itself, to reverse. Federal Rule of Criminal Procedure 24(c) gives a trial court power to "replace a juror with an alternate juror," which this Court reviews for "abuse of discretion." *United States v. Nelson*, 102 F.3d 1344, 1349 (4th Cir. 1996). That discretion is abused in two circumstances that are pertinent here. The first is when a court "decid[es] to dismiss" a juror "with neither [the defendant] nor his lawyer present," thus violating the defendant's Fifth Amendment "'right to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings.'" *United States*

*v. Runyon*, 707 F.3d 475, 517 (4th Cir. 2013) (quoting *Faretta v. California*, 422 U.S. 806, 819 n.15 (1975)). The second is when a court dismisses a juror based on "doubts [she] harbors about the sufficiency of the government's evidence," thus violating the defendant's Sixth Amendment right to "a unanimous verdict" by an "impartial jury." *United States v. Brown*, 823 F.2d 591, 595-96 (D.C. Cir. 1987).

By discharging Juror #88 outside the presence of Laffitte and his counsel, the district court violated his rights in both respects. Laffitte objected as soon as the judge informed the parties that he had replaced Juror #88                      JA2282. Both errors are apparent from the record and the judge's *in camera* interview. Each independently requires a new trial.

## A.  The replacement of Juror #88 violated Laffitte's right to be present at all stages of trial

"[T]he Due Process Clause guarantees a defendant the 'right to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings.'" *Runyon*, 707 F.3d at 517 (quoting *Faretta*, 422 U.S. at 819 n.15). By mandating that the defendant "be present at

. . . every trial stage," Federal Rule of Criminal Procedure 43(a)(2) "enshrines an even broader right." *Id.* This Court has "extended" these requirements to this specific context, holding that defendant and counsel must both be "present when the district court decided to excuse and replace a juror." *Id.* (citing *United States v. Hanno*, 21 F.3d 42, 46-47 (4th Cir. 1994)). The district court did not contest any of these propositions, and instead defended its decision on the false premise that Laffitte had "agreed" to waive these rights through a procedure that entailed the removal of Juror #88 without him or counsel present—and, indeed, that entailed them not even being informed, ahead of her removal, what her *in camera* interview had revealed. JA2410.

That is not a tenable reading of the record, and it is not a tenable understanding of how the Constitution works. The Supreme Court has explained that "[w]aivers of constitutional rights" must be "voluntary" and "knowing." *Brady v. United States*, 397 U.S. 742, 748 (1970). This Court therefore "'presume[s] that a defendant did not waive his rights.'" *United States v. Johnson*, 400 F.3d 187, 197 (4th Cir. 2005) (quoting *North Carolina v. Butler,* 441 U.S. 369, 373 (1979)). When "a fundamental right such as the right to be present at jury selection is at issue," the

45

Fifth Circuit has held, "there is a long-standing presumption against waiver." *United States v. Thomas*, 724 F.3d 632, 643 (5th Cir. 2013).

Far from demonstrating that Laffitte waived his right to be present when the district judge removed Juror #88, this record demonstrates the opposite. The district court never addressed Laffitte directly or asked him to "participate personally in the waiver," a step that was required in light of the importance of the "right at stake." *United States v. Olano*, 507 U.S. 725, 733 (1993). Moreover, when the district judge sought and obtained "consent" from counsel regarding the interview of Juror #88, what he unambiguously sought and received was, in his own words, "consent of the parties for me creating a record to **question** the juror." JA2279 (emphasis added). The judge unquestionably never asked for, and never obtained, the parties' consent to **replace** her without notice to—and outside the presence of—the defendant and his counsel.

The record allows no other conclusion. In the moments leading up to the judge asking for the parties' consent to the actions he said he would take, the subject of discussion was the juror who was accused of being unwilling to deliberate. The judge told the parties he would be seeking their "consent" to ask questions of and "create a record" with that juror:

46

> THE COURT: … I will need -- with the consent of the parties, we are going to set up a place where I will take a court reporter, and without anyone present but the court reporter, I will create a record. And with my deputy and my court reporter, I will ask the juror if there's a problem.

JA2279. The Government then immediately suggested doing the "same thing" with the juror "who's reporting being anxious":

> MS. LIMEHOUSE: Your Honor, we would request that you maybe do the same thing with the juror who's reporting being anxious. There could be a contribution. This sort of environment could be contributing to the anxiety that could be alleviated depending on how you decide to handle the jurors.

