APPEAL NO. 23-4509 (L); CROSS APPEAL NO. 23-4566

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee/Cross-Appellant*,

*versus*

RUSSELL LAFFITTE,

*Defendant-Appellant/Cross-Appellee.*

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA AT BEAUFORT

CORRECTED REDACTED
BRIEF OF APPELLEE/CROSS-APPELLANT

ADAIR F. BOROUGHS
UNITED STATES ATTORNEY

KATHLEEN MICHELLE STOUGHTON
EMILY EVANS LIMEHOUSE
WINSTON D. HOLLIDAY, JR.
ASSISTANT U.S. ATTORNEYS
1441 MAIN STREET, SUITE 500
COLUMBIA, SOUTH CAROLINA 29201
TEL.:      (803) 929-3114
FAX:      (803) 929-3135
Kathleen.Stoughton@usdoj.gov
*ATTORNEYS FOR APPELLEE/CROSS-APPELLANT*

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ..........................................................................vii

CORPORATE DISCLOSURE STATEMENT...................................................xii

INTRODUCTION ........................................................................................1

STATEMENT OF JURISDICTION...................................................................2

STATEMENT OF ISSUES...............................................................................3

I.     ████████████████████████████████████████
████████████████████████████

II.     Whether Laffitte waived his challenges to the replacement of two jurors by consenting to the procedure the court used to remove them and, if not, whether the district court abused its significant discretion by excusing them based on legitimate medical issues.

III.     Whether the district court abused its discretion by excluding evidence when, after several opportunities, Laffitte failed to show it was probative of motive or bias for the Government's witnesses, and the court found it would have led to a trial within a trial and confused the jury.

IV.     Whether the evidence was sufficient to convict Laffitte of bank and wire fraud, or aiding and abetting bank and wire fraud, where the Government's 15 witnesses and 222 exhibits proved Laffitte took affirmative steps and made misrepresentations in furtherance of an extensive scheme to defraud Murdaugh's clients.

V.     Whether the district court plainly and reversibly erred by waiving interest on Laffitte's restitution order without first finding Laffitte is unable to pay, as required by statute.

STATEMENT OF THE CASE.........................................................................3

    I.     In 2006, Murdaugh had Laffitte appointed as conservator for Alania and Hannah Plyler.........................................................................4

II.     In 2009, Murdaugh had Laffitte appointed as conservator for Natasha Thomas and Hakeem Pinckney ..................................................... 5

III.    In 2010, Laffitte was appointed as conservator for Malik Williams, who was not Murdaugh's client ........................................................... 7

IV.     In 2012, Murdaugh had Laffitte appointed as personal representative for the estate of Donna Badger ..................................................... 7

V.      In 2021, Murdaugh's firm and Laffitte's bank uncovered their years-long scheme to enrich themselves at the expense of Murdaugh's clients. ................................................................................................ 8

        A.  The firm discovered Laffitte negotiated $1,325,000 of Badger's settlement money for Murdaugh's benefit. ................................ 9

        B.  The firm learned Laffitte also negotiated $634,581.46 of Pinckney and Thomas's settlement money for Murdaugh's benefit ........... 14

        C.  The firm learned Laffitte had extended Murdaugh loans from conservatorships Laffitte was charged with managing, and Murdaugh had to steal from his clients to pay them back .......... 17

VI.     After Murdaugh's firm uncovered the thefts, Laffitte tried to cover his tracks before the bank learned he was involved ............................ 19

VII.    Laffitte was indicted, went to trial, and was found guilty of all six charged counts ......................................................................... 24

VIII.   During deliberations, the court received four notes from jurors in rapid succession. After fully discussing how to proceed with the parties, the court replaced two jurors—Jurors 93 and 88—due to medical issues ................................................................................................ 25

IX.     Laffitte filed a supplemental Rule 29 motion, new-trial motion, supplemental new-trial motion, and second new-trial motion and retained new counsel ................................................................. 32

X.    Laffitte was sentenced to 84 months in prison and ordered to pay over $3.5 million in restitution.............................................34

SUMMARY OF THE ARGUMENT ................................................35

ARGUMENT..................................................................38

I.    ███████████████████████████████████████████████
      ████████████████████.........................................38

      A. Standard of review ......................................38

      B. ████████████████████████████████████████████
         █████...................................................38

      C. ██████████████████████████████████████████████
         ███████..................................................41

II.   LAFFITTE'S AFTER-THE-FACT OBJECTIONS TO THE AGREED-
      UPON APPROACH THE COURT USED TO REPLACE JURORS 93 AND
      88 FAIL TO SHOW ANY REVERSIBLE ERROR.................................44

      A. Standard of review ......................................45

      B. Laffitte waived all of his challenges to the replacement of Juror 93 by
         agreeing to excuse her. Those claims are unreviewable......................47

      C. Laffitte waived his claims that the court erred by excusing Juror 88 and by
         doing so outside of his presence. They are unreviewable ...................52

      D. The district court did not abuse its broad discretion in replacing Jurors 93
         and 88......................................................56

         1. The district court did not clearly err by finding Jurors 93 and 88 were
            unable to serve, and it did not abuse its discretion by replacing them.
            ..........................................................56

2. The district court did not violate Laffitte's right to be present when either juror was removed...........................................................61

    a. Laffitte was unquestionably present when the district court decided to replace Juror 93..........................................62

    b. The district court did not plainly err by questioning and excusing Juror 88 outside Laffitte's presence without his objection..................................................................63

3. The district court did not remove either juror based on her view of the evidence ...................................................................................66

    a. The district court made clear that it replaced Juror 93 based on her need to get medication ....................................69

    b. The district court made clear that it replaced Juror 88 based on her significant emotional distress..........................72

III. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY EXCLUDING IRRELEVANT, CONFUSING EVIDENCE THAT WAS NOT PROBATIVE OF BIAS OR MOTIVE ...................................................76

A. Standard of review ........................................................................76

B. The district court did not abuse its discretion by excluding evidence that was not probative of bias or motive and would have confused the jury. ...................................................................................................76

1. Laffitte did not preserve his challenge to the exclusion of testimony about selling the bank.................................................................77

2. Defense Exhibit 81 was inadmissible because it was hearsay, and it could not be authenticated...........................................................80

3. Laffitte's proposed evidence was properly excluded because it did not show bias or motive; it would have led to a trial within in a trial; and it would have confused the jury .....................................................81

iv

a. The court did not abuse its discretion by excluding the evidence under Rules 608(b) and 401 .......................... 81

b. The court did not abuse its discretion by excluding the evidence under Rule 403 ............................................ 86

4. Any error in excluding the proposed evidence was harmless ........... 87

IV. THE EVIDENCE WAS SUFFICIENT TO CONVICT LAFFITTE OF BANK AND WIRE FRAUD AS AN AIDER AND ABETTOR AND A PRINCIPAL ..................................................................................... 90

A. Standard of review ....................................................................... 90

B. The evidence was more than sufficient to convict Laffitte of bank and wire fraud ............................................................................. 90

1. The evidence was sufficient to convict Laffitte of aiding and abetting bank and wire fraud ..................................................................... 91

2. The evidence was sufficient to convict Laffitte of bank and wire fraud ..................................................................................... 98

a. Laffitte's misrepresentation that he had authority to direct disbursement of the Badger settlement funds induced the bank and wire fraud transactions ............................... 100

b. Laffitte's misrepresentation that Badger money was Murdaugh's induced the bank and wire fraud transactions. ............................................................................. 102

V. THE DISTRICT COURT PLAINLY AND REVERSIBLY ERRED BY WAIVING INTEREST ON RESTITUTION WITHOUT FIRST FINDING LAFFITTE IS UNABLE TO PAY ...................................................... 104

A. Standard of review ..................................................................... 104

B. The district court plainly erred by waiving Laffitte's obligation to pay restitution interest without first finding Laffitte is unable to pay, as required by statute.........................................................................105

CONCLUSION.........................................................................110

STATEMENT REGARDING ORAL ARGUMENT......................................111

CERTIFICATE OF COMPLIANCE..............................................112

# TABLE OF AUTHORITIES

**<u>Cases</u>**                                              **<u>Page(s)</u>**

*Allen v. United States,*
   164 U.S. 492 (1896)..................................................................25

*Anderson v. Miller,*
   206 F. Supp. 2d 352 (E.D.N.Y. 2002).......................................72

*Clark v. Stinson,*
   214 F.3d 315 (2d Cir. 2000)......................................................55

*Davis v. Alaska,*
   415 U.S. 308 (1974)..................................................................86

*Gov't of Virgin Islands v. Nicholas,*
   758 F.2d 1073 (3d Cir. 1985)....................................................40

*Guaranty Serv. Corp. v. Am. Emp'rs' Ins. Co.,*
   893 F.2d 725 (5th Cir. 1990)....................................................71

*Horner v. Nines,*
   995 F.3d 185 (4th Cir. 2021)....................................................50

*Loughrin v. United States,*
   573 U.S. 351 (2014).........................................................99, 102

*Massaro v. United States,*
   538 U.S. 500 (2003)..................................................................50

*North Carolina v. Butler,*
   441 U.S. 369 (1979)..................................................................54

*Olden v. Kentucky,*
   488 U.S. 227 (1988)..................................................................86

*Quinn v. Hayes,*
   234 F.3d 837 (4th Cir. 2000)....................................................81

*Ramos v. Louisiana,*
   140 S.Ct. 1390 (2020)..............................................................66

*Rice v. Wood,*
   44 F.3d 1396 (9th Cir. 1995)....................................................61

*Rodriguez v. Colorado,*
   580 U.S. 206 (2017)..................................................................38

*Rosemond v. United States,*
   572 U.S. 65 (2014)....................................................................91

*Sexton v. French,*
   163 F.3d 874 (4th Cir. 1998)....................................................49

*Tanner v. United States,*
   483 U.S. 107 (1987)............................................................41, 43

*U.S. ex rel. Ubl v. IIF Data,*
  *Sols.*, 650 F.3d 445 (4th Cir. 2011)...........................................................77
*United States v. Abbell,*
  271 F.3d 1286 (11th Cir. 2001)................................................................67
*United States v. Abel,*
  469 U.S. 45 (1984)..............................................................................82, 86
*United States v. Acker,*
  52 F.3d 509 (4th Cir. 1995)......................................................................43
*United States v. Al-Hamdi,*
  356 F.3d 564 (4th Cir. 2004)....................................................................84
*United States v. Anderson,*
  859 F.2d 1171 (3d Cir. 1988)....................................................................85
*United States v. Beard,*
  161 F.3d 1190 (9th Cir. 1998) ..................................................................60
*United States v. Birchette,*
  908 F.3d 50 (4th Cir. 2018)......................................................................41
*United States v. Blatstein,*
  482 F.3d 725 (4th Cir. 2007)..................................................................107
*United States v. Boynes,*
  515 F.3d 284 (4th Cir. 2008)............................................................50, 55
*United States v. Burfoot,*
  899 F.3d 326 (4th Cir. 2018)....................................................................87
*United States v. Burgos,*
  94 F.3d 849 (4th Cir. 1996)......................................................................97
*United States v. Caldwell,*
  7 F.4th 191 (4th Cir. 2021) ......................................................................34
*United States v. Camacho,*
  955 F.2d 950 (4th Cir. 1992)....................................................................65
*United States v. Cannon,*
  475 F.3d 1013 (8th Cir. 2007) ..................................................................60
*United States v. Chittenden,*
  848 F.3d 188 (4th Cir. 2017)....................................................................98
*United States v. Colkley,*
  899 F.2d 297 (4th Cir. 1990)....................................................................57
*United States v. Corrine Brown,*
  996 F.3d 1171 (11th Cir. 2021)..........................................................70, 73
*United States v. Cuthel,*
  903 F.2d 1381 (11th Cir. 1990)................................................................70
*United States v. Dawkins,*
  202 F.3d 711 (4th Cir. 2000)..................................................................105

*United States v. De Oleo*,
  697 F.3d 338 (6th Cir. 2012)......................................................................56
*United States v. Delva*,
  858 F.3d 135 (2d Cir. 2017)........................................................................67
*United States v. Ealy*,
  363 F.3d 292 (4th Cir. 2004)......................................................................98
*United States v. Elbaz*,
  52 F.4th 593 (4th Cir. 2022)................................................................63, 99
*United States v. Gagnon*,
  470 U.S. 522 (1985)..............................................................................54, 55
*United States v. Ginyard*,
  444 F.3d 648 (D.C. Cir. 2006).......................................................70, 71, 74
*United States v. Goode*,
  342 F.3d 741 (7th Cir. 2003).....................................................................107
*United States v. Greenwood*,
  796 F.2d 49 (4th Cir. 1986)........................................................................81
*United States v. Hassouneh*,
  199 F.3d 175 (4th Cir. 2000)......................................................................76
*United States v. Hayden*,
  85 F.3d 153 (4th Cir. 1996)........................................................................66
*United States v. Hill*,
  322 F.3d 301 (4th Cir. 2003)................................................................86, 87
*United States v. Huntress*,
  956 F.2d 1309 (5th Cir. 1992)....................................................................60
*United States v. James*,
  609 F.2d 36 (2d Cir. 1979).................................................................87, 89
*United States v. Janati*,
  374 F.3d 263 (4th Cir. 2004)......................................................................58
*United States v. Johnson*,
  400 F.3d 187 (4th Cir. 2005)......................................................................55
*United States v. Kemp*,
  500 F.3d 257 (3d Cir. 2007)................................................................67, 73
*United States v. Liu*,
  654 F. App'x 149 (4th Cir. 2016)....................................................77, 78, 79
*United States v. McGill*,
  815 F.3d 846 (D.C. Cir. 2016)...............................................68, 70, 71, 74
*United States v. McNatt*,
  931 F.2d 251 (4th Cir. 1991)..............................................................81, 85
*United States v. Nelson*,
  102 F.3d 1344 (4th Cir. 1996)............................................................57, 59

*United States v. O'Brien,*
  898 F.2d 983 (5th Cir. 1990) ................................................................. 60
*United States v. Olano,*
  507 U.S. 725 (1993) ................................................................. 46, 107
*United States v. Ozomaro,*
  44 F.4th 538 (6th Cir. 2022) ................................................................. 67, 70
*United States v. Palomino-Coronado,*
  805 F.3d 127 (4th Cir. 2015) ................................................................. 90
*United States v. Penn,*
  870 F.3d 164 (3d Cir. 2017) ................................................................. 56, 61
*United States v. Perkins,*
  67 F.4th 583 (4th Cir. 2023) ................................................................. 46
*United States v. Perkins,*
  108 F.3d 512 (4th Cir. 1997) ................................................................. 107
*United States v. Picardi,*
  739 F.3d 1118 (8th Cir. 2014) ................................................................. 56
*United States v. Pincus,*
  No. 19-cr-436, 2023 WL 3571218 (E.D.N.Y. May 19, 2023) ....................... 109
*United States v. Raza,*
  876 F.3d 604 (4th Cir. 2017) ................................................................. 99
*United States v. Richardson,*
  195 F.3d 192 (4th Cir. 1999) ................................................................. 49
*United States v. Robinson,*
  744 F.3d 293 (4th Cir. 2014) ................................................................. 46, 48, 52
*United States v. Runyon,*
  707 F.3d 475 (4th Cir. 2013) ................................................................. passim
*United States v. Shatley,*
  448 F.3d 264 (4th Cir. 2006) ................................................................. 75
*United States v. Spruill,*
  808 F.3d 585 (2d Cir. 2015) ................................................................. passim
*United States v. Symington,*
  195 F.3d 1080 (9th Cir. 1999) ................................................................. 67, 68
*United States v. Thompson,*
  528 F.3d 110 (2d Cir. 2008) ................................................................. 60
*United States v. Thorn,*
  917 F.2d 170 (5th Cir. 1990) ................................................................. 81
*United States v. Turner,*
  836 F.3d 849 (7th Cir. 2016) ................................................................. 67
*United States v. Vidacak,*
  553 F.3d 344 (4th Cir. 2009) ................................................................. 38, 76

*United States v. Vinson*,
  852 F.3d 333 (4th Cir. 2017)...............................................97, 99
*United States v. Walker*,
  934 F.3d 375 (4th Cir. 2019)..............................................62
*United States v. Walsh*,
  75 F.3d 1 (1st Cir. 1996)...................................................60
*United States v. Warren Brown*,
  823 F.2d 591 (D.C. Cir. 1987)........................................ passim
*United States v. Warren*,
  973 F.2d 1304 (6th Cir. 1992)..........................................71
*United States v. Wiley*,
  93 F.4th 619 (4th Cir. 2024)..........................................90, 93
*Warger v. Shauers*,
  574 U.S. 40 (2014)..........................................................42
*Wilburn v. Eastman Kodak Co.*,
  180 F.3d 475 (2d Cir. 1999)...........................................71

## **Statutes**

18 U.S.C. § 1349 ................................................................97
18 U.S.C. § 3231 ..................................................................2
18 U.S.C. § 3612(f)(1)...............................................105, 107
18 U.S.C. § 3612(f)(3)(A)..............................................105
18 U.S.C. § 3663A...........................................................35, 105
18 U.S.C. § 3742(b)(1)......................................................2
18 U.S.C. § 1343 ..............................................................91, 99
18 U.S.C. § 1344(2).........................................................91, 98
28 U.S.C. § 1291 ................................................................2

## **Rules**

Fed. R. Crim. P. 24(c)....................................................48, 57
Fed. R. Crim. P. 43(a)(1)....................................................71
Fed. R. Crim. P. 31(a).........................................................66
Fed. R. Evid. 103(a)(2)..............................................77, 79, 80
Fed. R. Evid. 606(b)(1).......................................................42
Fed. R. Evid. 608 ...............................................................78, 81
Fed. R. Evid. 801(c)..........................................................80, 81

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. __23-4566__      Caption: __United States v. Russell Laffitte (23-4509(L))__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__United States of America__
(name of party/amicus)

_____

who is ___Appellee, Cross-Appellant___, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO

2.  Does party/amicus have any parent corporations?  ☐ YES ☑ NO
    If yes, identify all parent corporations, including all generations of parent corporations:



3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO
    If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☑YES ☐NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

    (1) Peters Murdaugh Parker Eltzroth & Detrick, PA
    (2) Palmetto State Bank (parent corporation - Palmetto State Bankshares, Inc.)

Signature: /s Kathleen M. Stoughton          Date: March 22, 2024

Counsel for: United States

xiii

Print to PDF for Filing

# INTRODUCTION

Russell Laffitte worked his way up through the ranks of his family's bank in Hampton, South Carolina, eventually becoming its CEO. Then he used his position to help Alex Murdaugh—the now-infamous South Carolina attorney—steal nearly $2,000,000 from his clients. Their scheme dates back to 2011. Murdaugh would have Laffitte appointed as conservator or personal representative for Murdaugh's clients. Laffitte then extended himself and Murdaugh loans from conservatorship accounts Laffitte was charged with managing. And he helped Murdaugh steal from other clients to pay them back. Murdaugh made sure Laffitte was paid handsomely for his services.

The scheme unraveled in 2021, when Murdaugh's firm uncovered the thefts and Laffitte's bank discovered Laffitte's role in them. For his part, Murdaugh has pleaded guilty to dozens of financial crimes in both state and federal court.[1] Laffitte was separately indicted and went to trial. After the jury heard from two dozen Government and defense witnesses and saw over 300 exhibits during nearly three weeks of trial, they reached the only conclusion supported by the evidence: guilty on all counts.