JA2279. The judge's immediate response was:

> THE COURT: Do I have the consent of the parties for me creating a record to question the juror?

JA2279. It was in response to this request that the Government and Laffitte answered, "Yes." JA2279. The request was, by its terms, for the parties' consent to "creating a record to **question** the juror." JA2279 (emphasis added). It was not for their consent to **replace** her—and certainly not for their consent to do so without first informing them what she had said and soliciting their views.

Nothing that preceded or followed this request suggested that Laffitte was waiving his rights in the way the district court later maintained. In denying the motion for a new trial, the district judge focused

47

on his own statement, as he was leaving the courtroom, that he was "going to take action." JA2281. The judge concluded that Laffitte had thus "plainly agreed" that he would "'take action' **on the juror's request to be replaced.**" JA2410 (emphasis added). But that is not, plainly or otherwise, what was said. The words "take action" were spoken by the judge, but the words "on the juror's request to be replaced" plainly were not. JA2281.

The district court also suggested that Laffitte was at fault for not having "asked for clarification" about what "action" the judge planned to "take." JA2401. But just the opposite is true. Ambiguities are construed against waivers of criminal defendants' rights, not in their favor. As the D.C. Circuit has ruled, "the law demands clarity when constitutional rights are waived." *United States v. Moreno-Membache*, 995 F.3d 249, 251 (D.C. Cir. 2021). This Court thus refuses to "interpret an ambiguity caused by the Government to be a waiver" of "the right to counsel." *Johnson*, 400 F.3d at 197. This Court likewise holds "'the Government to a greater degree of responsibility than the defendant' for any 'imprecisions'" in the terms through which defendants waive their right to trial in plea agreements. *United States v. Petties*, 42 F.4th 388, 397 (4th Cir.

2022) (quoting *United States v. Harvey*, 791 F.2d 294, 300 (4th Cir. 1986)). If the district judge believed that his statements would effectuate this waiver of Laffitte's Fifth Amendment rights, it was incumbent on him to make that clear.

Because he did not, the district court was compelled to declare a mistrial and grant Laffitte a new trial. "Any" violation of a defendant's right to be present at trial, this Court has long held, "mandates a new trial" unless "'the record completely negatives any reasonable possibility of prejudice.'" *United States v. Arriagada*, 451 F.2d 487, 488 (4th Cir. 1971) (quoting *Jones v. United States*, 299 F.2d 661, 662 (10th Cir. 1962)).



**B.    The replacement of Juror #88 also violated Laffitte's right to a unanimous and impartial jury**

The Sixth Amendment right to a trial "by an impartial jury" also

stands as a critical safeguard of the liberty of innocent criminal defend-

ants. U.S. CONST., amend. VI. One fundamental component is that the

"jury must reach a unanimous verdict in order to convict." *Ramos v. Louisiana*, 140 S. Ct. 1390, 1395 (2020). Federal Rule of Criminal Procedure 31 enshrines the same requirement, providing that the "verdict must be unanimous." FED. R. CRIM. P. 31(a).

Every Court of Appeals that has considered the matter has held that, as a result, "a court may not dismiss a juror during deliberations if the request for discharge stems from doubts the juror harbors about the sufficiency of the government's evidence." *Brown*, 823 F.2d at 596; *accord United States v. Ozomaro*, 44 F.4th 538, 544 (6th Cir. 2022); *United States v. Kemp*, 500 F.3d 257, 303 (3d Cir. 2007); *United States v. Abbell*, 271 F.3d 1286, 1302 (11th Cir. 2001); *United States v. Symington*, 195 F.3d 1080, 1085 (9th Cir. 1999); *United States v. Thomas*, 116 F.3d 606, 621-22 (2d Cir. 1997); *accord Nelson v. State*, No. A23A1278, 2023 WL 8588658, at *3 (Ga. Ct. App. Dec. 11, 2023). The seminal D.C. Circuit decision—authored by Judge Mikva and joined by Judge Bork and Judge Douglas Ginsburg—called this proposition "scarcely debatable," reasoning that "[i]f a court could discharge a juror on the basis of such a request, then the right to a unanimous verdict would be illusory." *Brown*, 823 F.2d at 596. The Sixth Circuit more recently explained that this principle was

"among the substantive 'requirements' 'carried'" at the Founding "'with' the public meaning of 'the term "trial by an impartial jury."'" *Wofford v. Woods*, 969 F.3d 685, 704 (6th Cir. 2020) (quoting *Ramos*, 140 S. Ct. at 1395).