---

[1] *United States v. Murdaugh*, No. 9:23-cr-396 (D.S.C.).

Laffitte argues he was simply "caught in the web of deception" Murdaugh weaved. Br. 3. To be sure, these crimes would not have happened without Alex Murdaugh. But they could not have happened without Russell Laffitte.

Laffitte has now challenged his convictions in six rounds of post-trial briefing with the benefit of nine attorneys. His claims remain unpersuasive. He contests 19 of the district court's rulings, but most of his arguments are waived or forfeited. And not one of them undermines the conclusion that he was provided a full and fair trial in front of an impartial jury of his peers. His convictions should be affirmed.

## STATEMENT OF JURISDICTION

The district court had jurisdiction over this criminal case under 18 U.S.C. § 3231. A jury convicted Laffitte of conspiracy to commit wire and bank fraud, bank fraud, wire fraud, and three counts of misapplication of bank funds. JA2287-2289. Judgment was entered on August 2, 2023. JA2640. Laffitte timely filed a notice of appeal on August 8, JA2652-2653, and the Government timely filed a notice of cross-appeal on September 6, JA2860. This Court has jurisdiction over the district court's final judgment under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(b)(1).

## STATEMENT OF THE ISSUES

I.    ██████████████████████████████████████
██████████████████████████

II.    Whether Laffitte waived his challenges to the replacement of two jurors by consenting to the procedure the court used to remove them and, if not, whether the district court abused its significant discretion by excusing them based on legitimate medical issues.

III.    Whether the district court abused its discretion by excluding evidence when, after several opportunities, Laffitte failed to show it was probative of motive or bias for the Government's witnesses, and the court found it would have led to a trial within a trial and confused the jury.

IV.    Whether the evidence was sufficient to convict Laffitte of bank and wire fraud, or aiding and abetting bank and wire fraud, where the Government's 15 witnesses and 222 exhibits proved Laffitte took affirmative steps and made misrepresentations in furtherance of an extensive scheme to defraud Murdaugh's clients.

V.    Whether the district court plainly and reversibly erred by waiving interest on Laffitte's restitution order without first finding Laffitte is unable to pay, as required by statute.

## STATEMENT OF THE CASE

Laffitte and Murdaugh grew up across the street from each other, and their families' relationships go back generations. JA1834 (Russell Laffitte testimony); JA1608 (Charlie Laffitte testimony). Murdaugh was a personal injury attorney at Peters Murdaugh Parker Eltzroth & Detrick (PMPED), a prominent Lowcountry law

---

[2] Like Laffitte's, this brief highlights matters related to sealed material whose admissibility is disputed in blue; it highlights matters related to all other sealed material in yellow.

firm. *See* JA775-776 (Ronnie Crosby testimony). He and his partners secured significant settlements in cases involving vehicle defects and car accidents. *See* JA776 (Crosby testimony). Murdaugh and his firm were big customers of Palmetto State Bank—Laffitte's family's bank where Laffitte had worked for decades. JA623 (Jan Malinowski testimony). Laffitte was Murdaugh's contact for all of his banking needs. JA278-279 (Norris Laffitte testimony).

The pair capitalized on Murdaugh's access to clients with large settlements and Laffitte's access to the bank. Together, they stole millions from clients to whom they both owed fiduciary duties.

## I.     In 2006, Murdaugh had Laffitte appointed as conservator for Alania and Hannah Plyler.

In July 2005, a tire exploded on the car Alania and Hannah Plyler were traveling in on I-95. JA898-900 (Spohn testimony); JA936 (Hannah Plyler testimony). The car ran into the woods, and their brother and mother were killed. JA900-901, JA903 (Spohn testimony); JA936 (Plyler testimony).

The Plylers' father hired Murdaugh. JA907 (Spohn testimony). In November 2006, Murdaugh had Laffitte—then a loan officer at Palmetto State Bank—appointed as Alania and Hannah's conservator. JA896 (Spohn testimony); JA935 (Plyler testimony); JA1308 (Agent Brian Womble testimony); JA1873 (Russell Laffitte testimony). A conservator is a fiduciary appointed to manage the assets of a minor or incapacitated person. JA1767 (Tiffany Provence testimony). Laffitte

4

managed the girls' money until they turned 18. JA907-908, JA919-920 (Spohn testimony); JA941 (Plyler testimony).

## II. In 2009, Murdaugh had Laffitte appointed as conservator for Natasha Thomas and Hakeem Pinckney.

In 2009, a tire failed when Natasha Thomas was traveling on I-95 with her aunt and two cousins. JA1286 (Natasha Thomas testimony). Thomas woke up in the hospital. JA1287 (Thomas testimony). She suffered significant and lasting injuries. JA1287-1288 (Thomas testimony). And one of her cousins, Hakeem Pinckney, was ejected from the car and rendered a quadriplegic. JA1288 (Thomas testimony); JA807 (Crosby testimony).

The Pinckney-Thomas family hired Murdaugh, JA1288 (Thomas testimony), and in September 2010, Murdaugh had Laffitte appointed as conservator for both Pinckney and Thomas, JA1365 (Womble testimony); JA809 (Crosby testimony).

Laffitte signed an application to serve as Thomas's conservator that misrepresented her age, stating she was several years younger than she was. JA1366-1377 (Womble testimony). In reality, she was just shy of her 18th birthday. JA1367 (Womble testimony).

No one ever told Thomas that Laffitte had been hired to be her conservator. JA1289 (Thomas testimony). She never met him in his capacity as her conservator. JA1289 (Thomas testimony). She did, however, meet him at Palmetto State Bank in December 2010, when she went to get a loan for school expenses before her case

settled. JA1289-1290 (Thomas testimony). Thomas brought Laffitte a letter from her lawyer (Murdaugh), addressed to "Russell Laffitte As Conservator for Natash [*sic*] Thomas." JA1293 (Thomas testimony); SA015. Thomas provided her date of birth, which reflected that she was already 18 years old, and Laffitte extended her a loan at an 18% interest rate. JA1291-1292 (Thomas testimony). Laffitte didn't mention that he was her conservator. JA1292 (Thomas testimony). He didn't talk to her about a future settlement in her case. JA1292 (Thomas testimony). And he didn't meet or talk to her ever again. JA1293 (Thomas testimony).

Thomas's case settled in November 2011. JA1371 (Womble testimony) Laffitte signed the release as her conservator, even though by then she was 19 years old. JA1371 (Womble testimony); JA1297 (Thomas testimony). Thomas didn't know Laffitte took a $15,000 conservator fee from her settlement funds. JA1297 (Thomas testimony).

Pinckney passed away in a nursing home on October 11, 2011. JA1294 (Thomas testimony). His case settled nearly a month later, and Laffitte signed the release as his conservator. JA1370 (Womble testimony). He collected a $60,000 fee from Pinckney's settlement. JA1373 (Womble testimony).

Thomas received her settlement funds in December 2011: a $650,000 structured payment and a $83,719.73 lump sum. JA1296-1298 (Thomas testimony). She didn't know she was also supposed to receive two checks for $325,000 and

$25,245.08 that were disbursed to Palmetto State Bank. JA1298-1301 (Thomas testimony).

### III. In 2010, Laffitte was appointed as conservator for Malik Williams, who was not Murdaugh's client.

In 2010, Murdaugh's law partner Paul Detrick had Laffitte appointed as conservator for Malik Williams. JA803-804 (Crosby testimony); SA007. Williams, a minor, had been in a car accident. JA803 (Crosby testimony). Murdaugh played no role in his case. JA805 (Crosby testimony).

### IV. In 2012, Murdaugh had Laffitte appointed as personal representative for the estate of Donna Badger.

In January 2011, Arthur Badger and his wife Donna were in a car accident involving a UPS truck. JA1334-1335 (Arthur Badger testimony). Donna and another passenger died on the scene. JA1336 (Badger testimony). She left behind six children who were between two and 13 years old. JA1336 (Badger testimony).

Arthur and the other surviving passengers hired Murdaugh. JA1336-1337 (Badger testimony). At Murdaugh's request, Laffitte replaced Arthur as the personal representative (PR) for Donna's estate in September 2012.[3] JA1337-1338 (Badger testimony); JA1887-1888 (Russell Laffitte testimony). A PR is a fiduciary appointed to administer an estate. JA1766-1767 (Provence testimony). Arthur never met

---

[3] Badger testified that Murdaugh put paper in front of him and told him to sign, and he did. JA1338 (Badger testimony). But he did not understand that he was resigning as PR and Laffitte was taking his place. JA1338 (Badger testimony).

Laffitte. JA1339-1340 (Badger testimony). He did not know Laffitte collected $35,000 from his settlement as a PR fee, JA1341 (Badger testimony), even though Laffitte was not Arthur's PR. JA1341 (Badger testimony). Arthur also had no idea that when the case settled, he was supposed to receive a $1,325,000 payment that was disbursed to Palmetto State Bank. JA1343 (Badger testimony).

## V.   In 2021, Murdaugh's firm and Laffitte's bank uncovered their years-long scheme to enrich themselves at the expense of Murdaugh's clients.

In June 2021, Jeanne Seckinger, the law firm's CFO, confronted Murdaugh about a missing fee in a case Murdaugh had worked with his close friend, Chris Wilson. JA439-440, JA489-494 (Jeanne Seckinger testimony); JA815 (Crosby testimony). That night, Murdaugh's wife and son were brutally murdered.[4] JA494 (Seckinger testimony). The law firm temporarily paused its efforts to collect the fee, but in July, Wilson assured them that he had the money in his trust account. JA494 (Seckinger testimony).

In early September 2021, the law firm discovered Wilson had paid the missing fee to Murdaugh personally, instead of to the law firm, which was owed the money. JA549-550 (Seckinger testimony); JA815-816 (Crosby testimony). Murdaugh's law partners quickly learned Murdaugh had been stealing from both the firm and his clients. JA495-496, JA549-552 (Seckinger testimony); JA816 (Crosby testimony).

---

[4] Murdaugh was convicted for the murder of his wife and son in state court in March 2023. *State v. Murdaugh*, Nos. 2022-GS-15-00592-595 (S.C.).

The firm terminated Murdaugh and reported his thefts to authorities. JA496-497 (Seckinger testimony). They also notified Laffitte that Murdaugh was no longer part of the firm. JA497-499 (Seckinger testimony). Then they hired a forensic auditor to analyze their accounts, and they started by looking into Murdaugh's biggest cases. JA498, JA500 (Seckinger testimony).

### A. The firm discovered Laffitte negotiated $1,325,000 of Badger's settlement money for Murdaugh's benefit.

The first case the law firm looked into was Arthur Badger's. When it settled in 2012, Palmetto State Bank was supposed to receive a payment of $1,325,000 to fund a structure "per [Arthur's] request." JA1394 (Womble testimony); JA2881-2882. Badger signed his disbursement sheet (which shows how settlement money should be allocated) on November 19, 2012. JA449-450 (Seckinger testimony); JA2882-2883. The firm discovered that the same day, Murdaugh had a meeting at the bank. JA501 (Seckinger testimony); JA2884. They saw that two days later, Laffitte deposited a $35,000 PR fee taken from Arthur's settlement. JA501-502 (Seckinger testimony); JA1313-1314 (Womble testimony). Beyond that, Seckinger could see that the law firm had written checks from the Badger settlement to Palmetto State Bank, but she could not see where the money went after the checks were deposited. JA503 (Seckinger testimony). She asked Laffitte (her brother-in-law) to get her information about how the checks were applied. JA445, JA503 (Seckinger testimony).

In early October 2021, Laffitte gave Seckinger all of the Badger checks except the one for his PR fee. JA503-504, JA515 (Seckinger testimony). When he delivered them, he also volunteered to pay the law firm $680,000. JA505 (Seckinger testimony). As she reviewed the checks, Seckinger immediately noticed that the Badger settlement funds were spent to benefit Murdaugh, not the Badgers. JA506-507 (Seckinger testimony).

On October 28, 2021, Laffitte gave the law firm an unsolicited check for $680,000 drawn on a Palmetto State Bank account. JA511 (Seckinger testimony); JA824 (Crosby testimony). Laffitte wrote "Badger Settlement from AM Misappropriation" in the remitter line and told the firm he had not yet run it by the bank's Board. JA285-286 (Norris Laffitte testimony); JA827 (Crosby testimony); *see* JA512 (Seckinger testimony); JA2872. The $680,000 figure represented half of the $1,325,000 that was supposed to go to Arthur Badger, plus Laffitte's $35,000 PR fee. JA512-513 (Seckinger testimony). When he presented the check, Laffitte took no responsibility for the misappropriation of the Badger money. JA510 (Seckinger testimony). And he did not tell anyone that he had personally negotiated every single Badger check that had passed through Palmetto State Bank. JA510 (Seckinger testimony). This $680,000 is the basis for the misapplication of bank funds offense charged in Count Four. JA41.

Months later, the law firm uncovered the full extent of Laffitte and Murdaugh's fraud in the Badger case. Ronnie Crosby, one of Murdaugh's partners, pulled all of the email communications between Murdaugh and Laffitte. JA832 (Crosby testimony). He found two emails from February 2013 showing Laffitte helped Murdaugh steal Badger's money. *See* JA833 (Crosby testimony).

Murdaugh emailed Laffitte with instructions: "Pls email me and ask that check number 43162 dated 11-19-12 for 1,325,000 be re-cut as listed above." JA2933. The email listed four amounts:

> 388,687.60
> Whatever the amount I owe on Hannah loan
> 75k
> Whatever the balance would be on 1,325,000 after these deductions.

JA2933. The check number referenced—43162—was a client trust check dated the same day Arthur's disbursement sheet was signed (and the same day Murdaugh had a meeting at the bank), for the same amount that Palmetto State Bank was supposed to receive to fund Arthur's structure. JA833 (Crosby testimony); JA3297. Instead of responding to Murdaugh's email, JA834 (Crosby testimony), Laffitte did the math Murdaugh asked for, then created a *new email chain* and emailed Murdaugh:

11

**From:** Russell L. Laffitte [mailto:rlaffitte@palmettostatebank.com]
**Sent:** Wednesday, February 06, 2013 4:15 PM
**To:** Alex Murdaugh
**Subject:** Check #43162

Alex,

Can you get the Jeanne to re-cut check #43162 dated 11/19/2012 as follows?

$388,687.50
$151,726.05
$75,000.00
$709,586.45


Thanks,

Russell L. Laffitte
Vice President

Palmetto State Bank

JA2932. Murdaugh forwarded the email to Seckinger, JA2932, and the $1,325,000 check was recut as requested, JA3297.

The first three recut checks—for $388,687.50, $151,726.05, and $75,000— were all made payable to Palmetto State Bank and said "Arthur Badger" in the memo line. JA1399-1400 (Womble testimony); JA2885-2888. Laffitte negotiated the first to pay one of Murdaugh's law partners; the second to Hannah Plyler's conservatorship; and the third to Murdaugh's father, all to repay Murdaugh's personal loans. JA1400 (Womble testimony); JA2885-2888; JA517-518, JA524-525 (Seckinger testimony).

The $709,586.45 check was later voided and cut into 11 smaller checks. JA1397-1398 (Womble testimony); JA3297. Nine of those checks were drawn on the firm's client trust account, were made payable to Palmetto State Bank, and said

"Estate of Donna Badger" in the memo line. JA1400 (Womble testimony); JA2889-2906. Laffitte negotiated all nine.[5] JA1986 (Russell Laffitte testimony). He sent money to Murdaugh and his wife, to Hannah Plyler's conservatorship, and to equipment and car companies, all for Murdaugh's benefit. JA1400-1401 (Womble testimony); JA2889-2906; JA3154. Check No. 45027 for $101,369.49, which was deposited into Hannah Plyler's conservatorship, was the basis for the bank fraud offense charged in Count Two:



JA2890; JA39.

Check No. 45035 for $33,789.83, which was deposited directly into Murdaugh's account, was the basis for the wire fraud offense charged in Count Three:

---

[5] The remaining two checks, which said "Settlement Proceeds" in the memo line, were deposited in Murdaugh's personal Bank of America account. JA2907-2908.



JA2903; JA40. None of the money Laffitte negotiated for Murdaugh went to the Badgers. JA3154.

**B.    The firm learned Laffitte also negotiated $634,581.46 of Pinckney and Thomas's settlement money for Murdaugh's benefit.**

In late November 2021, as the law firm's investigation into Murdaugh's misdeeds continued, they discovered that in Natasha Thomas and Hakeem Pinckney's cases—like in Badger's—there were settlement checks made payable to Palmetto State Bank that they could not track. JA519 (Seckinger testimony). Seckinger asked Laffitte to provide details for the checks, and he did. JA519-520 (Seckinger testimony). It was clear to Seckinger that the checks had been used to pay for Murdaugh's expenses. JA520 (Seckinger testimony).

The firm found an email from Murdaugh to Laffitte dated December 20, 2011, asking Laffitte to call him. JA531-532 (Seckinger testimony); SA005. The same day, the law firm issued checks payable to Palmetto State Bank in the amount of $325,000

for "Settlement Proceeds; Natasha Thomas," JA2909, and $309,581.46 for "Settlement Proceeds, Hakeem L. Pinckney," JA2911.

Laffitte deposited both checks in Palmetto State Bank the following day, then issued nine money orders redirecting Pinckney and Thomas's settlement funds for Murdaugh's benefit. JA1374, JA1378 (Womble testimony); JA1986 (Russell Laffitte testimony); *see* JA2912. Laffitte deposited their money in Hannah Plyler and Malik Williams's conservatorships, used it to repay a personal loan from Laffitte's father and to make payments on Murdaugh's boat, and directed it to Murdaugh's father and wife. JA3151; JA1376-1377 (Womble testimony).

On December 22, 2011—the day after Laffitte negotiated all of Pinckney and Thomas's settlement money for Murdaugh's benefit instead of putting it in their conservatorships—Laffitte filed paperwork telling the probate court that Pinckney and Thomas's conservatorships had never received any money. SA008-009; SA011-012. He asked to close Pinckney's conservatorship because Pinckney had passed away in October 2011. SA010. He asked to close Thomas's because she had turned 18. SA013. Incredibly, just two weeks after he told the probate court that neither Pinckney nor Thomas needed a conservator and that he had not managed any money for either, he collected $75,000 in conservator fees from them. JA1389 (Womble testimony); JA1987, JA1990-1991 (Russell Laffitte testimony); JA3295.

For weeks leading up to late December 2011, Laffitte emailed Murdaugh reminding him he had payments due on two bank loans. JA1379-1384 (Womble testimony); SA001-004; SA006. But when Murdaugh walked into the bank with over $600,000 in settlement checks on December 21, Laffitte did not use that money to pay down Murdaugh's bank loans. Instead, he helped Murdaugh steal it. *See* JA3151 (summarizing how Laffitte disbursed Pinckney and Thomas funds for Murdaugh). Then he used Murdaugh's legitimate income from the law firm to pay off the bank loans later that week. JA1384 (Womble testimony).

Laffitte wasn't done helping Murdaugh steal Thomas's money. In August 2012, she was supposed to get a check for $25,248.08. JA1387-1388 (Womble testimony); JA2877. The firm wrote the check to Palmetto State Bank and put "Settlement Proceeds – Natasha Thomas" in the memo line. JA2910. Murdaugh cashed the check at the bank, and Laffitte admitted he helped Murdaugh structure the funds over three separate days.[6] JA2000-2001 (Russell Laffitte testimony). None of the money went to Thomas. JA1388 (Womble testimony).