To the extent courts have expressed any disagreement about this issue at all, it has been about not whether this rule exists, but what "evidentiary standard" is to be employed when it is enforced. *Thomas*, 116 F.3d at 622. Each of these courts has recognized that "the reasons underlying a request for a dismissal" by a juror "will often be unclear" because the court must avoid "intrud[ing] on the secrecy of the jury's deliberations." *Brown*, 823 F.2d at 596. The consequence is a strong presumption **against** a juror's dismissal, with some courts "slightly modif[ying]" only the language about how strong the presumption must be. *Kemp*, 500 F.3d at 303. Some decisions hold that the court must deny the request if the record discloses "any possibility that the request to discharge stems from the juror's view of the" case. *Brown*, 823 F.2d at 596; *Thomas*, 116 F.3d at 622. Other decisions clarify that the "possibility" needs to have been "reasonable" or "substantial." *Ozomaro*, 44 F.4th at 545-46; *Kemp*, 500 F.3d at 304; *Symington*, 195 F.3d at 1087; *Abbell*, 271 F.3d at 1302.

52

The Sixth Amendment precluded the district court from replacing

Juror #88 no matter which standard applies.



The judge's perception that this juror was "emotionally very fragile" and "could hardly speak to me" did not justify his failure to discharge this duty. JA2283. As the Eleventh Circuit has suggested, trial judges must take care to avoid "honestly misinterpreting" ordinary citizens who are thrust into the stressful responsibilities associated with jury duty. *United States v. Brown*, 996 F.3d 1171, 1193-94 (11th Cir. 2021) (en banc).

55

In most cases in which courts have found a reasonable possibility that a juror's request



to be removed was tied to her doubts about the Government's case, "the convictions were reversed without discussion." *United States v. Litwin*, 972 F.3d 1155, 1175 (9th Cir. 2020). But the obvious prejudice to Laffitte makes his entitlement to a new trial clear. For this reason as well, the district court's failure to order a new trial should be reversed.

## II. The district court erred when it replaced Juror #93, whose notes said she needed an antibiotic and was feeling "pressured to change my vote"

The district court's dismissal of Juror #93 stands as an independent reason to reverse. After the judge announced that he had "replaced" the "juror regarding the medicine," Laffitte's counsel stated, "We agreed with that at the time," which the district court later suggested amounted to a "waiver" of Laffitte's rights in this respect. JA2283; JA2408. But that remark did not have that effect, for a number of reasons. First, despite what counsel said, the record does not, in fact, reflect any prior "agree[ment]" by Laffitte or his lawyers to the dismissal of Juror #93. JA2283. Second, because the district judge never addressed Laffitte directly after receiving the juror notes, the record reflects no suggestion he "participate[d] personally in" any purported waiver, which would have been necessary to make it effective due to the Fifth and Sixth Amendment "right[s] at

stake." *Olano*, 507 U.S. at 733. Third, in light of this juror's statement that she was feeling pressured to change her vote, any such agreement at that stage would have been an "egregious and prejudicial" error by Laffitte's lawyers that denied their client effective assistance of counsel and thus would not be binding on him. *Murray v. Carrier*, 477 U.S. 478, 496 (1986).



## A. The testimony of Juror #93 on these matters is admissible



**B.    The replacement of Juror #93 was error that independently requires reversal**

Because counsel's after-the-fact and erroneous statement of "agree[ment]" did not mark Laffitte's "'intentional relinquishment or abandonment of a known right,'" the district judge's removal of Juror #93 independently requires reversal. *Olano*, 507 U.S. at 733 (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). To the extent counsel was simply mistaken in representing to the judge that they previously had "agreed with that at the time"—or, in the alternative, to the extent counsel actually *had* agreed to that replacement—the "objective[ly]" obvious error in that concession and "prejudice" Laffitte would suffer from it would mean that any such "agree[ment]" could not be attributed to him. *Cf. United States v. Mikalajunas*, 186 F.3d 490, 493 (4th Cir. 1999) (discussing procedural default due to counsel error in the habeas context). ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

In these circumstances, the law could not fault Laffitte for his counsel's failure to affirmatively object, so the district court's errors in replacing Juror #93 should require reversal and be subject only to harmless-

error review under *Chapman v. California*, 386 U.S. 18, 24 (1967). But even assuming that counsel's lack of an objection required this Court to apply "*Olano*'s plain error standard" instead, that standard would require reversal as well. *Runyon*, 707 F.3d at 518.