---

[6] Banks are required to file currency transaction reports on cash transactions over $10,000. "Structuring" refers to cash withdrawals designed to avoid reporting requirements by staying just below that threshold. JA1503-1504 (John Peters testimony).

**C.    The firm learned Laffitte had extended Murdaugh loans from conservatorships Laffitte was charged with managing, and Murdaugh had to steal from his clients to pay them back.**

As the firm's investigation continued, they uncovered emails explaining why Laffitte and Murdaugh were depositing Badger and Pinckney-Thomas money into the Plyler and Williams conservatorships. JA534-535 (Seckinger testimony); JA2934; JA2936; JA2937. Laffitte told Seckinger he had loaned Murdaugh money out of Hannah Plyler's conservatorship. JA534 (Seckinger testimony). He didn't tell her he had loaned himself money as well. JA534 (Seckinger testimony).

But in July 2011—unbeknownst to the Plylers—Laffitte had started taking personal loans from Hannah's conservatorship. JA919 (Spohn testimony); JA943 (Plyler testimony); JA1312 (Womble testimony). He used Hannah's money to pay back loans he had gotten from an independent bank at a much higher interest rate, pay off his credit card bills, and pay for personal expenses like a pool and kitchen renovations. JA975 (Cyndra Swinson testimony); JA2040 (Russell Laffitte testimony). He took out six loans and four renewals, totaling approximately $355,000. JA1313 (Womble testimony).

Laffitte paid Hannah back using his $35,000 PR fee from Arthur Badger and his $60,000 conservator fee from Hakeem Pinckney. JA1313-1315 (Womble testimony). Then he credited himself conservator fees he claimed Hannah owed him

17

and took out a personal loan to make Hannah whole when he had to close the conservatorship. JA1316 (Womble testimony).

In September 2011, months after Laffitte started taking loans for himself, he began extending Murdaugh loans out of Hannah's conservatorship. JA1316 (Womble testimony). For three years—until Hannah turned 18—Laffitte used Hannah's conservatorship money to cover Murdaugh's overdraft. JA1318, JA1322, JA1324 (Womble testimony). He extended Murdaugh 16 unsecured loans worth approximately $960,000. JA1324 (Womble testimony). Murdaugh was in overdraft almost every time:



SA014; JA1324 (Womble testimony).

In November 2011, Laffitte also extended Murdaugh a $40,000 unsecured loan from Malik Williams's conservatorship. JA1360-1361 (Womble testimony). Murdaugh was not involved in Williams's case. JA805 (Crosby testimony). He had no reason to know that Laffitte was Williams's conservator, that the conservatorship existed, or that he could take a loan from it. The conservatorship loans were Laffitte's idea. And Murdaugh paid this one back with settlement proceeds he stole from Pinckney and Thomas. JA1362 (Womble testimony).

Although the Plyler and Williams conservatorship loans themselves were not illegal, the way Murdaugh paid them back—with money he stole from Badger, Pinckney, and Thomas—was. [7]

All told, Laffitte collected approximately $458,000 in PR and conservator fees from the Plylers, Pinckney, Thomas, and Badger. JA1410 (Womble testimony); JA3157. In exchange, he helped Murdaugh steal nearly $2,000,000.

## VI.  After Murdaugh's firm uncovered the thefts, Laffitte tried to cover his tracks before the bank learned he was involved.

After Murdaugh's wife and son were murdered in June 2021, and as his financial situation began to unravel, the bank's Board of Directors became

---

[7]  In February 2015, when Laffitte had to close Hannah's conservatorship, he advanced Murdaugh $284,787.52 from a line of credit meant for purposes of "farming." JA1244-1246 (Tim Rich testimony). That advance is the basis for the misapplication of bank funds offense charged in Count Six. *See* JA43.

19

increasingly concerned about how Murdaugh would pay back his debts to the bank. *See* JA230-232 (Norris Laffitte testimony); JA623 (Malinowski testimony). At a Board meeting on July 20, 2021, Norris Laffitte asked the other Board members whether anyone knew what was going on with Murdaugh. JA233-234 (Norris Laffitte testimony). Laffitte said Murdaugh was still working.[8] JA234 (Norris Laffitte testimony).

Laffitte did not tell the Board that he had just given Murdaugh a bank loan on July 15. JA235-238 (Norris Laffitte testimony). But at Murdaugh's request, Laffitte had wired $350,000 to Chris Wilson's law firm trust account. JA240-242 (Norris Laffitte testimony). Five days before the Board meeting where Norris raised questions about Murdaugh, barely a month after Murdaugh's wife and son were murdered, and just days before Chris Wilson told the law firm that he had Murdaugh's missing fee in his trust account, Laffitte loaned Murdaugh bank money to cover a fee Murdaugh had stolen. *See* JA240-242 (Norris Laffitte testimony); JA494-495 (Seckinger testimony). At the time, Murdaugh was over $160,000 in overdraft. JA3140-3141.

On August 9, 2021, still concerned about the bank's potential liability involving Murdaugh, Norris Laffitte emailed the bank's Executive Committee:

---

[8] A number of Laffittes testified at trial. This brief refers to the defendant as "Laffitte" and to other family members by their first and last names.

Laffitte (then the CEO), Gray Henderson (Laffitte's sister, the bank Secretary), Charlie Laffitte (Laffitte's father, the Chairman of the Board), Jan Malinowski (the bank President), and Scott Swain (the bank CFO). JA244 (Norris Laffitte testimony); *see* JA594-595 (Malinowski testimony). He copied the remaining Board members on the email: Jim Gibson, Spann Laffitte, Liz Laffitte Malinowski, Lucius Laffitte, Charles Laffitte, III, and Becky Laffitte. Norris asked the Executive Committee to prepare a summary of the bank's total exposure with regard to Murdaugh. JA248 (Norris Laffitte testimony).

Barely an hour after receiving Norris's email, Laffitte transferred $400,000 in bank funds into Murdaugh's account. JA250-251 (Norris Laffitte testimony); JA670 (Malinowski testimony). At the time, Murdaugh was $347,784.67 in overdraft. JA253-254 (Norris Laffitte testimony).

At its August 2021 meeting, the Board got an overview of Murdaugh's loans showing he owed $3,544,894. JA263-264 (Norris Laffitte testimony). It indicated Murdaugh had received a $750,000 loan in July for "beach house renovations." JA260 (Norris Laffitte testimony). Laffitte didn't tell the Board that he had already wired $350,000 to Chris Wilson and used the other $400,000 to cover Murdaugh's overdraft. JA1041-1042 (Spann Laffitte testimony). Board members asked to see paperwork for the $750,000 loan, but Henderson could not find any. JA270 (Norris Laffitte testimony); *see* JA632-633 (Malinowski testimony). The Board members

21

"could not believe it." JA270 (Norris Laffitte testimony). It turns out the loan documentation was not completed until the day after the Board meeting—well after all $750,000 had already been advanced. *See* JA675 (Malinowski testimony).

On September 6, 2021, Laffitte sent the bank's Board of Directors a press release announcing Murdaugh had resigned from his law firm and entered rehab. JA279 (Norris Laffitte testimony). Becky Laffitte and Jim Gibson responded, expressing concern that Murdaugh's loss of employment left the bank and its shareholders vulnerable. JA281-283 (Norris Laffitte testimony). Sure enough, Murdaugh never made a payment on the $750,000 loan. JA283 (Norris Laffitte testimony). That loan is the basis for the misapplication of bank funds offense charged in Count Five. JA42.

On October 28, 2021, after the firm realized Laffitte had helped Murdaugh steal Badger's settlement money, Laffitte told the bank's Executive Committee that he had "just [written] up $680,000 to losses other than loans from a 2013 case with Alex Murdaugh." JA651 (Malinowski testimony); JA2963. Laffitte said, "We converted 1.1 million plus in checks made to Palmetto State Bank on a settlement that Alex stole. The law firm and I agreed to split the loss and make the client whole." JA651 (Malinowski testimony); JA2963.

The Board met on November 3. JA309 (Norris Laffitte testimony). Laffitte didn't explain to the Board where the $680,000 figure came from, didn't tell the

Board it included half of a $35,000 PR fee he had personally collected and half of two checks that were processed by a different bank, didn't tell the Board how the stolen money was converted (including to pay back hundreds of thousands of dollars in loans Laffitte had extended Murdaugh from Hannah's conservatorship), and didn't show the Board any of the Badger checks. JA310, JA331-332 (Norris Laffitte testimony).

On December 1, 2021, after the firm learned the Pinckney-Thomas settlement money had been misappropriated, Laffitte sent the Board another email. JA343-344 (Norris Laffitte testimony). This one said, "We have found another 2 settlements that were stolen." JA344 (Norris Laffitte testimony). He attached copies of the checks converting the Pinckney and Thomas settlement funds. JA346-351 (Norris Laffitte testimony). But he did not explain to the Board why he sent Pinckney and Thomas's money to his father, Murdaugh's father, and Hannah Plyler and Malik Williams's conservatorships. JA358-365 (Norris Laffitte testimony).

After learning Laffitte was involved in Murdaugh's theft of the Badger, Pinckney, and Thomas settlement funds, the Board voted to sever the bank's relationship with Laffitte in January 2022. JA366 (Norris Laffitte testimony). Laffitte's father, brother, and sister were the only Board members who did not vote to terminate him. JA1092 (Lucius Laffitte testimony).

## VII. Laffitte was indicted, went to trial, and was found guilty of all six charged counts.

In September 2022, Laffitte was charged in a second superseding indictment with conspiracy to commit wire and bank fraud, bank fraud, wire fraud, and three counts of misapplication of bank funds. JA28-45. The five substantive counts charged him as a principal and as an aider and abettor. JA39-43. He pleaded not guilty and proceeded to trial in November 2022. JA17.

The Government called 15 witnesses. Five were members of the bank's Board of Directors: Norris Laffitte, Jan Malinowski, Spann Laffitte, Lucius Laffitte, and Becky Laffitte. Two were from the law firm: Jeanne Seckinger and Ronnie Crosby. Four were victims: Alania Plyler Spohn, Hannah Plyler, Natasha Thomas, and Arthur Badger. One, Tim Rich, was an FDIC expert; and one, Mark Altman, worked for the bank. Two were from the FBI: Special Agent Brian Womble and Forensic Accountant Cyndra Swinson.

Laffitte called eight witnesses and testified in his own defense. Charles Laffitte, III, Charlie Laffitte, and Gray Henderson—all bank Board members and Laffitte's brother, father, and sister, respectively—testified. As did three bank employees: John Peters, Chastity Malphrus, and Nancy Drawdy. Laffitte called a character witness, John Marvin Murdaugh; and an expert on probate matters, Tiffany Provence.

**VIII.  During deliberations, the court received four notes from jurors in rapid succession. After fully discussing how to proceed with the parties, the court replaced two jurors—Jurors 93 and 88—due to medical issues.**

Jury deliberations began around 10:22 am on November 22. JA2266. Around 7:45 pm, the court notified the parties that it had received two notes.[9] JA2270-2271. Both notes were from the same juror. The first note said the juror needed antibiotics "at 19:21" but "could delay one to two hours." JA2271. The second note said the juror was "[f]eeling pressured to change my vote." JA2271. The court said its "instinct" was that there were alternates and that it was "not practical" to send this juror home to get her medicine and then return to continue deliberations. JA2271. The court requested input from the parties, "welcom[ing] any thoughts anyone may have." JA2271.

Defense counsel asked whether the jury could come back in the morning. JA2271. The court answered that there was no issue with the jury deliberating, no message that the jury was stuck, and no indication an *Allen*[10] charge was needed. JA2271. The court said it was "trying to be fair," and "it just strikes me that under this sort of situation, the better course is -- that's why we have alternates." JA2272. "But," the court continued, "I want to hear from you about this." JA2272. The

---

[9] The jury had earlier asked to hear evidence again at 1:12 and 3:11 pm. JA2266-2267; JA2269.

[10] *Allen v. United States*, 164 U.S. 492 (1896).

Government suggested that the jury be permitted to continue deliberating that night, "especially since there's been no indication from the jury that they are having issues deliberating." JA2272.

The court expressed concern about having the jury return the following day, which was the day before Thanksgiving: "I don't think that's in anybody's interest. Okay? And I'm going to be honest, I'm kind of trying to protect the defendants here in this situation. And I don't think it's in your interest to try to force people to come back tomorrow. I don't like the effect that has on pushing people to a verdict." JA2272.

The court then received a third note. JA2272. The court said, "This appears to be -- I can't quite figure it out. May be all the other jurors." JA2273. A group of jurors expressed concern that "[a] juror's previous court experience is influencing that juror's ability to discuss the trial in a group setting." JA2273. The note said the juror had made comments "on having been bullied as a juror on previous trials," and advised that the juror in question would not consider evidence in this trial, was "hostile to hearing any debate from certain other jurors," and disagreed with the jury charge. JA2273. The jurors who wrote the note asked that the court "consider speaking to this issue so that we are able to proceed with deliberations." JA2273.

Before the parties could be heard on the third note, the court received a fourth note. JA2273. The fourth note asked the court, "can you please call an alternate as I

am experiencing anxiety and unable to clearly make my decision?" JA2273. The court told the parties this note was from a different juror than the one who had written the first two notes. JA2273. The court then "welcome[d] suggestions from the parties." JA2274.

The Government asked the court to relieve both the juror who was not following the law and the juror who needed to take her medication. JA2274. The court again requested input from defense counsel, stating, "Mr. Daniel, your suggestions? I value your experience." JA2274. At defense counsel's request, the court re-read the third note. JA2275.

The court then told the parties that it was inclined to speak to the juror who potentially was refusing to deliberate, with a court reporter present but outside the presence of the parties, to ask whether there was a problem. JA2276. If there was not a problem, the court would allow the juror to continue deliberating. JA2276. Turning to the first and fourth notes, the court stated:

> *I think the one with the medicine we need to send home.* She needs her medicine. I understand that. . . .
>
> The person with the anxiety, that's a concern for me too. I don't want someone who is not functioning to be -- I've got 12 jurors for a reason. The defendant's rights are protected by having 12 functioning jurors. And it's got to be unanimous. So I've got a problem having somebody who says I can't do it anymore. That's my concern.
>
> *But I want to hear from everybody before I make a decision*[.]

JA2277 (emphasis added).

The Government asked the court to relieve the juror who needed medicine, remove the juror who could not follow the law, and inquire as to whether the juror who was experiencing anxiety was still a viable juror. JA2277-2279.

As to the juror who potentially refused to follow the law, the court said, "I don't want anybody else ganging up on somebody and trying to bump them off a jury. I need to confirm that." JA2277-2278. It continued, "I've got to confirm that. I can't let a juror be bumped out one way or the other who says, that's not accurate, I'm fully participating, they just don't agree with me. That -- you know, that's not a juror I remove." JA2278. And it stated a third time, "I've got to confirm it. I can't rely on someone else's account." JA2279.

The court then said, "with the consent of the parties, we are going to set up a place where I will take a court reporter, and *without anyone present but the court reporter*, I will create a record. And with my deputy and my court reporter, I will ask the juror if there's a problem." JA2279 (emphasis added).

The Government asked that the court "do the same thing with the juror who's reporting being anxious." JA2279. The court asked, "Do I have consent of the parties for me creating a record to question the juror?" JA2279. Defense counsel said, "Yes, you do have the consent, Your Honor." JA2279. Defense counsel did not object to the court's proposed procedure or request to be present during the voir dire.

The last thing the court said before leaving the courtroom was, "*I'm going to take action*. Fair enough? Everybody happy with that?" JA2281 (emphasis added). The Government agreed. JA2281. There was no objection, request for clarification, or expression of confusion from the defense. *See* JA3438 (sealed).

When the court returned, it notified the parties that it had relieved the juror who needed medicine (later identified as Juror 93). JA2281. The court had also relieved the juror experiencing anxiety (later identified as Juror 88). It stated:

> I spoke with the juror expressing anxiety. And she asked to be relieved and said she wasn't able to go forward, and I removed her. I relieved her. I granted her request to -- for an alternate. I just basically said to her, tell me, can you do your duties? And she said, I cannot do my duties. She's got medication issues herself, anxiety issues. And I relieved her.
>
> And the decisions I've made resolved the other issue, so I didn't have to address it.

JA2281-2282. Defense counsel responded, "we would object not to the juror that was replaced for medication. *We agreed to that. We agreed to that at the time.*" JA2282-2283 (emphasis added). Counsel continued, "But the second juror that was replaced about the anxiety is the one we would like to -- make an objection to." JA2283.

The court answered that the juror in question was "emotionally very fragile" and could hardly speak. JA2283. The court further explained that the juror

> was on anxiety medication and that she was not physically capable or emotionally capable of going forward. I didn't think I had any choice.

> We never got into what's going on in the jury room or anything like that. It was -- and she was shaking when she was speaking to me. There wasn't any confusion about that one.

JA2283; *see also* JA3438 (sealed).

The court seated two alternates and instructed the jury to begin deliberations again. JA2283. Within an hour, the jury reached a verdict. JA2284. Defense counsel then reiterated their objection to replacing the anxious juror. JA2284. The court answered, "I did what y'all asked me to do." JA2284. Defense counsel said, "I am not asking you to do anything differently now. Our understanding is that's essentially, with the case law, it's akin for moving to a mistrial . . . We object to replacement of *one juror*." JA2284 (emphasis added).

The court responded:

> On what basis? Because I asked you what did you want me to do on these? And we agreed I would talk to the juror, who could hardly speak, she was so emotionally upset. And I asked her if she could serve. . . . And she asked me to remove her, as she had written me already and asked me to remove her. So I was doing exactly what we all agreed I would do.
>
> I'm a little perplexed by that, Mr. Austin, to after the fact coming in and start complaining about something on a procedure we had agreed to already.

JA2284-2285. The court continued:

> You know, I try to be as transparent as I could. I read everybody everything. I asked you what you wanted me to do. I interviewed the juror, who was plainly incapable of continuing, and she was in an emotional meltdown. And I removed her. And that's what I understood

30

y'all -- we had agreed that I would interview her and I would make a decision.

> Now you now, after the fact, want to change that. You are a little -- moment late. I already sent her home following the procedure.

JA2285-2286. Defense counsel said he thought the court was "coming back to tell us what the juror said or to give us what your decision would be so that we could object to it." JA2286. The court asked, if "I had come back and told you that she was emotionally incapable of functioning and she asked me again to remove her, [] you would have objected to that?" JA2286. Counsel said, "I think we would have stated that it's a hung jury." JA2286. The court responded, "It's not a hung jury. I have alternates." JA2286. The court continued:

> You know, folks, to come in after the fact here, after the court laid it all out and we agreed on a process, I thought it was very clear, and I did -- but there's a record of her I don't think anybody would really question. It's all on the record about what she told me. And I was, of course, following up on her request that she be removed and told me she could explain it to me, and she did. I don't want to invade her privacy. But she is on significant medication. And she was, in my estimation, in an emotional meltdown situation.

JA2285-2287. At no point did Laffitte object to the court having excused the jurors outside of his or his counsel's presence.

The reconstituted jury convicted Laffitte on all counts. JA2287-2289.

**IX.** **Laffitte filed a supplemental Rule 29 motion, new-trial motion, supplemental new-trial motion, and second new-trial motion and retained new counsel.**

Laffitte filed a supplement to his Rule 29 motion, JA106, then moved for a new trial and judgment of acquittal. JA2293-2327. He argued the court erred by replacing the two jurors and the evidence was insufficient to convict him. JA2293-2327.