The district court's error in replacing this juror was "plain" in three different respects. *Olano*, 507 U.S. at 734 (quoting FED. R. CRIM. P. 52(b)). First, Federal Rule of Criminal Procedure 24(c) allows courts to replace jurors only when they are "unable to perform" or "disqualified from performing their duties" ███████████████████████████████████ ███████████████████████████. FED. R. CRIM. P. 24(c)(1). Second, this Court's longstanding precedent extended Laffitte's Fifth Amendment right to be present to the proceedings in which "the district court decided to excuse and replace" Juror #93. *Runyon*, 707 F.3d at 517; *see supra* at 44-45. Third, no *in camera* interview was even necessary to demonstrate a substantial "possibility that" Juror #93's communications to the district judge related to her "view of the sufficiency of the government's evidence." *Brown*, 823 F.2d at 596; *see supra* at 50-53. Once her note informed the judge that she was "feeling pressured to change my vote," the

Sixth Amendment required him to keep this jury intact. The judge's failure to account for that statement is evident from his incorrect assessment that the note he received next, expressing several other jurors' concerns about the state of deliberations, "raise[d] an entirely different issue." JA2272. No less than that note or the note he subsequently would receive from Juror #88, Juror #93's note demonstrated that the disagreements in the jury room were over the merits of the case.

These constitutional violations "affect[ed]" Laffitte's "substantial rights." *Olano*, 507 U.S. at 734 (quoting FED. R. CRIM. P. 52(b)). As was true of Juror #88, Laffitte's and his lawyers' presence at the time of Juror #93's dismissal would have yielded information showing that she should not have been sent home ██████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████.

The reconstituted jury's rapid return of guilty verdicts following her dismissal leaves no doubt that these errors "affected the outcome of" these "district court proceedings." *Olano*, 507 U.S. at 734.

So, too, did those circumstances "seriously affect the fairness, integrity or public reputation of judicial proceedings." *Olano,* 507 U.S. at 736.

65

The Supreme Court has held that an error may satisfy that test even "independent of the defendant's innocence," but in this case the link between these constitutional violations and the jury's verdict is direct. *Id.* As the Second Circuit has held, "removal of the sole holdout for acquittal is an issue at the heart of the trial process and must be meticulously scrutinized." *United States v. Hernandez*, 862 F.2d 17, 23 (2d Cir. 1988). That scrutiny, as applied to this extraordinary case, requires reversal here.

## III. The district court erred when it excluded evidence demonstrating Government witnesses' bias

The district court also erred when it precluded Laffitte from offering evidence that supported his defense during trial. The Government called four of the bank's board members to testify, asking each whether they had voted to terminate Laffitte. JA368; JA682-684; JA1092-1093; JA1164-1165. When Laffitte presented his defense, counsel attempted to ask other board members about the "new Board members, family members that came in, and" how "they started moving toward trying to sell the bank." JA1556. Counsel also attempted to offer a memorandum Laffitte's father had written to the board, responding to several members'

professed belief that "we should position the bank to sell" and warning that "desiring to sell the bank is contrary to our mission statement." JA3300; JA1688. When the Government objected, defense counsel told the Court that this evidence was relevant to those witnesses' "bias" against Laffitte, who was aligned with his father, and their "motive for testifying" against him. JA1676.

The district judge barred Laffitte from eliciting this testimony on two grounds: that it was impeachment Laffitte was "trying to prove . . . by extrinsic evidence," and that the testimony was irrelevant and could confuse the jury. JA1680; JA1686. The first ground marked an erroneous conclusion of law this Court should review *de novo*, and the second marked a straightforward abuse of discretion.

In this context, the district judge's reasoning that "you can't be impeaching with extrinsic evidence" was erroneous. JA1557. This Court has made an important "distinction" between "impeachment of general credibility" on the one hand and "impeachment evidence proving bias" on the other. *Quinn v. Haynes*, 234 F.3d 837, 845 (4th Cir. 2000). While "generally applicable evidentiary rules limit inquiry into specific instances of conduct through the use of extrinsic evidence, . . . no such limit applies

67

to credibility attacks based on motive or bias." *Id.* The Supreme Court has elaborated that "[t]he 'common law of evidence' allowed the showing of bias by extrinsic evidence." *United States v. Abel*, 469 U.S. 45, 52 (1984). The law thus gave Laffitte free rein to offer evidence that the bank directors had been motivated to testify against him—and, previously, had voted to remove him—based on their disagreements as to whether the bank should be sold.