Two weeks later, Laffitte moved to file under seal affidavits from the two relieved jurors. JA2328-2330. The court ordered the parties to brief whether it could receive the affidavits under Federal Rule of Evidence 606(b). JA20-21, Dkt. 233. Laffitte then moved to file a third juror affidavit. JA2393-2395.

████████████████████████████████████████ JA3313-3328 (sealed).

Days later, he retained new counsel, JA21, Dkt. 243-244, ████████████

██████████████████████████████████████████████████

JA3329-3355, JA3423-3428 (sealed). ████████████████████

██████████████████████████████████████████████████

████████████████ JA3343 (sealed), ██████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████ JA3344 (sealed). ████

███████████████████████████████████████

██████ JA2337-2392; JA3370-3406 (sealed).

The district court denied Laffitte's new-trial and acquittal motions. JA2396-

2437. █████████████████████████████████

████████████████ JA3439; JA3443-3444; JA3445 (sealed), ███████████

███████████████████████████████████████

███████████████████████████████████████

██████ JA3448 (sealed). ██████████████████

██████████████ JA3445-3447 (sealed).

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████ JA3439-3440 (sealed). ████

███████████████████████████████████████

███████████████████████████████████████

───────────────────

11 ████████████████████████████████████

██████████████████████████████████ JA3450 (sealed).

█████████ JA3451 (sealed). ████████

█████████████████████████████████████ JA3451

(sealed).

████████████████████████████

████████  JA3444 (sealed). ████████

████████████████████████████

████████████  JA3440, JA3444 (sealed).

Laffitte then filed a new-trial motion based on Murdaugh's testimony during his state murder trial. JA2438-2444. The district court denied it. JA2480-JA2485. Laffitte suggests the court erred by precluding him from calling Murdaugh as a witness and denying his new-trial motion based on Murdaugh's testimony. Br. 19, 36-37. But he did not develop either argument, thereby waiving both. *United States v. Caldwell*, 7 F.4th 191, 207 n.13 (4th Cir. 2021).

## X. Laffitte was sentenced to 84 months in prison and ordered to pay over $3.5 million in restitution.

Laffitte's presentence investigation report (PSR) noted that restitution to the bank and the law firm was required under 18 U.S.C. § 3663A, the Mandatory Victims Restitution Act. JA3522. The PSR also recommended several conditions of supervision, one of which related to restitution:

> You must pay any remaining unpaid restitution balance imposed by the Court in minimum monthly installments of $2,000.00 to commence 30 days after release from custody . . . *Interest on any restitution/fine ordered is waived.*

JA3522 (emphasis added). The Government did not object to the PSR. JA3524.

The case was called for sentencing in August 2023. JA25, Dkt. 312. The court

imposed an 84-month sentence, a two-year downward variance. JA2847. It also ordered "mandatory restitution in the amount of $3,555,884.80 to the victims in this case," "due and payable immediately." JA2847. The court summarily stated, "Interest on restitution is waived." JA2847. There was no further discussion of restitution interest, and the court made no finding that Laffitte could not pay interest. The court did find Laffitte "does not have the ability to pay a fine." *Id.*

The judgment was entered the next day. JA2640. It states, "The court determined that the defendant does not have the ability to pay interest and it is ordered that the interest requirement is waived for the restitution." JA2644.

Laffitte appealed, JA2652-2653, and the Government cross-appealed, JA2860. In September 2023, this Court denied Laffitte's motion for bond pending appeal. Dkt. 51.

## SUMMARY OF THE ARGUMENT

**I.** ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

**II.** Laffitte's belated objections to the agreed-upon approach the court used to replace Jurors 93 and 88 do not show any reversible error. Nearly all of Laffitte's challenges to the replacement of the jurors are waived or, if not, forfeited. They also all fail on the merits. First, the district court did not clearly err by finding Jurors 93 and 88 were unable to perform their duties, and it did not abuse its broad discretion in replacing them. Second, the court did not violate Laffitte's right to be present when the court decided to remove the jurors. Laffitte *was* present when the court decided how to proceed, and there was no plain error that affected his substantial rights. Third, the court did not violate Laffitte's right to an impartial jury. Both jurors were replaced based on legitimate medical needs, not their views of the evidence.

**III.** The district court did not abuse its discretion by excluding testimony from Laffitte's witnesses about how some Board members were interested in trying to sell the bank or by excluding a memo addressing Board members' desire to position the bank to sell. Laffitte did not preserve his objection to the former, and the latter was inadmissible. Moreover, despite repeated opportunities, Laffitte did not show the evidence was probative of any Government witness's motive or bias. So the evidence was irrelevant, and it would have led to a "trial within a trial" and confused the jury. Finally, any error in excluding the evidence was harmless.

**IV.** The evidence was sufficient to convict Laffitte of bank and wire fraud as both an aider and abettor and as a principal. Laffitte has not appealed his aiding and abetting convictions. Nor could he. Overwhelming evidence shows Laffitte took affirmative acts with the intent of facilitating the bank and wire fraud scheme. The evidence was also sufficient to convict Laffitte as a principal. He made numerous misrepresentations that induced the bank and wire fraud transactions charged in Counts Two and Three.

**V.** The district court plainly and reversibly erred by waiving restitution interest. Interest on restitution was mandatory unless the district court found Laffitte cannot pay it. The court did not make that finding. That was plain error, and it affects the Government's substantial rights. If the court had considered whether Laffitte has the ability to pay interest, it could not have reasonably concluded he does not. Waiving interest harms Laffitte's victims and erodes public trust in the judicial system. The order waiving interest should be vacated and the case remanded for the required factual finding.

## ARGUMENT

**I.** ████████████████████████████████████████████
████████████████████████████

### A.  Standard of Review

Decisions to admit or exclude evidence are reviewed for an abuse of discretion. *United States v. Vidacak*, 553 F.3d 344, 348 (4th Cir. 2009). The Court "may not substitute its judgment for that of the district court; rather, it must determine whether the district court's exercise of discretion, considering the law and the facts, was arbitrary or capricious." *Id.* (alterations omitted).

### B.  ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████ *See Peña-Rodriguez v. Colorado*, 580 U.S. 206, 225-26 (2017) (committing to a trial court's discretion whether defendant has made a "threshold showing" to overcome Rule 606(b) "in light of all the circumstances," including "the reliability of the proffered evidence").

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████



JA3442 (sealed).

Br. 62.

JA3442, *see* JA3438-3439 (sealed),

JA3435 (sealed).

Br. 61.

JA3439-3440, JA3443-3444 (sealed).

Br. 61.



JA3367-3368 (sealed).

JA3368 (sealed).

JA3307 (sealed).

JA3308 (sealed),

JA3439 (sealed).

JA3308; JA3311 (sealed),

A3440 (sealed).

JA3440  (sealed).

JA3450 (sealed).

[REDACTED]

[REDACTED] The court observed the jury, interacted with it throughout the trial, and interviewed Juror 93 during jury selection and Juror 88 when she requested to be replaced. JA131-132; JA3309-3312; *see United States v. Birchette*, 908 F.3d 50, 58-59 (4th Cir. 2018). [REDACTED]

[REDACTED] *See Tanner v. United States*, 483 U.S. 107, 125-26 (1987) (noting in parenthetical that it "'was appropriate for the trial judge to draw upon his personal knowledge and recollection in considering the factual allegations that related to events that occurred in his presence'" (alteration omitted) (quoting *Gov't of Virgin Islands v. Nicholas*, 758 F.2d 1073, 1077 (3d Cir. 1985))). [REDACTED]

[REDACTED]

**C.** [REDACTED]

Federal Rule of Evidence 606(b) prohibits testimony from jurors—like the affidavits Laffitte relies on—that seeks to undermine a jury's verdict. And for good reason. Accepting jury verdicts is "essential to respect for the rule of law." *Peña-Rodriguez*, 580 U.S. at 210. Admitting juror evidence to impeach verdicts "would have dangerous consequences: no verdict would be safe and the practice would open

the door to the most pernicious arts and tampering with jurors." *Id.* at 216 (quotation marks omitted). It would undermine the public's trust in the judicial system, the finality of jury verdicts, and the sacred nature of jury service. *See id.* at 218. Rule 606(b)(1) protects against these consequences by prohibiting jurors' testimony "about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment" during "an inquiry into the validity of a verdict or indictment." Fed. R. Evid. 606(b)(1).

███████████████████████████████████████████
██████████████████████████████. But the rule prohibits the use of juror testimony during "an injury into the validity of a verdict." *Id.* And the Supreme Court has held "an inquiry into the validity of a verdict" means any "*proceeding* in which the verdict may be rendered invalid." *Warger v. Shauers*, 574 U.S. 40, 49 (2014). Laffitte's new-trial motion is such a proceeding, so Rule 606(b)(1) applies.

The Supreme Court recently confirmed Rule 606(b)'s expansive scope: It prohibits "the use of *any* evidence of juror deliberations, subject only to the express exceptions for extraneous information and outside influences." *Id.* at 48. █████

███████████████████████████████████████████
████████ *See, e.g.*, JA3360; JA3364 (sealed). ██████████████████

███████████████████████████████ *See United States v.*
*Acker*, 52 F.3d 509, 516 (4th Cir. 1995) (applying Rule 606(b) to an excused juror's
testimony). ███████████████████ *See* Br. 60 ███████████████

███████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████████████ Br. 60. ████

████ The Supreme Court has not cabined "jury deliberations" with a "rigid
distinction based only on whether the event took place inside or outside the jury
room." *See Tanner*, 483 U.S. at 117. Instead, the focus is the "nature of the
allegation." *See id.* (applying Rule 606(b) to prohibit juror's testimony on conduct
that occurred during trial and during jury's lunches throughout trial). ███████

████████████████████████████████████

████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████ Br. 56, 60. *Acker* forecloses his claim. 52 F.3d 509. There,
defense counsel secured an affidavit from a juror excused during deliberations
stating she would have held out to acquit the defendant. *Id.* at 515. But, in holding

that evidence was not admissible, this Court noted that—absent exceptions not applicable here—"courts have consistently rejected juror affidavits or testimony about mental processes."[12] *Id.* at 516. ████████████████████

████████████████████████████████████████████████

████████████████████ *See Peña-Rodriguez*, 580 U.S. at 215 (citing *Vaise v. Delaval*, 1 T.R. 11, 99 Eng. Rep. 944 (K.B. 1785)).

████████████████████████████████████████████

████████████████████████████████

## II.    LAFFITTE'S AFTER-THE-FACT OBJECTIONS TO THE AGREED-UPON APPROACH THE COURT USED TO REPLACE JURORS 93 AND 88 FAIL TO SHOW ANY REVERSIBLE ERROR.

Federal Rule of Criminal Procedure 24(c)(1) allows courts to "impanel up to 6 alternate jurors to replace any jurors who are unable to perform or who are disqualified from performing their duties." The district court read Juror 93 and 88's notes aloud in open court and engaged in a lengthy discussion with the parties about how to address them. Laffitte and his counsel were present for that exchange. They did not object. They did not express confusion. They did not ask for clarification. Instead, they agreed with the court's proposed approach: to excuse Juror 93 to allow

---

[12] ████████████████████████████████████████

████████████████████████████████████████████

JA3325-3327 (sealed).████████████████████

her to get her medication and to question Juror 88 *in camera* and "take action" on her request to be replaced. The court then found Jurors 93 and 88 were unable to perform their duties, and it did not abuse its discretion by replacing them with still-sequestered alternates.

Laffitte's new counsel, with the benefit of knowing how the jury would ultimately vote and "from the calm confines of their office," JA2414, now argue the district court erred by proceeding as it did instead of choosing alternative routes Laffitte never suggested. And they argue Laffitte's trial counsel were ineffective for agreeing with the court's proposal. But the court's announced and uncontested approach to replacing Jurors 93 and 88 with alternates was appropriate under both Rule 24 and this Court's case law. There was no error, on the part of the district court or trial counsel, and Laffitte's claims should be rejected.

## A.    Standard of Review

In recognition of the district court's superior vantage point on matters of trial management, the Court typically reviews the decision to replace a juror with an alternate for abuse of discretion, "which is rarely found in this context." *United States v. Runyon*, 707 F.3d 475, 517 (4th Cir. 2013). But when a defendant had "an opportunity to object" to the district court's decision and failed to do so, the Court reviews only for plain error. *Id.* at 517-18. And when a defendant intentionally decides not to assert a right, or intentionally relinquishes a known right, he waives

45

any subsequent claim that the action was error. *United States v. Robinson*, 744 F.3d 293, 298 (4th Cir. 2014). While Rule 52(b) provides courts discretion to correct errors that were forfeited because not timely raised, no such discretion applies when there has been true waiver. *See United States v. Olano*, 507 U.S. 725, 731-34 (1993).

The district court's factual findings are reviewed for clear error. *United States v. Perkins*, 67 F.4th 583, 589 (4th Cir. 2023).

Laffitte argues the court erred three ways by dismissing Jurors 93 and 88. All but one of his claims are either waived or forfeited. First, he argues the district court erred by finding Jurors 93 and 88 were unable to perform their duties. His claim as to both is waived. Assuming either claim is properly preserved, the district court's factual findings are reviewed for clear error and its decisions to replace the jurors for an abuse of discretion. Second, Laffitte argues the court violated his Rule 43 and Fifth Amendment rights to be present when Jurors 93 and 88 were excused. His claim as to both is waived. Assuming either claim is reviewable, it is only for plain error. Third, Laffitte argues the court violated his Sixth Amendment right to a unanimous verdict when it removed Jurors 93 and 88. His claim as to Juror 93 is waived. Assuming it is not, it is reviewed for plain error. His claim as to Juror 88 is preserved and reviewed for an abuse of discretion.

46

**B.    Laffitte waived all of his challenges to the replacement of Juror 93 by agreeing to excuse her. Those claims are unreviewable.**

Laffitte's trial counsel told the district court three times that they agreed to the replacement of Juror 93 based on her need for medication. JA2282-2283 ("We agreed with that. We agreed with that at the time."); JA2284 ("We object to replacement of one juror."); JA2301 ("Laffitte consented to the removal of the juror needing her antibiotic."). Trial counsel had access to the full record. They were present for the proceedings, got copies of the transcripts, and secured Juror 93's affidavit. Yet they never argued their consent was not knowing or voluntary. The Court should decline new counsel's invitation to disregard trial counsel's plain representations to the district court.

The district court asked the parties for input on how to address Juror 93's notes at least five times. JA2271; JA2272; JA2274; JA2276-2277. The Government took the position that Juror 93 should be excused so she could take her medicine. JA2271; JA2274; JA2277. The court's instinct was the same. JA2271; JA2277. Despite the court's numerous requests for suggestions, defense counsel voiced no objection to that plan, asked no questions, and proposed no alternative course of conduct. Instead, counsel told the court, they "agreed" to excusing Juror 93 "at the time." JA2283. That was not an after-the-fact consent; it was an unequivocal confirmation of what everyone in the courtroom knew to be true—that defense counsel had consented to Juror 93's removal before the judge left the courtroom. The court correctly found

Laffitte waived his challenge to the replacement of Juror 93 by consenting to her removal. JA2408. His claims related to the removal of Juror 93 are therefore unreviewable. *Robinson*, 744 F.3d at 298.

Laffitte's attempts to escape his admitted waiver are meritless. First, Laffitte claims any consent to excusing Juror 93 would have amounted to ineffective assistance of counsel and therefore cannot bind him. Br. 58. The district court squarely rejected that argument, finding trial counsel's performance "in addressing the issue of the juror notes and developing a common plan of action was well within professional standards and there was not the slightest suggestion of ineffectiveness." JA2413. Counsel "deliberately addressed the issues" and "had to exercise their best professional judgment about the proper course of action." JA2413.

They made a strategic decision to allow Juror 93 to be excused. They knew at the time that she needed medication *and* that she was "feeling pressured" to change her vote. JA2271-2272. But after two days of Laffitte's testimony and nearly 10 hours of deliberation (which included the jury asking to rehear Laffitte's testimony and one of his exhibits, JA2266-2267; JA2269), defense counsel could reasonably have estimated that the jury was moving toward an acquittal and she was a holdout for the Government. Having observed defense counsel's performance firsthand, it was "certainly not the impression" of the district court that they were ineffective. JA2414. The record does not show any deficient performance, much less conclusive

48

evidence of it. Laffitte's ineffective assistance claim is not cognizable in this appeal, and it cannot excuse his waiver. *See United States v. Richardson*, 195 F.3d 192, 198 (4th Cir. 1999).

Second, Laffitte asserts that his waiver was invalid because the district court did not address him directly and he did not "participate[] personally in" it. Br. 57. Neither was necessary. "There are essentially two categories of decisions made by a criminal defendant's trial counsel: those decisions, deemed 'personal,' that must be made with the defendant's consent and those that may be made without the defendant's consent." *Sexton v. French*, 163 F.3d 874, 885 (4th Cir. 1998). Decisions that require a defendant's consent include whether to plead guilty, waive a jury trial, pursue an appeal, and testify at trial. *Id.* Those that may be made without a defendant's consent typically involve "trial strategy and tactics," like "what evidence should be introduced, what stipulations should be made, *what objections should be raised*, and what pre-trial motions should be filed." *Id.* (quotation marks omitted, emphasis added). Laffitte cites no authority holding that removal of a juror is a "personal" decision that required his personal consent. *See United States v. Spruill*, 808 F.3d 585, 597 n.8 (2d Cir. 2015). To the contrary, whether to replace a juror with medical needs is exactly the type of "tactical decision" that can be made by trial counsel with "superior experience with the criminal process and detailed, objective

49

knowledge of the strengths and weaknesses of the defendant's case." *See Sexton*, 163 F.3d at 885.

But even assuming excusal of Juror 93 implicated a personal right, the district court was not required to engage in a colloquy with Laffitte to confirm he waived it. The question is whether trial counsel consulted with Laffitte and obtained his consent. *Horner v. Nines*, 995 F.3d 185, 203 (4th Cir. 2021); *see United States v. Boynes*, 515 F.3d 284, 286 (4th Cir. 2008) (holding no colloquy with defendant is necessary to waive right to jury trial as long as record shows waiver was "knowing, intelligent, and voluntary"). The record is clear that they did. The district court noted that Laffitte, "a sophisticated businessman, was sitting at counsel table" as his four attorneys "were actively engaged in the discussions with the Court and Government." JA2413. "The full discussion and plan agreed to for the replacement of Juror No. 93" took place in Laffitte's presence. JA2408. Any suggestion from Laffitte that his counsel consented to excusing Juror 93 without his knowledge, understanding, or agreement is belied by the record.[13]

So is his claim that his consent was not "knowing" because he "lacked critical information"— ████████████████████████████████████████

---

[13] Like his claim that the waiver amounted to ineffective assistance, any factual dispute Laffitte raises about what his attorneys told him and what he understood when they consented to replacing Juror 93 should be resolved in a § 2255 motion. *Massaro v. United States*, 538 U.S. 500, 504-05 (2003).

██████████████████████████████████████████████

███████████████████████. Br. 58-59.████████████████████

██████████████████████████████████████████████

████████ they do not undermine Laffitte's consent to replacing Juror 93. The information he says he lacked was available when he consented to her removal—but he didn't ask the court for any of it. He did not ask to see the notes. He did not ask for the juror number, which would have enabled him to see from the juror questionnaire where she lived. He did not ask the court whether it was possible to have her medicine brought to her so she could continue deliberating. He did not ask for any additional information about or questioning of the juror. The Court should reject his claim that his waiver was unknowing because he lacked information he didn't ask for or otherwise try to obtain.