The district court's ruling that this evidence was "irrelevant" and would "produce jury confusion" also was contrary to the law. JA1686. "One of the most important factors affecting credibility," this Court has reasoned, "is the presence of any bias, prejudice or incentive on the part of a witness to favor one party to the litigation." *Chavis v. North Carolina*, 637 F.2d 213, 225 (4th Cir. 1980). The Supreme Court has thus held that "[p]roof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony." *Abel*, 469 U.S. at 52.

This case is no exception to that rule. The Government made a point of calling every board member who had vote to terminate Laffitte, asking

68

what their vote had been and why. JA368; JA682-684; JA1092-1093; JA1164-1165. One of those witnesses, Laffitte's cousin Norris, claimed among other things that Laffitte had "lied." JA368. The very last question the Government chose to ask during its cross-examination of Laffitte's father was, "Isn't it true that you and your daughter were the only members of the Board who didn't vote for his termination?" JA1652. Having made those votes a central part of this case—and having accused Laffitte's father, via that final question, of himself being biased in his son's favor—the Government could not colorably maintain that the jury should not be allowed to hear reasons that could have motivated its witnesses to testify against Laffitte as they did.

This error was "prejudicial to" Laffitte's "right to a fair trial and therefore a basis for reversal." *United States v. Turner*, 198 F.3d 425, 430 (4th Cir. 1999). If the Court also reverses due to the removal of the jurors, it should instruct the district court that it cannot preclude Laffitte from offering evidence of these Government witnesses' biases and motives during the new trial.

69

## IV. The district court erred when it denied Laffitte's motion for judgment of acquittal on Counts 2 and 3

Finally, the district court erred in denying Laffitte's motion for judgment of acquittal on Counts 2 and 3, the bank- and wire-fraud counts, a ruling this Court reviews *de novo*. *United States v. Millender*, 970 F.3d 523, 528 (4th Cir. 2020). These two counts were premised on a common factual nucleus: $101,369.49 and $33,789.83 Murdaugh had his firm withdraw from Badger's settlement funds in the latter part of 2013, in checks made payable to Palmetto State Bank, which he then distributed for personal purposes via bank transactions that went through Laffitte. In determining whether the district court erred in denying a judgment of acquittal, this Court asks "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 528 (emphasis removed). No rational trier of fact could have found these crimes' essential elements beyond a reasonable doubt because there was no evidence that Laffitte committed a "fraud" relating to these transactions.

The critical common element of both crimes is that the defendant must have effectuated prohibited transactions "by means of false or

fraudulent pretenses, representations, or promises." 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 1344(2) (bank fraud). Interpreting the bank-fraud statute, the Supreme Court has reasoned that the phrase "by means of" creates "a relational component" to the charge, which requires "the defendant's false statement" to be "the mechanism naturally inducing a bank (or custodian) to part with its money." *Loughrin v. United States*, 573 U.S. 351, 362-63 (2014). As applied to the wire-fraud statute, that logic also means the defendant's "false or fraudulent pretenses, representations, or promises" need to have naturally caused the defrauded person, via wire transmission, to hand over their money. 18 U.S.C. § 1343.

The Government offered no evidence suggesting that Laffitte made these transactions happen "by means of" fraud. 18 U.S.C. § 1343; 18 U.S.C. § 1344(2). As to these transactions, it was not alleged that Laffitte pretended he was someone else or made any statement that was false. It was instead alleged that he negotiated a customer's checks, which his customer had delivered and made payable to the bank, and had the funds distributed as his customer directed.

71

That is not fraud—and, correspondingly, not a violation of either of these statutes. It is no doubt true that, as everyone later learned, the checks were from funds Murdaugh had stolen from his clients. But even if the Government had shown that Laffitte was somehow complicit in those thefts—and, to be clear, he always has steadfastly maintained that he was not—this Court has explained that "'theft' and 'fraud'" are not the same, and instead have "key differences." *Soliman v. Gonzales*, 419 F.3d 276, 282 (4th Cir. 2005). "Theft" is the taking of another person's property "without his consent." *Id.* (quoting BLACK'S LAW DICTIONARY 1647-48 (4th ed.1951)). "Fraud," on the other hand, is using a falsehood to induce someone into "voluntarily surrender[ing]" their property. *Id.* (quoting BLACK'S LAW DICTIONARY 788 (4th ed.1951)). "The key and controlling distinction between these two crimes is therefore the 'consent' element— theft occurs without consent, while fraud occurs with consent that has been unlawfully obtained." *Id.* The Government provided no evidence that Laffitte's alleged acts fell within that latter definition.