████████████████████████████████████████JA3443 (sealed).████████████████████████████████████

████████████████████████████JA3443 (sealed). His claims regarding the removal of Juror 93—that the court erred by finding she was unable to perform, that her removal violated his right to be present, and that her replacement violated his right to a unanimous verdict, Br. 64-65—are all unreviewable. But they are addressed on the merits below.

**C.**    **Laffitte waived his claims that the court erred by excusing Juror 88 and by doing so outside of his presence. They are unreviewable.**

When Laffitte agreed that the district court would speak to Juror 88 *in camera* and then "*take action*" regarding her request to be replaced with an alternate, he waived any challenge to the court's decision to excuse her and his right to be present when the court did so. JA2410. His claims that the court erred by finding Juror 88 needed to be excused and by excusing her outside of his presence are unreviewable. *Robinson*, 744 F.3d at 298.

Juror 88 asked to be replaced with an alternate. After reading her note, the court requested input from defense counsel, stating, "Mr. Daniel, your suggestions? I value your experience." JA2274. The court said it was inclined to speak to the juror who potentially was refusing to deliberate, with a court reporter present but outside the presence of the parties, to ask whether there was a problem. JA2276. The court continued:

> The person with the anxiety, that's a concern for me too. I don't want someone who is not functioning to be -- I've got 12 jurors for a reason. The defendant's rights are protected by having 12 functioning jurors. And it's got to be unanimous. So I've got a problem having somebody who says I can't do it anymore. That's my concern.
>
> *But I want to hear from everybody before I make a decision*[.]

JA2277 (emphasis added).

The court said, "*with the consent of the parties*, we are going to set up a place where I will take a court reporter, and *without anyone present but the court reporter*,

I will create a record. And with my deputy and my court reporter, I will ask the juror if there's a problem." JA2279 (emphasis added).

The Government asked the court to "do the same thing with the juror who's reporting being anxious." JA2279. The court asked, "Do I have consent of the parties for me creating a record to question the juror?" JA2279. Laffitte's counsel replied, "Yes, you do have the consent, Your Honor." JA2279.

The last thing the court stated before leaving the courtroom was, "Okay. *I'm going to take action*. Fair enough? Everybody happy with that?" JA2281 (emphasis added). The court then questioned Juror 88 in a separate courtroom, determined she could not continue to serve, and relieved her. Laffitte objected after the court released Juror 88, surprising both the court and the Government given his earlier consent to the proposed procedure. JA2284-2287; JA2410 (finding "[t]he Court and Government counsel expressed surprise because defense counsel had plainly agreed to the *in camera* questioning of the juror and for the Court to 'take action' on the juror's request to be replaced").

Laffitte waived his argument that the district court erred by finding Juror 88 needed to be excused by agreeing to let the court question her without him present. He also waived his Rule 43 and Fifth Amendment right-to-presence claim. A criminal defendant's failure to invoke his Rule 43 right to be present "at a conference which he knows is taking place between the judge and a juror in chambers constitutes

53

a valid waiver of that right." *United States v. Gagnon*, 470 U.S. 522, 529 (1985). That's what happened here.

Laffitte argues he consented to questioning Juror 88 outside his presence, not to deciding whether to replace her. Br. 46. His argument is only persuasive if he convinces the Court to confine its analysis to "the moments leading up to the judge asking for the parties' consent" to create a record, Br. 46, and ignore the broader context of the district court's exchange with the parties. The court's inquiry was prompted by Juror 88 asking the court to call an alternate because she was "unable to clearly make [her] decision." JA2273. The Government asked the court to speak to her and find out if she was still a viable juror. JA2279. The court said it was going "to take action." JA2281. Laffitte's failure to invoke his right to be present when the court took that action "constitutes a valid waiver of that right" under Rule 43. *Gagnon*, 470 U.S. at 529.

Laffitte also waived his due process right-to-presence claim. Although "courts must presume that a defendant did not waive his [constitutional] rights," "[t]hat does not mean that the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver, may never support" a finding of waiver. *North Carolina v. Butler*, 441 U.S. 369, 373 (1979). In fact, courts have "explicitly repudiated" Laffitte's argument that the district court was required to address him directly and ask him to personally participate in the waiver of his right to be present.

*Clark v. Stinson*, 214 F.3d 315, 324 (2d Cir. 2000). "Such a waiver need not be express; it may be implied." *Rice v. Wood*, 44 F.3d 1396, 1400 (9th Cir. 1995), *vacated in part on other grounds by reh'g en banc*, 77 F.3d 1138 (9th Cir. 1996). What matters is that the waiver was knowing and voluntary. *See Boynes*, 515 F.3d at 286.

It was. The district court announced in open court—in Laffitte's presence—its intention to speak with Juror 88 on her request to be relieved and to "take action" *in camera*. *See Gagnon*, 470 U.S. at 527. Laffitte asserted no right to be present. *Id.* He lodged no objection, asked no questions, requested no clarification, and expressed no confusion. He proposed no alternative course. Laffitte knowingly waived any due process right to be present when the district court addressed Juror 88's request to be excused. *See* JA3438 (sealed).

Laffitte cites cases interpreting plea agreements and other documents drafted by the Government to support his claim that any ambiguity in the record should be construed against the Government. Br. 48-49. Of course ambiguities *created by the Government* should not be construed against a defendant. *E.g.*, *United States v. Johnson*, 400 F.3d 187, 195 (4th Cir. 2005). But this case doesn't involve a dispute about a document drafted by the Government, so those cases are irrelevant. Laffitte waived his claims that the district court erred by finding Juror 88 needed to be

excused and that the court erred by excusing her outside of his presence. They are
unreviewable.

### D. The district court did not abuse its broad discretion in replacing Jurors 93 and 88.

Rule 24(c) "expressly authorizes district courts to impanel alternate jurors and
to substitute them for jurors who can no longer serve." *Runyon*, 707 F.3d at 517. And
district courts have significant discretion in deciding whether to replace jurors with
alternates. *See, e.g.*, *United States v. Penn*, 870 F.3d 164, 171 (3d Cir. 2017); *United
States v. Picardi*, 739 F.3d 1118, 1122 (8th Cir. 2014); *United States v. De Oleo*, 697
F.3d 338, 341 (6th Cir. 2012). If Laffitte's claims are preserved, he cannot show the
district court abused its substantial discretion in replacing either juror. First, the court
did not clearly err by finding Jurors 93 and 88 were unable to perform their duties
because of legitimate medical issues. Second, the court did not violate Laffitte's Fifth
Amendment right to be present when either juror was removed. Finally, the court did
not violate Laffitte's Sixth Amendment right to a unanimous verdict because it did
not replace either juror based on her views of the evidence.

### 1. The district court did not clearly err by finding Jurors 93 and 88 were unable to serve, and it did not abuse its discretion by replacing them.

Laffitte waived his claims that the district court erred by finding Jurors 93
and 88 needed to be replaced. *Supra* Parts II.B, II.C. But even if he did not, the district
court did not abuse its discretion by replacing Jurors 93 and 88 after finding they

were "unable to perform" their duties. *See* Fed. R. Crim. P. 24(c). "A finding that a district court acted on an irrelevant legal basis or lacked factual support for the conclusion that a juror was unable or disqualified to perform his duty amounts to a finding that the court abused its discretion." *United States v. Nelson*, 102 F.3d 1344, 1349 (4th Cir. 1996). This Court has affirmed the substitution of a juror who was 30 minutes late "without further inquiry," *United States v. Colkley*, 899 F.2d 297, 303 (4th Cir. 1990), two jurors whose vacation plans might have interfered with deliberations, *Nelson*, 102 F.3d at 1350, and a juror whose mother died during a break in the trial because it was unclear when she might return and what inconvenience any delay might cause, *Runyon*, 707 F.3d at 517. The district court's decisions fit comfortably within that precedent.

The court concluded it was "not practical" for Juror 93 to "get her medicine and drive back." JA2271; JA2277. Laffitte asked whether the jury could "just come back in the morning." JA2271. Because it appeared that the jury was still deliberating and it was the Tuesday before Thanksgiving, the court expressed concern that it was not "in anybody's interest" to send the jury home and tell them they had to return the next day. JA2272. It explained, "I'm kind of trying to protect defendants here in this situation. And I don't think it's in your interest to try to force people to come back tomorrow. I don't like the effect that has on pushing people to a verdict." JA2272.

Laffitte disagrees with the court's judgment call. He accuses the court of caring more about its holiday schedule than Laffitte's constitutional rights and claims the court just wanted to "get to a verdict" that night. Br. 21-22, 42. His complaint ignores substantial evidence that shows the district court's primary concern was ensuring Laffitte's case was heard by effective jurors, even if that meant holding court outside of normal business hours. *E.g.*, JA882-883 ("in fairness to the jury, I'd love to try to, you know, get as much done as we can" before the Thanksgiving holiday, "[b]ut we will take the time we need to take"); JA891 (expressing willingness to continue trial on a Saturday if necessary); JA2218-2219 (allowing jury to decide whether it wanted to be charged and begin deliberations when closings finished at 5:25 pm or whether it wanted to resume in the morning); JA2276 ("I worry about do I have effective jurors."); JA2277 ("The defendant's rights are protected by having 12 functioning jurors.").

It was the court's considered judgment that Laffitte's interests were better protected by allowing the jury to continue deliberations that night because breaking up active deliberations and bringing the jury back the day before a holiday might push the jury to a verdict. That is precisely the type of trial management decision left to a district court's "particularly broad" discretion. *See United States v. Janati*, 374 F.3d 263, 273-74 (4th Cir. 2004). "While it is undoubtedly true that the court could have considered other alternatives to further the important goal of keeping the

original jury together," it considered the single alternative Laffitte suggested and opted to proceed differently—without objection from the defense. *Nelson*, 102 F.3d at 1349. That was not an abuse of discretion.



Br. 58, 64.

JA3366 (sealed).

JA3366-3367 (sealed).

JA3367 (sealed).

JA3441 (sealed). And "[g]iven the uncertainty regarding when she might be able to return, as well as the inconvenience that any delay might cause," this Court should have "no trouble," as it did in *Runyon*, "concluding that the district court was well within its discretion in deciding to excuse and replace [Juror 93] rather than postpone the proceedings." 707 F.3d at 517.

The same is true of Juror 88. Appellate courts pay particular deference to trial courts when a juror's mental or physical capacity to continue serving is at issue. *E.g.*, *United States v. Thompson*, 528 F.3d 110, 121 (2d Cir. 2008) (juror replaced after telling judge her nerves "were shot"); *United States v. Cannon*, 475 F.3d 1013, 1018, 1023 (8th Cir. 2007) (juror replaced after she reported being "emotionally wrought over being on the jury"); *United States v. Beard*, 161 F.3d 1190, 1193-95 (9th Cir. 1998) (deliberating juror replaced because of her distraught emotional state); *United States v. Walsh*, 75 F.3d 1, 4-5 (1st Cir. 1996) (deliberating juror dismissed because she was not "capable of engaging in rational discussions based upon the evidence"); *United States v. Huntress*, 956 F.2d 1309, 1313 (5th Cir. 1992) (deliberating juror replaced after becoming "impaired as a result of mental illness"); *United States v. O'Brien*, 898 F.2d 983, 986 (5th Cir. 1990) (deliberating juror dismissed because of recent history of severe depression).

The district court found it was "obvious that Juror No. 88 was under considerable stress." JA2409. When she spoke to the court, she "initially asked the Court to wait to allow time to compose herself," then said she was not able to perform her duties as a juror. JA2409; JA3310-3311 (sealed). The court found she was "plainly incapable of continuing" and "emotionally incapable of functioning." JA2281-2283; JA2285-2287. It noted she was experiencing anxiety, shaking and could hardly speak, and, by the court's estimation, in an "emotional meltdown

situation." JA2281; JA2285; JA2287. None of those findings are clearly erroneous. And after making them, the court appropriately exercised its discretion to replace Juror 88 because—███████████████—she could not uphold her duties as a juror. *See* JA3311 (sealed).

Laffitte's argument that the court "had alternatives" that could have "eased the stress," Br. 55 (alteration omitted), does not show an abuse of discretion. The court repeatedly asked for his input, and he declined to suggest alternatives. District courts are afforded broad discretion in handling juror matters, *Penn*, 870 F.3d at 171, and the fact that the court could have proceeded differently does not mean it acted unreasonably by proceeding as it did. Laffitte's after-the-fact objection and speculative second-guessing cannot establish that the district court abused its discretion. It did not. And if it did, for the reasons explained below, any error was harmless. *Infra* Parts II.D.2.b, II.D.3.a.

## 2. The district court did not violate Laffitte's right to be present when either juror was removed.

Federal Rule of Criminal Procedure 43(a)(2) and the Fifth Amendment's Due Process Clause require a defendant's presence when the district court decides to excuse and replace jurors. Fed. R. Crim. P. 43(a)(2) (requiring defendant's presence at "every trial stage"); *Runyon*, 707 F.3d at 517. Laffitte waived any challenge to the removal of Juror 93 and waived his Rule 43 and due process rights to be present when the court decided to excuse Juror 88. *Supra* Parts II.B, II.C. Assuming these

claims are not waived, they are without merit. Laffitte was present when the parties and court agreed to remove Juror 93. And the district court did not plainly or reversibly err by removing Juror 88 based on her inability to perform her duties.

### a. Laffitte was unquestionably present when the district court decided to replace Juror 93.

Assuming Laffitte did not waive his challenge to the release of Juror 93, he forfeited it by failing to object. To prevail on plain-error review, he must show (1) an error that (2) was clear or obvious, (3) affected his substantial rights, and (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings. *United States v. Walker*, 934 F.3d 375, 378 (4th Cir. 2019).

He fails at the first prong. Laffitte has provided no support for his claim that Juror 93 was replaced in violation of his "right to be present to *the proceedings in which the district court decided* to excuse and replace Juror #93." Br. 64 (quotation marks omitted, emphasis added). Nor can he. The district court called his claim "simply untrue." JA2408. "The full discussion and plan agreed to for the replacement of Juror No. 93" took place in Laffitte's presence in open court. JA2408. He had a right to be present "when the district court decided to excuse and replace" Juror 93, and he was. *See Runyon*, 707 F.3d at 517. The court did not err, plainly or otherwise, by obtaining Laffitte's consent to release Juror 93 and then replacing her.

**b.    The district court did not plainly err by questioning and excusing Juror 88 outside Laffitte's presence without his objection.**

If Laffitte did not waive his right to be present when the court decided to excuse Juror 88, he forfeited his claim by failing to object. Laffitte was present when the court told the parties it was going to question Juror 88 *in camera* and "take action" on her request to be replaced. Yet he raised no objection until *after* the court returned and told the parties she had been relieved. JA2282-2283. And when he did object, it was because he thought the court should have declared a mistrial for a hung jury—not because he had a right to be present when Juror 88 was questioned and excused. JA2284; JA2286. He had "an opportunity to object" based on his right to be present, and he did not. *Runyon*, 707 F.3d at 517-18. So if he did not outright waive his Rule 43 and due process rights to be present, he forfeited them. His claim should be reviewed, at most, for plain error. *Id.*; *United States v. Elbaz*, 52 F.4th 593, 611 (4th Cir. 2022) ("objections must be made with sufficient specificity so as reasonably to alert the district court of the true ground for the objection" (quotation marks omitted)).

There was no error, plain or otherwise. Under any reasonable interpretation of the presence requirement, Laffitte and his counsel *were* present when the court considered whether to relieve and replace Juror 88. She was excused after extensive discussion with both parties in open court. Laffitte's counsel were actively engaged

63

in those discussions about how to proceed, and Laffitte "was sitting at counsel table throughout[.]" JA2413. Laffitte was present when the court, the Government, and his counsel devised a plan for responding to Juror 88's request to be replaced. The court did not plainly err by proceeding with that plan. JA2284-2285.

If there was plain error in replacing Juror 88 (or Juror 93), it did not affect Laffitte's substantial rights. This Court's decision in *Runyon* is instructive. There, the district court plainly erred by dismissing a juror "at an *in camera* proceeding from which both [the defendant] and his lawyer were absent and of which they received no notice." *Runyon*, 707 F.3d at 517. But that error did not satisfy the third prong of plain-error review because the district court replaced the juror "with an alternate who had been selected along with all the other jurors and alternates during voir dire," at which both the defendant and his lawyers were present. *Id.* at 518.

The same is true in Laffitte's case. The two alternates were empaneled at the same time as the other jurors, while Laffitte and his counsel were present. They were subjected to the same voir dire and opening and final jury charge as the other jurors. When polled, each juror affirmed the verdict. JA2289. And overwhelming evidence supported Laffitte's guilt on all six counts. [14] *See Runyon*, 707 F.3d at 519.

---

[14] The evidence supporting a harmlessness finding on the bank and wire fraud counts is set forth below. *Infra* Part IV.B. Laffitte did not challenge the other four counts on appeal. The evidence supporting each of them is set forth in the Statement of the Case and addressed in the Government's response to Laffitte's post-trial Rule 29 motion. JA2377-2392.

Moreover, *Runyon* noted, "[h]ad there been any risk of prejudice from the substitution, one would have expected [the defendant's] lawyer to have vigorously objected" and to have asked for a continuance until the excused juror could return, "yet he did neither." *Id.* "It would set a poor precedent to allow a party to remain silent when a substitution is announced, await the verdict, and lodge an objection only when the jury's determination was adverse." *Id.* "In common parlance, such a tactic is called sandbagging." *Id.*

That's exactly what Laffitte's counsel did. They sat through extensive discussion with the court and the Government about how to address Juror 88's request to be relieved, yet they lodged no objection until after the court had executed the procedure everyone agreed on. JA2282-2283. And they raised no claim that the court violated Laffitte's right to be present until post-trial briefing. Laffitte has not shown any effect on his substantial rights or any miscarriage of justice.

Finally, if Laffitte preserved his objection and the district court abused its discretion by excusing Juror 88 outside of his presence, the error was harmless beyond a reasonable doubt. *See United States v. Camacho*, 955 F.2d 950, 955 (4th Cir. 1992). Simply put, Laffitte's presence during the court's interview of Juror 88 would have made no difference. When defense counsel objected to the replacement of Juror 88, the court asked, "had I come back and told you that she was emotionally incapable of functioning and she asked me again to remove her, [] you would have

objected to that?" JA2286. Counsel responded, "I think we would have stated that it's a hung jury." JA2286; JA2284 ("it's akin to moving [for] a mistrial"). The district court correctly responded, "It's not a hung jury. I have alternates." JA2286; *see United States v. Hayden*, 85 F.3d 153, 157 (4th Cir. 1996) (holding courts "should consider whether there are less drastic alternatives to a mistrial"). And it reiterated that Juror 88 was "in an emotional meltdown situation." JA2287.

Laffitte's presence during the interview may have given him a chance to encourage the court to ask more questions about why Juror 88 was anxious or to argue she shouldn't be relieved. But it would not have changed the outcome. The district court was uniquely situated to evaluate whether Juror 88 could continue to serve, and the record is clear that it would have removed her based on her fragile emotional state even over Laffitte's argument that the jury was hung. Any error in deciding to remove Juror 88 outside of Laffitte's presence was harmless.

The district court did not violate Laffitte's right to be present when it decided to replace Jurors 93 and 88.