The Government's response during trial made no sense. It argued that "the heart of this is really under false pretenses" and that "because of his role as the personal representative for the estate of Donna Badger,

72

it put him in a position where he was able to steal the money." JA1475. The district court, for its part, suggested that the email Laffitte sent at Murdaugh's request, asking him to have the law firm's CFO "re-cut" the $1.325 million check into the four smaller checks, amounted to a "false and fraudulent pretense or representation" for these purposes. JA2430. Both those theories have multiple problems.

The first is that neither the $1.325 million check addressed by the district court, nor the $101,369.49 and $33,789.83 checks at issue in Counts 2 and 3, were from funds belonging to the estate of Donna Badger. They were from funds belonging to Donna's husband, Arthur. Laffitte was not personal representative—or anything else—for him. *See supra* at 10.

The Government, moreover, offered no evidence to support its theory that Laffitte's role as personal representative for Donna Badger "put him in a position where he was able to" induce the law firm into withdrawing Arthur's funds. JA1475. The firm's CFO testified that when the firm's administrators wrote checks at Murdaugh's request, they did so "under the authority of the attorney on the case and the trust we had for the attorney in the case." JA527. She would "have re-cut the checks," she

confirmed in response to the Government's question, "even if [Murdaugh] had just told [her] to do it." JA527. And the Government presented no evidence that Laffitte was involved with the firm's preparation of the $101,369.49 and $33,789.83 checks that were the subject of Counts 2 and 3. Those two checks were not issued when the firm "re-cut" the $1.325 million check in the early part of 2013 after the emails between Murdaugh and Laffitte, but instead later that year. *See supra* at 13.

Counts 2 and 3 thus never should have been before a jury. A judgment of acquittal should follow, and any new trial must be limited to the other counts in the Second Superseding Indictment.

## CONCLUSION

Laffitte is innocent. The district court erred in excluding evidence crucial to his defense, in allowing Counts 2 and 3 to go to the jury, in improperly replacing the jurors during deliberations, and in denying the motions for a new trial. This Court should reverse the district court's judgment and remand for a new trial with instructions, and should enter a judgment of acquittal on Counts 2 and 3.

Respectfully submitted,

s/ William W. Wilkins

*One of the Attorneys for*
*Defendant-Appellant*
*Russell Lucius Laffitte*

**OF COUNSEL:**

Mark C. Moore
Michael A. Parente
MAYNARD NEXSEN PC
1230 Main Street, Suite 700
Columbia, SC 29201
Phone: 803.771.8900
mmoore@maynardnexsen.com
mparente@maynardnexsen.com

William W. Wilkins
MAYNARD NEXSEN PC
104 S. Main Street, Suite 900
Greenville, SC 29601
Phone: 864.370.2211
bwilkins@maynardnexsen.com

John C. Neiman, Jr.
MAYNARD NEXSEN PC
1901 Sixth Avenue N., Suite 1700
Birmingham, AL 35203
Phone: 205.254.1000
jneiman@maynardnexsen.com

# CERTIFICATE OF COMPLIANCE

This brief complies with the applicable type-volume limitation. According to the word-count feature in Microsoft Word 2016, the relevant parts of this brief contain 14,969 words, which is below the limit of 15,000 words set by this Court's order on December 20, 2023.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5)(A) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6). I prepared this brief in Century Schoolbook font, a proportionally spaced typeface. I used 14-point type or, for headings, a larger point size.

/s/ John C. Neiman, Jr.
OF COUNSEL

# CERTIFICATE OF SERVICE

On December 27, 2023, I served the sealed version of this brief on counsel for the United States via electronic mail at the following addresses:

> Winston Holliday (Winston.Holliday@usdoj.gov)
>
> Emily Limehouse (Emily.Limehouse@usdoj.gov)
>
> Kathleen Stoughton (Kathleen.Stoughton@usdoj.gov)

I served the redacted version of this brief on counsel for the United States via CM/ECF. On January 5, 2024, I used the same methods to serve the corrected versions of this brief on counsel for the United States.

/s/ John C. Neiman, Jr.
OF COUNSEL