### 3. The district court did not remove either juror based on her view of the evidence.

The Sixth Amendment guarantees a trial by an impartial jury that must reach a unanimous verdict to convict. *Ramos v. Louisiana*, 140 S.Ct. 1390, 1395 (2020); Fed. R. Crim. P. 31(a) ("The verdict must be unanimous."). To protect that right, courts have held a district court "may not dismiss a juror during deliberations if the

request for discharge stems from doubts the juror harbors about the sufficiency of the government's evidence." *United States v. Warren Brown*, 823 F.2d 591, 596 (D.C. Cir. 1987).

Laffitte's Sixth Amendment claims rely on a line of cases that follow the D.C. Circuit's opinion in *Warren Brown*, all holding that if the record shows a substantial possibility that a juror's request to be discharged stems from his doubts about the sufficiency of the evidence, "the court must deny the request." *Id.*; Br. 51-52. Every court he cites has limited that test to circumstances where the juror is discharged "for bias, failure to deliberate, failure to follow the district court's instructions, [or] jury nullification."[15] *United States v. Kemp*, 500 F.3d 257, 304 (3d Cir. 2007); *see United States v. Ozomaro*, 44 F.4th 538, 545 (6th Cir. 2022) (quoting *Kemp*); *United States v. Abbell*, 271 F.3d 1286, 1304 n.19 (11th Cir. 2001) (discussing "when a district court is investigating the possibility of impermissible nullification by a juror"); *United States v. Symington*, 195 F.3d 1080, 1087 n.6 (9th Cir. 1999) (discussing

---

[15] All of the cases Laffitte cites also addressed whether deliberating jurors were properly removed for "good cause" under Rule 23(b)(2)(B). Courts have split on whether Rule 23(b)'s "good cause" standard applies to deliberating jurors replaced under Rule 24(c)(1). *Compare United States v. Turner*, 836 F.3d 849, 866 (7th Cir. 2016), *with United States v. Delva*, 858 F.3d 135, 158 (2d Cir. 2017). The Court need not resolve this question for two reasons. First, Laffitte has not argued that the district court failed to demonstrate "good cause" for excusing the jurors. He did not cite Rule 23 or use the term "good cause" in his brief. Second, for the same reasons excusing Jurors 93 and 88 was not an abuse of discretion under Rule 24, their replacement satisfies the "good cause" standard.

"cases where the allegations go to the quality and coherence of the juror's views on the merits"). "[N]ullification is the concern of the any possibility rule." *Spruill*, 808 F.3d at 594 n.7.

That makes sense, because "[a] trial judge faces special challenges when attempting to determine whether a problem between or among deliberating jurors stems from disagreement on the merits of the case." *Symington*, 195 F.3d at 1086. The court "may not delve deeply into a juror's motivations because it may not intrude on the secrecy of the jury's deliberations," but that may make it hard "to determine conclusively whether or not a juror's alleged inability or unwillingness to deliberate is simply a reflection of the juror's opinion on the merits of the case, an opinion that may be at odds with those of her fellow jurors." *Id.* The "any possibility" rule was meant to balance those concerns. *Spruill*, 808 F.3d at 594.

The rule does not, however, "stand in the way of dismissing [even] a known holdout juror for reasons independent of his views about the evidence." *United States v. McGill*, 815 F.3d 846, 868 (D.C. Cir. 2016). When the reason for a juror's dismissal "poses no inherent potential for confusion with a juror's evidence-based inclination to acquit," the Sixth Amendment does not bar removal of the juror. *Id.* at 869.

That's the case here. Both jurors were replaced based on legitimate medical needs—not their views of the evidence—so the *Warren Brown* line of cases has no

bearing on Laffitte's appeal. To be clear, Laffitte waived his claim that the district court erred by replacing Juror 93. *Supra* Part II.B. If he did not, he forfeited it by failing to object, and it is reviewed only for plain error. But on the merits, the district court did not plainly err by replacing Juror 93 or abuse its discretion by replacing Juror 88 because neither juror was excused based on her view of the Government's evidence. His Sixth Amendment claims should be rejected.

### a. The district court made clear that it replaced Juror 93 based on her need to get her medication.

If Laffitte did not waive his challenge to the replacement of Juror 93, *supra* Part II.B, he forfeited his Sixth Amendment claim by failing to object to her removal. Juror 93's second note said she was "feeling pressured to change [her] vote." JA2271. Yet defense counsel agreed to replace her without raising any concern that doing so would violate Laffitte's Sixth Amendment right to a unanimous verdict. If the Court reviews this claim at all, it should do so only for plain error. Laffitte has not met that standard.

There was no Sixth Amendment error in excusing Juror 93, much less a plain one, for three reasons. First, as discussed above, *supra* Part II.D.1, the record amply supported the court's decision that Juror 93 should be replaced to take her medicine, and the parties agreed. There was no "causal link" between Juror 93's view of the evidence and her dismissal, so *Warren Brown*'s "substantial possibility" test is

irrelevant. *See United States v. Ginyard*, 444 F.3d 648, 652 (D.C. Cir. 2006); *McGill*, 815 F.3d at 868.

Second, the "substantial possibility" test only applies when courts address a request for a juror to be relieved. *E.g.*, *Ozomaro*, 44 F.4th at 544 (stating "the court must deny *the request*" if there is any possibility "that *the request* to discharge stems from the juror's view of the sufficiency of the government's evidence" (quoting *Warren Brown*, 823 F.2d at 596) (emphasis added)). ███████████████ ████████████████████████████ Br. 58, 60, 65; she was excused because the court and the parties believed she could no longer serve.

Third, Juror 93's note that she was feeling "pressure" comes nowhere close to satisfying the threshold for insulation from removal. Her note did not indicate whether she was leaning toward the Government or instead harbored doubts about the Government's case. JA2271; *see Warren Brown*, 823 F.2d at 596. It does not suggest she was considering nullification. *See Spruill*, 808 F.3d at 594 (noting the "strict 'any possibility' rule does not reach beyond nullification"). And there is no contemporaneous evidence that she was a "dissenting juror." *See United States v. Corrine Brown*, 996 F.3d 1171, 1186 (11th Cir. 2021) (en banc). Simply feeling pressure "suggest[s] the normal dynamic of jury deliberations, with the intense pressure often required to reach a unanimous decision." *United States v. Cuthel*, 903 F.2d 1381, 1383 (11th Cir. 1990). Her second note doesn't show any possibility—let

alone a substantial one—that she was requesting to be removed because she had doubts about the sufficiency of the evidence. *See Warren Brown*, 823 F.2d at 596.

If there was error, it was not plain. The district court—with the consent of the parties—excused Juror 93 based on a medical need, not her view of the evidence. The D.C. Circuit's opinions in *McGill* and *Ginyard* expressly contemplate that removal even of a holdout juror does not violate the Sixth Amendment when there is no causal link between the request for removal and the juror's views of the case. Under that precedent, the district court cannot have plainly erred. *McGill*, 815 F.3d at 869-69; *Ginyard*, 444 F.3d at 652.

If there was plain error, it did not affect Laffitte's substantial rights. *Supra* Part II.D.2.b. Laffitte claims prejudice based on the jury's quick verdict after Juror 93 was dismissed ██████████████████████████. Br. 65. Neither ground is persuasive. As the district court explained, "there is no minimum time required for jury deliberations." JA2415 (citing *Wilburn v. Eastman Kodak Co.*, 180 F.3d 475, 476 (2d Cir. 1999); *Guaranty Serv. Corp. v. Am. Emp'rs' Ins. Co.*, 893 F.2d 725, 729 (5th Cir. 1990)). And the court did not need the parties' consent—much less the juror's—to replace her under Rule 24 after he found she was unable to perform.[16] *United States v. Warren*, 973 F.2d 1304, 1308-1309 (6th Cir. 1992).

---

16 ████████████████████████████████████████
████████████████████████ JA3345 (sealed). The Government agrees that "[a]

████████████████████████████████████

████████████  Laffitte has not shown that excusing Juror 93 based on her need for

medication was a plain error that affected his substantial rights.

> **b.    The district court made clear that it replaced Juror 88 based on her significant emotional distress.**

The district court did not violate Laffitte's Sixth Amendment rights when it

excused Juror 88 because, as with Juror 93, its decision was unrelated to Juror 88's

views of the evidence. The court called Laffitte's claim that Juror 88 was replaced

because of her disagreement with other jurors "simply untrue." JA2411. It explained

that it spoke with Juror 88 only "because she indicated that she was anxious and

needed to be replaced with an alternate," and its "singular focus was on [her] ability

to perform her duties as a juror." JA2411. The court conscientiously (and correctly)

avoided any discussion of her position with respect to the other jurors, her views of

the evidence, or the allegations that a juror was unwilling to deliberate or follow the

court's instructions. JA2410-2411; *see Spruill*, 808 F.3d at 593 (holding district

court's discretion in removing deliberating jurors extends to deciding "whether, and

to what degree, to question a deliberating juror regarding circumstances that may

give cause for removal"). It "never had to address" the potential issue of dissension

---

juror's subjective perceptions cannot trigger constitutional concerns." *Anderson v. Miller*, 206 F. Supp. 2d 352, 361 (E.D.N.Y. 2002).████████████████████

████████████████

and "never got into what's going on in the jury room or anything like that" with either of the excused jurors. JA2282; JA2283. As with Juror 93, *Warren Brown*'s "substantial possibility" test wasn't triggered when Juror 88 requested to be removed.



First, ███████████████████████████████

███████████████████████ *see Warren Brown*, 823 F.2d at 596, ████████

█████████████████████ *see Spruill*, 808 F.3d at 594. JA3310-3311 (sealed). ████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████ JA3361 (sealed). ████

███████████████████████████████████████ there is no

evidence that the court dismissed "a dissenting juror." *See Corrine Brown*, 996 F.3d at 1186. The *Warren Brown* line of cases is therefore inapplicable. *Kemp*, 500 F.3d at 304.

More importantly, even if Juror 88 had expressed doubts about the Government's case, the district court would not have abused its discretion by excusing her based on her debilitating mental state. The D.C. Circuit has explained that, "[w]ere a holdout juror to request dismissal because he was experiencing a heart attack, [*Warren*] *Brown* would not prevent a district court from excusing that

juror . . . even if the record suggested that juror independently had doubts about the sufficiency of the evidence." *Id.* That Juror 88's impairment was emotional, not physical, rendered it no less incapacitating. It was an independent and justified basis for excusing Juror 88, and there was no "causal link" between the Juror 88's view of the evidence and her dismissal. *See Ginyard*, 444 F.3d at 652.

The court found Juror 88 was "visibly anxious," JA2401; she asked the court to "give [her] a minute" to compose herself before she started talking, JA2401; it was "obvious that [she] was under considerable stress," JA2409; she was "in obvious distress and advised the Court that she was not capable of performing her duties as a juror," JA2409; ██████████████████████████████████ JA3438 (sealed); and after observing her "demeanor, her note to the Court, and her responses to the Court's questions, it was obvious that she was unable to perform her duties as a juror." JA2411. Like the D.C. Circuit, this Court should be "highly reluctant to second guess the conclusion of an experienced trial judge, when, as here, that conclusion was based in large measure upon personal observations that cannot be captured on a paper record." *McGill*, 815 F.3d at 871-72 (cleaned up).

██████████████████████████████████████████████

██████████████████████ Br. 55, Laffitte seems to accuse the district court of doing exactly what it said it would not—allow a dissenting juror to be bumped off the jury based on her views. The court said it didn't "want anybody else ganging

up on somebody and trying to bump them off a jury," JA2277-2278, and it wouldn't "let a juror be bumped out one way or the other," JA2278. And it plainly stated why it replaced Juror 88: when she "advised the Court she was unable to perform her duties and it was apparent from her demeanor she was in significant emotional distress," she "effectively disqualified herself as a juror." JA2411. The district court excused Juror 88 because of her debilitating anxiety and her representation that she was unable to continue deliberations. JA2411. Laffitte has given this Court no reason not to take the district court at its word. *Cf. United States v. Shatley*, 448 F.3d 264, 268 (4th Cir. 2006).

Juror 88's extreme anxiety justified her dismissal wholly independent of her views of the evidence, so there was no Sixth Amendment violation. If there was, it was harmless beyond a reasonable doubt. *Supra* Part II.D.3.a.

* * *

The district court cautiously considered how to address Juror 93 and 88's notes. It repeatedly asked for Laffitte's input. Where he didn't explicitly agree, he didn't object either. He suggested one alternative, and the court rejected it *for fear that it was unfavorable to Laffitte. See* JA2272. The court did what it clearly believed all parties had agreed to do. It excused Juror 93, met with Juror 88, and "took action" on her request to be replaced. Now that the dust has settled, Laffitte wants to

backdate his objections. There's a term for that tactic: sandbagging. *See Runyon*, 707 F.3d at 518. The Court shouldn't entertain his claims.

## III. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY EXCLUDING IRRELEVANT, CONFUSING EVIDENCE THAT WAS NOT PROBATIVE OF BIAS OR MOTIVE.

### A. Standard of Review

Decisions to admit or exclude evidence are reviewed for an abuse of discretion. *Vidacak*, 553 F.3d at 348. A district court's decision to admit or exclude evidence under Rule 403 is reviewed "under a broadly deferential standard" and will not be reversed "in the absence of 'the most extraordinary circumstances' in which the court's 'discretion has been plainly abused.'" *United States v. Hassouneh*, 199 F.3d 175, 183 (4th Cir. 2000).

### B. The district court did not abuse its discretion by excluding evidence that was not probative of bias or motive and would have confused the jury.

The district court did not abuse its considerable discretion by barring Laffitte from (1) eliciting testimony from his witnesses about how newer Board members were moving toward trying to sell the bank and (2) introducing Charlie Laffitte's memo to the Board addressing members' desire to position the bank to sell. Br. 66-67. Laffitte did not preserve an objection to the exclusion of the former, and the latter was inadmissible. Moreover, the evidence was not probative of bias or motive so it

was not relevant, it would have led to a trial within a trial, and it would have confused the jury. Finally, any error in excluding the evidence was harmless.

> **1.    Laffitte did not preserve his challenge to the exclusion of testimony about selling the bank.**

Under Federal Rule of Evidence 103(a)(2), a party may not claim error in a ruling to exclude evidence unless he informed the district court of the substance of the evidence by an offer of proof and the error affected his substantial rights. "[I]t is paramount that the proponent inform the court in an offer of proof the substance of the evidence sought to be admitted, unless that substance is apparent from the context of the request." *United States v. Liu*, 654 F. App'x 149, 154 (4th Cir. 2016) (argued but unpublished). An offer of proof serves two purposes: It "informs the trial court of the content of the evidence and its relevance to the case, which enables the court to make an informed evidentiary ruling," and it "permits the appellate court to evaluate whether the exclusion of evidence affected the substantial rights of the party seeking its admission." *Id.* Laffitte did not sufficiently proffer the anticipated testimony, and this issue is not preserved for appeal. *See U.S. ex rel. Ubl v. IIF Data Sols.*, 650 F.3d 445, 455 n.2 (4th Cir. 2011).

Laffitte asserts that "counsel attempted to ask other board members about the 'new Board members, family members that came in, and' how 'they started moving toward trying to sell the bank.'" Br. 66 (quoting JA1556). But he quotes an exchange with the court (not a witness) that followed questions defense counsel asked Charles

77

Laffitte, III, about the Shareholder Repurchase Program—not the sale of the bank. JA1556. And Laffitte has not appealed the exclusion of evidence about the Shareholder Repurchase Program.

Later in Charles Laffitte's testimony, defense counsel asked whether he had attended a Board retreat in 2020 and what the purpose of the retreat was. JA1561. The Government objected based on relevance, and defense counsel told the court this was "the same issue"—meaning the Shareholder Repurchase Program. JA1561. Laffitte did not proffer expected testimony about anything different. Laffitte told the court the excluded evidence related to an issue entirely separate from the sale of the bank, and he did not proffer any specific statements about selling the bank. So he did not preserve any challenge to the exclusion of evidence about selling the bank during Charles Laffitte's testimony. *See Liu*, 654 F. App'x at 154.

During Charlie Laffitte's testimony, defense counsel asked when the "tone or collegiality" of the Board changed. JA1608. The court sustained the Government's objection because the question was "not relevant based on [its] prior rulings." JA1608. Defense counsel responded, "Okay." JA1609. He made no offer of proof regarding the testimony he sought to elicit and no effort to explain how the testimony was relevant or showed motive or bias.

Defense counsel then tried to admit minutes of a special Board meeting from September 19, 2021. JA1619. The Government objected based on relevance and the

78

court's prior rulings. JA1620. Defense counsel said he was not using the evidence to impeach prior witnesses; he was trying to "show there's a tremendous riff on the Board" and there was "a motive for action" (not a motive to testify). JA1620, JA1622. The court excluded the evidence based on its understanding that it "was an attempt to prove that -- damage the credibility of the Laffittes," and "[y]ou can't prove it by extrinsic evidence." JA1621. Laffitte did not argue that the Board minutes went to motive to testify or bias, not general credibility. And he has not appealed the exclusion of the minutes.

It was during a break in Gray Henderson's testimony that counsel first expressed a desire to use defense witnesses to demonstrate factions on the bank Board showed the Government's witnesses had "bias and motive for testifying." JA1675-1677. But defense counsel never proffered any specific evidence they sought to elicit; they made only vague assertions like that there were "factions within this family." JA1677. The substance of the testimony they were seeking is far from "apparent from the context," Fed. R. Evid. 103(a)(2), and counsels' argument was insufficient to inform the district court of the content of the evidence and how it was relevant. *See Liu*, 654 F. App'x at 154. Laffitte's challenges to the exclusion of questions about selling the bank are not preserved for appeal.

After the court ruled the defense was improperly seeking to impeach with extrinsic evidence, JA1680, defense counsel asked to "make a proffer to the Court,"

JA1683. Counsel then proffered Defense Exhibit 81—a memo from Charlie Laffitte to the bank's Board. JA1684-1686. That is the only offer of proof sufficient to preserve the issue under Rule 103(a)(2). But as explained below, Exhibit 81 was still inadmissible.

> ### 2.    Defense Exhibit 81 was inadmissible because it was hearsay and it could not be authenticated.

Charlie Laffitte's memo to the Board was inadmissible. First, the memo was hearsay barred by Federal Rule of Evidence 801. Laffitte's theory that there was a riff on the Board related to selling the bank is based on a report issued by a consultant after a 2020 Board retreat. JA1684-1685. But defense counsel told the court the report is "not in evidence and we don't have it. And I am not asking for that." JA1685. Instead, counsel proposed to introduce a purported memo from Charlie Laffitte to the Board relaying the contents of the report—that several Board members wanted to position the bank to sell over the next decade. JA1685. The memo relayed the report's statements, and Laffitte wanted to introduce it for the truth of those statements—that some members were considering selling the bank. *See* Fed. R. Evid. 801(c). It was inadmissible hearsay.

Second, none of Laffitte's remaining witnesses could authenticate the memo, which he did not proffer until after Charlie Laffitte, its author, testified and was released. JA1653-1654. The memo does not name Russell or Charlie Laffitte or any of the Government's witnesses. JA3300. It is unsigned and unaddressed. JA3300.

80

None of Laffitte's remaining witnesses could have authenticated it, and the district court did not abuse its discretion by excluding it regardless of whether it somehow showed bias or motive. *See United States v. McNatt*, 931 F.2d 251, 255 (4th Cir. 1991).

> **3.    Laffitte's proposed evidence was properly excluded because it did not show bias or motive; it would have led to a trial within a trial; and it would have confused the jury.**

If Laffitte's challenge to the excluded testimony was properly preserved and Exhibit 81 was otherwise admissible, the district court still did not abuse its discretion by excluding them under Federal Rules of Evidence 608(b), 401, and 403.

> **a.    The court did not abuse its discretion by excluding the evidence under Rules 608(b) and 401.**

Rule 608(b) prohibits the use of extrinsic evidence "to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness." "[B]ut no such limit applies to credibility attacks based upon motive or bias." *Quinn v. Hayes*, 234 F.3d 837, 845 (4th Cir. 2000). The motive exception applies to extrinsic evidence that tends to show "motive for the witness to testify untruthfully." *United States v. Thorn*, 917 F.2d 170, 176 (5th Cir. 1990). And "[t]he point of a bias inquiry is to expose to the jury the witness's special motive to lie, by revealing facts such as pecuniary interest in the trial [or] personal animosity or favoritism toward the defendant[.]" *United States v. Greenwood*, 796 F.2d 49, 54 (4th Cir. 1986) (quotation marks and citation omitted). "A successful showing of

bias on the part of a witness would have a tendency to make the facts to which he testified less probable in the eyes of the jury than it would be without such testimony." *United States v. Abel*, 469 U.S. 45, 51 (1984).

Contrary to Laffitte's arguments, Br. 67, the district court consistently showed that it understood—and applied—the proper legal standard. When the court thought the defense was attempting to impeach prior witnesses using extrinsic evidence, it correctly ruled that evidence inadmissible under Rule 608(b). *E.g.*, JA1620 ("You are trying to undermine the credibility of prior witnesses on the basis of extrinsic evidence. That is not allowed."); JA1621 ("You can't use him to prove that someone else is lying by extrinsic evidence."); JA1621 ("It was only offered, as I understood it, was an attempt to prove that -- damage the credibility of the Laffittes. You can't prove it by extrinsic evidence."). After defense counsel argued the evidence was meant to show bias or motive—not to impeach the general credibility of the Government's witnesses—the court's analysis changed, and it gave defense counsel numerous opportunities to explain how the proposed evidence would show any of the Government's witnesses had bias or motive. *See* JA1677-JA1678; JA1680. They did not do so.

The district court did not abuse its discretion by finding the proposed evidence about disagreements over selling the bank did not establish any bias or motive to lie on the part of any of the Government's witnesses. The court gave defense counsel at

least a half-dozen opportunities to explain how the proposed evidence would show any of the Government's witnesses had bias or motive. *See, e.g.*, JA1677 ("Motives for whom?"); JA1677 ("point me to the testimony [of] the witness you seek to impeach by their motive"); JA1677 ("Give me a specific witness and how it's relevant to that specific witness."); JA1678 ("Give me a specific witness by name and why that's relevant to that testimony."); JA1678 ("Give me what specific testimony is evidence of bias."); JA1680 ("You haven't pointed me to one thing, one specific evidence, that somehow would be evidence of their bias.").

In response, Laffitte pressed several theories about the relevance of this evidence at trial: "there are factions within this family, some that have worked at the bank for years, some that have come into the bank more recently. And so the testimony that we have been trying to elicit . . . is about the *motives for testifying relating to things like selling the bank*," JA1677 (emphasis added); "wanting to sell the bank goes to [Norris Laffitte's] motivation for then wanting to testify against Mr. Laffitte," JA1678; and "the rush to judgment" and "the Monday morning quarterbacking that's going on with the Government's witnesses" were produced by bias, JA1679-1680. None of these generalities can properly be characterized as evidence of any specific witness's bias toward Laffitte. More importantly, none of these is the claim Laffitte presses on appeal.

Laffitte first raised the argument he makes now in his post-trial briefing: the Government was permitted to ask Board members why they voted to remove him, and evidence about the disagreement over selling the bank would have shown the "bias and underlying motive in their answers."[17] JA2318; Br. 68-69. The district court can hardly be faulted for not addressing a theory of admissibility that counsel never advanced during trial. But even under this theory, the court did not abuse its discretion by excluding the evidence.

Laffitte's claim seems to be that (1) in 2020, some Board members expressed an interest in selling the bank; (2) the Government's witnesses were the Board members who wanted to sell, while Laffitte and his immediate family members did not; (3) after the 2020 retreat, there was an ongoing divide among the Board members; (4) when Laffitte and Murdaugh's criminal conduct came to light in the Fall of 2021, those who wanted to sell the bank used it as a pretext to fire Laffitte so that—although his immediate family members, who also did not want to sell the bank, would stay on the Board—they would somehow have an easier time making

_____

[17] Although Laffitte raised this general argument in his post-trial briefing, he did not argue the court erred by excluding evidence he sought to introduce through *his* witnesses. Instead, he argued in his Rule 33 motion only that the court's alleged limitation of his right to cross-examine the Government's witnesses on the sale of the bank violated the Confrontation Clause. JA2316-2319. The court found Laffitte's argument was "wholly without merit." JA2422. He did not renew his Confrontation Clause claim on appeal and has therefore waived it. *United States v. Al-Hamdi*, 356 F.3d 564, 571 n.8 (4th Cir. 2004) ("[C]ontentions not raised in the argument section of the opening brief are abandoned.").

the sale; and (5) after voting to fire Laffitte, those Board members believed it would advance their interest in selling the bank to testify falsely against him at trial.

Laffitte essentially argues his "collateral evidence should have been permitted so that he could argue the possibilities of rivalry and if there was a rivalry, the possibilities of motivation, and if there was motivation, the possibilities of untruthful testimony. Resourceful as this argument may be, it is too speculative, too remote, too attenuated." *See United States v. Anderson*, 859 F.2d 1171, 1178 (3d Cir. 1988) (quotation marks omitted). And it does not show bias or motive to lie on the part of any Government witness.

After giving defense counsel numerous opportunities to identify with specificity which witnesses their proposed evidence would show had bias or a motive to lie and to explain how Laffitte's theory was relevant to the case, the court found, "I think you are just, you know, just dressing it up and calling it motive. This is classic impeachment evidence. But it's impeachment evidence irrelevant to the case. And it is -- you are trying to prove it by extrinsic evidence." JA1680. The district court did not abuse its discretion by finding Laffitte did not show his proposed evidence was probative of bias or motive. JA1678; JA1680; JA1686; JA1687; *see McNatt*, 931 F.2d at 256. "[I]t was an effort to attack [the witnesses'] credibility by extrinsic evidence," and the court "properly excluded it" under Rule

608(b). *Id.* Because it did not show bias or motive, the court also properly found it was irrelevant under Rule 401. JA1678; JA1680; JA1686.

> **b.** **The court did not abuse its discretion by excluding the evidence under Rule 403.**

Even if Rule 608(b) allowed the evidence, the district court did not abuse its discretion by excluding it because it would have led to a "trial within a trial" and confused the jury. JA1678; JA1686. Under Rule 403, evidence admissible under Rule 608(b) "still might be properly excluded 'if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.'" *United States v. Hill*, 322 F.3d 301, 305-06 (4th Cir. 2003) (quoting Fed. R. Evid. 403); *see* Fed. R. Evid. 608, 2003 Amend. cmt. ("the amendment leaves the admissibility of extrinsic evidence offered for other grounds of impeachment (such as . . . bias . . . ) to Rules 402 and 403").

Although a witness's bias is "always relevant," *Davis v. Alaska*, 415 U.S. 308, 316 (1974), "a trial court may, of course, impose reasonable limits on defense counsel's inquiry into the potential bias of a prosecution witness, to take account of such factors as" confusion of the issues or questioning that would be "only marginally relevant," *Olden v. Kentucky*, 488 U.S. 227, 232 (1988) (cleaned up). Assessing the probative value of proposed evidence "and weighing any factors counseling against admissibility is a matter first for the district court's sound judgment under Rules 401 and 403[.]" *Abel*, 469 U.S. at 54.

Here, admitting Laffitte's proposed evidence "would have necessitated an exhaustive case within a case that would have confused the jury as to the issues to be decided." *Hill*, 322 F.3d at 306. At the very least, the jury would have had to (1) determine which members of the Board wished to explore selling the bank and which did not; (2) consider whether any Government witness's feelings about exploring a sale of the bank in 2020 led to an ongoing riff with Laffitte in the Fall of 2021; (3) decide whether any ongoing riff motivated any of the Government's witnesses to vote to fire Laffitte when his criminal conduct was uncovered; and (4) decide whether their motivations for firing Laffitte would motivate them to lie on the stand or make their testimony less credible. In rejecting Laffitte's "invitation to go down this path, the district court acted rationally and reasonably." *Id.* The court found the evidence would have led to a "trial within a trial" and confused the jury. JA1678; JA1686. The court did not abuse its discretion by excluding it.

### 4.     Any error in excluding the proposed evidence was harmless.

An evidentiary error "is harmless if it's highly probable that it did not affect the judgment." *United States v. Burfoot*, 899 F.3d 326, 340 (4th Cir. 2018) (cleaned up). Exclusion of evidence relevant to bias or motive is harmless if "the jury is in possession of sufficient information to make a discriminating appraisal of the witness' possible motives for testifying falsely in favor of the government." *United States v. James*, 609 F.2d 36, 47 (2d Cir. 1979). The jury had sufficient evidence to

examine the possible bias or motive of the Government's witnesses, and there was overwhelming evidence of Laffitte's guilt. Any exclusion of Laffitte's proposed evidence was harmless.

Defense counsel argued in opening that there were "two different sides of the family"—one that "actually works at the bank and has worked at the bank for generations, while the other side . . . no longer works at the bank. And they have sort of completely different interests in the bank and with each other." JA209. The jury knew that Laffitte and his father, brother, and sister all worked day-to-day in the bank, and others on the Board did not. JA370 (Norris Laffitte testimony); JA1052 (Spann Laffitte testimony); JA1093 (Lucius Laffitte testimony); JA1136 (Becky Laffitte testimony); JA1548, JA1555 (Charles Laffitte, III, testimony); JA1601-1602 (Charlie Laffitte testimony); JA1655-1656 (Gray Henderson testimony). They knew the Government's witnesses were shareholders and heard several of them testify that they voted to fire Laffitte because of their duty as Board members to protect the bank's shareholders. JA367-368, JA372 (Norris Laffitte testimony); JA713-714, JA745-746 (Malinowski testimony); JA1056 (Spann Laffitte testimony); JA1137, JA1165-1166 (Becky Laffitte testimony). And they knew Laffitte's father, brother, and sister were the only Board members who did not vote to fire him. JA1092 (Lucius Laffitte testimony).

Defense counsel asked Jan Malinowski whether Board members were worried about avoiding personal liability for the money stolen from Murdaugh's clients and "if somehow Russell Laffitte is painted as a rogue board member or rogue bank employee or rogue Board officer, and did all this on his own, . . . wouldn't it be less of a chance for the Board members to be personally responsible?" JA713-714. He underscored that argument in closing: "And the Board members testified, understandably, they were worried about personal liability, so they wanted to pin everything on Russell." JA2152. Counsel also argued, "a really key piece of this was the motivation for people to testify. And on direct examination by the Government, their own witnesses, these Board members, testified that they were shareholders of the bank. And they kept talking about how much they wanted to look out for what was in the best interest of the shareholders." JA2187-2188. Counsel emphasized, "it helps to know what people's intentions and motivations are based on." JA2188. The court also charged the jury before the trial and before deliberations that, in deciding what weight to give a witness's testimony, it should consider whether the witness has "an interest in the outcome of the case or any bias or prejudice concerning any party or any matter involved." JA174; JA2229.

The record was more than sufficient to "put the jury on notice" of the supposed reasons the Government's witnesses had for testifying, *see James*, 609 F.2d at 47,

and the jury had overwhelming evidence of Laffitte's guilt, *supra* n. 14; *infra* Part IV.B. Any error in excluding the evidence was harmless.

## IV. THE EVIDENCE WAS SUFFICIENT TO CONVICT LAFFITTE OF BANK AND WIRE FRAUD AS AN AIDER AND ABETTOR AND A PRINCIPAL.

### A. Standard of Review

The Court reviews the denial of a motion for acquittal de novo, taking the evidence in the light most favorable to the Government. *United States v. Wiley*, 93 F.4th 619, 632 (4th Cir. 2024). The Court cannot consider the credibility of witnesses and assumes the jury resolved any contradictions in testimony in the Government's favor. *Id.* Reversal is warranted only if "no reasonable juror could have found the essential elements of the crime charged beyond a reasonable doubt," *id.* (quotation marks omitted), and it "must be confined to cases where the prosecution's failure is clear," *United States v. Palomino-Coronado*, 805 F.3d 127, 130 (4th Cir. 2015) (quotation marks omitted).

### B. The evidence was more than sufficient to convict Laffitte of bank and wire fraud.

A reasonable juror could convict Laffitte of bank and wire fraud as both an aider and abettor and a principal. Counts Two and Three related to Laffitte's conspiracy with Alex Murdaugh to obtain money from and defraud Murdaugh's clients. Count Two alleged Laffitte committed bank fraud and aided and abetted bank fraud by negotiating and distributing a check totaling $101,369.49 from the Badger

settlement to Hannah Plyler, in violation of 18 U.S.C. §§ 1344(2) and 2. JA39; JA30 n.1. Count Three alleged Laffitte committed wire fraud and aided and abetted wire fraud when he distributed $33,789.83 in Badger funds into Murdaugh's personal account, in violation of 18 U.S.C. §§ 1343 and 2. JA40, JA30 n.1. The jury was instructed that it could convict Laffitte as a principal or as an aider and abettor. JA2253-2256. And it convicted him of bank and wire fraud as the principal, aider and abettor, and/or co-participant in a jointly undertaken criminal activity. JA2287-2288. Those convictions should be affirmed.

### 1.   The evidence was sufficient to convict Laffitte of aiding and abetting bank and wire fraud.

The evidence was sufficient to prove that, at the very least, Laffitte aided and abetted Murdaugh in committing bank and wire fraud. A defendant is guilty of aiding and abetting if he "(1) takes an affirmative act in furtherance of [an] offense, (2) with the intent of facilitating the offense's commission." *Rosemond v. United States*, 572 U.S. 65, 71 (2014). The second element is satisfied when a person "actively participates in a criminal scheme knowing its extent and character[.]" *Id.* at 77. Laffitte has not appealed his aiding and abetting convictions, and they should be affirmed.

First, the evidence supported the jury's finding that Laffitte took affirmative action in furtherance of the bank and wire fraud scheme. Murdaugh asked Laffitte to serve as Hannah Plyler's conservator. Laffitte then extended himself and

Murdaugh hundreds of thousands of dollars in loans from Hannah's conservatorship. For three years, he moved money from Hannah's conservatorship to Murdaugh's accounts to cover Murdaugh's overdraft. Murdaugh had Laffitte appointed as conservator or personal representative for additional clients—Natasha Thomas, Hakeem Pinckney, and Donna Badger—and the pair used money stolen from those clients to pay Hannah back.

When Pinckney and Thomas's settlement funds were disbursed in December 2011, Pinckney was deceased and Thomas was 19. JA1294, JA1297 (Thomas testimony). Neither needed a conservator. JA1990 (Russell Laffitte testimony). But Laffitte signed their disbursement sheets as conservator anyway, and he collected $75,000 in conservator fees despite never managing any money for them. JA2873; JA2878. Those disbursement sheets said Palmetto State Bank was supposed to get $325,000 for Thomas and $309,581.46 for Pinckney. JA2873; JA2878.

On December 20, Murdaugh asked Laffitte to call him. SA005. The same day, the law firm issued checks payable to Palmetto State Bank in the amount of $325,000 for "Settlement Proceeds; Natasha Thomas," JA2909, and $309,581.46 for "Settlement Proceeds, Hakeem L. Pinckney," JA2911. The next day, both checks were deposited at the bank. JA1374 (Womble testimony). Laffitte used Pinckney and Thomas's settlement funds to repay loans he had extended Murdaugh from Hannah Plyler and Malik Williams's conservatorships; to repay a personal loan from

92

Laffitte's father; and to make payments on Murdaugh's boat. JA3151. He also sent money to Murdaugh's father and wife. JA3151. The day after he distributed the settlement money, Laffitte filed documents telling the probate court no money had come through the conservatorships, and he asked the court to close them out because neither Pinckney nor Thomas needed a conservator. SA008-013.

The day Arthur Badger signed his disbursement sheet—November 19, 2012—Murdaugh had a meeting at the bank. JA2883-2884. The disbursement sheet said $1,325,000 was to go to Palmetto State Bank to fund a structure.[18] JA2882. It also showed $35,000 from Arthur's settlement would go to "Russell Laffitte (Personal Representative Fee)"—even though he did not serve as Arthur's personal representative or manage any funds for the estate. JA2882. Two days later, Laffitte deposited that $35,000 PR fee and used it to pay off loans he had taken from Hannah's account. JA1313-1314 (Womble testimony); JA3137.

In February 2013, Murdaugh emailed Laffitte and asked him to email Murdaugh requesting that check number 43162, dated November 19, 2012 (the same day Arthur's disbursement sheet was signed and the same day Murdaugh had a

---

[18] At his bond hearing in September 2022, Laffitte testified that he had seen the disbursement sheet, which was consistent with an earlier statement to the FBI. JA1969; JA3222 (Laffitte's bond hearing testimony); JA2003-2004 (Laffitte's trial testimony). Although Laffitte testified at trial that he was not sure when he first saw the disbursement sheet, JA2004, evidence supports his earlier, contrary testimony. And the Court is to assume the jury resolved the contradiction in the Government's favor. *Wiley*, 93 F.4th at 632.

meeting at the bank), for $1,325,000 (the same amount that Palmetto State Bank was supposed to receive to fund Arthur's structure) be recut into four smaller checks. JA2933. Laffitte created a new email chain and asked Murdaugh to have the law firm's CFO recut the check into four smaller ones. JA2932. Murdaugh forwarded that email to the CFO, JA2932, and the checks were recut as Laffitte requested, JA3297. Laffitte deposited one of the recut Badger checks into Hannah Plyler's conservatorship four days later. JA2886-2887. He directed the second check to one of Murdaugh's law partners and the third to Murdaugh's father. JA2885; JA2888.

As the scheme continued, the fourth check recut at Laffitte's behest—for $709,586.45—was voided and cut into 11 smaller checks. JA1397-1398 (Womble testimony); JA3297. Laffitte deposited one of those checks—for $101,369.49 with "Estate of Donna Badger" in the memo line, JA2890—into Hannah Plyler's conservatorship. That check was the basis for the bank fraud charge in Count Two. Laffitte negotiated another of the checks—for $33,789.83 with "Estate of Donna Badger" in the memo line—directly into Murdaugh's account. JA2903-2904. Laffitte wrote "for deposit only" on the check and Murdaugh's account number on the deposit slip—which also said "Donna Badger"—and gave it to a teller to deposit:





JA2903-2904; JA2012-2013 (Russell Laffitte testimony). That check was the basis

for the wire fraud charge in Count Three.

In another example, on October 22, 2013, Laffitte emailed Murdaugh asking

for a deposit. JA2934. Murdaugh was nearly $65,000 in overdraft. JA1007-1008

(Swinson testimony). He responded, "Can u make a loan from Hannah and I will

pay it as we discussed." JA2934. Laffitte answered the next day, "I transferred 70k this morning." JA2934. He had transferred $70,000 from Hannah's account into Murdaugh's. JA1321 (Womble testimony). Five days later, Laffitte negotiated $101,369 from Arthur Badger's settlement to pay back Hannah. JA2892-2893. The trend continued until Hannah turned 18.

In sum, Laffitte negotiated every single one of the Pinckney, Thomas, and Badger checks for Murdaugh's benefit, even though the checks were drafted to Palmetto State Bank and referenced the victims on the memo lines. Purporting to have authority to direct disbursement of the Badger settlement funds, he asked the law firm to recut Arthur's check into smaller amounts, making it easier for Murdaugh to steal it. He directed stolen client funds into the conservatorship accounts he was charged with managing to repay loans he had extended Murdaugh to cover Murdaugh's overdraft. He even structured cash withdrawals for Murdaugh. JA2000-2001 (Russell Laffitte testimony). Overwhelming evidence supported the jury's finding that Laffitte took affirmative action in furtherance of the bank and wire fraud scheme. He has not argued otherwise.

Second, the evidence was sufficient to prove Laffitte intended to facilitate the bank and wire fraud. The jury found Laffitte guilty of conspiracy to commit wire and bank fraud, JA2287-2288, with the object of "obtain[ing] money and property by means of false and fraudulent pretenses, representations, and promises, and

[defrauding Murdaugh's] personal injury clients," JA37-38. In convicting him, the jury necessarily found that Laffitte and Murdaugh agreed to commit wire and bank fraud, that Laffitte knew of that unlawful purpose, and that he willfully joined the agreement with the intent to further the unlawful purpose. *See United States v. Vinson*, 852 F.3d 333, 351 (4th Cir. 2017); 18 U.S.C. § 1349. Laffitte has not appealed that conviction. And the same evidence proving he joined the conspiracy with intent to further the bank and wire fraud scheme "prov[es] guilt of aiding and abetting as well." *United States v. Burgos*, 94 F.3d 849, 873 (4th Cir. 1996) (en banc) (cleaned up).

In short, helping Murdaugh helped Laffitte. Laffitte admitted he took actions to help Murdaugh because Murdaugh was a customer, JA1996, JA2009, JA2013-2014, JA2049, JA2053 (Russell Laffitte testimony)—a "large customer" who earned the bank a lot of money and who Laffitte admitted got more leeway than others, JA1842-1843, JA2046 (Russell Laffitte testimony). Keeping Murdaugh happy benefitted Laffitte's bank.

It also benefitted Laffitte personally. He collected $110,000 from Pinckney, Thomas, and Badger without managing any money for them or even meeting them in his capacity as their conservator or PR. And he didn't pay taxes on that income because he knew he could hide it from the IRS. JA2043-2044 (Russell Laffitte testimony). His fee checks (like all of the settlement checks) were drafted to

Palmetto State Bank instead of to him directly.[19] JA2043-2044 (Russell Laffitte testimony). Laffitte helped Murdaugh defraud his clients, and in exchange, Laffitte made about $458,000 in conservator and PR fees. JA3157. Laffitte acted with intent to facilitate bank and wire fraud.

The Government proved Laffitte aided and abetted Murdaugh in committing bank and wire fraud. He's made no argument to the contrary, and his convictions should be affirmed. *See United States v. Ealy*, 363 F.3d 292, 298 (4th Cir. 2004) (holding that when a defendant is convicted based on alternative theories and evidence is sufficient to convict on one, the Court need not consider the other).

### 2. The evidence was sufficient to convict Laffitte of bank and wire fraud as a principal.

Laffitte's convictions should also be affirmed because there was sufficient evidence for the jury to find he committed bank and wire fraud as a principal. As relevant here, Count Two required the Government to prove beyond a reasonable doubt that Laffitte knowingly executed a scheme to obtain property held by a financial institution "by means of" false or fraudulent pretenses. 18 U.S.C. § 1344(2); *see United States v. Chittenden*, 848 F.3d 188, 195 n.4 (4th Cir.), *cert granted, judgment vacated on other grounds*, 583 U.S. 971 (2017). Count Three required the Government to prove that Laffitte devised, or intended to devise, a

---

[19] Laffitte amended his tax returns in 2021, after his crimes were uncovered. JA1975-1976 (Russell Laffitte testimony).

scheme or artifice to defraud or for obtaining money or property "by means of" false or fraudulent pretenses, representations, or promises. 18 U.S.C. § 1343; *see United States v. Raza*, 876 F.3d 604, 614 (4th Cir. 2017).

*Loughrin v. United States*, 573 U.S. 351, 362-63 (2014), held the bank fraud statute's "by means of" language imposes a textual limitation on its reach: there must be a "relational" connection between the false statement and the obtaining of bank property, meaning "[t]he criminal must acquire (or attempt to acquire) bank property 'by means of' the misrepresentation." Contrary to Laffitte's claims, Br. 70-74, a reasonable juror could find the $101,369.49 and $33,789.83 transactions were induced by Laffitte's misrepresentations (1) that he had authority to direct disbursement of the Badger money and (2) that the Badger money belonged to Murdaugh.[20]

---

[20] Laffitte's claim that it is a "critical" element of the wire fraud statute that the transaction be effectuated "by means of" misrepresentations, Br. 70-71, seems to conflict with this Court's precedent. *Elbaz*, 52 F.4th at 603 n.4 (noting "scheme or artifice" under wire fraud statute "may alternatively be" one "to defraud" or one "for obtaining money or property by means of false or fraudulent pretenses, representations, or promises"); *Vinson*, 852 F.3d at 355 ("[T]he essential elements of wire fraud 'are (1) the existence of a scheme to defraud and (2) the use of a wire communication in furtherance of the scheme.'"). But if the *Loughrin* standard does apply to the wire fraud statute, it is satisfied here.

99

> **a.** **Laffitte's misrepresentation that he had authority to direct disbursement of the Badger settlement funds induced the bank and wire fraud transactions.**

Murdaugh had Laffitte appointed as the personal representative for Donna Badger's estate. JA1887 (Russell Laffitte testimony). He had a disbursement sheet for Arthur's settlement prepared listing Laffitte as the PR and Palmetto State Bank as the payee for $1,325,000. JA2882; JA451 (Seckinger testimony). Then he emailed Laffitte, asking Laffitte to email him requesting to have the $1,325,000 settlement check recut. JA2933. Laffitte didn't ask any questions. He didn't tell Murdaugh to do it himself. He didn't respond to Murdaugh's email directly or forward it to the law firm. Instead, he created a new email thread and asked Murdaugh to have the law firm's CFO recut Arthur's check. JA2932; JA2933. Laffitte misrepresented himself to have authority to direct disbursement of the funds, knowing the firm would listen to him. A reasonable juror could easily find that misrepresentation was integral to ensuring the success of the scheme.

Explaining why the firm recut the checks, the law firm's CFO, Jeanne Seckinger, testified she was relying on Laffitte: "[W]e were relying on the fact that Alex was telling us the truth and that this is where the money should go, and *relying on the banker that we have a long relationship, who is also my brother-in-law.*" JA531 (Seckinger testimony) (emphasis added). Cross-examined about the $1,325,000 check that got recut, she said, "at this point, we were relying -- if they

100

had never gotten a check, the question in my mind is, *why didn't [Laffitte] say, what check, and what is this for?*" JA558 (Seckinger testimony) (emphasis added). Relying on Laffitte—the PR for the estate—Seckinger thought the recut checks "were going to be funds that were invested for the various children, the beneficiaries of Donna Badger." JA531 (Seckinger testimony).

Murdaugh's law partner, Ronnie Crosby, testified that when he uncovered Murdaugh and Laffitte's emails about recutting the Badger check in early 2022, he was "alarmed and shocked at what [he] was seeing." JA833 (Crosby testimony). He said, "everything just fit like a perfect glove. And the way Alex had asked Russell to do this, instead of him asking, you know, Jeanne to do it, he got Russell to do it. And then Russell replied, *not back to that e-mail copying Jeanne, but it was a totally separate e-mail that did not have Alex's request on it.* And I found it very concerning." JA834 (Crosby testimony) (emphasis added). Even Laffitte testified, "I realized how [that email] implicated me." JA1894 (Russell Laffitte testimony).

Laffitte argues the money involved in Counts Two and Three belonged to Arthur Badger, not Donna's estate, and "Laffitte was not personal representative— or anything else—for him." Br. 73. But as the Government argued at trial, "to the extent there was any confusion about these funds, that was all part of the scheme." JA2070. Laffitte was Donna's PR, but he took a $35,000 PR fee from Arthur's settlement. JA2882. That fee check had Arthur's name—not Donna's—in the memo

line.[21] JA3137. The $101,369.49 and $33,789.83 checks came from Arthur's settlement, but they said "Estate of Donna Badger" in the memo lines. JA2890; JA2903; JA1900 (Russell Laffitte testimony). Laffitte and Murdaugh blurred the lines between the estate's settlement and Arthur's. And they used the confusion to further their scheme to get Arthur's money.

The evidence was sufficient to prove Laffitte misrepresented that he had authority to direct the disbursement of the $1,325,000. Then he negotiated $101,369.49 he knew belonged to the Badgers to repay unsecured loans he had extended Murdaugh from Hannah Plyler's conservatorship, and he deposited $33,789.83 of Badger money into Murdaugh's account. Laffitte's bank and wire fraud convictions should be affirmed.

> **b.    Laffitte's misrepresentations that the Badger money was Murdaugh's induced the bank and wire fraud transactions.**

The evidence is also sufficient to convict Laffitte as a principal because every time he negotiated a check involving stolen settlement funds, he misrepresented to the bank that the money belonged to Murdaugh. Without those misrepresentations, the bank and wire fraud transactions would not have happened. *See Loughrin*, 573

---

[21] Laffitte says collecting his PR fee from Arthur's settlement, instead of Donna's, was just a "mistake." Br. 10 (citing JA2005). It wasn't. Laffitte testified that only $500 went through Donna's estate. JA2054 (Russell Laffitte testimony). It would have been impossible—and illegal absent court approval—for Laffitte to collect a $35,000 fee from an estate with only $500 in it. JA1767-1769; JA1812-1813.

U.S. at 363 (noting "by means of" requirement is satisfied "most clearly, when a defendant makes a misrepresentation to the bank itself").

The checks underlying Counts Two and Three were made out to Palmetto State Bank—not Murdaugh—and said "Estate of Donna Badger" in the memo lines. JA2890; JA2903. Laffitte said he did not know the money came from Badger's settlement, *e.g.*, JA1900-1901 (Russell Laffitte testimony), but the jury did not believe him. Regardless, Laffitte admitted he knew the money belonged to the bank because it was the payee on the checks. *See* JA1903 (Russell Laffitte testimony). The bank's compliance officer—Laffitte's first witness—said he would not have negotiated those checks for Murdaugh like Laffitte did, and any bank teller would have known not to. JA1507, JA1509, JA1512 (John Peters testimony). If the money had been Murdaugh's, the checks would have been made payable to Murdaugh. JA1510-1511 (Peters testimony).

When Laffitte negotiated the checks for Murdaugh's benefit, he misrepresented to the bank that the $101,369.49 and $33,789.83 belonged to Murdaugh. A reasonable juror could find those misrepresentations induced the bank to part with the money. Without them, the transactions would not and could not have occurred.

Any argument that Laffitte could not have defrauded the bank because he could not have defrauded himself fails twice over. First, Laffitte was a banker, but

he was not the bank. *See* JA593 (Malinowski testimony); JA1272-1273 (Rich testimony). Second, the evidence supported a finding that Laffitte used tellers to effectuate the transfers. When the $33,789.83 check underlying Count Three was deposited into Murdaugh's account on January 21, 2014, at 11:33 am, so was another check for $50,684.75 that also said "Estate of Donna Badger" in the memo line. JA2895-2896; JA2903-2904. Laffitte wrote "for deposit only" on both checks, and both deposit slips had Donna Badger's name and Murdaugh's account number on them. JA2895-2896; JA2903-2904. Laffitte testified that he gave the $50,684.75 check to a teller to deposit. JA2011 (Russell Laffitte testimony). The jury was entitled to infer that he gave her the $33,789.83 check at the same time. And when he did, he misrepresented to the bank that the money was Murdaugh's.

Laffitte's misrepresentations induced the bank and wire fraud transactions, and his convictions should be affirmed.

## V.    THE DISTRICT COURT PLAINLY AND REVERSIBLY ERRED BY WAIVING INTEREST ON RESTITUTION WITHOUT FIRST FINDING LAFFITTE IS UNABLE TO PAY.

### A.    Standard of Review

The Government did not object to the waiver of interest on restitution, so review is for plain error.

**B.** **The district court plainly erred by waiving Laffitte's obligation to pay restitution interest without first finding Laffitte is unable to pay, as required by statute.**

The Mandatory Victims Restitution Act (MVRA) requires district courts to order restitution in the full amount of the victims' loss caused by certain offenses—including Laffitte's—without regard to the defendant's financial condition or ability to pay. 18 U.S.C. §§ 3663A, 3664. Section 3612(f) of Title 18 requires district courts to impose interest on restitution orders exceeding $2,500 if they're not paid with 15 days of the judgment. 18 U.S.C. § 3612(f)(1). Interest may be waived *only* if the court first "determines that the defendant does not have the ability to pay interest." 18 U.S.C. § 3612(f)(3)(A). The court did not make the required finding in Laffitte's case. That was plain error.

In *United States v. Dawkins*, 202 F.3d 711, 716 (4th Cir. 2000), this Court vacated and remanded a restitution order where the district court did not make the factual findings required by the MVRA. The statute requires district courts to (1) consider several statutory factors before determining how restitution is to be paid and (2) "make a factual finding keying the statutory factors to the type and manner of restitution ordered;" courts "must find that the manner of restitution ordered is feasible." *Id.* The Court explained that "[s]uch fact-finding requirements are necessary to facilitate effective appellate review," and district courts may comply with them by announcing their findings on the record or "by adopting adequate

proposed findings contained within a presentence report." *Id.* (quotation marks omitted).

The court in this case did neither. There was no discussion at sentencing about whether Laffitte could pay restitution interest. JA2654-2859. The court did not announce its "finding" in the negative until it issued a written judgment. JA2644. And although the court adopted the PSR as its findings of fact, JA2701, the PSR did not contain a finding—or factual information to support a finding—that Laffitte could not pay restitution interest.

The PSR did include a recommended special condition of supervision stating interest on any restitution order would be waived. JA3522. It also noted Laffitte's "ability to pay the required restitution may be impacted should a fine be imposed," and "it d[id] not appear the defendant will have the ability to pay a fine in addition to" restitution. JA3518. But the PSR estimated restitution to be $4,352,582.78, and the guideline fine range was $30,000 to $300,000 per count. JA3518; JA3522. The final restitution order was nearly $800,000 less than the amount estimated in the PSR, and the district court did not impose a fine. JA3522; JA3454. So the district court's adoption of the PSR as its factual findings did not amount, and could not have amounted, to a finding that Laffitte could not pay restitution interest.

At sentencing, Laffitte objected to an $85,854.73 forfeiture money judgment for conservator fees he had not disgorged. Counsel argued, "[the court] made a

comment earlier about, you know, the fine and victims having priority," and "there is going to be an ability-to-pay problem at the end of the day here." JA2717. The court responded, "I'm not sure that's true." JA2717. It told defense counsel, "You know, the PSR, which I've adopted as the findings of fact for purposes of sentencing, shows he has assets of $10 million and liabilities of 5 million. But I've just assessed restitution of $3,555,884. So, there should be sufficient funds, so I'm not sure that's a factor." JA2719-2720. The court seemed to suggest Laffitte's assets and liabilities would weigh in favor of a finding that he could also pay restitution interest.

The district court's waiver of interest without finding Laffitte cannot pay runs directly counter to the plain language of the statute and this Court's directive in *Dawkins*. The error is plain. *See United States v. Goode*, 342 F.3d 741, 744 (7th Cir. 2003) (holding imposition of interest was proper because it is mandatory under § 3612(f)(1) and the "interest obligation could not be disturbed because the court made no determination at sentencing under § 3612(f)(3) that [the defendant] was unable to pay").

The error also affects the Government's substantial rights. *United States v. Perkins*, 108 F.3d 512, 517 (4th Cir. 1997) ("Under *Olano*, the government can demonstrate an effect on substantial rights if the plain error prejudiced the outcome of the proceedings."); *see United States v. Blatstein*, 482 F.3d 725, 732-33 (4th Cir.

2007). Had the district court considered whether Laffitte can pay interest on restitution, it could not have reasonably concluded he cannot.

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████

The restitution judgment was $3,555,884.80. JA2641. At a rate of 5.34% (the rate under § 3612(f)(2)(B) as of August 11, 2023), Laffitte would accrue about $190,000 in annual interest. It would take over four years for the ordered restitution plus interest to reach the original restitution number included in the PSR—$4,352,582.78—which the Probation Office found Laffitte had the ability to pay. *See* JA3518 (noting Laffitte's ability to pay restitution would be impacted only if a fine were imposed). The district court could not have reasonably found Laffitte is unable to pay interest. Waiving interest without making a finding on his ability to pay therefore affected the outcome of the proceeding.

Additionally, waiving interest has a substantial negative effect on Laffitte's

---

22 ████████████████████████████████████████████

████████████████████████████████████████ The court enjoined Laffitte from liquidating or transferring any interest in those assets. JA2856-2857. Laffitte has not liquidated them and therefore has not yet incurred any tax liability.

victims. Money depreciates over time, and "the 'time-value' of money means that restitution paid sooner is more valuable for the victim[s]." *United States v. Pincus*, No. 19-cr-436, 2023 WL 3571218, at *3 (E.D.N.Y. May 19, 2023). Laffitte's bank and Murdaugh's law firm paid millions to make Laffitte and Murdaugh's victims financially whole. Laffitte has means to repay them, and every day he doesn't, the victims lose more money. They should be paid the statutorily mandated interest.

Finally, the district court's error seriously affects the fairness, integrity, and public reputation of judicial proceedings. The MVRA makes restitution mandatory, and § 3612 makes interest mandatory unless a defendant is unable to pay. Laffitte is able to pay. Allowing him not to despite the law's unequivocal directive diminishes the purpose of restitution in making victims whole. It also weakens public trust in the criminal sentencing scheme by allowing similarly situated defendants to face disparate consequences.

Laffitte and Murdaugh's crimes have attracted substantial attention from across the world, and they have seriously undermined public faith in the legal system, particularly in South Carolina. Allowing Laffitte to escape paying required interest on the restitution he owes his victims risks further eroding the public's trust in judicial proceedings. The waiver of interest should be vacated, and the case should be remanded for factual findings on Laffitte's ability to pay.

## CONCLUSION

Laffitte received a full and fair trial before an impartial jury of his peers, and his convictions should be affirmed. But the district court's order waiving restitution interest should be vacated, and the case should be remanded for further factual findings.

## STATEMENT ON ORAL ARGUMENT

Nearly all of Laffitte's claims are either waived or forfeited and the remainder are meritless. The United States respectfully suggests that oral argument is not necessary.

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

No.  23-4509 (L); 23-4566   Caption: United  States  v. Russell  Laffitte

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

**Type-Volume Limit for Briefs:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2), 35(b)(2) & 40(b)(1).

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6).

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

☑ this brief or other document contains 25994 [*state number of*] words

☐ this brief uses monospaced type and contains_____[*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

☑ this brief or other document has been prepared in a proportionally spaced typeface using Microsoft Word 2016_____ [*identify word processing program*] in Times New Roman 14 Point_____ [*identify font size and type style*]; **or**

☐ this brief or other document has been prepared in a monospaced typeface using _____ [*identify word processing program*] in _____ [*identify font size and type style*].

*/s/Kathleen Michelle Stoughton*, Assistant United States Attorney
Party Name:  United States of America, Appellee
Dated:  March 22, 2024

11/14/2016 SCC